UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATES OF ALASKA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, AND WASHINGTON, *EX. REL.* OMNI HEALTHCARE, INC.<br><br>                     Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC. AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>                     Defendants. | Case No. 18-12558<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 *et seq.*]; ALASKA MEDICAL ASSISTANCE FALSE CLAIMS AND REPORTING ACT [AK Stat § 09.58.010 *et seq.*]; CALIFORNIA FALSE CLAIMS ACT [Cal. Govt Code §12650 *et seq.*]; COLORADO MEDICAID FALSE CLAIMS ACT [Col Rev. Stat. 25.5-4-303.5 through 25.5-4-310]; CONNECTICUT FALSE CLAIMS ACT [Conn. Gen. Stat. § 4-274 *et seq.*]; DELAWARE FALSE CLAIMS AND FALSE REPORTING ACT [6 Del. C. §1201]; THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT [D.C. Code § 2-381.01 *et seq.*]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. Ann. §68.081 *et seq.*]; GEORGIA FALSE MEDICAID CLAIMS ACT [Ga. Code Ann. §49-4-168 *et seq.*]; HAWAII FALSE CLAIMS ACT [Haw. Rev. Stat. §661-21 *et seq.*]; ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat. §175 *et. seq.*]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT [Ind. Code Ann. §5-11-5.5-1 *et seq.*]; IOWA FALSE CLAIMS ACT [I.C.A. § 685.1 *et seq.*; LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [La. R.S. § 46:437.1 *et. seq*]; MARYLAND FALSE HEALTH CLAIMS ACT [Md. Health-Gen. Code Ann. §§ 2-601 through 2-611]; MASSACHUSETTS FALSE CLAIMS LAW [Mass. Gen Laws ch.12 §5 *et seq.*]; MICHIGAN MEDICAID FALSE CLAIMS ACT [Mich. Comp. Laws. §400.601 *et seq.*]; MINNESOTA FALSE CLAIMS ACT, [Minn. Stat. § 15C.01 *et seq.*]; MONTANA FALSE CLAIMS ACT [Mon. Code Anno. § 17-8-401 *et seq.*]; NEVADA FALSE CLAIMS ACT [Nev. Rev. Stat. Ann. §357.010 *et seq.*]; NEW |

JERSEY FALSE CLAIMS ACT [N.J. Stat. § 2A:32C-1 *et seq.*]; NEW MEXICO MEDICAID FALSE CLAIMS ACT [N.M. Stat. Ann. §27-14-1 *et seq*]; NEW YORK FALSE CLAIMS ACT [N.Y. State Fin. §187 *et seq.*]; NORTH CAROLINA FALSE CLAIMS ACT [NC Gen. Stat. § 1-605 *et seq.*]; OKLAHOMA MEDICAID FALSE CLAIMS ACT [63 Okla. St. § 5053 *et seq.*]; RHODE ISLAND FALSE CLAIMS ACT [R.I. Gen. Laws §9-1.1-1 *et seq.*]; TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code Ann. §71-5-181 *et seq.*]; TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann. §36.001 *et seq.*]; VERMONT FALSE CLAIMS ACT [32 V.S.A. § 630 *et seq.*]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code Ann §8.01-216.1 *et seq.*]; WASHINGTON FALSE CLAIMS ACT [RCW § 74.66.005 *et seq*]; CALIFORNIA STATE INSURANCE FRAUDS PREVENTION ACT [Cal. Ins. Code §1871 *et. seq.*]; and ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT [740 Ill. Comp. Stat. §92].

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**

**JURY TRIAL DEMANDED**

Plaintiff-Relator OMNI Healthcare, Inc., through its attorneys, on behalf of the United States of America (the "Federal Government") and the States and Commonwealths of Alaska, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington (hereafter, collectively, the "Plaintiff-States") for its Complaint against defendants MD Spine Solutions LLC, d/b/a MD Labs Inc. (hereafter "MD Labs") and Doe Healthcare Providers 1 - 100 (collectively "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   **INTRODUCTION**

1.       This is an action to recover damages and civil penalties on behalf of the United States and the Plaintiff-States arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the Plaintiff-States' False Claims and insurance fraud prevention acts, as set forth below.

2.        MD Labs and its co-conspirator Defendants have engaged in a brazen scheme to take advantage of individual patients in need of clinical laboratory tests and bilk tens of millions of dollars from Medicare, Medicaid and other government-funded healthcare programs and commercial insurers across the country.

3.       To do this, MD Labs misled providers into ordering a high volume of medically unnecessary bacterial urine culture tests, pharmacogenetic tests, and urine drug tests.

4.      Federal and State laws governing payment for healthcare services, as well as contractual requirements for both government-funded and commercial insurers, rely on the fundamental principle that they will only pay for healthcare services that are "medically necessary." A service is "medically necessary" if it is "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

5.      Thus, for clinical laboratory tests to be covered, they must provide information about the patient's condition that can or will help the treating physician care for the patient. There must be clinical evidence – *e.g.*, the patient exhibiting symptoms of a disease, abnormal results on other tests – in the patient's medical record to support the decision to order any given lab test.

6.      Moreover, each test ordered, and for which the clinical laboratory seeks payment, must meet the test of medical necessity. Labs may not bundle a group of tests together into a "panel" as a way to pad their profits if only one, or a few, of the tests in the panel are medically necessary. Medicare and other payers will not pay for two tests, or five tests or twenty tests, when only one was medically necessary. And they will certainly not pay for twenty tests if none of them were medically necessary.

7.      MD Labs violated these fundamental principles, using and misusing standing orders, overly broad and rigid test requisition forms and other misleading paperwork to cause physicians to prescribe many tests at once, when only one or a few (and sometimes no) tests were medically necessary.

8.      MD Labs also misled providers about the accuracy of alternative tests, and Medicare rules governing the necessity of certain tests.

9.      Furthermore, many of the tests MD Labs included in its broad panels were substantially more expensive than standard treatment, and provided no additional medically useful information beyond what was produced by the initial conventional testing methods.

10.      For example, a bacterial urine culture test is used to identify and quantify bacteria that might be causing a urinary tract infection.  The standard urine culture both shows whether bacteria are present, and allows for any bacteria to be identified and the size of the colony quantified.  Medicare pays approximately $10 for this test.  If additional tests are required to identify the bacteria, Medicare pays an additional $10 for that billing code.

11.      MD Labs, on the other hand, bills Medicare and other payers for the initial bacterial culture, but then submits additional bills for sophisticated identification tests using polymerase chain reaction ("PCR") technology.  These tests do not provide any clinically useful information to help treat a urinary tract infection above and beyond what is available from the conventional tests.  Yet for just one such DNA test, Medicare pays $43 – four times the cost of the standard culture and twice the cost of a standard culture plus additional conventional identification testing.

12.      But MD Labs' fraud does not stop there.  MD Labs does not bill for just one DNA identification test – its standard practice is to bill for 17 such DNA tests whenever a bacterial urine culture test is ordered for a urinary tract infection.

13.      By doing so, MD Labs gets Medicare to pay it approximately $700 for tests that produce no clinically useful information beyond what was available from the initial urine culture and conventional bacterial identification, for which Medicare reimburses approximately $10.  More importantly the tests that MD Labs performs are not approved by Medicare and should be at best considered investigational.

14.     MD Labs bills for its full panel of 17 tests even if the initial culture was negative
– meaning there were no bacteria present to even test.  It also bills the full panel of tests when the
referring physician provided no evidence that the bacterial identification was medically
necessary.  MD Labs also bills for its full panel of 17 tests even when the results of the culture
indicate that the sample was likely contaminated

15.     MD Labs similarly uses misleading order forms to cause treating providers to
order an overly broad, medically unnecessary panel of pharmacogenetic tests designed to
identify genetic differences in the way drugs are processed by a patient's body.

16.     While such tests may hold promise for medically effective treatment in the future,
there is currently insufficient evidence that most such tests provide clinically useful information.
For that reason, Medicare and many other payers will only pay for pharmacogenetic testing for
two genes, and only if the treating physician is considering ordering four specific drugs and for
certain specific diagnoses.

17.     To get Medicare and other payers to pay for more tests, MD Labs bundles its
pharmacogenetic tests into a panel that tests 20 genes.  So, if a physician orders a test for one
gene, MD Labs automatically performs – and bills payers for – the full panel.

18.     MD Labs coaches providers to provide a false justification of the medical
necessity for even part of the test.  Specifically, MD Labs personnel tell providers that they can
order the full panel – and get the results for genes and drugs that are not covered by Medicare or
other insurers if they are willing to assert that they are "considering" treating their patient for one
of the approved drugs, and one of the approved diagnoses.

19.     For example, an MD Labs employee told an OMNI oncologist that he could
justify the tests by saying that he was "considering" treating his patient with one of the approved

drugs for depression (one of the approved diagnoses). The MD Labs employee reasoned that such a diagnosis is appropriate because "all oncology patients are depressed."

20.     In the same vein, MD Labs has established a panel of urine drug tests that is large enough to get the maximum reimbursement from Medicare and other payers. As with its other tests, MD Labs misuses standing orders and test requisition forms to cause physicians to order an unnecessarily broad, and medically unnecessary panel of tests.

21.     As with the urine culture test, MD Labs also performs an extensive panel of follow-up tests even where these follow up tests are not capable of providing any additional clinically valuable information than the initial test results did.

22.     To ensure a steady supply of patient referrals to support this over-testing scheme, MD Labs routinely pays referring physicians and other providers substantial kickbacks. In particular, although MD Labs does all or nearly all of the work performing the lab tests, it offers to "split the profits" from the work with referring providers – in clear violation of Federal and State anti-kickback laws.

23.     MD Labs also pays providers to perform a service not covered by Medicare or other payers in connection with any pharmacogenetic test ordered for one of the provider's patients, and gives referring providers free testing supplies.

24.     Defendants use improper billing codes to keep their fraud from being detected, and further boost their profits by violating rules governing who can bill for services and how much can be billed by a provider that did not perform the test.

25.     Each claim:

  a.   for a medically unnecessary laboratory test;

  b.   for a test resulting from a kickback-induced referral;

6

     c.  for a test billed by a provider legally prohibited form submitting that claim; or

     d.  that is fraudulently inflated by the use of improper billing codes or by violation of
         an anti-markup provision;

is a false and/or fraudulent claim within the meaning of the Federal False Claims Act and the

Plaintiff-State False Claims and insurance fraud prevention acts.

      26.     Defendants have submitted thousands of fraudulent claims to Medicare, Medicaid

and other federal and state-funded health care programs and commercial insurers for these

medically unnecessary, kickback-induced and otherwise improper claims for clinical laboratory

services. Each such claim for service is a false and fraudulent claim within the meaning of the

Federal and Plaintiff-State False Claims Acts and insurance fraud prevention acts.

      27.     The Federal False Claims Act (the "FCA") was originally enacted during the Civil

War. Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to

enhance the ability of the United States Government to recover losses sustained as a result of

fraud against it.

      28.     The Act was amended after Congress found that fraud in federal programs was

pervasive and that the Act, which Congress characterized as the primary tool for combating

government fraud, was in need of modernization. Congress intended that the amendments would

create incentives for individuals with knowledge of fraud against the Government to disclose the

information without fear of reprisals or Government inaction, and to encourage the private bar to

commit legal resources to prosecuting fraud on the Government's behalf.

      29.     The FCA prohibits, inter alia: (a) knowingly presenting (or causing to be

presented) to the federal government a false or fraudulent claim for payment or approval; (b)

knowingly making or using, or causing to be made or used, a false or fraudulent record or

statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to violate any of these three sections of the FCA. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G). Any person who violates the FCA is liable for a civil penalty of up to $22,363 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

30.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

31.     Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in connection with provision of medical services that were medically unnecessary or otherwise in violation of federal and state regulations.

32.     As set forth below, Defendant's actions alleged in this Complaint also constitute violations of the *qui tam* provisions of the: Alaska Medical Assistance False Claims and Reporting Act, AK Stat § 09.58.010 *et seq.*; California False Claims Law, Cal. Gov. Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-303.5 through 25.5-4-310; Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.;* Florida False Claims Act, Fla. Stat. §§ 68-081-68.09; Georgia False

8

Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*; Hawaii False Claims Law, HRS § 661-21 *et seq.*; Illinois Whistleblower Reward & Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*; Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5-1 *et seq.*; Iowa False Claims Act, I.C.A. § 685.1 *et seq.*; Louisiana Qui Tam Action Act, La. R.S. § 46:437.1 *et seq.*; Maryland False Health Claims Act, Md. Health-Gen. Code Ann. §§ 2-601 through 2-611; Massachusetts False Claims Act, ALM Ch. 12 § 5 *et seq.*; Michigan Medicaid False Claims Act, Mich. Code 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mon. Code Anno. § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 *et seq.*; New York False Claims Act, NY State Fin. § 187 *et seq.*; North Carolina False Claims act, N.C. Gen. Stat. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okla St. § 5053 *et seq* (2011); Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, §§ 71-5-181 through 71-5-185; Texas False Claims Act, Texas Human Resources Code, § 36.001 *et seq.*; Vermont False Claims Act, 32 V.S.A. § 630 *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; Washington False Claims Act, RCW § 74.66.005 *et seq.*; the California Insurance Frauds Prevention Act, Cal. Ins. Code §1871 *et seq.*; and the Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92.

33.    The Plaintiff-State False Claims and insurance fraud prevention acts prohibit similar conduct as that prohibited by the Federal FCA, allow plaintiffs to bring an action on the State's behalf or on behalf of private insurers, and provide analogous remedies to those provided in the Federal FCA.

34.    Based on the foregoing laws, Relator seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made to federal and state-funded insurance programs and commercial insurers in connection with provision of clinical laboratory services that were

9

medically unnecessary, kickback-tainted and/or otherwise provided in violation of federal and state regulations and commercial insurance rules, regulations and contracts.

## II.    PARTIES

35.    Relator OMNI Healthcare, Inc. ("OMNI") is a multi-specialty medical professional group with seven locations, all located in Brevard County, Florida. Formed in 1994, it practices through physicians in the central Florida region and specializes in multiple fields, including endocrinology/diabetes, family medicine, gastroenterology, general surgery, hematology/oncology, internal medicine, orthopedic surgery, pediatrics, radiation oncology, radiology, rheumatology, and urgent care. More than twenty medical professionals deliver medical services at OMNI Healthcare's locations.

36.    Defendant MD Spine Solutions, LLC is a California corporation headquartered in Reno, Nevada. It operates a clinical medical laboratory that does business under its own name as well as the d/b/a name MD Labs (hereafter, collectively, "MD Labs").

37.    MD Labs provides clinical laboratory services to patients across the United States, especially specializing in bacterial urine culture testing to detect urinary tract infections, pharmacogenetic testing that identifies key genetic markers that can indicate how the patient could metabolize certain drugs, and urine toxicology testing.

38.    MD Labs was founded in 2011 as a toxicology testing facility for physicians nationwide. It expanded to pharmacogenetic testing in 2014 with the development of its proprietary genetic test Rxight, which maps genes that affect more than 200 medications.

39.    The laboratory founders include Matthew Rutledge, Cofounder and President, and Denis Grizelj, Cofounder and CEO. The laboratory currently employs more than 100 sales representatives, and has more than 200 employees.

40.     One of MD Labs' senior leaders, Lab Director Alexander Stojanoff, is no stranger to healthcare fraud. Mr. Stojanoff was Chief Executive Officer of Consolidated Laboratory Services, d/b/a, CLS, Inc. ("CLS"). On October 16, 2008, he, on behalf of CLS, pleaded guilty to two counts of felony healthcare fraud in connection with a scheme to bill for services that were not performed. The scheme cost Medicare more than $7 million.

41.     Defendants Doe Healthcare Providers 1 to 100 are physicians, physician groups, hospitals, clinical laboratories, pharmacies and other healthcare providers who submitted or, by participating in MD Labs' fraudulent scheme, caused the submission of claims for clinical laboratory services performed by MD Labs that were medically unnecessary, kickback-tainted and/or otherwise provided in violation of federal and state regulations and commercial insurance rules, regulations and contracts

## III.    JURISDICTION AND VENUE

42.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) vests this Court with jurisdiction over the claims under the Plaintiff-State False Claims Acts asserted in this Complaint. Jurisdiction over the claims brought pursuant to the Plaintiff-State insurance fraud prevention acts is based on this Court's supplemental jurisdiction.

43.     Under 31 U.S.C. § 3730(e), and the analogous provisions of the Plaintiff-State False Claims Acts, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Even if there had been any such public disclosure, Relator is an original source of the allegations herein because it has direct, independent and material

11

knowledge of the information that forms the basis of this complaint – especially, *inter alia*, through direct communications by Relator's employees and agents with Defendants' employees and agents, and relevant documents in the possession of Relator. Moreover, Relator voluntarily disclosed that information to the Government before filing.

44.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in and have transacted business in the District of Massachusetts.

45.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this district. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district.

## IV.     APPLICABLE LAW

### A.     Federal and State-Funded Health Care Programs

46.     Various federal and state-funded health care programs and commercial insurers pay for clinical diagnostic testing, including bacterial urine culture tests, pharmacogenetic testing and urine drug tests. Examples of such payer programs include the following:

#### i.     The Medicare Program

47.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease. The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

48.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient

hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary

Supplemental Insurance Plan, covers the cost of services performed by physicians and certain

other health care providers, such as services provided to Medicare patients by physicians,

laboratories, and diagnostic testing facilities. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).

Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized

prescription drug coverage for Medicare beneficiaries.

49.     The Defendants billed Medicare under Part B, which covers certain medical

services, such as clinical laboratory test services, furnished by physicians and other providers

and suppliers. 42 U.S.C. § 1395k(a)(2)(B)

50.     CMS administers the Medicare program. At all times relevant to this complaint,

CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and

Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims

submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100,

421.104.

51.     To participate in the Medicare program as a new enrollee, clinical laboratories,

such as MD Labs, must submit a Medicare Enrollment Application, CMS Form-855B.

52.     Laboratories also must complete Form CMS-855B to change information or to

reactivate, revalidate and/or terminate Medicare enrollment.

53.     Medicare regulations require providers and suppliers to certify that they meet, and

will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. §

424.516(a)(1).

54.     An authorized official must sign the "Certification Section" in Section 15 of Form

CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations,

and program instructions of the Medicare program," which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

55.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers.  All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

56.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form.  Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

57.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician.  42 U.S.C. § 1395l(q)(1).

58.     Since 2012, Noridian Healthcare Solutions, LLC, has been responsible for processing Medicare Part B claims in the State of Nevada.  As MD Labs performed all of its tests at facilities in Nevada, it submitted all claims to Noridian contractors.

### ii.     The Medicaid Program

59.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients.   Funding for Medicaid is shared between the Federal Government and those states participating in the program.

60.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary").  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

61.     Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.

### iii.     Other Federal-Funded Health Care Programs

62.     The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, the Federal Employee Health Benefit Program, and federal workers' compensation programs.

63.     TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

64.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781-1786; 38 C.F.R. § 17.270(a).

65.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.  5 C.F.R. § 890.101 *et seq.*

15

66.     The Plaintiff States provide health care benefits to certain individuals, based either on the person's financial need, employment status or other factors. To the extent those programs are covered by that State's False Claims Act, those programs are referred to in this Complaint as "state-funded health care programs."

**B.     Medical Necessity**

67.     Medicare only pays for services that are "medically necessary" – i.e., Medicare requires as a condition of coverage that services be "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

68.     Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. §1320c-5(a).

69.     Providers may be excluded from participation in the Medicare program and other federally-funded health care programs, if they routinely bill Medicare for medically unnecessary items or services. See 42 CFR § 1003.102.

70.     The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary.

**C.     General Rules Governing Payment for Laboratory Services**

71.     Medicare, Medicaid and other government-funded healthcare programs will only pay for laboratory tests that were ordered by the physician treating the patient for the treatment of a specific illness or injury. Laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and claims for such services will be denied.

72.     Under the Medicare program, laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

73.     Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory. 42 C.F.R. § 410.32(d)(v). "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition." Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1.

74.     Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."

75.     Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. The MBPM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . . . [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MBPM, Ch. 15, Section 80.6.1.

76.     Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 410.32(a). Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). MBPM, Ch. 15, § 80.1.

17

77.     In order to assess whether those services are reasonable and necessary and

whether reimbursement is appropriate, Medicare requires proper and complete documentation of

the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this
> part unless there has been furnished such information as may be necessary in
> order to determine the amounts due such provider or other person under this part
> for the period with respect to which the amounts are being paid or for any prior
> period.

42 U.S.C. § 1395l(e).

78.     Medicare regulations expressly state that a laboratory's claim for a service will be

denied if there is not sufficient documentation in the patient's medical record to establish that the

service was reasonable and necessary.  42 C.F.R. § 410.32(d)(3).

79.     The Department of Health and Human Services, Office of Inspector General

("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories.  63 Fed

Reg. 45076 (Aug. 24, 1998).  Among other things, the HHS-OIG guidance emphasizes that

laboratory order forms should emphasize the need for a justification and assessment of each test

ordered.

80.     Of particular concern, the guidance warns about situations where the standardized

order or requisition form encourages or even misleads the physician into ordering more than one

test as part of a "panel" when the full "panel" is not medically necessary and/or without giving

the physician the option or enough information to understand how to order only those tests that

are necessary.

81.     Specifically, the Guidance cautions:

a. Requisition design: While [CMS] does not design or approve requisition
forms, laboratories should construct the requisition form to capture the correct
program information as required by Federal or private health care programs and to
promote the conscious ordering of tests by physicians or other authorized

individuals.  The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. . . ."

. . . .

4. Reliance on Standing Orders: Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices.  Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . .  Medicare contractors can and may require additional documentation to support the medical necessity of the test.  As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.

*Id.* at 45079, 45081 (emphasis added).

82.     That Guidance similarly warns about the risk that non-medically necessary tests might be caused by overly broad "reflex testing" policies:

e. Reflex testing:  Reflex testing occurs when initial test results are positive or outside normal parameters and indicate that a second related test is medically appropriate.  In order to avoid performing unnecessary reflex tests, labs may want to design their requisition form in such a way which would only allow for the reflex test when necessary.  Therefore, the condition under which the reflex test will be performed should be clearly indicated on the requisition form. Laboratories may wish to adopt a similar policy for confirmation testing which may be mandatory.

*Id.*

## D.     <u>Common Fraudulent Schemes Involving Clinical Laboratory Service</u>

83.     In May of 2018, the Healthcare Fraud Prevention Partnership published a report highlighting the problem of fraud in the clinical laboratory industry.  *See* EXAMINING CLINICAL LABORATORY SERVICES: A Review by the Healthcare Fraud Prevention Partnership ("HFPP Report") at: https://hfpp.cms.gov/hfpp-white-papers/hfpp-clinical-lab-services-white-paper.pdf (visited Oct. 19, 2018).

84.     The HFPP is a voluntary, public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance

19

plans, employer organizations, and healthcare anti-fraud associations that seeks to identify and reduce fraud, waste, and abuse across the healthcare sector.

85.     As to the scope of the problem, the HFPP Report noted that the clinical laboratory services industry in North America generated an estimated $87.3 billion in revenue in 2017, and while "the total volume of laboratory fraud and abuse is unknown, investigations have demonstrated that the losses can be in excess of tens or even hundreds of millions of dollars."

86.     MD Labs' fraudulent scheme incorporated many of the major potential fraud and abuse schemes identified in the report, including:

      a.   Use of excessively large testing panels and standing orders;

      b.   Excessive and improper urine drug and genetic testing;

      c.   Pass-through billing; and

      d.   Improper use of Modifier 91.

87.     Although not separately identified in the report, another common illegal scheme that often underlies and coexists with the enumerated frauds is the use of illegal inducements to get providers to refer their Medicare, Medicaid and other business to the clinical lab (in violation of the Stark Law and the Anti-Kickback Statute).  MD Labs' scheme depends heavily on this fraudulent means of capturing patient referrals.

88.     Defendants also violate the rules that require Medicare not be charged substantially more than other payers.

      1.     *Improper Use of Large Testing Panels and Standing Orders*

89.     As set forth above, a core principle of healthcare reimbursement is that government and commercial payers will generally only pay for medically necessary services. This requirement applies not only to the overall treatment of a patient, but to the individual

services provided as well. Healthcare providers cannot evade this rule by unreasonably "bundling" medically unnecessary services with those services that are medically necessary.

90.    A common way that service providers such as clinical labs often try to fraudulently evade this requirement is by using standardized paperwork to mislead treating physicians into believing that they are ordering just one service when the lab actually intends to bill multiple services based on the physician's order, or that a collection of different services are medically necessary and clinically inseparable, when actually the services are easily, and in some cases, necessarily separable.

91.    As discussed above, HHS OIG raised concerns about the use of improperly designed order forms and misuse of standing orders in its 1998 Compliance Guidance. The HFPP Report confirms that HHS OIG's 20-year old concerns remain valid as to the risk of these fraudulent activities. Specifically, the HFPP Report noted:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels. For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances, such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels (*i.e.*, 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances. While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity. A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

HFPP Report at 11.

92.    Furthermore, the HFPP Report warned, as to standing orders:

> Standing orders refers to either a policy of prescribing a certain test or other medical service for all individuals that meet a specific set of inclusion criteria or a policy of setting up a recurring order for the course of an individual patient's treatment. In the past, standing orders have been used to order testing for any

patient that has a given condition or is a member of a specific population group. Current Medicare rules, which serve as the basis for rules of many private payers, allow for standing orders only in certain defined circumstances. <u>Broad, population-based orders are not reimbursable</u>. Despite existing controls and requirements, the development of practices to avoid the labeling of population-based testing as standing orders have been implicated as a driver of laboratory fraud.

*Id.* (emphasis added).

> 2.     *Excessive and improper urine drug and genetic testing*

93.     Related to, and often reliant on, the improper use of overly broad testing panels

and standing orders are a set of common schemes to bill for medically unnecessary urine drug

and genetic testing. Of particular relevance in the present case, the HFPP Report observed that:

The routine use of definitive (quantitative) urine drug testing, in place of lower-cost presumptive (qualitative) testing, was another major concern described by Partners. Presumptive drug screening detects the presence of a suspected substance or demonstrates adherence to pharmacotherapy treatment by providing a "yes or no" answer regarding whether the substance has been consumed. Definitive drug screenings are used to assess the levels or quantity of a specific substance that was detected during screening. Some HFPP Partners suggested that definitive testing in the absence of a presumptive test result should trigger a clinical record exam or be unallowable.

*Id.* at 12.

94.     Similarly, the HFPP Report warned about excessive genetic testing:

When used correctly, genetic testing may offer opportunities to reshape the way healthcare is delivered and can potentially lead to substantial improvements in population health and individual health outcomes. Currently, most genetic tests are only applicable in specific circumstances and all genetic tests are generally only needed one time, as the results would typically not be expected to change in the absence of a new disease process.

. . . .

Multiple [members of the HFPP] noted that direct-to-consumer marketing increased patient demand for potentially unnecessary genetic testing. In some instances, physicians obliged by ordering the unnecessary test.

*Id.*

95.     Specific billing rules and guidelines for urine drug and genetic testing are set forth in greater detail below.

### 3.    *Pass-through billing*

96.     As a general rule, physicians may not engage in "pass through billing," where an independent/unrelated lab performs clinical tests, and then the physician bills those tests to Medicare as if the physician had performed them.  However, labs (which may be owned by physicians) can, under some circumstances, refer tests to a separate lab, pay the second lab for performing the services, and then bill Medicare directly for the entire service.

97.     Such arrangements, where a physician is essentially buying lab services from an unrelated clinical laboratory and then billing government or commercial payers for those services presents a substantial risk of fraud.  *See* HFPP Report at 7.

98.     A primary fraud concern for federal payers is that the "pass through" arrangement will allow the clinical lab that performs the service to funnel illegal kickbacks in violation of the Stark Law and Anti-Kickback Statute (as discussed below) to referring physicians.

99.     Another concern for both government-funded payers and commercial insurers is that the arrangement will result in unnecessary markups of the service.

100.    This risk is particularly high where the billing laboratory, because of its contractual relationship with the provider or another special status is entitled to substantially higher reimbursement than the lab that performed the services.  In such cases, the pass-through relationship is typically an improper mechanism to take care of the higher reimbursement.

101.    For this reason, many commercial payers simply prohibit pass through billing in their provider contracts.

102.    Medicare's rules address pass-through billing through a broader, if somewhat less-direct method.

103.    First, physicians are prohibited from billing for clinical laboratory services they did not provide. *See* 42 U.S.C. § 1395l(h)(5).  Moreover, if, somehow, a physician were allowed to bill for services provided by others, he or she would be barred from billing more than the amount charged by the lab that performed the service. *See* 42 C.F.R. § 405.515.

104.    Clinical laboratories may bill for work they refer to other laboratories, but only if such outsourced work represents 30% or less of the tests referred to the billing laboratory in the year. *Id.*

105.    Thus, a physician group could theoretically evade this restriction by billing the outsourced tests through a laboratory owned by the physicians.  However, this avenue would be barred by the Stark Law, except possibly in some limited situations where none of the profits from the clinical laboratory were passed along to the physicians who ordered the tests.  Even if the arrangement complied with the Stark Law, there is still a substantial risk that the Anti-Kickback Statute would bar it.

106.    Moreover, various state laws bar such arrangements outright (*e.g.,* Arizona, California, Colorado, Connecticut, Massachusetts, Nevada, New Jersey, New York, Rhode Island, Louisiana, Ohio, Tennessee, Indiana, Iowa, Maryland, Montana, Washington), and/or bar the billing laboratory from marking up the services (*e.g.*, California, Florida, Michigan, Virginia, Washington).

107.    For example, California Business and Professional Code § 655 prohibits providers from billing for clinical laboratory services performed by another provider unless: (1) the patient is informed; and (2) the billing provider does not markup the charge.

24

108.    Illinois law similarly requires physicians to disclose to patients that an anatomic pathology service was performed by someone other than the physician and the amount charged by the service provider, and prohibits the physician from marking up the charges when billing the patient, an insurer or another third-party payor (except for certain limited exceptions). *See* 410 ILCS 50/3.3.

### 4.    *Fraudulent Use of Modifier 91*

109.    Modifiers are a type of "suffix" appended to CPT procedure codes to provide additional information about the circumstances under which the service was provided. They are often used to "explain" why a claim should be paid even though it might appear that the code is duplicative of another code, or otherwise would be denied.

110.    Modifier 91 should be used when the same test is performed multiple times on the same patient at different points in time. The subsequent tests are intended to monitor the same clinical indicator over time, such as testing a patient with pneumonia's arterial blood gases in the morning and again in the afternoon on the same day.

111.    Modifier 91 is not intended to be used if the same test is performed in a different location, or for a similar but different test (*e.g.*, looking for a different type of infection) performed on the same patient.

112.    The HFPP Report explains the risk of fraudulent use of Modifier 91 as follows:

The complexity of scanning patient claims history, matching claims, and developing different algorithmic rules for every test eligible for a 91-modifier complicates the ability of payment systems to identify potential fraud and abuse of this modifier in an automated fashion.

....

Claims payment systems may be programmed to override any payment claim edit in the system when a 91-modifier is detected. This enables the 91-modifier to be

25

used to trick the automated payment system into paying a claim it would not otherwise pay.

HFPP Report at 7.

113.    In the present case, where MD Labs performs multiple (medically unnecessary) follow up identification tests as part of its standard urine tests, by using Modifier 91, MD Labs could potentially evade claims processing edits designed to limit the number of such follow up tests, or evade follow up analysis aimed at identifying situations where such follow up tests are being ordered too often.

114.    Modifier 59, rather than Modifier 91, should be used, as in the present case, where the same test is repeated multiple times looking for different species or strains of bacteria, or for tests performed on different specimens or sites of the body.

115.    Moreover, Modifier 59 may only be used to bill multiple instances of a given CPT code if multiple tests are performed.  If only one test is performed, and that one test identifies multiple bacteria, then the given CPT code may only be billed once, and modifier 59 may not be used to get additional instances of that CPT code paid.

5.    *The Stark Law and Anti-Kickback Statute*

116.    Two separate but related federal laws are designed to ensure that physicians and other healthcare providers make decisions based on their unbiased medical judgement and their patients' best interest, rather the provider's own financial interests.

*i.    The Stark Law*

117.    Congress enacted the Stark Law, 42 U.S.C. § 1395nn, to address concerns that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.

118.     Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships.  *See, e.g.*, 60 FR 41914, 41923 (Aug. 14, 1995) ("There have been at least 10 studies conducted over the past few years that concluded that patients of physicians who have financial relationships with health care suppliers receive a greater number of health care services from those suppliers than do patients generally").  The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable (but often hard to individually identify) utilization of services.

119.     The Stark Law prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception.  42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq.*

120.     The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ."  42 C.F.R. § 411.353(d).

121.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

122.     Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ."  42 C.F.R. § 411.351.

123.    A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

124.    The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements. The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

### ii.    The Anti-Kickback Statute

125.    Similarly, the Medicare and Medicaid Fraud and Abuse Statute ("Anti-Kickback Statute" or "AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.

126.    In a 1994 Special Fraud Alert, the Department of Health and Human Services' Office of the Inspector General ("HHS OIG") addressed the issue in a question and answer format as follows:

> Why Is It Illegal for Hospitals to Provide Financial Incentives to Physicians for Their Referrals?
>
> … .
>
> These incentive programs can interfere with the physician's judgment of what is the most appropriate care for a patient. They can inflate costs to the Medicare program by causing physicians to overuse inappropriately the services of a particular hospital. The incentives may result in the delivery of inappropriate care to Medicare beneficiaries and Medicaid recipients by inducing the physician to

refer patients to the hospital providing financial incentives rather than to another hospital (or non-acute care facility) offering the best or most appropriate care for that patient.

Federal Register Volume 59, Issue 242 (December 19, 1994).

127.   To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

128.   The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute provides:

(b) Illegal remunerations . . .

> (2)   whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>
> > (A)   to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B)   to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

### iii.    *Common Application of Stark Law and AKS*

129.    The two laws have somewhat different scope (the Stark Law covers only referrals of certain "Designated Health Services" where the AKS covers all healthcare services for a wider range of programs), and standards of proof (the Stark law imposes strict liability where the AKS requires proof of intent), but taken together they establish a clear policy that decisions about how, when and if to treat patients should be based on sound medical decision making rather than the referring or treating physician's financial interest.

130.    Moreover, both statutes have exceptions (called safe harbors) that exempt certain conduct from liability.  Although the safe harbors often cover similar conduct, they are not necessarily fully overlapping.  "Compliance with a Stark law exception does not immunize an arrangement under the anti-kickback statute.  Rather, the Stark law sets a minimum standard for arrangements between physicians and hospitals.  Even if a hospital-physician relationship qualifies for a Stark law exception, it should still be reviewed for compliance with the anti-kickback statute."  "OIG Supplemental Compliance Program Guidance for Hospitals," 70 Fed. Reg. 4858, 4863 (Jan. 31, 2005) (hereafter "the 2005 Supplemental Guidance for Hospitals").

131.    Claims for payment submitted in violation of these statutes are false claims within the meaning of both the federal and Plaintiff-state false claims acts.  This is true for a variety of reasons.  First, Federal law specifically provide that a violation of the AKS and/or Stark Law are violations of the respective False Claims Acts.  *See* 42 U.S.C. § 1320a-7b(g) (providing that a violation of the AKS is a violation of the Federal False Claims Act).

132.    Second, the Stark Law "prohibits hospitals from submitting—and Medicare from paying—any claim for a 'designated health service' (DHS) if the referral of the DHS comes from

a physician with whom the hospital has a prohibited financial relationship." Supplemental

Compliance Program Guidance for Hospitals (70 Fed. Reg. 4858, 4862; January 31, 2005).

133.    Third, Medicare and other provider agreements establish that compliance with

these laws is a condition of payment – meaning that the government will not pay for claims

submitted for services provided based on a kickback-tainted referral.

*iv.    Advisory Opinions Applying These Rules*

134.    Applying these rules, HHS has long expressed concerns that arrangements where

a service provider, like a clinical laboratory, offers a physician or other referral source an

opportunity to enter into a "joint venture" that is essentially just an opportunity for clinical

laboratory to trade a share of its profits for a steady stream of referrals. *See* HHS OIG Advisory

Opinion 04-17 (Dec. 10, 2004) (discussing and applying HHS OIG's 1989 Special Fraud Alert

on Joint Venture Arrangements and its 2003 Special Advisory Bulletin titled "Contractual Joint

Ventures").

135.    HHS OIG has also expressed concern about arrangements where a clinical lab

essentially gives a referral source the opportunity to earn a fee that otherwise would be earned by

the lab. *See, e.g.*, HHS OIG Advisory Opinion 05-08, at *4 (Jun. 6, 2005) ("[T]he Proposed

Arrangement essentially would give the physicians the opportunity to earn a fee otherwise

earned by the Lab. Because the physicians would receive a portion of the Lab's reimbursement

for blood tests resulting from the physicians' referrals, the physicians have a strong incentive to

order more blood tests. As a result, there is a risk of overutilization and inappropriate higher

costs to the Federal health care programs. We discern no safeguards in the Proposed

Arrangement to rebut the inference or reduce the risk that the blood draw remuneration would be

intended to induce referrals.").

136.    Similarly, HHS OIG has warned against schemes where a clinical lab gives a physician or other referral source a discount on tests that the physician itself bills to commercial providers or other health care programs (and thus where the physician stands to make a profit), in exchange for that physician referring all or a substantial portion of its government-funded business (that the physician cannot legally be the one to bill for) to the lab – a practice known as "swapping." *See* HHS OIG Advisory Opinion 99-13 (Nov. 30, 1999).

*v.*    *The Discount Safe Harbor*

137.    When analyzing the potential impact of the AKS to common situations such as those in the above Advisory Opinion and the present case, a common AKS Safe Harbor at issue is the one for "discounts." *See* 42 CFR §1001.952(h).  This Safe Harbor provides that a discount (as defined in the regulation) does not count as "remuneration" and thus does not violate the AKS as long as both the giver and recipient of the discount (and the entity that bills Medicare, Medicaid or other Federal health care programs, if that is a third person) meet certain requirements.

138.    The discount safe harbor imposes different, but related, obligations on the buyer and seller of the services.  Key among these obligations are that: (1) "[t]he discount must be made at the time of the sale of the good or service or the terms of the rebate must be fixed and disclosed in writing to the buyer at the time of the initial sale of the good or service"; (2) if the buyer submits the claim for the service, "the seller must fully and accurately report such discount on the invoice, coupon or statement submitted to the buyer"; and (3) whoever submits a claim for the service must inform the government payer of the discount, to the extent required by law or relevant regulations.  *Id*. at §§ 1001.952(h)(1)(iii), (h)(2)(iii).

32

139.    A "discount" is defined as "a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction." *Id*. at § 1001.952(h)(5).

140.    A "rebate" is defined as "any discount the terms of which are fixed and disclosed in writing to the buyer at the time of the initial purchase to which the discount applies, but which is not given at the time of sale." *Id*. at § 1001.952(h)(4).

141.    Thus, for example, a situation where – as alleged below – a seller offered to put a fixed number in a sales contract, but promised to analyze the profitability of the tests after 90 or 120 days and "split the profits" on the tests, would not comply with the discount safe harbor because the price reduction is not set in advance.

142.    Also important to the present situation, the "discount" safe harbor does not apply at all to price reduction "applicable to one payer but not to Medicare, Medicaid or other Federal health care programs." *Id*. at §1001.952(h)(5)(iii).

<i>vi.</i>    <i>State Law Anti-Kickback Statutes</i>

143.    Several of the Plaintiff States also have Anti-Kickback Statutes or otherwise prohibit the payment of kickbacks in connection with services reimbursed by Medicaid and/or other insurance programs, including: California (Cal. Bus. & Prof. Code § 650; Cal. Welf. & Inst. Code §14107.2); Connecticut (Conn. Gen. Stat. § 53a-161d; Conn. Gen. Stat. § 53a-161c); Delaware (31 Del. C. § 1005); the District of Columbia (D.C. Code § 4-802(c)); Florida (Fla. Stat. § 409.920; Fla. Stat. § 456.054(2); Illinois (305 ILCS 5/8A-3(b)); Indiana (Ind. Code Ann. § 12-15-24-2); Louisiana (La. Rev. Stat. Ann. § 46:438.2); Maryland (Md. CRIMINAL LAW Code Ann. § 8-511; Md. HEALTH OCCUPATIONS Code Ann. § 14-404); Massachusetts (ALM GL ch. 118E, § 41); Michigan (MCLS §§ 400.604, 400.606); Minnesota (Minn. Stat. §

62J.23); Montana (Mont. Code Ann. § 45-6-313); Nevada (Nev. Rev. Stat. Ann. § 422.560);

New Jersey (N.J.Stat. § 30:4D-17); New Mexico (N.M. Stat. Ann. §§ 30-41-1, 30-41-2 ); New

York (NY CLS Educ. § 6530); North Carolina (N.C. Gen. Stat. § 108A-63); Oklahoma (56 Okla.

St. § 1005(A)(6)); Rhode Island (R.I. Gen. Laws § 9-1.1-1 *et seq.*); Virginia (Va. Code Ann. §

32.1-315); and Washington (Rev. Code Wash. (ARCW) § 19.68.010).

### 6.    *Providers May Not Charge Medicare "Substantially More" Than the Provider's Usual Charges*

144.    MD Labs' policy of charging referring providers substantially less than it bills to

Medicare, and of routinely waiving patient copay and coinsurance amounts also violates the

prohibition on charging Medicare "substantially more" than the "usual" charges.

145.    Federal law and related rules allow CMS to exclude providers from participation

in Medicare or other government-funded programs if those providers charge Medicare or

Medicaid substantially more than they charge other customers for the same service. *See* 42

U.S.C. 1320a–7(6)(A).

146.    As explained in HHS OIG Advisory Opinion 99-13 (Nov. 30, 1999):

> Price reductions offered to physicians that are not offered to Medicare or
> Medicaid raise additional issues under section 1128(b)(6)(A) of the Act, which
> provides for permissive exclusion from the Federal health care programs of
> individuals or entities that submit or cause to be submitted bills or requests for
> payment (based on charges or costs) under Medicare or Medicaid that are
> substantially in excess of such individual's or entity's usual charges or costs,
> unless the Secretary finds good cause for such bills or requests.  In determining an
> individual's or entity's "usual" charges, we will look at the amounts charged to
> non-Federal pay[e]rs, including physicians.  If the charge to Medicare or
> Medicaid substantially exceeds the amount the laboratory most frequently charges
> or has contractually agreed to accept from non-Federal pay[e]rs, the laboratory
> may be subject to exclusion under section 1128(b)(6)(A) of the Act.

*Id.* (emphasis added)

147.    In a later Advisory Opinion, HHS OIG reviewed its effort to provide more

specific definition of the term "substantially in excess" as follows:

> The OIG has attempted on numerous occasions to provide definitive guidance on
> this provision. However, we have not finalized definitions for 'substantially in
> excess' or 'usual charges.' We have clearly stated that we would not use this
> authority to exclude or attempt to exclude any provider or supplier that provides
> discounts or free services to uninsured or underinsured patients, but this policy
> statement does not apply to [an arrangement where a lab] would provide free
> services to patients who are insured and whose services could be covered if they
> were to use the laboratory designated by their insurance plan.
>
> We have also stated that "a provider need not even worry about section
> 1128(b)(6)(A), unless it is discounting close to half of its non-Medicare or non-
> Medicaid business."

148.    Ultimately, HHS OIG refused to approve the proposed arrangement under

consideration in Advisory Opinion 15-04 because it:

> would essentially result in a two-tiered pricing structure. A substantial number of
> patients (all patients insured by Exclusive Plans) would receive services for free,
> regardless of financial need. The Requestor has provided no reason to offer free
> services other than to remove an obstacle to the physician practices referring all of
> their laboratory business to the Requestor.
>
> The substantially in excess provision is not designed to prevent providers and
> suppliers from negotiating their rates with private plans. However, the Proposed
> Arrangement is not an example of negotiating discounts with certain private
> pay[e]rs that may result in rates slightly less than the rate Medicare pays. Instead,
> the Proposed Arrangement would completely relieve patients and their Exclusive
> Plans of any obligation to pay in order to pull through all of the Federal health
> care program business, which would be charged at the full rate.

Advisory Opinion 15-04 (Mar. 18, 2015).

## V.    CLINICAL BACKGROUND

149.    Defendants' fraudulent scheme primarily involves three types of clinical

diagnostic tests each of which is described in greater detail below: (A) Bacterial Urine Culture

tests; (B) Pharmacogenomic Testing; and (C) Urine Drug Testing.

### A.    Urinary Tract Infections and Testing

150.    "A bacterial urine culture is a laboratory procedure performed on a urine specimen to establish the probable [cause] of a presumed urinary tract infection." *See* Medicare National Coverage Determinations Manual ("NCDM") ch. 1, part 3 §190.12.  Urinary tract infections ("UTIs") are among the most common human bacterial infections, affecting almost 50% of the population at least once in their lifetime.  In the United States, they account for an estimated $3.5 billion in healthcare spending every year.  UTIs are primarily treated by the use of antibiotics.

151.    Several tests are available for screening patients for UTIs, including urine dipstick testing, urinalysis, Gram staining, and bacterial urine culture ("BUC").  The BUC is the "gold standard" for establishing a diagnosis of UTIs, because it allows the quantification and identification of the uropathogenic species, and subsequent testing to determine whether the bacteria in question is resistant to one or more antibiotics.

152.    "It is common practice to do a urinalysis prior to a urine culture." *Id*.  The Medicare payment policy (known as a "National Coverage Determination" or "NCD") for BUC testing explains that it may be medically necessary to conduct at BUC where:

> A patient's urinalysis is abnormal suggesting urinary tract infection, for example, abnormal microscopic (hematuria, pyuria, bacteriuria); abnormal biochemical urinalysis (positive leukocyte esterase, nitrite, protein, blood); a Gram's stain positive for microorganisms; positive bacteriuria screen by a non-culture technique; or other significant abnormality of a urinalysis.

*Id*.

153.    The NCD further provides, however, that it "is not essential to evaluate a urine specimen by one of these methods before a urine culture is performed."  Instead, "certain clinical presentations with highly suggestive signs and symptoms may lend themselves to an antecedent

urinalysis procedure where follow-up culture depends upon an initial positive or abnormal test result." *Id.*

154.    Thus, for example, a BUC may be medically necessary if the "patient has clinical signs and symptoms indicative of a possible . . . UTI," such as painful or frequent urination, discolored urine, fever or chills. *See id.*

155.    As defined in the NCD, "[t]he procedure includes aerobic agar-based isolation of bacteria or other cultivable organisms present, and quantification of types present based on morphologic criteria." *See id.* (emphasis added).

156.    Stated more simply, the standard practice for BUC involves putting a sample of the urine on one or more types of media that provide an opportunity for bacteria to grow. The culture is then incubated for 24 hours. After the first 24 hours, the initial results are documented, including whether any bacteria have grown, how many different types of bacteria have grown, and how big each bacterial colony is (measured in colony forming units per milliliter of urine or CFU/ml).

157.    At this point, the type of bacteria can generally be identified based on the type of medium used, the color of the colony, and other details about the formation and shape of the colony.

158.    The presence of three or more bacteria indicates likely contamination of the urine sample. In such cases, further testing on that culture should be discontinued and a new sample collected.

159.    Pursuant to Medicare and standard coding rules, the initial BUC test, including baseline bacteria identification and quantification, are billed using CPT Code 87086. For 2018, Medicare pays $9.96 for this code.

160.    In some situations, additional conventional laboratory tests may be necessary to identify bacteria type. Such additional testing should be billed using CPT Code 87077, for which Medicare pays $9.97.

161.    If initial testing indicates the presence of bacteria, then antibiotic resistance testing can be an important part of developing a plan of care because an antibiotic to which the bacteria is resistant will not be effective. Even more, a major factor in the rise of antibiotic resistant bacteria is the use of antibiotics without consideration of resistance issues. *See id.* ("Isolates deemed significant may be subjected to additional identification and susceptibility procedures as requested by the ordering physician.").

162.    Susceptibility testing is billed using CPT Code 87186, for which Medicare pays $10.67 in 2018. This code may be billed multiple times if multiply strains of bacteria are tested for antibiotic susceptibility.

163.    Including the initial culture, the second day of incubation and susceptibility testing (if necessary) the standard BUC takes 24 to 72 hours.

**B.    Pharmacogenetic Testing**

164.    Pharmacogenetics is the study of how certain genes cause different people to metabolize certain drugs differently. These differences can affect both how effective the drugs are and the likelihood and severity of adverse events.

165.    A pharmacogenetic test is meant to guide treatment strategies, patient evaluations and decisions based on its ability to predict response to treatment in particular clinical contexts.

166.    Although there are a significant number of pharmacogenetic tests, Medicare and other healthcare providers consider most of them to be investigational or otherwise lacking sufficient medical evidence of their efficacy to warrant payment.

167.    Accordingly, Medicare only pays for pharmacogenetic testing ["PGX Testing"] for a limited number of drugs, and for each of them for only a limited number of diagnoses.

168.    Medicare considers genetic testing of the CYP2C19 gene medically necessary for patients with Acute Coronary Syndrome ("ACS") undergoing Percutaneous Coronary Interventions ("PCI") who are who are planning to start taking Clopidogrel (Plavix).

169.    When medically necessary, this test should be billed using CPT Code 81225, and in 2018 Medicare paid $291.36.

170.    Medicare considers genetic testing of the CYP2D6 gene medically necessary for patients with depressive disorders who are planning to start taking amitriptyline or nortriptyline or are planning to start taking tetrabenazine doses greater than 50 mg/day.

171.    When medically necessary, this test should be billed using CPT Code 81226, and in 2018 Medicare paid $45.91.

172.    Notably, these drugs are relatively old, and rarely prescribed.

173.    Medicare generally does not pay for PGX testing for other genes, for other drugs, or for these drug / gene combinations for treatment of other diagnoses.

### C.    Urine Drug Testing

174.    Urine drug testing ("UDT") is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system.  UDT can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte).  Different testing methodologies have different capabilities and limitations.

175.    UDT is performed in a number of contexts.  Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations.  In the clinical

health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

176.    There are different types of drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

177.    "Point of care" or "POC" testing—at a physician's office or clinic—is generally performed by "immunoassay" methodologies, which generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels. In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips, each of which tests for a specific drug or drug class.

178.    POC testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

179.    POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management. Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

180.    Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS"). These testing methodologies can provide quantitative results, identifying the concentration of a drug or metabolite in a sample. Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes.

181.    Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

182.    MD Labs performed UDT using the enzyme immunoassay ("EIA") technique, a common method for qualitative and quantitative determination of therapeutic and recreational drugs and certain proteins in urine.

183.    The clinical value of MD Labs' "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition, especially whether the POC test result is expected or unexpected, the patient's drug abuse history and clinical presentation.

184.    For example, if a patient is prescribed a certain drug, such as Xanax, a positive POC test result for benzodiazepines (of which Xanax is one) would be expected.  If the test result is negative for benzodiazepines, however, and the patient insists that he or she is taking their Xanax as prescribed, a quantitative laboratory test to "confirm" whether this unexpected negative result may be reasonable and necessary.

185.    Similarly, if a patient's POC test yielded a positive result for a non-prescribed or illicit drug, then a quantitative laboratory test to evaluate (*i.e.*, "confirm") this unexpected positive result may be reasonable and necessary.

186.    In some instances, laboratory testing of an expected POC test result or for a substance not available on a POC test may also be warranted.  For example, aberrant patient behavior, unexpected clinical presentation, or a history of drug abuse may justify specific laboratory tests.  The clinical value of such tests, however, depends on the presentation and physician assessment of each individual patient and that patient's need for each such test.  If a POC test is negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory

test for that drug is not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

187.    Established clinical guidelines for UDT provide that if the initial test is negative, further confirmatory testing is not necessary. *See, e.g.*, 73 Fed. Reg. 71858, 71878 at Sec. 1.5 (Nov. 25, 2008) (Substance Abuse and Mental Health Services Administration's Federal Drug-Free Workplace Program Guidelines) (providing that a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class.").

188.    Similarly, confirmatory testing is not required when the results are expected. Instead, under established clinical protocols, confirmatory testing is generally only recommended (and thus medically necessary) when the initial result is unexpected.

## VI.    **ALLEGATIONS**

189.    Although the Defendants' scheme is brazen, much of it is not particularly novel – as demonstrated by the fact that many elements of the fraud (although not the essential details of Defendants' particular fraudulent scheme) were the subject of prior False Claims Act and other enforcement actions against other labs, and a recent government report describing the most pervasive and problematic fraudulent lab billing schemes.

190.    It is well established that laboratories may not use unreasonably large "panels" of tests, standing orders and other misleading paperwork to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.  Yet that is exactly what MD Labs has done and continues to do.

191.    MD Labs also made false and misleading statements about the need for and value of its testing services to encourage such testing.

192.    Defendants' fraudulent scheme is designed to, and does: (a) cause physicians and other providers actually treating a patient to order as many clinical laboratory tests as possible, regardless of medical necessity; (b) leverage the tests the treating providers actually do order to create a pretext to perform – and bill government and commercial insurers for – two, three, five or more times as many tests as the treating provider actually ordered; and (c) perform additional tests that provide no clinically useful information.

193.    MD Labs then bills government and commercial payers for the entire test panel, without disclosing to the government or commercial payer that only a small portion of the billed tests were medically necessary and supported by a valid physician order and other documentation in the medical record.  If these payers knew of the facts contained in the patients' medical records – especially the lack of evidence or documentation of the medical necessity for the substantial majority of the billed tests – they would not have paid the Defendants for those tests.

194.    Often, though, such deception is not enough.  To further motivate physicians to order the tests, MD Labs offers lucrative kickbacks to the ordering physicians and other providers (including pharmacists in a position to sell MD Labs' Rxight pharmacogenetic testing in retail locations) to illegally induce them to join as co-conspirators in the fraud.

195.    To prevent patients from raising concerns about the expensive, duplicative and medically unnecessary nature of many of its tests, MD Labs makes minimal efforts to require patients to pay their share (either due to coinsurance obligations or because the test is deemed not covered by their insurance) of the costs of tests.

196.    Defendants also routinely use improper billing code modifiers to get fraudulently-inflated claims paid.

197.    MD Labs also routinely charges Medicare and other federal government payors substantially more than its costs or its usual charges – as demonstrated by the amount it charges referring providers who bill the tests themselves and to individuals who owe some or all of the cost of the test due to a coinsurance obligation or lack of insurance coverage for the test.

198.    Finally, MD Labs also causes the submission of false claims by assisting physicians and other providers bill for services performed by MD Labs in spite of federal and state prohibitions on such pass-through billing.

199.    Numerous examples of patient laboratory test results from MD Labs and evidence of claims submission by MD labs and payment by government-funded healthcare programs are included in the statutory disclosure materials provided to the United States and the Plaintiff-States simultaneous with the filing of this Complaint.  To protect the confidentiality of the patients and their health care information, those records are not attached to this Complaint, but are incorporated herein by reference.

A.    **MD Labs' Fraudulent Scheme**

200.    OMNI learned of Defendants' fraudulent scheme first-hand through its interactions with MD Labs' personnel, as those personnel attempted to enlist OMNI into MD Labs' scheme.

201.    MD Labs' personnel offered OMNI kickbacks to order tests in the form of an agreement to "split profits" on the tests OMNI ordered (BUC, pharmacogenetic and urine drug tests), payment of a $50 fee in connection with each pharmacogenetic test ordered, free testing supplies and other inducements.

202.    MD Labs' personnel also coached OMNI on how to bill Medicare, Medicaid and other government-funded and commercial insurers for the clinical laboratory tests, and offered to assist OMNI in billing for these tests directly in violation of Medicare rules.

203.    For example, on April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers. Mr. Todd explained the financial assumptions underlying the proposal as follows:

- We considered a monthly volume of 200 specimens (plus or minus)
- We considered a payer mix of 35% Commercial and 65% all Federal plans to include
- Medicare, Medicaid and Tricare.
- You collect all specimens in your lab and we will pick up daily.
- We bill Omni their share monthly.

204.    Dr. Deligdish of OMNI responded, asking for evidence that commercial payers and/or Medicare actually paid for the test.

205.    Mr. Todd responded: "I asked for the EOBS. Hopefully I will get for you by Wed. I also thought you should want to re-evaluate every 120 days. "

206.    However, the next day, he replied:

My company felt that giving you our EOB's is not appropriate at this time. They are all over the place, even within the same Company. All of the Commercial payers and Medicare pay us. Medicaid is our problem ... generally below $100. We are not in network with any commercial payers. We are generally reimbursed between $200 to $550 per test. There is no National Lab with this test in network with these payers, so they generally pay as [Out of Network] or as experimental.

I would propose to trial for at least 120 days so you can determine yourself. Of course you can stop at any time.

207.    On April 25, 2018, Mr. Todd provided additional information about the proposed business arrangement:

We understand completely your concern for the best billing options for this test. Our people felt that the info we could give you now would not be the best info for this region of Fla. Our data is designed for the entire country and we are constantly modifying our coding for individual plans.

We would propose that we would bill all your payers for 90 - 120 days and then give to you all the billing data for your commercial carriers in your patient population. At that time we could modify a program that works best for your billing practices.

What do you think?

If you agree to this we should set you up as an account and plan to in-service your locations with reqs and supplies. I am not sure if this would be 1 account or multiple accounts for each provider or location. I asked Dale to send us a copy of your existing Allscripts order form so we can identify if this is able to be used in our system.

208.    On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg wrote to

OMNI's practice administrator, offering to bring the office lunch the following week.

209.    On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent

Care Clinic, asked MD Labs' Dale Stenberg how much MD Labs bills for BUC testing. Mr.

Stenberg forwarded her question to Jack Todd, with the note: "This question comes up

frequently, what should my response be? This is the Urgent Care Omni."

210.    Mr. Stenberg forwarded Mr. Todd's response to Ms. Williams:

Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we. (FYI. Currently it is approximately $700.00.)

We accept whatever the insurance company pays us ... no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

211.    At noon on August 10, 2018 OMNI's Dr. Deligdish and Brad Smith spoke with

MD Labs' Kelly Hall for approximately 30 minutes. Ms. Hall explained MD Labs' Rxight

pharmacogenetics, which she had been in charge of since January 2018.

212.    As part of that discussion, Ms. Hall offered that, if it chose, OMNI could provide this service (which she called "personalized medication review") to the patients instead. She noted that the service is not billable to or considered medically necessary by Medicare or other payers, but that MD Labs would pay OMNI $50 per test to explain the test to the patient.

213.    MD Labs' promotional material indicates that pharmacies that sell the Rxight test kit in their retail locations are also "eligible" to provide this service to MD Labs' patients (and presumably be paid by MD Labs for doing so).

214.    On August 13, 2018, OMNI's Dr. Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen for approximately 30 minutes. Mr. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were doing 16 samples a month and they are now doing 16,000 samples of month. He then stated that approximately 70% of MD Labs' BUC tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance. With respect to the UDT business, he reported approximately 35% of the tests are paid for by Medicare, 30% by Medicaid and the remainder by commercial insurance.

215.    After discussing the clinical aspects of the three MD Labs tests (as set forth in greater detail below), Mr. Clausen then discussed MD Labs' billing practices. He stated that if a patient's insurance (whether government-funded or otherwise) denied coverage for a test, MD Labs would bill the patient only $50. However, if the patient failed to pay after MD Labs sent one or two bills, MD Labs does not further pursue the payment.

216.    He said that MD Labs has a similar policy with respect to patient coinsurance or copay amounts – charging no more than $50, and taking limited steps to actually collect these amounts.

217.    As to the business arrangements with the referring physician group, he stated that MD Labs would allow OMNI's laboratory to bill for the services, and would be willing to split the profits, with OMNI.

218.    More specifically, Mr. Clausen stated that MD Labs would initially set an "arbitrary" amount to charge OMNI – such as $100 per specimen – and then MD Labs and OMNI could reevaluate the pricing after three to four months depending on how much Medicare and commercial payers reimbursed for the tests.

219.    On August 24, 2018, Ms. Hall again emailed OMNI personnel about MD Labs' pharmacogenetic testing program, discussing the potential financial arrangement and provision of free testing supplies:

> As we discussed, I am attaching the Practice set up form which will allow us to create an account and send you kits.  Please let me know where you would like the kits sent and how many you anticipate needing for your first few weeks.  We can replenish as they are utilized so you don't need to keep too many on hand.
>
> If you decide that you would like to have us bill you and then you bill the carrier (or some combination of the 2 like you are doing with our other tests) just let me know and we can create an agreement for the amount.  We have a self pay rate of $399 but when we bill a practice or a Health System, we provide a 25% discount down to $300.

220.    On August 24, OMNI personnel had a teleconference with MD Labs' Howard Clausen and Jack Todd.   Mr. Todd proposed that for the pharmacogenetic testing, MD Labs would bill commercial insurers, as directed by OMNI, and that MD Labs would charge OMNI $300 (a 25% discount below the price charged to "self-pay" patients).

221.    He also reiterated that MD Labs was willing to pay an OMNI pharmacist to provide the medication management service.

222.    Mr. Clausen then asked whether OMNI wanted to bill only for commercial payers, or for both commercial and government payers.  When OMNI personnel suggested they

were interested in having OMNI bill directly for both commercial and government payers, Mr.

Clausen stated that MD Labs would establish an initial price that Md Labs would charge OMNI

for each test to put in the contract.

223.    Mr. Clausen stated that they would review the reimbursement received after 90

days, and then readjust the price (including for the previously billed tests) so that MD Labs

would split the profit with OMNI. He stated that the cost of the tests to OMNI was

approximately $50.

224.    On August 27, 2018, MD Labs' Mr. Todd emailed OMNI personnel, reiterating

that MD Labs' cost for all tests was approximately $50, and offering to review "billing history to

date" for BUC tests. He then provided the CPT billing information for BUC and UDT tests

(discussed below).

225.    On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Mr. Clausen

and Mr. Todd. Mr. Bobango reported in an email summary of the call that Mr. Clausen had

stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure.
> This is what he confirmed:
>
> 1. They will not bill any patient anything greater than $50.00 regardless of
> insurance, co-pay or deductible. They do not want patients to have to pay a lot for
> this service. They do not go after the patient for any balances over $50.00.
>
> . . ..
>
> 3. For UTI tests, he stated Omni will profit between $200 and $700 per claim.
> The price for Omni is $250.00. Their cost is approximately $75.00 for these tests.
> After 90 days, they will take a look at EOBs and negotiate the rate as well.

226.    On August 27, 2018, Mr. Todd also emailed OMNI personnel a proposed

"Clinical Testing Program Agreement," between "MD Spine Solutions, LLC dba MD Labs" and

"Omni Healthcare, a practice organized and existing under the laws of the State of Florida."

Although Dr. Deligdish had asked in an earlier email that any billing arrangement be "set [] up through the Melbourne Medical Laboratory," MD Labs nonetheless proposed a contract directly with OMNI, the physician group.

227.   The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI: (a) $250 for BUC testing; (b) $150 per test for UDT (with the screening included in the price for the standard confirmatory testing); and (c) $300 for the full Rxight test panel.

228.   None of the tests included an option or differential pricing for a smaller panel of tests than the standard, broad MD Labs panel.  Although the BUC price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

229.   Moreover, although MD Labs personnel had clearly and repeatedly stated that the prices would be renegotiated after 90 days, the contract purported to provide, as to price changes: "This pricing can be re-negotiated on January 1, 2019 and each year thereafter, to take into account reimbursement changes affecting either party."

230.   Any claim submitted for a service performed pursuant to a kickback-tainted referral or otherwise performed or billed in violation of federal or state laws, regulations or contracts is a false and/or fraudulent claim within the meaning of the Federal False Claims Act and Plaintiff-State False Claims and insurance fraud prevention acts.

**B.    MD Labs' Scheme: Medically Unnecessary Tests**

231.   MD Labs' scheme used common approaches to generate pretexts to perform and bill for medically unnecessary tests, but with variations depending on the particular test.

232.    Any claim for payment for a clinical laboratory test that was not medically necessary, especially where MD Labs fraudulently caused it to be ordered by use of an overly broad testing panel, a misleading standard order form, or by coaching physicians to misrepresent what drug he or she was actually considering treating the patient with, is a false or fraudulent claim within the meaning of the Federal False Claims Act and Plaintiff-State False Claims and insurance fraud prevention acts.

### 1.    Bacterial Urine Culture Tests

233.    MD Labs provides a variation on the standard BUC test.  It performs an initial culture on the urine sample, and then uses an unreasonably broad panel of expensive, medically unproven nucleic acid tests using polymerase chain reaction ("PCR") technology to identify the specific bacteria found during the standard BUC test.

234.    The PCR technology identifies the bacteria based on specific tests of the bacterial DNA.

235.    MD Labs claims that its testing protocol produces more comprehensive and more accurate results.  For example, in an August 13, 2018 teleconference, MD Labs' Director of Sales, Howard Clausen, told OMNI personnel that MD Labs' BUC tests, was a "direct replacement for culture and sensitivity," and the same technology used to diagnose cancer.  He claimed that the MD Labs test was needed because: "cultures get it wrong 50-70% of the time." He stated that there was a clinical study supporting these points, performed by Florida Hospital in Orlando.  He offered to provide a copy of the study – but never did.

236.    Similarly, MD Labs' marketing "fact sheet" for physicians indicates that its test identifies 17 different pathogens with 100% accuracy, compared to the 5 to 6 pathogens identified with 71% accuracy in standard BUC testing.

237.    However, the "fact sheet" does not indicate that the 17 pathogens are identified using 17 different tests above and beyond the initial culture (which includes the cost of bacterial identification and colony counts), or that each of those 17 additional tests was separately billed to Medicare or other payers at nearly four times the price of the standard culture -- APIECE.  Taken together, the amount MD Labs bills (and thus far has been paid by Medicare) for its full panel BUC test is as much as 60 to 70 times more than the cost of the approved, standard BUC testing.

238.    Moreover, the fact sheet does not outline, nor has MD Labs explained to OMNI personnel or identified any medical literature that documents how or why any purported increased accuracy in identification is actually clinically useful (and thus possibly medically necessary) – let alone sixty to seventy times more accurate.

239.    In fact, as outlined below, often that greater specificity and accuracy are not clinically useful (and thus not medically necessary) because any incremental information they provide does not affect the treatment the patient will receive.

240.    Nor does the fact sheet indicate or did MD Labs tell OMNI that there was any option to order only a limited number of follow-up PCR tests to identify specific bacteria. Instead, the lab order form only gives the option to order a "Urinary Tract Infection Testing Panel on File."

241.    MD Labs did not ask OMNI to sign or otherwise approve the MD Labs testing protocol, to set up an OMNI-specific testing panel, protocol or standing order, or in any other way offer OMNI any opportunity to establish a more limited testing panel, protocol or standing order.

242.    Although MD Labs' standard order form provides a line asking for a physician signature, MD Labs processes the orders even if there is not a valid physician signature

52

(including appropriate credentials). All that MD Labs appears to require is that a physician or other provider's name and credentials be selected from amongst a list of possible providers at the top of the form.

243. Whether pursuant to protocol or otherwise, MD Labs' standard practice appears to be to perform follow up PCR tests on every bacteria culture generated during a BUC test, regardless of medical necessity.

244. As noted above, Medicare and other payers will not pay for a clinical laboratory test unless there is an order for the test that includes documentation that the test is medically necessary. Medicare does not pay for BUC tests for "screening" purposes (*i.e.*, without a specific clinical or laboratory reason to believe an infection exists) except in very limited circumstances not applicable here.

245. MD Labs' own standard test results form recognizes the importance of this medical justification, not just as a matter of Medicare payment rules, but also as a clinical matter, noting: "The presence of bacteria without concordant patient symptoms is typically indicative of a false positive or a contaminated specimen."

246. Yet, MD Labs routinely conducts BUC tests, and its full panel of follow up DNA bacterial identification tests even when the physicians' order provides no medical justification for the culture (either results of an initial urinalysis or other symptoms or reasons to perform the culture).

247. Further, MD Labs conducts a full panel of follow up DNA-based bacterial identification tests (notwithstanding the fact that the base BUC code includes bacterial identification and quantification) even when the initial bacterial culture: (a) was negative –

indicating that there were no bacteria present to identify; or (b) produced a bacterial colony count that was either too small to be clinically significant or was a contaminated culture.

248.    Conducting follow-up bacterial identification tests on negative cultures is never medically necessary – there is nothing there to test so there is no result that will give additional clinically useful information.

249.    For similar reasons, conducting follow-up bacterial identification tests when culture yield or insignificant colony count ("CC") is generally not medically necessary, because bacterial species identification is itself rarely clinically significant.  The primary clinical utility of species identification is to allow antibiotic resistance testing.  But if a bacterial colony identified in the culture is too small to be clinically significant, then resistance sensitivity testing should not be performed.

250.    MD Labs' own reports indicate as much, routinely noting the futility of antibiotic susceptibility testing where an identified colony count is at or below clinical thresholds with language such as: (1) "The identified organism was detected by qPCR; due to insufficient growth, susceptibility testing cannot be performed."; or (2) "*Enterococcus faecalis* was detected by qPCR; due to no growth, susceptibility testing cannot be performed."

251.    In addition, the standard protocol for a culture that shows no growth or insufficient growth after the initial 24 hours is to wait an additional day to see if there is a slow-growing bacteria.

252.    Yet MD Labs does not appear to be following this protocol regularly.  For a substantial number of the tests MD Labs did for OMNI's patients, the results of "negative" or "low growth" test results were reported within a day of the initial processing of the urine sample.

(Tests that were subjected to susceptibility testing, on the other hand, typically took two or more days.)

253.    MD Labs should have allowed those cultures to incubate for an additional day before reporting them as negative or low growth – and certainly should have allowed the additional time for growth before conducting any additional bacterial identification or quantification tests (let alone their $700 mega-DNA panel).

254.    By the use of the PCR technology, MD Labs claims it can reduce the 48 to 72 hours required to conduct a standard BUC test by up to 24 hours.  Any clinical significance of such a reduction is undermined, however, by the fact that much of this promised time-savings is typically lost because the urine samples to be tested must be shipped to MD Labs in Nevada before the process can begin.  Moreover, MD Labs' apparent truncation of the standard culture period (especially the follow up period for no- or low-growth cultures) undermines the validity of any of its test results.

255.    MD Labs' standard billing practice, which is demonstrated in the claims it submitted to government and commercial payers as well as in the advice it gave OMNI, is to bill $10 for the initial culture using CPT code 87086 ("Culture, bacterial; quantitative, colony count, urine").  The Medicare allowed amount for this code was $9.96 (which was then reduced to $9.76 to reflect the effect of the federal budget sequestration law) when MD Labs was paid by Medicare for this code on June 22, 2018.

256.    For each of the follow up PCR bacterial identification tests, MD Labs bills $44.  MD Labs bills three tests using CPT codes specific to those tests: 87481 ("Infectious agent detection by nucleic acid (DNA or RNA); Candida species, amplified probe"); 87500 ("Vancomycin DNA amp probe"); and 87653 ("Infectious agent detection by nucleic acid (DNA

or RNA); Streptococcus, group B, amplified probe technique"). The Medicare allowed amount for these codes, as well as 87798, was $43.33 (reduced to $42.46 because of sequestration) when MD Labs was paid by Medicare for this code on June 22, 2018.

257. The remaining fourteen PCR test are billed using a catchall CPT code, 87798 ("Infectious agent detection by nucleic acid (DNA or RNA), not otherwise specified; amplified probe technique, each organism").

258. If susceptibility testing is done, MD Labs bills $11, using CPT code 87176 ("Susceptibility study"). The Medicare allowed amount for this code was $10.67 (reduced to $10.46 because of sequestration) when MD Labs was paid by Medicare for this code on June 22, 2018.

259. MD Labs also improperly uses Modifier "91" when it bills CPT code 87798. Modifiers are used on claims forms to provide addition information to justify a claim for payment. In this case, both modifiers 91 and 59 are used when the same CPT codes is billed multiple times on the same day.

### 2. *Pharmacogenetic Tests*

260. MD Labs' Rxight pharmacogenetic tests for 79 conditions on 20 genes and variants. *See* https://www.ncbi.nlm.nih.gov/gtr/tests/552573/ (visited October 22, 2018. It is offered as a single panel, but MD Labs bills, and encourages others to bill, individual tests separately regardless of medical necessity, as described in greater detail below.

261. At noon on August 10, 2018 OMNI's Dr. Deligdish and Brad Smith spoke with MD Labs' Kelly Hall for approximately 30 minutes. Ms. Hall explained MD Labs' Rxight pharmacogenetics, which she had been in charge of since January 2018.

262.    Ms. Hall had been introduced to Dr. Deligdish and Mr. Smith by MD Labs' Jack Todd as "one of my reps who is running my PGX business with Memorial and Baptist Hospitals in South Florida."

263.    After explaining the test itself, she recommended that any patient receiving or who might be prescribed one of more than 50 drugs with FDA black-box warnings be tested using the MD Lab pharmacogenetic panel.

264.    Ms. Hall reported MD Labs has pharmacists on staff who are certified in pharmacogenetics, who as part of the program, will both interpret and discuss the results of the test with the patient. As discussed above, she also offered that MD Labs would pay OMNI $50 per report to provide this service – even though it was not billable to Medicare or most other insurers.

265.    Ms. Hall then brought up the topic of reimbursement. She stated that Medicare only pays for pharmacogenetic testing for four drugs (Amitriptyline, Nortriptyline, Clopidogrel and Tetrabenazine), and even for those, only for specific diagnoses.

266.    For example, she stated that Medicare will only pay for pharmacogenetic testing for Nortriptyline and Amitriptyline with a diagnosis of depression.

267.    Ms. Hall suggested, however, a way to work around this rule. She stated that one need not actually prescribe these drugs to use them as a justification for pharmacogenetic testing. Instead, she suggested a physician need only be "considering" treating patients for depression with these drugs. Thus, she suggested one can use these drugs as a pretext for ordering pharmacogenetic testing at any time.

268.    Knowing that Dr. Deligdish is a hematologist / oncologist, she suggested that all "oncology patients are depressed," and so "to get paid" "you say you are considering it."

269.     Ms. Hall suggested that this was enough to justify ordering the full MD Labs Rxight test.

270.     She also claimed that the FDA recommended performing pharmacogenetic testing, and that it was required for any patient receiving not only these four drugs but also any of the fifty drugs listed on the Rxight marketing material.

271.     She acknowledged, however that, despite her claim that the FDA required pharmacogenetic testing for all fifty of the drugs covered by the Rxight test, nonetheless Medicare did not pay for the testing except for the four drugs discussed above.

272.     Taken together, she strongly suggested that doctors should falsely state that they were ordering the test for the four covered drugs / diagnoses as a pretext to justify ordering the entire panel.

273.     On August 18, 2018, Ms. Hall emailed OMNI's Dr. Deligdish to provide follow up information about the pharmacogenetics program.  She again discussed the "personalized medication review" program – which would pay an OMNI pharmacist $50 per test to counsel patients.

274.     She also forwarded a PowerPoint, titled "Reimbursement," that highlighted the drugs and diagnoses necessary to support Medicare reimbursement for the Rxight test.

275.     Among other practical questions she posed to OMNI "to facilitate implementation," she asked:

> 1. We need to determine the population you wish to implement the testing with.  A few of the options for that are:
>    - Only those where there is insurance coverage
>    - All patients who have a prescription drug where there is a black box warning
>    - All patients who are currently taking 5 or more prescriptions (polypharmacy)
>    - Other

276.    She never suggested, or offered, the option to test only those patients who were actually taking or being considered for medications covered by Medicare (or other payers) or the use of a test panel limited to the genes connected (whether coved by Medicare or otherwise) to drugs that the patient in question was actually taking or considering.

277.    On August 24, 2018, Ms. Hall again emailed OMNI personnel about setting up the pharmacogenetic testing program. She stated that: "In a few moments, I will also forward the CPT codes that we use for billing. The ICD10 code would be whichever one you choose when you send us the requisition. That information for billing is attached here for your reference."

278.    The "requisition form" gave referring physicians the option of choosing one of the four drugs that Medicare covers, or selecting "other." Notably, no option was provided to order any panel other than the full Rxight panel.

279.    Notwithstanding the fact that the requisition form was focused on the four drugs that Medicare covers, the billing information Ms. Hall provided to OMNI covered the entire Rxight panel. Shortly after promising "the CPT codes that we use for billing," she forwarded an email chain that started with an email from her to other MD Labs personnel:

> Good morning,
>
> Just met with Memorial [Hospital in South Florida] and they are thinking that they will do their own billing and just purchase the test from us. Therefore, they would like to know what they will receive from us as far as codes and a patient bill so they can process a claim.
>
> Please advise - thanks!

280.    Lori Martin, MD Labs' General Manager & Director of Hospital Pharmacogenetics replied:

> Here is the list of CPT Codes:
> 81225
> 81226

81227
81230
81231
81232
81291
81328
81335
81355
81479 times 10

I am attaching the Medicare LCD for MolDX that has the ICD-10 codes that Medicare sees as medically necessary with descriptions. I have highlighted the section with the codes.

281.    Notably, CPT codes 81225 and 81226 are for the Cyp2c19 and Cyp2d6 gene variants (the two for which pharmacogenetics can be covered by Medicare). Medicare pays $291.36 and $450.91, respectively for these tests.

282.    The remaining codes are for genes not covered by Medicare. CPT Code 81479 is a code for otherwise unlisted pharmacogenetic tests, and is generally only supposed to be billed one time per day.

283.    Medicare does not have an established rate for CPT Code 81479. If the remaining codes were all billed and paid, the total payment would be $1,944.67 for 2018.

### 3.  *Urine Drug Tests*

284.    MD Labs' fraudulent scheme with respect to the medical necessity of its urine drug tests is less creative than its schemes as to its BUC and PGX tests. It simply promotes the overuse of confirmatory drug tests regardless of the results of the initial screen or other clinically relevant facts, and, in those cases where confirmatory testing might be medically necessary, uses standing orders and an overly rigid order form to cause physicians and other providers to "order" more tests than are medically necessary.

285.    In a telephone call on August 13, 2018, MD Labs' Director of Sales, Howard

Clausen, explained MD Labs' UDT policy. He stated that, while other labs do initial screenings

and then confirm positive results, MD Labs' policy is to do initial screenings only if the

customer specifically requests it. Instead, MD Labs starts off doing "confirmation" testing for

fifty drugs on every sample.

286.    He attempted to justify this approach by arguing – falsely – that screening tests

have a 30% false positive rate for opioids.

287.    Nonetheless, regardless of the purported error rate for initial screenings, that does

not justify as medically necessary MD Labs' policy, which is to perform an overly broad panel

of confirmation tests, regardless of the results of the initial test and in fact whether or not an

initial POC test was done.

288.    MD Labs uses an initial "standing order" form as a key part of the fraud. It asks

its customer practices and labs to fill out at "Panel Customization Form" to use as a standing

order. The form states, at the bottom, "Unless explicitly state otherwise, I agree to have all

samples submitted to MD Labs to be tested and billed for the specified analytes." The majority

of the drugs / analytes are pre-marked with an "X" indicating the "most commonly requested

tests." Providers are encouraged to cross out any such "X" selections or add additional tests.

289.    Significantly, there is no option on the form to limit the ordering of any specific

test conditional on the results of an earlier or related test.

290.    Later, although MD Labs' testing order form offers the provider the opportunity

to identify any positive results from POC testing, and to indicate any drugs the patient is taking,

there is no option to conduct a limited panel of follow up tests based on those results. Instead,

the order form only allows the provider to order one of the pre-established panels.

291.    MD Labs also offered to conduct OMNI's initial screening tests, and allow OMNI to bill government-funded and commercial insurers for the tests.

292.    In a telephone call on August 24, 2018, MD Labs' Howard Clausen and Jack Todd noted the importance of OMNI having a clinical protocol setting forth the schedule for testing chronic pain patients. They stated that they could not "recommend" what OMNI should do, but could report "what others did." Under this guise, they test patients once a month if they were high risk and once a year if they were low risk.

293.    In an August 27, 2018 email, an OMNI employee recounted a conversation with Mr. Clausen about MD Labs' billing practices and advice to its customers who opted to bill for the services themselves as follows: "For Tox tests, the billing code is G0483. This is for a panel of 22-25 drug tests."

294.    In 2018, Medicare pays $246.92 for CPT Code G0483, which covers a panel of twenty-two or more urine drug tests.

295.    However, Medicare pays much less if fewer tests are medically necessary. Specifically, Medicare pays $114.43 for CPT Code G0480 (which covers 1 to 7 urine drug tests); $156.59 for G0481 (which covers 8 to 14 tests); and $198.74 for G0482 (which covers 15 to 21 tests).

296.    Thus, even where confirmation testing was medically necessary – which it often was not – MD Labs' scheme causes Medicare and other payers to pay at times more than twice as much as it would have paid for the medically necessary tests.

297.    In a telephone call on August 13, 2018, MD Labs' Director of Sales, Howard Clausen confirmed this analysis, stating that Medicare pays MD Labs $317 for its full UDT

confirmation testing. He further stated that Medicaid pays 40-70% of that amount, depending on the state.

### C.    MD Labs' Fraudulent Scheme's Impact on Private Insurers

298.    The states of California and Illinois have enacted Insurance Fraud Prevention Acts that permit Relator to bring a qui tam action to recover for fraudulent claims submitted to *commercial* insurance companies in those states. *See* Counts XXXII and XXXIII below.

299.    Although the above paragraphs focus primarily on the impact of Defendants' practices on government-funded healthcare programs, the same fraudulent practices also defraud private insurance companies in the same manner that the practices defraud the federal and state governments.

300.    The practices alleged herein are systematic, nationwide practices that defraud private insurance companies that reimburse clinical laboratory tests in every state where defendant conducts business, including California and Illinois.

<u>**Count I**</u>
<u>**Federal False Claims Act**</u>
<u>**31 U.S.C. §§ 3729(a)(1)(A)-(C) and (G)**</u>

301.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

302.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

303.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

304.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

305.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the United States and to deceive the United States for the purpose of getting the United States to pay or allow false or fraudulent claims.

306.    By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

307.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

308.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

309.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

**Count II**
**Alaska Medical Assistance False Claims and Reporting Act**
**AK Stat § 09.58.010**

310.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

311.    This is a claim for treble damages and penalties under the Alaska Medical Assistance False Claims and Reporting Act.

312.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Alaska State Government for payment or approval.

313.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Alaska State Government to approve and pay such false and fraudulent claims.

314.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Alaska State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

315.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Alaska State Government.

316.    The Alaska State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

317.    By reason of Defendants' acts, the State of Alaska has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

318.    Additionally, the Alaska State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count III
## California False Claims Act
## Cal. Gov't Code § 12651(a)(1)-(3), (7)

319.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

320.    This is a claim for treble damages and penalties under the California False Claims Act.

321.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

322.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

323.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the California State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

324.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the California State Government.

325.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

326.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

327.    Additionally, the California State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count IV**
**Colorado Medicaid False Claims Act**
**C.R.S.A. § 25.5-4-305**

328.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

329.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

330.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

331.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

332.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Colorado State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

333.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Colorado State Government.

334.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

335.    By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

336.    Additionally, the Colorado State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count V**
**Connecticut False Claims Act**
**Conn. Gen. Stat. § 4-275**

337.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

338.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

339.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

340.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

341.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Connecticut State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

342.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Connecticut State Government.

343.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

344.    By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

345.    Additionally, the Connecticut State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count VI
### Delaware False Claims and Reporting Act
### 6 Del. C. § 1201

346.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

347.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

348.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

349.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

350.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Delaware State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

351.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Delaware State Government.

352.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

353.    By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

354.    Additionally, the Delaware State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count VII
## District of Columbia Procurement Reform Amendment Act
## D.C. Code § 2-381.02

355.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

356.    This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

357.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

358.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

359.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the District of Columbia Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

360.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the District of Columbia Government.

361.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

71

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

362.    By reason of Defendants' acts, the District of Columbia Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

363.    Additionally, the District of Columbia Government is entitled to the maximum penalty for each and every violation alleged herein.

<b><u>Count VIII</u></b><br>
<b><u>Florida False Claims Act</u></b><br>
<b><u>Fla. Stat. Ann. § 68.082</u></b>

364.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

365.    This is a claim for treble damages and penalties under the Florida False Claims Act.

366.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

367.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

368.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Florida State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

369.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Florida State Government.

370.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

371.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

372.    Additionally, the Florida State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count IX
## Georgia False Medicaid Claims Act
### Ga. Code Ann. § 49-4-168.1

373.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

374.    This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

375.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

376.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

377.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Georgia State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

378.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Georgia State Government.

379.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

380.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

381.    Additionally, the Georgia State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count X
### Hawaii False Claims Act
### Haw. Rev. Stat. § 661-21

382.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

383.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

384.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

385.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

386.     By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Hawaii State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

387.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Hawaii State Government.

388.     The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

389.     By reason of Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

390.     Additionally, the Hawaii State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XI**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. § 175/3**

391.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

392.     This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

393.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

394.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

395.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Illinois State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

396.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Illinois State Government.

397.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

398.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

399.    Additionally, the Illinois State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XII
## Indiana False Claims and Whistleblower Protection Act
## Ind. Code § 5-11-5.5-2

400.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

401.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

402.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

403.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

404.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Indiana State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

405.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Indiana State Government.

406.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

407.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

408.    Additionally, the Indiana State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XIII**
**Iowa False Claims Act**
**I.C.A. § 685.2**

409.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

410.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

411.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

412.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

413.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Iowa State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

414.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Iowa State Government.

415.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

416.    By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

417.    Additionally, the Iowa State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XIV
## Louisiana Medical Assistance Programs Integrity Law
## La. R.S. § 46:437.1 *et seq.*

418.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

419.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

420.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

421.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

422.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Louisiana State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

423.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Louisiana State Government.

424.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

425.    By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

426.    Additionally, the Louisiana State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XV
## Maryland False Claims Act
## Md. Code Health General § 2-602

427.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

428.    This is a claim for treble damages and penalties under the Maryland False Claims Act.

429.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

430.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

431.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Maryland State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

432.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Maryland State Government.

433.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

434.    By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

435.    Additionally, the Maryland State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XVI**
**Massachusetts False Claims Act**
**ALM Ch. 12 § 5B**

436.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

437.    This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

438.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government of the Commonwealth of Massachusetts for payment or approval.

439.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government of the Commonwealth of Massachusetts to approve and pay such false and fraudulent claims.

440.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Government of the Commonwealth of Massachusetts and to deceive the Commonwealth for the purpose of getting the Commonwealth to pay or allow false or fraudulent claims.

441.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Government of the Commonwealth of Massachusetts.

442.    The Government of the Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

443.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

444.    Additionally, the Government of the Commonwealth of Massachusetts is entitled to the maximum penalty for each and every violation alleged herein.

**Count XVII**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws § 400.601**

445.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

446.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

447.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

448.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

449.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Michigan State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

450.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Michigan State Government.

451.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

452.    By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

453.    Additionally, the Michigan State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XVIII
### Minnesota False Claims Act
### Minn. Stat. § 15C.02

454.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

455.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

456.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

457.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

458.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Minnesota State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

459.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Minnesota State Government.

460.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

461.. By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

462. Additionally, the Minnesota State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XIX**
**Montana False Claims Act**
**M.C.A. § 17-8-403**

463. Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

464. This is a claim for treble damages and penalties under the Montana False Claims Act.

465. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

466. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

467. By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Montana State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

468.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Montana State Government.

469.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

470.    By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

471.    Additionally, the Montana State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XX
## Nevada False Claims Act
## Nev. Rev. Stat. § 357.040

472.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

473.    This is a claim for treble damages and penalties under the Nevada False Claims Act.

474.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

475.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

476.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Nevada State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

477.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Nevada State Government.

478.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

479.    By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

480.    Additionally, the Nevada State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXI**
**New Jersey False Claims Act**
**N.J.S.A. § 2A:32C-3**

481.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

482.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

483.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

484.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

485.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the New Jersey State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

486.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Jersey State Government.

487.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

488.    By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

489.    Additionally, the New Jersey State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXII
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-4

490.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

491.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

492.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

493.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

494.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the New Mexico State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

495.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New Mexico State Government.

496.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

497.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

498.    Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXIII**
**New York False Claims Act**
**N.Y. State Fin. Law § 189**

499.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

500.    This is a claim for treble damages and penalties under the New York False Claims Act.

501.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

502.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

503.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the New York State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

504.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the New York State Government.

505.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

506.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

507.    Additionally, the New York State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXIV**
**North Carolina False Claims Act**
**N.C.G.S.A. § 1-607**

508.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

509.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

510.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

511.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

512.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the North Carolina State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

513.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the North Carolina State Government.

514.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

515.    By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

516.    Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXV**
**Oklahoma Medicaid Program Integrity Act**
**56 Okla. St. Ann. § 5053.1**

517.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

518.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

519.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

520.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

521.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Oklahoma State

Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

522.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Oklahoma State Government.

523.     The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

524.     By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

525.     Additionally, the Oklahoma State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXVI
### Rhode Island State False Claims Act
### Gen. Laws 1956, § 9-1.1-3

526.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

527.     This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

528.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

529.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

530.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Rhode Island State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

531.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Rhode Island State Government.

532.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

533.    By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

534.    Additionally, the Rhode Island State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXVII**
**Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. § 71-5-182**

535.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

536.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

537.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims under Medicaid program to the Tennessee State Government for payment or approval.

538.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

539.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims under Medicaid program to the Tennessee State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

540.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Tennessee State Government.

541.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

542.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

543.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XXVIII
## Texas Medicaid Fraud Prevention Law
## Tex. Hum. Res. Code Ann. §36.002

544.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

545.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

546.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

547.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

548.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Texas State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

549.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Texas State Government.

550.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

551.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

552.    Additionally, the Texas State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXIX
### Vermont False Claims Act
### 32 V.S.A. § 632

553.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

554.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

555.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

556.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Vermont State Government to approve and pay such false and fraudulent claims.

557.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Vermont State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

558.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Vermont State Government.

559.    The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

560.    By reason of Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

561.    Additionally, the Vermont State Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXX
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3

562.    Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

563.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

564.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Government of the Commonwealth of Virginia for payment or approval.

565.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government of the Commonwealth of Virginia to approve and pay such false and fraudulent claims.

566.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Government of the

Commonwealth of Virginia and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

567.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Government of the Commonwealth of Virginia.

568.     The Government of the Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

569.     By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

570.     Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every violation alleged herein.

### Count XXXI
### Washington False Claims Act
### RCW § 74.66.020

571.     Relator realleges and incorporates by reference the allegations contained in each paragraph above as though fully set forth herein.

572.     This is a claim for treble damages and penalties under the Washington False Claims Act.

573.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

574.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

575.     By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit false claims to the Washington State Government and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims.

576.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money to the Washington State Government.

577.     The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

578.     By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

579.     Additionally, the Washington State Government is entitled to the maximum penalty for each and every violation alleged herein.

**Count XXXII**
**California Insurance Frauds Prevention Act**
**California Insurance Code § 1871.7**

580.     Relator repeats and realleges each and every allegation contained in each paragraph above as though fully set forth herein.

581.    This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended (referred to in this Count as "the Act"). The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code §1871.7(b).

582.    Subsection (e) of Cal. Ins. Code §1871.7 provides for a *qui tam* civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code §1871.1(e). The *qui tam* provision was patterned after the Federal False Claims Act, 31 U.S.C. §§3729-32, and the California False Claims Act, Cal. Gov't Code §§12650 *et seq.*

583.    Subsection (b) of Cal. Ins. Code §1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others:

(a)    It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

\*        \*        \*        \*        \*        \*

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

\*        \*        \*        \*        \*        \*

(b)    It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code § 550.

584.    By virtue of the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for health care benefits, in violation of Penal Code §550(a).

585.    By virtue of the acts described in this Complaint, Defendants also concealed and/or failed to disclose information that would have affected their right to receive reimbursement, in violation of Penal Code §550(b).

586.    Each claim for reimbursement that was inflated as a result of defendant's illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

587.    Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by defendant, paid and continue to pay the claims that would not be paid but for defendant's unlawful conduct.

588.    The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code §1871.7.    Additionally, the California State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XXXIII
### Illinois Insurance Claims Frauds Prevention Act
### 740 Ill. Comp. Stat. §92

589.    Relator repeats and realleges each and every allegation contained in each

paragraph above as though fully set forth herein.

590.    This is a claim for treble damages and penalties under the Illinois Insurance

Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92.

591.    Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:

> A person who violates any provision of this Act or Article 46 of the
> Criminal Code of 1961 shall be subject, in addition to any other penalties that
> may be prescribed by law, to a civil penalty of not less than $5,000 nor more than
> $10,000, plus an assessment of not more than 3 times the amount of each claim
> for compensation under a contract of insurance.

*Id.*

592.    Article 46 of the Illinois Criminal Code, referenced in the above-quoted section,

provides criminal penalties for any person who commits the offense of insurance fraud, defined

in the statute as follows:

> (a)    A person commits the offense of insurance fraud when he or she
> knowingly obtains, attempts to obtain, or causes to be obtained, by deception,
> control over the property of an insurance company or self-insured entity by the
> making of a false claim or by causing a false claim to be made on any policy of
> insurance issued by an insurance company . . . .

720 Ill. Comp. Stat. §5/46-1(a).

593.    Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides

for a qui tam civil action in order to create incentives for private individuals to prosecute

violations of the statute.  Subsection 15(a) provides: "An interested person, including an insurer,

103

may bring a civil action for a violation of this Act for the person and for the State of Illinois. The action shall be brought in the name of the State." 740 Ill. Comp. Stat. §92/15(a).

594.    By virtue of the conduct described in this Complaint, Defendants committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act:  knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat. §5/46-1(a).

595.    As a result of such conduct, Defendants have received illegal profits to which it was not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

596.    The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. §92. Additionally, the Illinois State Government is entitled to the maximum penalty for each and every violation alleged herein.

## PRAYER

WHEREFORE, Relator prays for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*, and the counterpart provisions of the state statutes set forth above;

2.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 31 U.S.C. §3729;

3.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Alaska has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of AK Stat § 09.58.010(c);

4.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Cal. Govt. Code §12651(a);

5.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Col Rev. Stat. 25.5-4-305;

6.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Conn. Gen. Stat. § 4-275;

7.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 6 Del. C. §1201(a);

8.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of D.C. Code § 2-381.02;

9.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Fla. Stat. Ann. §68.082(2);

10.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Georgia Code Ann. §49-4-168.1;

11.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Haw. Rev. Stat. §661-21;

12.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 740 Ill. Comp. Stat. §175/3;

13.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Ind. Code §5-11-5.5-2;

14.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of I.C.A. § 685.2;

15.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of La. R.S. § 46:437.1 *et seq.*;

16.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Maryland has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Md. Health-Gen. Code Ann. §§ 2-602;

17.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Massachusetts has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of ALM Ch. 12 § 5B;

18.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendant's actions,

plus the maximum civil penalty allowed for each violation of Mich. Comp. Laws §400.601 *et seq.*;

19.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of the Minn. Stat. § 15C.02;

20.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Mon. Code Anno. § 17-8-403;

21.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Nev. Rev. Stat. Ann. §357.040;

22.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of N.J. Stat. §2A:32C-3;

23.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of N.M. Stat. Ann. §27-14-4;

24.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of N.Y. State Fin. §189;

25.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of the NC Gen. Stat. § 1-607;

26.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 63 Okla. St. §5053.1;

27.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of R.I. Gen. Laws §9-1.1-3;

28.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Tenn. Code Ann. § 71-5-182;

29.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Tex. Hum. Res. Code Ann. §36.002;

30.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Vermont has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of 32 V.S.A. § 632;

31.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation of Va. Code Ann. §8.01-216.3;

32.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of defendant's actions, plus the maximum civil penalty allowed for each violation Rev. Code Wash. (ARCW) § 74.66.020;

33.    that this Court enter judgment against Defendants in an amount equal to three times the amount of each claim for compensation submitted by Defendants in violation of 740 Ill. Comp. Stat. §92, plus the maximum civil penalty allowed for each violation of 740 Ill. Comp. Stat. §92;

34.    that Relator be awarded the maximum amount allowed pursuant to §3730(d) of
the False Claims Act, and the equivalent provisions of the state statutes set forth above;

35.    that Relator be awarded all costs of this action, including attorneys' fees and
expenses; and

36.    that Relator recover such other relief as the Court deems just and proper.


Dated:  December 11, 2018


By:    _____

Eric G. Penley (BBO #678920)
epenley@preti.com
PRETI FLAHERTY BELIVEAU
  & PACHIOS LLP
60 State Street, Suite 1100
Boston, MA 02109
Tel: (617) 226-3800
Fax: (617) 226-3801

Timothy P. McCormack (BBO #650847)
tmccormack@vblawfirm.com
VAN MEER & BELANGER PA
215 Commercial St., 4th Floor
Portland, ME 04101
Tel: (207) 871-7500
Fax: (207) 871-7505

Gregory P. Hansel (*pro hac vice
application to be filed*)
ghansel@preti.com
Michael S. Smith (BBO #669983)
msmith@preti.com
PRETI FLAHERTY BELIVEAU
  & PACHIOS LLP
One City Center
Portland, ME 04101
Tel: (207) 791-3000
Fax: (207) 791-3111

*Attorneys for Relator*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury on all claims so triable.

Dated:  December 11, 2018

By:    _____

Eric G. Penley (BBO #678920)
epenley@preti.com
PRETI FLAHERTY BELIVEAU
  & PACHIOS LLP
60 State Street, Suite 1100
Boston, MA 02109
Tel: (617) 226-3800
Fax: (617) 226-3801

Timothy P. McCormack (BBO #650847)
tmccormack@vblawfirm.com
VAN MEER & BELANGER PA
215 Commercial St., 4th Floor
Portland, ME 04101
Tel: (207) 871-7500
Fax: (207) 871-7505

Gregory P. Hansel
(*pro hac vice application to be filed*)
ghansel@preti.com
Michael S. Smith (BBO #669983)
msmith@preti.com
PRETI FLAHERTY BELIVEAU
  & PACHIOS LLP
One City Center
Portland, ME 04101
Tel: (207) 791-3000
Fax: (207) 791-3111

*Attorneys for Relator*

110