UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
OMNI HEALTHCARE, INC. ET AL,        )
                                    )
         Plaintiffs,                )
                                    )       Civil Action
v.                                  )       No. 18-cv-12558-PBS
                                    )
MD SPINE SOLUTIONS LLC, ET AL,      )
                                    )
         Defendants.                )
_____)

**MEMORANDUM AND ORDER**

August 23, 2022

Saris, D.J.

**INTRODUCTION**

Relator Omni Healthcare alleges that Defendants MD Labs and its owners Denis Grizelj and Matthew Rutledge submitted or caused the submission of false claims for Urinary Tract Infection ("UTI") testing. Relator asserts claims under the federal False Claims Act ("FCA") and 32 state laws. The United States and the state plaintiffs have reached settlements on other portions of the case concerning urine drug testing ("UDT"). They have declined to intervene as to the remaining allegations that pertain to UTI testing. Defendants have moved to dismiss the Amended Complaint.

For the reasons provided below, the Court **DENIES** the motion to dismiss (Dkt. 84) as to the FCA claim regarding the medically

[1]

unnecessary testing allegations and **DENIES** the motion to dismiss the analogous state law claims.

## BACKGROUND

### I. Procedural Background

On December 12, 2018, Relator filed a Complaint against MD Labs and other unnamed medical providers. See Dkt. 1. After an investigation by the Department of Justice, the Defendants entered into a settlement agreement with the United States and Relator on October 20, 2021. The United States filed a notice under seal of its decision to intervene in part of the action, for the purposes of settlement, concerning UDT services. The United States declined to intervene with respect to Relator's other claims. On February 24, 2022, the Court entered the parties' proposed order dismissing all claims against MD Labs and its owners except those claims based upon the alleged false claims for UTI testing. See Dkt. 68.

On March 21, 2022, MD Labs moved to dismiss the Complaint for failure to state a claim. See Dkt. 69, 70. On April 4, 2022, Relator filed an Amended Complaint. See Dkt. 71. Defendants moved to dismiss on May 18, 2022. See Dkt. 84. In the 105-page Amended Complaint, Relator provided extensive factual background on multiple theories of liability, namely medically unnecessary testing, kickbacks, and improper billing codes. At a hearing on

August 4, 2022, Relator acknowledged that this was a case about submitted claims for medically unnecessary testing. The following factual background therefore focuses on the relevant allegations.

II. **Factual Background**

Relator is a medical professional group located in Florida made up of more than twenty medical professionals in varying specialties at seven locations. Defendant MD Spine Solutions LLC, doing business as MD Labs ("MD Labs") operates a clinical medical laboratory headquartered in Reno, Nevada. It specializes in bacterial urine culture testing, pharmacogenetic testing, and urine toxicology testing. Matthew Rutledge is the cofounder and president of MD Labs. Denis Grizelj is the cofounder and CEO of MD Labs. Together, they own 95% of MD Labs.

*1. Settlement Agreement*

MD Labs and its owners Grizelj and Rutledge entered into a settlement agreement with the government and Relator on October 20, 2021. In that agreement, MD Labs and its owners admitted that between 2015 and 2019, MD Labs regularly billed federal programs for medically unnecessary urine drug tests. MD Labs performed both presumptive testing, a test that provides rapid qualitative results, and confirmatory testing, an expensive verification test to quantitatively confirm the results of the

presumptive test. By performing these tests around the same time, MD Labs could provide both results to doctors and bill for an irrelevant test. Per the Settlement Agreement, MD Labs and Owners will pay the government and various states between $11.6 million to $16 million. Relator retains claims against MD Labs and its owners for allegations relating to the submission of false claims for urinary tract infection testing, discussed below.

    *2. UTI Panel Testing*

Relator alleges that MD Labs and its owners carried out a fraudulent scheme involving a clinical diagnostic test known as the Bacterial Urine Culture ("BUC") test. The test is performed to establish the cause of a UTI, an infection that affects almost half the population at least once in their lifetime and which accounts for approximately $3.5 billion in annual healthcare spending. While medical providers have several tests available to them for screening patients with a UTI, including urinalysis, "[t]he BUC is the 'gold standard' for establishing a diagnosis of UTIs, because it allows the quantification and identification of the uropathogenic species, and subsequent testing to determine whether the bacteria in question is resistant to one or more antibiotics." Dkt. 71 ¶ 159. According to the Medicare payment policy, known as National Coverage Determination, a BUC may be medically necessary if the patient

exhibits symptoms of a UTI such as fever, chills, pain while urinating, discolored urine, or frequent urge to urinate. To conduct a BUC, a sample of urine is collected, and the culture is incubated for 24 hours, allowing time for bacteria to grow. After 24 hours, the lab will record any bacteria that have grown, the type of bacteria, and the size of the bacterial colony. This initial BUC test is billed to Medicare using CPT Code 87086, and Medicare paid $9.96 for this code in 2018.

Relator alleges that MD Labs bills Medicare and other payers for the initial bacterial culture, but then additionally submits bills for sophisticated identification tests using polymerase chain reaction ("PCR") technology. MD Labs claims that the PCR tests produce more comprehensive and accurate results. Relator alleges that the purported "greater specificity and accuracy" is not "clinically useful (and thus not medically necessary) because any incremental information [the PCR tests] provide does not affect the treatment the patient will receive." Dkt. 71 ¶ 227. Medicare pays $43 for one PCR DNA test. MD Labs' standard practice is to bill for 17 of those DNA tests whenever a BUC test is ordered for a urinary tract infection. By billing additional tests, Medicare pays MD Labs approximately $700 for tests that Relator alleges "produce no clinically useful information beyond what was available for the initial urine culture and conventional bacterial identification" and which

[5]

Medicare reimburses around $10. MD Labs bills for this full panel of 17 tests even when the initial culture is negative, meaning no bacteria was present in the sample to test. MD Labs provides a marketing "fact sheet" for doctors that explains that its PCR test identifies 17 different pathogens with 100% accuracy, compared to the 71% accuracy in standard BUC testing that can only identify 5 to 6 pathogens. The fact sheet did not explain that the 17 different pathogens are identified using 17 different tests, each one separately billed to Medicare in addition to the initial culture test.

Relator provides two examples of allegedly false claims submitted through these "medically unnecessary" testing panels. Dkt. 71 ¶ 224. Around May 29, 2018, MD Labs performed 17 different PCR tests on a Medicare patient. These tests were analyzed by MD Labs at its facility in Reno, Nevada on May 30, 2018. MD Labs then submitted a false claim for payment of the tests in the amount of $699.58, which was paid by Medicare on June 15, 2018 under the internal control number 18F610406900. Again, on or about May 29, 2018, MD Labs performed 17 PCR tests on a Medicare patient and processed those tests at its facility in Reno on May 30, 2018. MD Labs subsequently submitted a claim for payment in the amount of $699.58, which was paid on June 22, 2018 under Medicare internal control number 221815903990. Relator alleges that MD Labs' standard practice is to perform

PCR tests after every urine culture test, whether it is medically necessary to do so or not. Moreover, MD Labs conducts this panel of follow-up tests "even when the initial bacterial culture: (a) was negative – indicating that there were no bacteria present to identify; or (b) produced a bacterial colony count that was either too small to be clinically significant or was a contaminated culture." Dkt. 71 ¶ 235.

## LEGAL STANDARD

Fraud claims must meet the heightened pleading standard of Rule 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 228 (1st Cir. 2004) (holding that claims under the FCA must satisfy Rule 9(b)). "The particularity requirement means that a complaint must specify 'the time, place, and content of an alleged false representation.'" United States ex. rel. Kelly v. Novartis Pharms. Corp., 827 F.3d 5, 13 (1st Cir. 2016) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)). Relators "must allege the 'who, what, when, where, and how of the alleged fraud.'" Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 31 (1st Cir. 2016) (quoting United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 123 (1st Cir. 2013)).

[7]

**DISCUSSION**

**I.     False Claims Act**

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," id. § 3729(a)(1)(B); who conspires to commit violations of the FCA, see id. § 3729(a)(1)(C); or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," id. § 3729(a)(1)(G). "[F]raud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." Hagerty, 844 F.3d at 31. "The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Universal Health Servs., Inc. v. United States, 579 U.S. 176, 194 (2016) (internal citation omitted). Thus, to establish an FCA claim, Relator must show knowledge, falsity, and materiality.

**A.     Falsity**

"Evidence of an actual false claim is 'the sine qua non of a False Claims Act violation.'" Karvelas, 360 F.3d at 225 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir.2002)). A relator "may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery." Karvelas, 360 F.3d at 231. "Because FCA liability attaches only to false claims, merely alleging facts related to a defendant's alleged misconduct is not enough." Ge, 737 F.3d at 124 (citing Karvelas, 360 F.3d at 225). The First Circuit has identified a number of types of information that contribute to the particularity of the allegations, including

> the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices.

Karvelas, 360 F.2d at 233.

Relator alleges several aspects of the overarching scheme—overly broad panel testing, misuse of modifier codes, kickbacks—but only provides examples of submitted claims for the panel testing. The examples provide the dates when the tests were received and analyzed by MD Labs, when they were billed to Medicare, and the code number they were billed under. The

[9]

defendants contend that these allegations should fail as well because Relator has merely declared that the PCR tests were medically unnecessary without specifically showing that the claims were false or that MD Labs knowingly submitted false claims.

The Amended Complaint alleges that the "greater specificity and accuracy" that the tests provide "are not clinically useful (and thus not medically necessary) because any incremental information they provide does not affect the treatment the patient will receive." Dkt. 71 ¶ 227. Further, Relator alleges that MD Labs conducted the full panel follow up even when the initial bacterial culture was negative, when the colony count was too small to be clinically significant, and when the culture was contaminated. The Amended Complaint explains that testing in these circumstances is never medically necessary.

"To certify the medical necessity of [laboratory] tests (or cause such tests to be certified), knowing that the tests necessarily entailed procedures which were deleterious, inferior, and pursued solely for profit, is to submit a false or fraudulent claim." U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 42 (D. Mass. 2000). Here, Relator has adequately pled falsity as to the medically unnecessary panels. The PCR follow-up testing did not change the treatment plan and

resulted in Medicare paying 60 to 70 times more than it would for a standard BUC test.

### 1. *Particularity as to the Individual Defendants*

MD Labs and its owners argue that the complaint fails to satisfy 9(b)'s particularity requirements as to each defendant. While Relator easily satisfies particularity as to MD Labs, the individually named defendants are a closer question. The original complaint named MD Labs and Doe Healthcare Providers 1-100 as defendants. See Dkt. 1. When the parties settled the urine drug test claims, the settlement was individually executed by Grizelj and Rutledge, and the settlement refers to them as co-founders, owners, and operators. See Dkt. 85-1 at 1. Relator relies on this settlement to support adding Grizelj and Rutledge as individual defendants in the Amended Complaint. The parties do not dispute that the Court can look to the Settlement Agreement, as it is incorporated into the Amended Complaint and the defendants attach it to their motion to dismiss.

The Amended Complaint repeatedly refers to allegedly fraudulent actions taken by "MD Labs & Owners." While Grizelj and Rutledge are named as the two co-founders and owners, the complaint does not name them individually in connection with any specific fraudulent actions. The Amended Complaint describes a fraudulent scheme carried out by MD Labs & Owners, and it cites

[11]

the Settlement Agreement in which Grizelj and Rutledge admit to being the operators of MD Labs. Though many settlements disclaim individual fault or knowledge, the Settlement Agreement in this case admits both:

> <u>MD Labs & Owners admit, acknowledge, and accept their responsibility</u> for the following facts. From January 1, 2015 through December 31, 2019, MD Labs offered its health care provider ("HCP") clients UDT, including presumptive UDT via an enzyme immuno-assay method and confirmatory UDT via a liquid chromatography mass spectrometry method. For those HCP clients who submitted orders to MD Labs for presumptive and confirmatory UDT, MD Labs performed both tests at or around the same time, and simultaneously reported the results of both tests to the HCP clients. For drug targets that are reliably detected by both presumptive and definitive testing methods, <u>MD Labs & Owners knew, as defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCPs would not use such presumptive test results</u> in their medical decisionmaking because MD Labs reported more precise confirmatory test results to the HCPs at the same time. Although the laboratory is not responsible for ordering tests, <u>MD Labs & Owners also knew, as defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCP clients could not have reviewed such presumptive test results</u> for those drug targets for which presumptive testing was available prior to ordering confirmatory UDT. Absent HCP-designated reflex orders in certain situations or clear orders from HCPs, for example, this confirmatory testing was not medically reasonable and necessary. Yet, from January 1, 2015 through December 31, 2019, <u>MD Labs & Owners improperly billed, or caused to be billed</u>, Federal Health Care Programs for presumptive and confirmatory UDT that MD Labs simultaneously reported to HCP clients, without HCP-designated reflex orders in place.

Dkt. 85-1 at 3-4 (emphasis added). The Court may consider the Settlement Agreement and the individual defendants' acknowledgements within it. Relator has alleged that these individual defendants own 95% of MD Labs, they operate the

[12]

company of approximately 200 employees, and they have previously admitted responsibility to knowingly carrying out a similar scheme in connection with their UDT testing. The Court finds that Relator has plausibly alleged that Grizelj and Rutledge knew of and, through their operational role, were responsible for the alleged medically unnecessary UTI testing in the Amended Complaint.

### B. Materiality

"The materiality standard is demanding," and materiality "cannot be found where noncompliance is minor or insubstantial." Universal Health Servs., Inc., 579 U.S. at 194. The Supreme Court offered guidance on which factors would affect materiality:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Id. at 194-95. In sum, the Court advised looking "to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 193; see also United States ex rel.

[13]

Escobar v. Universal Health Servs., Inc., 842 F.3d 103, 110 (1st Cir. 2016) (quoting United States ex rel. Winkelman et al. v. CVS Caremark Corp., 827 F.3d 201, 211 (1st Cir. 2016)) ("[T]he fundamental inquiry is 'whether a piece of information is sufficiently important to influence the behavior of the recipient.'").

Relator argues that it has satisfied the materiality standard by alleging that "[t]he Government, unaware of the falsity of the records, statements and claims made or caused to be made by [Defendants] paid and continues to pay the claims that would not be paid but for [Defendants'] illegal conduct." Dkt. 93 at 17 (quoting Dkt. 71 ¶ 257). Moreover, Relator avers that the settlement of the closely related UDT claims confirms that the government believes these types of false claims are material. The defendants point out that Relator "does not allege that Government payers 'consistently refuse[] to pay claims in the mine run of cases based on' PCR testing for UTIs." Dkt. 85 at 17(quoting Universal Health Servs., Inc., 579 U.S. at 195). Moreover, the defendants contend that by resolving other allegations and expressly declining to intervene on the UTI claims, the government signaled that the claim is not material.

Section 1395y works in Relator's favor, explaining that Medicare and other providers will only pay for services that are

"reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). There is also no allegation that the government was aware of the excessive billing and chose to ignore it. Relator alleges that these tests were performed even when the initial culture was negative, the PCR tests would not change the outcome of patient care, and the cost of the PCR tests could be as much as sixty to seventy times the cost of a standard BUC test. Relator has plausibly alleged that Medicare would not pay for a test that is significantly more expensive and is not providing a clinical benefit above the standard urine culture test. The Court finds that materiality has been satisfied at this stage.

### C.  Knowledge

Relator must also show that the defendants acted with knowledge. See 31 U.S.C. § 3729(a)(1)(A), (B). The defendants argue that the use of the word "knowingly" sprinkled throughout the complaint is not enough, and Relator's assertion that the defendants had to know what they were doing given the nature of the scheme is "baseless conjecture." Dkt. 101 at 11. The Amended Complaint alleges that the lab performed medically unnecessary PCR tests and submitted claims for those medically unnecessary tests. The Settlement Agreement contains acknowledgments by the three defendants that they knew they were filing medically unnecessary UDTs, claims that have been settled but contain a

similar factual premise as the non-settled UTI claims. Taking the factual allegations in the Amended Complaint as true, the Court finds the allegation of knowledge plausible.

### D.     Statute of Limitations

In support of its motion to dismiss, the defendants also raise a statute of limitations issue. Section 3731(b) provides that a party may not file an FCA action more than six years after the violation. See 31 U.S.C. § 3731(b). Relator alleges that the false claims were filed with Medicare in 2018. Relator brought the action in 2018, and the Amended Complaint was filed in 2022. Both are within the six-year window of the violation, so the action is timely.

## II.    State Law Claims

Relator brings 32 additional counts under analogous state laws. Defendants contend that the state-law claims "rise or fall with Count I." Dkt. 85 at 19. Defendants additionally call out Count XXXIII, the Illinois law claim, because it requires the submission of false claims to an "insurance company," and Relator has not alleged a single claim involving a private insurer. Dkt. 85 at 19-20. Article 46 of the Illinois Criminal Code, quoted in the Amended Complaint and referenced in the applicable section of the Illinois Insurance Claims Fraud Prevention Act, has been repealed. See 720 Ill. Comp. Stat. Ann.

[16]

5/46-1, repealed by P.A. 96-1551, Art. 5, § 5-6, eff. July 1, 2011. The Court declines to dismiss this state law claim at this stage without briefing on this issue. The state law claims survive as to the medically unnecessary testing.

## ORDER

For the reasons provided above, the Court **DENIES** the motion to dismiss (Dkt. 84) as to the FCA claim regarding the medically unnecessary testing allegations and **DENIES** the motion to dismiss the analogous state law claims.

SO ORDERED.

/s/  PATTI B. SARIS
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE