**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>Defendants. | Case No. 18-cv-12558-PBS |

**DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE'S MEMORANDUM <u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 3

I. MD Labs and PCR UTI Testing .......... 3

II. The Unique Role of Clinical Laboratories .......... 5

III. MD Labs' Compensation of Sales Representatives .......... 5

IV. MD Labs' Billing Practices .......... 6

V. Deligdish Duplicitously Overrode Medical Necessity Determinations By Providers .......... 7

LEGAL STANDARD .......... 8

ARGUMENT .......... 8

I. Omni Cannot Prove Any False Claims Were Submitted to a Government Program. .......... 9

a. There is No Evidence that MD Labs' PCR UTI Testing Was Unnecessary .......... 9

i. There is no genuine dispute that PCR UTI testing is medically necessary as determined by a patient's treating clinician. .......... 9

ii. There is no genuine dispute that PCR UTI testing is medically necessary in certain circumstances. .......... 11

iii. At all relevant times, PCR UTI testing was not experimental. .......... 12

iv. MD Labs' PCR UTI panel was not overbroad. .......... 13

b. There is No Evidence that MD Labs' Compensation of Sales Representatives Violated the AKS to Render Resulting Claims False .......... 14

v. Claims Related to Defendants' W-2 Employee Distributors Did Not Violate the FCA Because They Were Protected by a Safe Harbor .......... 15

vi. Omni Cannot Prove Any FCA Violation Caused by Defendants' Agreements With Independent Contractor Sales Representatives .......... 15

c. There is No Evidence that Any Unlawful Agreement Between the Parties Resulted in False Claims .......... 19

II. Omni Cannot Prove MD Labs Caused the Submission of False Claims .......... 19

a. Omni Cannot Prove That Defendants Caused Medically Unnecessary Claims to Be Submitted .......... 19

b. Omni Cannot Prove That Any Unlawful Payments to Sales Representatives Caused Submission of a False Claim. .......... 20

c. Omni Cannot Prove That MD Labs' Billing Practices Caused the Submission of False Claims .......... 22

III. Omni Cannot Prove That Defendants Acted with Requisite Scienter .......... 23

a. There is No Evidence that Defendants Knowingly Performed Medically Unnecessary PCR UTI Tests .......... 23

b. Omni Has No Evidence that Defendants Knowingly Made Payments to Improperly Influence Provider Decisions .......... 23

IV. There Is No Evidence Supporting the Other Theories Raised in the SAC .......... 24

V. All of Omni's Claims Fail as a Matter of Law and Defendants are Entitled to Summary Judgment. .......... 25

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*,
334 F. Supp. 3d 349 (D. Mass. 2018) ....................10

*Burrage v. U.S.*,
571 U.S. 204 (2014) ....................21

*U.S. ex rel. Cairns v. D.S. Med. LLC*,
42 F.4th 828 (8th Cir. 2022) ....................21

*U.S. ex rel. Cantekin v. U. of Pittsburgh*,
192 F.3d 402 (3d Cir. 1999) ....................20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................8

*Deaton v. Town of Barrington*,
100 F.4th 348 (1st Cir. 2024) ....................25

*U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*,
147 F. Supp. 2d 39 (D. Mass 2001) (Saris, J.) ....................20

*U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*,
No. 96-cv-11651, 2003 WL 22048255 (D. Mass. Aug. 22, 2003) (Saris, J.) ....................22

*U.S. ex rel. Gohil v. Sanofi U.S. Servs. Inc.*,
2020 WL 4260797 (E.D. Pa. July 24, 2020) ....................24

*U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*,
296 F. Supp. 3d 155 (D.D.C. 2017) ....................10

*U.S. ex rel. Gugenheim v. Meridian Senior Living, LLC*,
36 F.4th 173 (4th Cir. 2022) (North Carolina) ....................26

*Guilfoile v. Shields*,
913 F.3d 178 (1st Cir. 2019) ....................17, 18, 21

*U.S. ex rel. Hart v. McKesson Corp.*,
2023 WL 2663528 (S.D.N.Y. Mar. 28, 2023) ....................25

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
647 F.3d 377 (1st Cir. 2011) ....................9

*Irobe v. U.S. Dep't of Agric.*,
890 F.3d 371 (1st Cir. 2018)........8

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
360 F.3d 220 (1st Cir. 2004)........9

*U.S. ex rel. King v. Solvay*,
No. H-06-2662, 2015 WL 8480148 (S.D. Tex. Dec. 10, 2015)........15

*Martin v. Hathaway*,
63 F.4th 1043 (6th Cir. 2023)........21

*Mazik v. Kaiser Permanente, Inc.*,
2024 WL 584162 (E.D. Cal. Feb. 13, 2024) (Colorado, Georgia, Washington)........26

*Miller by Miller v. Whitburn*,
10 F.3d 1315 (7th Cir. 1993)........13

*Penobscot Nation v. Frey*,
3 F.4th 484 (1st Cir. 2021) (en banc)........21

*U.S. ex rel. Quinn v. Omnicare Inc.*,
382 F.3d 432 (3d Cir. 2004)........9

*U.S. ex rel. Rahimi v. Zydus Pharms. (USA), Inc.*,
2017 WL 1503986 (D.N.J. Apr. 26, 2017) (Texas)........26

*Rush v. Parham*,
625 F.2d 1150 (5th Cir. 1980)........12, 13

*Scannell v. Attorney Gen.*,
70 Mass. App. Ct. 46, 872 N.E.2d 1136 (2007)........26

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)........23

*U.S. ex rel. Suarez v. AbbVie, Inc.*,
2019 WL 4749967 (N.D. Ill. Sept. 30. 2019)........24

*U.S. v. DaVita Inc.*,
No. 818CV01250JLSDFM, 2020 WL 3064771 (C.D. Cal. Apr. 10, 2020)........12

*U.S. v. Mallory*,
988 F.3d 730 (4th Cir. 2021)........6

*U.S. v. Marchetti*,
96 F.4th 818, 826 (5th Cir. 2024)........17, 18

*U.S. v. McClatchey*,
217 F. 3d 823 (10th Cir. 2000) ....................18

*U.S. v. Miles*,
360 F.3d 472 (5th Cir. 2004) ....................17

*U.S. v. Pfizer, Inc.*,
188 F. Supp. 3d 122 (D. Mass. 2016), aff'd sub nom. *U.S. ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52 (1st Cir. 2017) ....................8

*U.S. v. Regeneron Pharmaceuticals*,
No. 20-11217-FDS, 2023 WL 7016900 (D. Mass. October 25, 2023)....................18

*U.S. v. Ricard*,
922 F.3d 639 (5th Cir. 2019) ....................24

*U.S. v. Shaw*,
106 F. Supp. 2d 103 (D. Mass. 2000) ....................16, 18

*U.S. v. Shoemaker*,
746 F.3d 614 (5th Cir. 2014) ....................18

*U.S. v. Teva Pharms. USA, Inc.*,
682 F. Supp. 3d 142 (D. Mass. 2023) ....................16, 24

*U.S. v. Univ. of Mass., Worcester*,
80 F. Supp. 3d 296 (D. Mass. 2015) ....................26

*U.S. v. Univ. of S. California*,
No. 2:18-cv-08311-SSS-ASx, 2023 WL 2682298 (C.D. Cal. Feb. 9, 2023)....................15

*U.S. v. Wal-Mart Stores E., LP*,
858 F. App'x 876 (6th Cir. 2021) (Michigan) ....................26

*Weaver v. Reagen*,
886 F.2d 194 (8th Cir. 1989) ....................13

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
812 F. Supp. 2d 39 (D. Mass. 2011) ....................14, 16, 18

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ....................9

42 U.S.C. § 1320a-7b(b)(2) ....................14, 16

42 U.S.C. § 1320a-7b(b)(3)(B) ....................15

42 U.S.C. § 1320a-7b(g) ....................20

42 U.S.C. § 1395l(h)5 ....................19

**Other Authorities**

42 C.F.R. § 1001.952(i) ....................15

56 Fed. Reg. 35952 (July 29, 1991) ....................16

56 Fed. Reg. 35957 (July 29, 1991) ....................17

59 Fed. Reg. 37202, 37203 (July 21, 1994) ....................16

63 Fed. Reg. 45,076, 45,079 (Aug. 24, 1998) ....................10

Federal Rule of Civil Procedure 56(c) ....................8

## PRELIMINARY STATEMENT

Discovery has revealed this case to be based on nothing more than the fraudulent and deceptive practices to manufacture "facts" that could be used to substantiate a False Claims Act ("FCA") lawsuit against a national testing laboratory and its principals. Putting aside tests for which Relator's own fraudulent conduct was the proximate cause of false claims, Relator is left with unsubstantiated theories that discovery has proved to be without any supporting evidence. Defendants are entitled to summary judgment on all counts.

Omni Healthcare, Inc. ("Omni"), a Florida medical practice owned by Dr. Craig Deligdish ("Deligdish"), is the relator in numerous pending, settled, or dismissed actions.[1] After the government's settlement and dismissal of Omni's claims concerning urine drug testing, Omni is left with claims challenging Defendants' use of polymerase chain reaction ("PCR") technology to conduct urinary tract infection ("UTI") testing. Whatever superficial appeal may have existed in 2018 for Omni's argument that PCR technology is experimental and not medically necessary was erased by the COVID-19 pandemic because the public has come to understand what the medical community knew—that PCR technology is sensitive, reliable and can rapidly diagnose infections that other methods cannot. The benefits of PCR testing are confirmed by Defendants' medical expert and uncontroverted by Omni's own experts.

Beyond the obvious fallacy of Omni's theory of purported lack of medical necessity, discovery in this matter uncovered an equally important basis to dismiss this case. At his deposition, Deligdish admitted his fraudulent scheme: to create an FCA case against Defendants, he directed Omni staff to change UTI test selections that Omni's providers had ordered for their

---

[1] Filing *qui tam* actions is part of Omni's business model. Omni has received $10-20 million in revenue from settlements or other awards from *qui tam* actions. SOF ¶ 54. Deligdish also owns another entity, Lo Tignov, whose sole purpose is to investigate potential *qui tam* defendants and reap substantial investigatory fees through settlements with its targets. *Id.* ¶ 55.

patients from a bacterial urine culture ("BUC") to the PCR tests to be performed by Defendants' lab (generally without advising the Omni providers or their patients). Deligdish's fraudulent intervention eliminates any factual basis on which Omni could prove that Defendants knowingly and willfully caused a false claim to be submitted. Unaware of Deligdish's manipulation, Defendants reasonably relied in good faith on the requisitions received from Omni for PCR UTI testing. Although Deligdish tries to salvage his claim from his own deception by contending that MD Labs should have second-guessed the medical necessity determinations of ordering providers, that bald assertion finds no support in fact or law. Omni has no evidence that any medical practice other than Omni ordered medically unnecessary PCR UTI tests from MD Labs.

Omni's "kitchen sink" Second Amended Complaint alleges numerous other theories in support of its FCA count, Count I, many of which were never pursued by Omni in discovery. The theories subject to discovery, however, were all revealed to be without evidentiary support. There is, for example, no evidence that the compensation structure by which Defendants compensated sales representatives violated the federal Anti-Kickback Statute ("AKS") to render any claims false. Omni cannot establish that behavior of its MD Labs sales representatives or its providers' medical decisions were affected based on whether a sales representative was a W-2 employee or 1099 independent contractor. This is a logical result considering that Defendants trained, managed, and, if needed, disciplined all their sales representatives in the same manner, regardless of their employment status. The remaining counts, II through XXXIII, allege derivative claims state analogues of the FCA and themselves fail alongside Count I.

For these reasons, Defendants are entitled to summary judgment in their favor.

## FACTUAL BACKGROUND

### I. MD Labs and PCR UTI Testing

Defendant MD Spine Solutions LLC, d/b/a MD Labs Inc. ("MD Labs") is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011. SOF ¶ 1. MD Labs historically performed drug testing. In 2017, it added UTI testing using PCR technology. *Id.* ¶ 2. PCR testing has been available since the mid-1980s. *Id.* ¶ 3. It produces highly accurate results by amplifying copies of segments of DNA to enable identification of genetic material belonging to a particular biological origin. *Id.* ¶ 4. In recent years, PCR technology has become a standard test to identify a range of pathogens. *Id.* ¶ 5. By contrast, the standard test for UTIs for over 60 years has been the BUC, where a urine sample is placed on a growth medium in a Petri dish, and laboratories typically wait between 24 and 48 hours to determine if any bacteria grew, and sometimes longer for slow-growing bacteria. *Id.* ¶ 6.

MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens. *Id.* ¶ 7. In addition to the PCR test, MD Labs *simultaneously* conducted an antibiotic susceptibility test ("AST") by culturing the urine specimen to grow any bacteria present to then determine whether it was susceptible to an array of antibiotics. *Id.* ¶ 8. Performing both tests simultaneously provided faster results than would be available if the lab delayed culturing the sample for AST until PCR results were available. *Id.*¶ 9. More specifically, when PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST. *Id.*¶ 10. But if PCR tests did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test. *Id.* ¶ 11.

Because PCR testing is faster than BUC (SOF ¶ 12), MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results. *Id.* ¶ 13. Faster results were intended to enable providers to prescribe appropriate antibiotics more quickly or

eliminate a UTI as the cause of patient symptoms. *Id.* ¶ 14. Several of MD Labs' accounts also requested PCR UTI results reported before AST results were available to further aid in the clinical decision-making process. *Id.* ¶ 15. Moreover, PCR UTI testing is more accurate than BUC, which may miss bacteria where a patient has already started antibiotics or where there is a polymicrobial infection where a dominant organism overgrows a secondary pathogen. *Id.* ¶ 16. MD Labs' PCR testing thus provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. *Id.* ¶ 17. As explained by Defendants' urology expert, Dr. Dicken Ko, such testing decreases the spread of antibiotic-resistant bacteria that can generate dangerous infections because it ensures that clinicians use an effective antibiotic the first time around, rather than potentially using an antibiotic that may not be effective. *Id.* ¶ 18.

Both parties' experts agreed that PCR testing for UTIs can be medically necessary in certain circumstances, even though it is more costly than BUC.[2] Both parties' experts agreed that PCR UTI testing is reasonable and necessary in certain cases. SOF ¶ 20. Omni's own medical expert acknowledged myriad reasons that PCR testing for UTIs may be medically necessary. *Id.*¶ 21. His opinion was consistent with that of MD Labs' expert, who testified that PCR testing is indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome." *Id.*¶ 22; *see also id.* ¶ 23 (PCR UTI testing is indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component).

[2] When MD Labs offered PCR UTI testing, no local coverage determination or national coverage determination limited the use of PCR UTI testing and government and commercial payors routinely paid on claims. SOF ¶ 19.

## II. The Unique Role of Clinical Laboratories

The Parties also agree that clinical laboratories do not determine the medical necessity of testing ordered by medical providers. *See* SOF ¶ 33. Laboratory staff do not examine patients to assess their medication conditions and do not treat patients. *Id.* ¶ 34. By contrast, medical providers, like Deligdish, meet with patients, assess their conditions, have knowledge of their medical histories, and determine the course of treatment appropriate for patients based on their skill and expertise. *Id.* ¶ 35. Medical providers typically send laboratories such as MD Labs only a requisition form indicating the test the *provider* determined to be medically necessary and the applicable diagnosis code. *Id.* ¶ 36. Clinical laboratories must perform the tests ordered by providers; it would be inappropriate to override their clinical decisions. *Id.* ¶ 37.

## III. MD Labs' Compensation of Sales Representatives

At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of its testing. SOF ¶ 38. Pursuant to agreements with sales representatives, MD Labs paid commissions based on the number of tests ordered by the providers at their sales accounts. *Id.* ¶ 39. These agreements did not provide for any payment to providers. *Id.* ¶ 40.

Omni has made no effort to determine which of MD Labs' tests were performed as the result of sales by W-2 employees rather than independent contractors. Additionally, for claims that were the result of sales by independent contractors, the uncontroverted evidence shows that revenue-based compensation did not cause sales representatives to improperly influence providers to order medically unnecessary PCR tests. *Id.* ¶¶ 39-46. Furthermore, there is no evidence that any sales representative offered or paid inducements to providers. *Id.* ¶ 41.

Moreover, Omni has adduced no evidence that the sales representatives' behavior or providers' medical decisions were affected based on whether a sales representative was an

employee or independent contractor. This is unsurprising, given that MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner. SOF ¶ 42.

Finally, the evidence demonstrates that Defendants subjectively believed that paying independent sales representatives on a commission basis was lawful and believed that neither they nor their sales representatives had any improper influence on ordering providers. When MD Labs' outside counsel provided definitive advice to Defendants after the first appellate decision to analyze commissions for independent laboratory sales representatives was announced (*see U.S. v. Mallory*, 988 F.3d 730 (4th Cir. 2021)), MD Labs voluntarily and swiftly disbanded its independent contractor sales force and hired sales representatives as W-2 employees. SOF ¶ 48.

**IV. MD Labs' Billing Practices**

Omni alleges that MD Labs routinely waived copays and deductibles by capping patient financial responsibility at $50. SAC ¶¶ 286-89. For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. SOF ¶ 49. The alleged concern with a lower self-pay rate is that providers could be induced into ordering tests they would not otherwise order if they knew that the patient will only be charged a set amount. SAC ¶¶ 283-84. The only Omni provider that the record has shown was aware of some patients being charged $50 was Deligdish, who admitted he was motivated to send samples to MD Labs based on his desire to substantiate allegations in this lawsuit. SOF ¶ 50. MD Labs' intent in offering the lower rate was to relieve financial burden on patients, and Defendants did not believe a potential benefit to *patients* was an inducement to *providers*. *Id.*¶ 51. No evidence has been produced in this action suggesting that any provider was improperly influenced by the $50 cap. Regardless, MD Labs changed its financial hardship policy in or about 2020 to no longer offer the $50 maximum charge regardless of a patient's financial condition. *Id.*¶ 52.

## V. Deligdish Duplicitously Overrode Medical Necessity Determinations By Providers

Deligdish's testimony revealed that in many instances in which an Omni provider ordered a BUC, he fraudulently diverted Omni patient specimens to MD Labs for PCR UTI testing to create a basis for this action. SOF ¶ 56. In furtherance of his scheme to manufacture and profit from a *qui tam* lawsuit, Deligdish caused Omni to submit nearly 600 PCR UTI test requisitions to MD Labs, despite his claimed belief that all PCR UTI testing was medically unnecessary, and notwithstanding that patients' treating providers at Omni instead ordered a BUC. SOF ¶ 57. When an Omni provider determined that a particular laboratory test was necessary, the provider generally chose from a list of tests in Omni's electronic medical record and Omni medical assistants completed a requisition form for a particular lab. *Id.*¶ 59. However, in 2018-19, irrespective of the Omni providers' decisions to order a ***BUC*** test for their patients, Deligdish instructed Omni's staff to order a ***PCR*** test from MD Labs, admitting he did this "so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint." *Id.*¶ 60. Notwithstanding the fact that Omni providers determined that a BUC was the appropriate test for each patient, Omni ordered PCR testing at Deligdish's direction.[3,4]

Omni did not obtain discovery on the medical necessity of PCR UTI tests ordered by any other medical practice. SOF ¶ 64. As a result, Omni's expert witnesses reviewed and opined only upon claims submitted to MD Labs from Omni, representing less than 0.5% of all PCR UTI tests

---

[3] In furtherance of his scheme, and unbeknownst to MD Labs, Deligdish also submitted duplicate patient samples to up to ten *other* medical laboratories in order to support *qui tam* complaints, knowing that federal health care programs would be billed for the duplicate medically unnecessary tests. *Id.* ¶ 62.

[4] Although Deligdish asserted that the providers were informed that samples would be sent to MD Labs for PCR testing, he could not recall when they were informed, who informed them, or whether notice was verbally or in writing. SOF ¶ 58. Additionally, OMNI produced no documentation to support his assertion that providers were so informed. Medicare rules make clear that knowingly testing a patient with the same test multiple times on the same date of service is not medically necessary. *Id.* ¶ 63. Deligdish did in furtherance of his scheme, knowing that Medicare funds would be used to pay for this testing. *Id.* ¶ 62. A clear violation of the FCA by Deligdish.

performed by MD Labs. *Id.* Neither of Omni's experts performed any extrapolation of their results to the 99.5% of tests ordered by other practices (in which the owner of the practice did not fraudulently intervene). *See* id.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In that situation, there is "no genuine issue as to any material fact" because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. "The mere existence of a scintilla of evidence in support of the plaintiff's position is not enough to ward off summary judgment. Where the plaintiff has the burden of proof, there must be evidence on which the [factfinder] could reasonably find for the plaintiff." *Irobe v. U.S. Dep't of Agric*., 890 F.3d 371, 380 (1st Cir. 2018) (internal citations and quotations omitted); *see also U.S. v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 135 (D. Mass. 2016), *aff'd sub nom. U.S. ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52 (1st Cir. 2017) (summary judgment appropriate where "Relators appear not to have found any meaningful evidence of what they alleged and as such cannot show a genuine issue of material fact on the existence of kickbacks.").

## ARGUMENT

Omni's claims should be dismissed because the evidence does not create a genuine issue of fact on the elements of their *prima facie* FCA case. An FCA violation as alleged here requires Omni to prove that Defendants (1) knowingly (scienter); (2) presented or caused to be presented (causation); (3) a false claim (falsity); and (4) the falsity was material to the government's

payment decision (materiality).[5] *See* 31 U.S.C. § 3729(a)(1)(A); *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 382 (1st Cir. 2011). Despite over one year of fact and expert discovery, production of hundreds of thousands of pages of documents, and numerous depositions, Omni lacks admissible evidence sufficient to create a genuine issue of fact on its FCA claims, and MD Labs is entitled to summary judgment.

## I. Omni Cannot Prove Any False Claims Were Submitted to a Government Program.

A false claim is the essential element of an FCA action. *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp*., 360 F.3d 220, 225 (1st Cir. 2004) ("Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation.") (internal quotations omitted). Indeed, "[w]ithout proof of an actual claim, there is no issue of material fact to be decided by a jury." *U.S. ex rel. Quinn v. Omnicare Inc*., 382 F.3d 432, 440 (3d Cir. 2004). The record in this case is devoid of information about *any* false claims submitted to a government payor, whether federal or state. Omni is unable to prove either that the PCR UTI tests performed by MD Labs were medically unnecessary, or that the tests were the result of unlawful kickbacks in the form of compensation to sales representatives, and thus, no reasonable factfinder could find in its favor.

### a. There is No Evidence that MD Labs' PCR UTI Testing Was Unnecessary

#### i. There is no genuine dispute that PCR UTI testing is medically necessary as determined by a patient's treating clinician.

Clinical laboratories are entitled to rely on medical providers' determinations of medical necessity in the absence of a specific basis to second-guess providers' certifications regarding medical necessity. *U.S. ex rel. Allen v. Alere Home Monitoring, Inc.*, 334 F. Supp. 3d 349, 365 (D. Mass. 2018) (citing *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d

[5] Here, the Court need not reach the issue of materiality because Omni has failed to establish the requisite elements of falsity, scienter, or causation, as described in §§ I, II, and III, *supra*.

155, 165 (D.D.C. 2017)). In *Boston Heart*, the court held that "a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary." 296 F. Supp. 3d at 159 ("OIG Guidance[6] makes clear that 'laboratories do not and cannot treat patients or make medical necessity determinations,' but 'should be able to produce or obtain from the treating physician . . . the documentation to support the medical necessity of the service the laboratory has provided.") (citing OIG Guidance at 45,079). Finding that "neither the Medicare statute nor the regulation regarding laboratories require laboratories to independently determine the medical necessity of the tests billed," the *Boston Heart* court noted:

> HHS recognized "the special circumstances related to laboratories [because they] frequently do not have direct contact with the patient," [OIG Guidance at 58,801], and, in the Court's view, issued the regulation regarding recordkeeping and documentation in an attempt to balance a laboratory's statutory requirement to certify medical necessity with the requirement that the ordering physician determine medical necessity[.]

*Boston Heart*, 296 F. Supp. 3d at 162.

Given these "special circumstances," Omni's claims hinge on a fundamentally incorrect assertion of how medical necessity determinations are made for laboratory testing. As explained above, MD Labs performed PCR UTI testing upon receipt of a requisition form reflecting medical providers' determinations that PCR tests were medically necessary. (In the case of Omni's requisitions, however, Defendants were unaware that Deligdish had intervened to misrepresent Omni providers' determinations and followed the requisitions in good faith.)

Holding laboratories responsible for determining medical necessity would be inconsistent with well-established precedent and potentially harmful to patients. In most cases, laboratories

6 Office of the Inspector General for the Department of Health and Human Services ("HHS") Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45,076, 45,079 (Aug. 24, 1998) ("OIG Guidance").

do not have patients' complete medical record or knowledge of patients' condition or medical histories. Nor do laboratory staff have the appropriate education and experience to determine whether tests are appropriate for the patients for whom they are ordered. Treating providers have access to patients' medical records and examine patients, which is why the law requires treating providers—not laboratories—to determine what test is medically necessary. Because Omni's claims are predicated upon the fundamental inaccuracy that MD Labs had a role in determining the medical necessity of the tests it performed, those claims fail as a matter of law.

ii. There is no genuine dispute that PCR UTI testing is medically necessary in certain circumstances.

The Parties' experts agree that PCR UTI testing is medically necessary in certain circumstances. To the extent Omni claims MD Labs' PCR UTI testing violated the FCA because PCR UTI testing is *never* medically necessary, that theory of liability must fail based on its own expert's testimony. Although Deligdish's subjective, non-expert opinion is that PCR UTI testing is *never* medically necessary (SOF ¶ 65), "Relator's subjective difference of opinion with other physicians as to the medical necessity of certain treatments . . . is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA." *U.S. v. DaVita Inc.*, No. 818CV01250JLSDFM, 2020 WL 3064771, at *8 (C.D. Cal. Apr. 10, 2020) (internal quotations and citation omitted). And to the extent Omni alleges that its own orders submitted to MD Labs for PCR UTI testing were not medically necessary, that is only so to the extent *Deligdish* usurped the treating providers' medical necessity determinations by diverting patient BUC specimens to manufacture this action.

Furthermore, due to Omni's complete lack of analysis for the over 99.5% of MD Labs PCR UTI tests ordered by non-Omni providers, Omni cannot refute Defendants' overwhelming evidence—in the form of (1) Omni's own expert's and provider's testimony that PCR UTI

testing is medically necessary in certain circumstances, (2) MD Labs' expert testimony, and (3) thousands of requisition forms showing that MD Labs performed PCR UTI tests in accordance with provider orders—that PCR UTI testing was medically necessary for non-Omni patients.

iii. <u>At all relevant times, PCR UTI testing was not experimental.</u>

Omni's vague assertion that "the tests that MD Labs performed . . . should be at best considered investigational" (SAC ¶ 13) has no support. As an initial matter, Omni fails to identify what features of MD Labs' PCR UTI test allegedly rendered it an "investigational" test such that it would fall outside the scope of Medicare coverage. While there is no governing definition of what constitutes an "experimental" test for purposes of determining Medicare coverage, the Fifth Circuit has noted, "[t]he clearest articulation of the considerations that go into determining whether a particular service is experimental is found in a letter Medicare uses to explain to its clients and providers why a service is ineligible for reimbursement." *Rush v. Parham*, 625 F.2d 1150, 1156 n.11 (5th Cir. 1980). In *Rush,* these denial letters stated:

> In making such a decision (whether to provide payment for a particular service), a basic consideration is whether the service has come to be generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used. If it is, Medicare may make payment.

*Id.*; *see also Weaver v. Reagen*, 886 F.2d 194, 198 (8th Cir. 1989) (applying the *Rush* definition of "experimental."). PCR testing is not new, novel, relatively unknown or rarely used and is the standard test for a range of pathogens. SOF ¶ 24. Nonetheless, even procedures that "may be so new and, as a result, relatively unknown, that the medical community may not yet have formed an opinion as to their efficacy" are "not *per se* experimental. If 'authoritative evidence' exists that attests to a procedure's safety and effectiveness, it is not 'experimental.'" *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1320 (7th Cir. 1993) (citing *Rush*, 625 F. 2d at 1156); *see also Weaver*,

886 F.2d at 199 (affirming summary judgment ruling that prescription was not experimental where plaintiff's expert was uncontroverted by defendant's expert on that issue).

When questioned in deposition what medical literature supports his conclusory and inadmissible opinion that PCR UTI testing is experimental, Deligdish could cite nothing. This is in sharp contrast to the wealth of peer-reviewed literature—including data from the time period relevant to this litigation—supporting the accuracy of PCR UTI testing and its utility as an alternative to the BUC. This literature notes that BUC has several limitations, including missed microbial infections, false negatives, contamination of urine specimens, and prolonged turnaround times. SOF ¶ 25. Furthermore, MD Labs' expert opined that PCR UTI testing is not experimental and instead is "very standard across the country." *Id.* ¶ 28. Omni's experts did not touch upon, let alone refute, these conclusions. As the uncontroverted record demonstrates that PCR UTI testing is safe, effective, and medically necessary in certain circumstances (*see* Argument §§ I(a)(i-ii), *supra*), summary judgment is appropriate.

iv. <u>MD Labs' PCR UTI panel was not overbroad.</u>

Omni's allegation that MD Labs used "an unreasonably broad panel" for PCR testing (SAC ¶ 228) is likewise based on the conclusory and inadmissible opinion of Deligdish and without support in the record. MD Labs has put forth uncontroverted evidence both that MD Labs' test for 17 or 19 pathogens was within the range of pathogens endorsed by peer-reviewed literature and that the specific pathogens for which MD Labs tested were appropriate. SOF ¶ 29.

Ironically, while Omni claims MD Labs' PCR test was overbroad, Deligdish criticized another laboratory for running too *few* targets in its PCR UTI test, suggesting that a narrower panel "had a much greater likelihood of missing a diagnosis." SOF ¶ 67. Deligdish acknowledged this contradiction at his deposition, claiming that he believed the other lab "tests for too many, too, and at the same time, not enough" pathogens. *Id.* ¶ 68. In light of the

inconsistencies in Omni's position and its failure to adduce any evidence supporting Deligdish's unsupported opinion about the breadth of MD Labs' panel, no reasonable jury could find that MD Labs' PCR UTI panel was "unreasonably broad" such that it was medically unnecessary. As such, Omni cannot prove that any claims were actually "false" based on its theory that UTI PCR tests are not medically necessary. Defendants are entitled to summary judgment on this theory.

**b. There is No Evidence that MD Labs' Compensation of Sales Representatives Violated the AKS to Render Resulting Claims False**

Omni's second theory of falsity under the False Claims Act is based on the premise that Defendants violated the AKS based on their commission-based compensation of sales representatives. The AKS prohibits any person from knowingly or willfully paying or receiving remuneration to induce a referral for services under the Medicare or Medicaid programs. 42 U.S.C. § 1320a-7b(b)(2); *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 47 (D. Mass. 2011). To survive summary judgment, Omni must provide evidence of *specific* claims "linked to remuneration from [Defendants], some evidence of intent that the remuneration would lead to claims, and claims for [PCR UTI tests] written by these physicians that a reasonable juror could believe resulted from the unlawful remuneration." *U.S. ex rel. King v. Solvay*, No. H-06-2662, 2015 WL 8480148, at *6 (S.D. Tex. Dec. 10, 2015). It cannot do so.

Omni cannot establish the elements of its AKS theory for at least two reasons. *First*, Defendants' compensation payments to W-2 employee sales representatives satisfied statutory and regulatory safe harbors to the AKS, and Omni cannot establish any AKS violation as to any such arrangements with independent contractors. *Second*, Omni has no evidence of specific claims submitted to government payors as a result of the MD Labs' payment structure.

v. Claims Related to Defendants' W-2 Employee Distributors Did Not Violate the FCA Because They Were Protected by a Safe Harbor

A substantial number of MD Labs' claims for PCR UTI testing resulted from efforts by W-2 sales employees, and that compensation arrangement does not violate the AKS as a matter of law. The AKS contains a statutory safe harbor providing that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" is not a violation of the AKS. 42 U.S.C. § 1320a-7b(b)(3)(B). Similarly, under a related regulatory safe harbor, "any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs" is excluded from the definition of "remuneration" under the AKS. 42 C.F.R. § 1001.952(i). Under these safe harbors, an "employee may be paid incentives for patient referrals or receive volume-based compensation because the employee exemption covers any amount paid by an employer to an employee[.]" *U.S. v. Univ. of S. California*, No. 2:18-cv-08311-SSS-ASx, 2023 WL 2682298, at *5 (C.D. Cal. Feb. 9, 2023) (citation and internal quotations omitted); *see also* OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35953 (July 29, 1991). Omni has no evidence to suggest that these employees' compensation did not satisfy the safe harbor, and in fact conducted no discovery as to the composition of MD Labs' sales force. Any of Omni's claims based on commissions paid to W-2 employee sales representatives fails as a matter of law.

vi. Omni Cannot Prove Any FCA Violation Caused by Defendants' Agreements With Independent Contractor Sales Representatives

Omni has no evidence of any specific federal or state claim that resulted from improper payments to independent contractor sales representatives. Although volume-based payments to independent contractors are not protected by the safe harbors for payments to employees,

payments that fall outside a safe harbor are not *per se* unlawful. *See Amgen*, 812 F. Supp. 2d at 47 (entering into arrangements that do not fit within AKS safe harbor "is not a per se violation of the [AKS]"). Rather, "[w]hether a particular payment practice violates the [AKS] is a question that can only be resolved by an analysis of the elements of the statute as applied to that set of facts." *Id*. (quoting Medicare and State Health Care Programs: Fraud and Abuse; Clarification of the OIG Safe Harbor Anti–Kickback Provisions, 59 Fed. Reg. 37202, 37203 (July 21, 1994)).

Establishing an AKS violation requires proving that a defendant acted ***both*** knowingly and willfully. *U.S. v. Teva Pharms. USA, Inc.*, 682 F. Supp. 3d 142, 147 (D. Mass. 2023); 42 U.S.C. § 1320a-7b(b)(2). Omni cannot meet its burden because it lacks evidence to support a finding that Defendants acted with the intent required by the AKS. It is well-established that the mere structure of a payment arrangement is insufficient to establish a violation of the AKS; rather, the existence of a violation depends on "the intent of the parties." *Amgen*, 812 F. Supp. 2d at 48 (quoting Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti–Kickback Provisions, 56 Fed. Reg. 35952, 35955 (July 29, 1991)); *see also U.S. v. Shaw*, 106 F. Supp. 2d 103, 114 (D. Mass. 2000), (quoting 56 Fed. Reg. at 35957) ("[T]he fundamental analysis required of a trier of fact is 'to recognize that the substance rather than simply the form of the transaction should be controlling.'"). Omni must prove that Defendants not only intended for volume-based payments to independent sales representatives to influence the test ordering behavior of providers, but that they would influence providers ***improperly***. *See Guilfoile v. Shields*, 913 F.3d 178, 192-93 (1st Cir. 2019) ("[T]he heartland of what the AKS is intended to prevent [is] the use of payments to ***improperly*** influence decisions on the provision of health care that lead to claims for payment to federal health care programs.") (emphasis added)).

In *U.S. v. Marchetti*, the Fifth Circuit recently held that the fact that the defendant was "compensated based on the 'value of each referral'" was insufficient to satisfy the AKS's intent requirement. 96 F.4th 818, 826 (5th Cir. 2024). There, the trial court found the defendant guilty under the AKS based on evidence including indicia of scienter beyond mere payment structure, including the fact that the sales representative worked for two labs and received a percentage of revenues from each paid claim and due to his work for two labs, he controlled, collected and diverted specimens to a lab of his choosing irrespective of the physician's choice. *Id.* at 827. On appeal, the Fifth Circuit held the government must prove that the defendant "intended ***improperly*** to influence . . . those who make healthcare decisions on behalf of patients." *Id*. (citing *U.S. v. Miles*, 360 F.3d 472, 481 (5th Cir. 2004)) (emphasis added). "Plainly, not every sort of influence is improper." *Id*. In addressing what constitutes improper influence, the court drew a distinction between paying for referrals (impermissible) and paying for advertising (permissible). Where "advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser 'unduly influence[s]' or 'act[s] on behalf of' the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support" an AKS violation. *Id*. at 825 (citing *U.S. v. Shoemaker*, 746 F.3d 614, 616 (5th Cir. 2014)). Ultimately, the appeals court upheld the laboratory defendant's conviction as to a sales representative who determined which service would be rendered at what laboratory based on the value of his commission, but *not* based on a theory based solely on the *structure* of payments. *Id*. at 826-27. For the claims based only on payment structure, the court held the government did not prove that the defendant intended to improperly influence "those who make healthcare decisions on behalf of patients."

*Id*. at 827. Likewise, here, Omni has not alleged, and cannot prove, that MD Labs sales distributors improperly diverted samples to MD Labs unbeknownst to the ordering provider.[7]

*Marchetti*'s requirement of intent to improperly influence health care decisionmakers is consistent with First Circuit law. Courts in this circuit have recognized that the structure of a payment arrangement alone is insufficient to establish an AKS violation. *Amgen*, 812 F. Supp. 2d at 48; *Shaw*, 106 F. Supp. 2d at 114. They have similarly acknowledged that an AKS violation requires an intent to ***improperly*** influence a provider's judgment. *See Guilfoile*, 913 F.3d at 192-93 (the AKS "is intended to prevent . . . the use of payments to ***improperly*** influence decisions on the provision of health care that lead to claims for payment to federal health care programs") (emphasis added). *See also U.S. v. Regeneron Pharmaceuticals*, No. 20-11217-FDS, 2023 WL 7016900 at *4 (D. Mass. October 25, 2023) (citing *U.S. v. McClatchey*, 217 F. 3d 823, 834 (10th Cir. 2000)) ("[a]n intent to induce referrals . . . means an intent to gain influence over the reason or judgment of the [prescribing] physicians") (quotations omitted).

Here, there is no evidence that Defendants intended to improperly influence providers who ordered UTI testing. To the contrary, the undisputed evidence demonstrates revenue-based compensation did not cause sales representatives to influence providers to order medically unnecessary PCR tests. SOF ¶¶ 39-46. Independent contractor and W-2 employee sales representatives were trained identically and used the same marketing materials. *Id.* ¶¶ 43. Furthermore, there is no evidence that provider decision-making was affected by MD Labs' payment structure for its salesforce. Accordingly, Omni's distributor compensation theory fails as a matter of law and MD Labs is entitled to summary judgment.

---

[7] In fact, the only instance of test diversion to MD Labs uncovered during discovery is *Deligdish's* diversion of specimens to MD Labs to manufacture "facts" for a lawsuit.

**c. There is No Evidence that Any Unlawful Agreement Between the Parties Resulted in False Claims**

As to Omni's claim that MD Labs proposed unlawful contract terms—namely, profit splitting and pass-through billing—to be included in an agreement between the parties, the evidence shows: (1) MD Labs' written proposal to Omni did not include any such terms (SOF ¶ 69); (2) the parties never entered into the written agreement (*Id.* ¶¶ 70, 71); and (3) MD Labs' proposal was meant to be a reference agreement with Melbourne Medical (*Id.* ¶ 71)—Omni's physician-owned laboratory—through which Medicare rules permitted Omni to "refer" testing to MD Labs and MD Labs to directly bill the provider a per specimen fee (a lawful "reference lab arrangement"). *Id.* ¶ 71. Because the Parties never entered into any unlawful agreement, no agreement resulted in the submission of false claims and this theory fails as a matter of law.

**II. Omni Cannot Prove MD Labs Caused the Submission of False Claims**

**a. Omni Cannot Prove That Defendants Caused Medically Unnecessary Claims to Be Submitted**

Omni cannot prove Defendants proximately caused any medically unnecessary claims to be submitted. Even if the PCR UTI tests ordered by Omni providers were not medically necessary, which is not true, Deligdish broke the causal chain regarding the medical necessity determination for all PCR UTI claims submitted for Omni patients. SOF ¶¶ 56-61. Because Deligdish usurped the decision-making abilities of Omni'§s treating providers, Omni cannot establish that MD Labs ***knowingly and willfully*** performed *any* PCR UTI medically unnecessary tests for Omni patients. Rather, at Deligdish's direction, Omni provided MD Labs with false certifications of medical necessity, duping MD Labs into believing that Omni providers had determined each test was medically necessary when, in fact, they did not. Deligdish's deceitful and fraudulent actions were an unforeseeable intervening cause that broke the causal chain. *See U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 52 (D.

Mass 2001) (Saris, J.) (noting in the FCA context that an unforeseeable intervening force can break the chain of legal causation) (citing *U.S. ex rel. Cantekin v. U. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir. 1999) (applying intervening cause analysis to claim under the FCA)). Moreover, Omni has no evidence that Defendants' actions proximately caused any non-Omni provider to order medically unnecessary PCR UTI tests. No reasonable jury could find that Defendants caused the submission of false claims, and these claims should thus be resolved in MD Labs' favor.

**b. Omni Cannot Prove That Any Unlawful Payments to Sales Representatives Caused Submission of a False Claim.**

Omni's salesforce compensation theory fails because itcannot prove that any prohibited remuneration resulted in submission of false claims. To prove a false claim predicated on an alleged AKS violation, Omni must provide competent evidence that the claim includes items "*resulting from* [the alleged AKS] violation." 42 U.S.C. § 1320a-7b(g). The "resulting from" causation requirement derives from the AKS' 2010 amendments, which provide that "a claim that includes items or services ***resulting from*** a violation of [the AKS] constitutes a false or fraudulent claim for purposes" of the FCA. *Id.* The AKS does not define "resulting from," so a court must "give it its ordinary meaning." *See Burrage v. U.S.*, 571 U.S. 204, 210 (2014) (interpreting the phrase "resulting from" in the Controlled Substances Act); *Penobscot Nation v. Frey*, 3 F.4th 484, 491 (1st Cir. 2021) (en banc) (concluding that where a statute contains "an undefined term, we 'construe it in accordance with its ordinary meaning'") (citations omitted)).

Although the First Circuit has not directly ruled on the causation standard for AKS-based false claims, other circuits have held that the plain text of the AKS requires proof of "but-for" causation—*i.e.*, the government must prove that the claims at issue "would not have included particular 'items or services' absent the illegal kickbacks." *U.S. ex rel. Cairns v. D.S. Med. LLC*,

42 F.4th 828, 835 (8th Cir. 2022). And here, "[t]here's ***not one claim for reimbursement identified*** with particularity in this case ***that would not have occurred anyway,*** no matter whether the underlying [conduct] occurred or not." *Martin v. Hathaway*, 63 F.4th 1043, 1053 (6th Cir. 2023) (emphasis added). *Cairns* and *Martin* are consistent with the First Circuit's opinion in *Guilfoile* that a complaint plausibly alleged "a sufficient causal connection" where the court could "reasonably infer" that the healthcare company paid a consultant "to induce him" and that "***if not for***" a pharmacy provider's payments to a consultant that was also employed by hospitals so that the consultant could "use his position with the hospitals to influence them to select the [pharmacy provider] for the contracts at issue" the pharmacy provider "would not have been in a position to benefit from federal health care payments[.]"913 F.3d at 191 (emphasis added).[8] Further, the "but-for" standard of causation is both required by the plain text of the AKS and consistent with the FCA's causation requirement. *See, e.g., U.S. ex rel. Franklin*, 2003 WL 22048255, at *4 (Saris, J.) (discussing common law concepts of causation).

Here, as discussed in Argument § I(b), Relator has no evidence of any acts by a sales representative that influenced any ordering provider, let alone the testing decision of Omni providers. As the sole decisionmaker, Deligdish was not induced by any representations from MD Labs representatives because he sought out MD Labs' PCR UTI tests solely for the purpose of generating this lawsuit. There is therefore no evidence in the record that MD Labs sales representative compensation structure caused an improper inducement prohibited by the AKS.

Furthermore, Omni has adduced no evidence whatsoever that MD Labs sales representatives caused any non-Omni provider to order unnecessary testing. Omni has not

---

[8] Although the *Guilfoile* court found that the plaintiff had plausibly alleged an AKS violation, the facts of that case differ starkly from the facts here. 913 F.3d at 191. *Guilfoile* involved allegations that a pharmacy provider paid referral fees to a consultant, employed by two hospitals, for successfully securing hospital contracts because of his ability to influence his employer. *Id.* In contrast, those facts do not exist here.

subpoenaed documents from or deposed any non-Omni providers who ordered PCR UTI tests from MD Labs. Omni alleges MD Labs entered into independent contractor service agreements with Pace Solutions, LLC and KDB Consulting in which MD Labs agreed to compensate the companies for referrals and specimen collection services. SAC ¶¶ 268-78. However, Roy Riley ("Riley"), owner and sales representative of Pace Solutions LLC, explicitly denies that either the way he was compensated by MD Labs or his 1099 status affected the message he used about the benefits of PCR testing, nor did it incentivize him to sell medically unnecessary tests. SOF ¶ 44. In a sworn declaration, Riley explains that the marketing message he employed was that PCR UTI testing was appropriate for patients who suffer from recurrent or intractable UTIs. SOF ¶ 45. Furthermore, Riley indicated Defendants told him to promote PCR UTI testing based on medical necessity and never asked him to do anything that compromised his integrity. SOF ¶ 46.

Therefore, the record contains no evidence on which a reasonable finder of fact could find that MD Labs or its independent contractor sales representatives improperly influenced any medical provider to order PCR UTI tests. Accordingly, MD Labs is entitled to summary judgment on any FCA claims premised on allegations that MD Labs' payments to distributors and sales representatives violated the AKS.

**c. Omni Cannot Prove That MD Labs' Billing Practices Caused the Submission of False Claims**

Omni alleges that MD Labs' waiver of copayments and deductibles owed by patients induced providers into ordering tests they would not otherwise have ordered. The record contains no evidence supporting a finding that any such billing practices caused the submission of false claims. The only Omni provider who the record has shown was aware of the existence of a lower self-pay rate was Deligdish, who admitted that his motivation to send samples to MD Labs was based on his desire to substantiate allegations in this lawsuit. SOF ¶ 50. Thus, MD Labs' billing

practices did not cause any Omni provider to order a test from MD Labs. Furthermore, no evidence has been produced in this action suggesting that any non-Omni provider was improperly influenced by the existence of a lower self-pay rate. Accordingly, Omni cannot prove that MD Labs' billing practices caused the submission of any false claims.

## III. Omni Cannot Prove That Defendants Acted with Requisite Scienter

### a. There is No Evidence that Defendants Knowingly Performed Medically Unnecessary PCR UTI Tests

The FCA's scienter element refers to the defendant's knowledge and subjective belief at the time a claim is submitted, rather than what an objectively reasonable person may have known or believed. *U.S. ex rel. Schutte v. SuperValu Inc*., 598 U.S. 739, 743 (2023). Because the evidence establishes MD Labs' subjective belief was that PCR UTI tests were medically necessary, Omni cannot prove Defendants knowingly performed unnecessary PCR UTI tests.

Based on the clinical expertise of MD Labs' medical director of its division that performed UTI testing, an infectious disease specialist, Defendants believed PCR UTI testing could better assist providers treating patients than BUCs, as it could be completed more quickly and was more sensitive in identifying bacteria than a BUC. SOF ¶ 31. Moreover, Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous indicated the superiority over BUCs. *Id.* ¶ 32.[9]

### b. Omni Has No Evidence that Defendants Knowingly Made Payments to Improperly Influence Provider Decisions

Even if Omni could prove that commission-based payments resulted in false claims, which it cannot (*see* Argument § I(b), *infra*), it cannot prove that Defendants *knowingly* made such payments to improperly influence providers. The AKS's intent standard is "harder to meet"

---

[9] Furthermore, other providers not affiliated with MD Labs also recognized and praised the clinical utility of MD Labs' PCR UTI test. SOF ¶ 30.

than the FCA's scienter standard because "the AKS requires that a defendant have knowledge of illegality, whereas the FCA requires only recklessness or deliberate ignorance of illegality." *U.S. ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 2020 WL 4260797, at *13 (E.D. Pa. July 24, 2020); *see also Teva Pharms. USA, Inc.*, 682 F. Supp. at 147 (same). Omni must prove that the defendant subjectively thought that the arrangements in question were impermissible. *See, e.g.*, *U.S. ex rel. Suarez v. AbbVie, Inc.*, 2019 WL 4749967, at *13 (N.D. Ill. Sept. 30. 2019) (dismissing complaint because there was no basis for inference from allegations that defendant knew the program was unlawful and implemented it anyway); *U.S. v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019) (willfulness under AKS requires "that the act was committed voluntarily and purposely with the specific intent to do something that the law forbids . . . Under this definition of willfulness, knowledge that the conduct is unlawful is all that is required"); *U.S. ex rel. Hart v. McKesson Corp.*, 2023 WL 2663528, at *7 (S.D.N.Y. Mar. 28, 2023) (for FCA violation based on AKS violation, relator must show that that defendant knew its conduct was illegal).

Omni cannot meet its burden. For the accounts serviced by independent contractor sales representatives, there is ample evidence that Defendants believed that paying volume-based commissions to independent contractor sales representatives was lawful. SOF, ¶ 47.

**IV. There Is No Evidence Supporting the Other Theories Raised in the SAC**

The SAC asserts several additional theories that Omni has not pursued in discovery. Specifically, the SAC alleges claims based on allegations that MD Labs (1) charged Medicare more than other payors (SAC ¶¶ 103, 159-60, 189, 202, 206) or; (2) engaged in impermissible "pass-through" billing (*Id.* ¶¶ 101(c), 108-20, 190) declined to balance bill patients (*Id*. ¶¶ 279-89). Because Omni has not produced or discovered facts supporting these theories of recovery, Defendants are entitled to summary judgment on any claims based on these theories. *See Deaton v. Town of Barrington*, 100 F.4th 348, 357 (1st Cir. 2024)

### V. All of Omni's Claims Fail as a Matter of Law and Defendants are Entitled to Summary Judgment

Count I is the sole count that alleges violations of the FCA based on the theories discussed in Argument §§ I-III, *infra*. Because there is no genuine issue of material fact with respect to any of these theories, MD Labs is entitled to dismissal of Count I. Counts II through XXXIII allege claims under 32 state analogues of the FCA.[10] The Court should dismiss the state claims for all the reasons stated above. The state laws under which Omni is proceeding are interpreted consistently with the federal FCA in all material respects.[11] For those that permit FCA claims with respect to claims to commercial payors, Omni has no evidence of any false claim submitted to such insurers for the same reasons discussed above. As a result, this Court should dismiss the state FCA claims for the same reasons it dismisses the federal claim. Because each of these counts is derivative of Count I, MD Labs is entitled to dismissal of Counts II through XXXIII.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment against Omni on all claims.

[10] Counts XXXIV and XXXV were dismissed by the Court on January 22, 2024 (ECF No. 232).

[11] *See, e.g., Mazik v. Kaiser Permanente, Inc*., 2024 WL 584162, at *11-12 & n.14 (E.D. Cal. Feb. 13, 2024) (Colorado, Georgia, Washington); *U.S. ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 179 & n.2 (4th Cir. 2022) (North Carolina); *U.S. v. Univ. of Mass., Worcester*, 80 F. Supp. 3d 296, 299 (D. Mass. 2015) (citing *Scannell v. Attorney Gen.*, 70 Mass. App. Ct. 46, 872 N.E.2d 1136, 1138 n. 4 (2007)); *U.S. v. Wal-Mart Stores E., LP*, 858 F. App'x 876, 880-81 (6th Cir. 2021) (Michigan); *U.S. ex rel. Rahimi v. Zydus Pharms. (USA), Inc*., 2017 WL 1503986, at *12 (D.N.J. Apr. 26, 2017) (Texas).

Dated: July 31, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*

Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on July 31, 2024.

*/s/ Seth B. Orkand*
Seth B. Orkand