**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC.,

Plaintiffs,

v.

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,

Defendants.

Case No. 18-cv-12558-PBS

**DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE'S**
**STATEMENT OF MATERIAL FACTS**

## A. *MD Labs and PCR UTI Testing*

1. Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011. Denis Grizelj Deposition Transcript ("Grizelj Tr."), **Ex. 1**, at 16:20-17:17; Matthew Rutledge Deposition Transcript ("Rutledge Tr."), **Ex. 2**, at 10:7-12:14.

2. MD Labs historically performed urine drug testing ("UDT"). Declaration of Matthew Rutledge ("Rutledge Decl."), **Ex. 3**, ¶ 4; Second Amended Complaint ("SAC"), ECF No. 184, ¶ 34. In or about 2017, it added urinary tract infection ("UTI") testing using polymerase chain reaction ("PCR") technology. Rutledge Tr., **Ex. 2**, at 31:15-24; 42:21-43:1.

3. PCR testing technology has been available since the mid-1980s. *Polymerase Chain Reaction* (*PCR*), NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/probe/docs/techpcr/ (last visited July 29, 2024), **Ex. 4**.

4. PCR testing is highly accurate and amplifies copies of a segment of DNA to enable identification of genetic material belonging to a particular biological origin. Expert Report of Dr. Ko ("Ko Rpt."), **Ex. 5**, at 6-7; Dr. Dicken Ko Deposition Transcript ("Ko Tr."), **Ex. 6**,123:8-124:1.

5. In recent years, PCR technology has become a standard test to identify a range of pathogens, including HIV, Hepatitis C, and most recently, COVID-19. Ko Rpt., **Ex. 5**, at 6; Ko. Tr., **Ex. 6**, 123:12-21

6. By contrast the standard test for UTIs for over 60 years has been the bacterial urine culture ("BUC"), where a urine sample is placed on a growth medium in a Petri dish, and laboratories wait between 24 and 48 hours to determine if any bacteria grew, and sometimes longer for slow-growing bacteria. Ko Rpt. **Ex**. **5**, at 4; Ko. Tr. **Ex. 6**, 82:18-24.

7. MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens, depending on the time period. Grizelj Tr., **Ex. 1**, at 220:16-221:6; 226:9-16; Rutledge Decl., **Ex. 3**, ¶ 5.

8. In addition to the PCR test, MD Labs simultaneously conducted an antibiotic susceptibility test ("AST") by culturing the urine specimen to grow any bacteria present so it could then determine whether it was susceptible to a broad array of antibiotics. Grizelj Tr., **Ex. 1**, at 198:12-24; Dr. Steven Parker Deposition Transcript ("Parker Tr."), **Ex. 7**, at 75:16-76:1; Rutledge Decl., **Ex. 3**, ¶ 8.

9. Performing both tests simultaneously provided faster than results than would be available if the lab delayed culturing the sample for AST until PCR results were available. Rutledge Decl., **Ex. 3**, ¶ 9.

10. If PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST. Grizelj Tr., **Ex. 1**, at 198:12-24; 199:14-17; Rutledge Decl., **Ex. 3**, ¶ 10.

11. If a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test. Grizelj Tr., **Ex. 1**, at 198:12-199:2; Rutledge Decl., **Ex. 3**, ¶ 11.

12. PCR testing produces results more quickly than BUC. Ko Rpt., **Ex. 5**, at 5-6.

13. MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results. Parker Tr., **Ex. 7**, at 121:24-122:3; Ko Rpt., **Ex. 5**, at 4-5; Rutledge Decl., **Ex. 3**, ¶ 12.

14. MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of patient symptoms. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, at 134:21-135:19.

15. MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See, e.g.*, MDLabs_0008722, **Ex. 8**.

16. PCR UTI testing is more accurate than BUC, which may miss bacteria where a patient has already started antibiotics or where there is a polymicrobial infection where a dominant organism overgrows a secondary pathogen. Parker Tr., **Ex. 7**, at 114:15-23; Ko Tr., **Ex. 6**, 94:3-20; 113:12-24.

17. MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, 94:16-95:1; 113:12-24.

18. PCR testing, combined with AST, decreases the spread of antibiotic-resistant bacteria that can generate dangerous infections because it ensures that clinicians use an effective antibiotic the first time around, rather than potentially using an antibiotic that may not be as effective. Ko Rpt., **Ex. 5**, at 6-7.

19. At the time MD Labs offered PCR UTI testing, no local coverage determination ("LCD") or national coverage determination ("NCD") limited the use of PCR UTI testing and government and commercial payors routinely paid claims for PCR UTI testing. Rutledge Decl., **Ex. 3**, ¶ 7.

20. Both parties' experts agreed that PCR UTI testing is reasonable and necessary in certain cases. Dr. Mourtzinos Deposition Transcript ("Mourtzinos Tr."), **Ex. 9**, at 54:11-55:8; 77:4-20 Ko Tr., **Ex. 6**, at 89:4-13.

21. Omni's own medical expert agreed with a myriad of reasons that PCR testing for UTIs may be medically necessary, including: (1) Refractory UTI: failed standard therapy from urine culture/traditional empiric treatment; (2) Patients sent to urology for recurrent or refractory UTI; (3) Need for better test; (4) PCR test allows identification of specific organisms and resistance genes; (5) Repeat PCR test after treatment in symptomatic patients allows evaluation of treatment and tailoring to sterilize the urine; (5) Complicated UTI: male, fever, foreign body, stone, obstruction, etc.; (6) Empiric antibiotics started and tailored to resistance genes in 24 to 48 hours (urine culture 48-72 hours); (7) Urine Culture unable to identify extended-spectrum β-lactamase, high prevalence; and (8) Complete divergence of treatment course. Mourtzinos Tr., **Ex. 9**, at 77:4-20, 78:7-80:16; Jonathan Rubenstein, MD & Mark Painter, *How to get reimbursed for multiplex PCR urine cultures*, 50 Urology Times Journal (2022), **Ex. 10**.

22. Dr. Mourtzinos' opinion was consistent with that of MD Labs' expert, Dr. Ko, who testified that PCR testing was indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome." Ko Tr., **Ex. 6**. at 89:4-13; *see also id.* at 94:3-95:3.

23. PCR UTI testing is also indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component. Ko Tr., **Ex. 6**, at 94:8-20.

24. PCR testing is not new, novel, relatively unknown or rarely used and is the standard test for a range of pathogens. Ko Rpt., **Ex. 5**, at 6.

25. Peer-reviewed literature notes that BUC has several limitations, including missed polymicrobial infections, false negatives, contamination of urine specimens, and prolonged turnaround times. Ko Rpt., **Ex. 5**, at 4-5.

26. Additionally, one study found that in cases where PCR testing detected microorganisms missed by SUC, over 75 percent of those cases were "'true UTIs, as evidenced by elevated levels of urinary biomarkers in a symptomatic population with a presumptive UTI diagnosis.'" Ko Rpt., **Ex. 5**, at 6 (quoting Haley, et al., *Comparison Shows that Multiplex Polymerase Chain Reaction Identifies Infection-associated Urinary Biomarker-positive Urinary Tract Infections that are Missed by Standard Urine Culture*, 58 EUROPEAN UROLOGY OPEN SCI., 73-91 (2023)).

27. Furthermore, "[d]ata are now emerging that using PCR instead of SUC has led to fewer recurrent infections, hospitalizations, and significantly less overall cost for complicated

urinary infections." Ko Rpt., **Ex. 5**, at 7 (citing Ko, et al., *Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is Associated With Reduced Infection Severity and lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections*, 1 JU OPEN PLUS 5 (2023)).

28. MD Labs' expert opined that PCR UTI testing is not experimental and instead is "very standard across the country." Ko Tr., **Ex. 6**, at 84:22-86:3 (noting PCR UTI testing is not included among a list of experimental UTI tests).

29. MD Labs' test for 17 or 19 pathogens was within the range of pathogens endorsed by peer-reviewed literature, and the specific pathogens for which MD Labs tested were appropriate. Ko Rpt., **Ex. 5**, at 5.

30. Providers not affiliated with MD Labs also recognized and praised the clinical utility of MD Labs' PCR UTI test. *See, e.g.*, MD0211812, **Ex. 11**.

31. Based on MD Labs' medical director's clinical expertise, Defendants believed PCR UTI testing could assist providers treating patients better than BUCs, as PCR testing could be completed more quickly and was more sensitive in identifying bacteria than BUC. Grizelj Tr., **Ex. 1**, at 73:2-16; *see also* Parker Tr., **Ex. 7**, at 81:11-82:16; 104:10-20; 121:24-122:3.

32. Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority over BUCs. Rutledge Decl., **Ex. 3**, ¶ 6.

**B. *The Role of the Clinical Laboratory***

33. Clinical laboratories do not have a role in determining the medical necessity of testing ordered by medical providers. Dr. Deligdish Deposition Transcript ("Deligdish Tr."), **Ex. 12**, at 39:18-21.

34. Laboratory staff are not trained medical professionals, do not examine patients to assess their medication conditions, and do not treat patients. Rutledge Decl., **Ex. 3**, ¶ 14; *see also* Brief of Amicus Curiae American Clinical Laboratory Association at 3, *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 165 (D.D.C. 2017), **Ex. 13** ("In the vast majority of cases, laboratories do not see the patient for whom testing is being ordered. Even in cases in which the patient comes to a laboratory facility to have a specimen drawn, the laboratory does not examine the patient to assess his or her medical condition.").

35. By contrast, providers meet with patients, assess their conditions, have knowledge of their medical histories, and determine the course of treatment appropriate for patients based on their skill and expertise. *See*, *e.g.*, Dr. Kimberly McGrath Deposition Transcript ("McGrath Tr."), **Ex. 14**, at 25:3-26:13

36. Medical providers typically send laboratories such as MD Labs only a requisition form indicating the test the *provider* determined to be medically necessary and the applicable diagnosis code provided by the provider. *See*, *e.g.*, McGrath Tr., **Ex. 14**, at 15:2-8 (testifying that only he determines what laboratory tests to order for his patients).

37. Clinical laboratories must perform the tests ordered by providers; it would be inappropriate to override their clinical decisions. Ko Rpt., **Ex. 5**, at 9.

**C. *MD Labs' Sales Force***

38. At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of PCR UTI testing to providers. Grizelj Tr., **Ex. 1**, at 226:17-20; Rutledge Tr., **Ex. 2**, at 96:21-97:8; Rutledge Decl., **Ex. 3**, ¶ 15.

39. Pursuant to agreements with sales representatives, MD Labs paid commissions based on the revenue generated from the testing ordered by providers at their sales accounts. Rutledge Tr., **Ex. 2**, at 99:1-13; Rutledge Decl., **Ex. 3**, ¶ 17.

40. These agreements did not provide for any payment to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

41. MD Labs sales representatives did not offer or pay anything of value to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

42. MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner, regardless of whether they were independent contractors or W-2 employees. Grizelj Tr., **Ex. 1**, at 128:13-20; Rutledge Tr., **Ex. 2**, at 79:7-15; Rutledge Decl., **Ex. 3**, ¶ 16.

43. MD Labs trained independent contractor and W-2 employee sales representatives identically and all sales representatives were instructed to use the same marketing materials. Rutledge Decl., **Ex. 3**, ¶ 15.

44. Roy Riley ("Riley"), owner and sales representative of Pace Solutions LLC, explicitly denies that either the way he was compensated by MD Labs or his 1099 status affected the sales message he used about the benefits of PCR testing, or that his compensation structure incentivized him to sell medically unnecessary tests. Declaration of Roy Riley ("Riley Decl.,")., **Ex. 15**, ¶ 7.

45. Pace Solutions LLC and Riley promoted PCR UTI testing as appropriate for patients who suffer from recurrent or intractable UTIs. Riley Decl., **Ex. 15**, ¶ 5.

46. Defendants told Riley to promote PCR UTI testing based on medical necessity and never asked him to do anything that compromised his integrity. Riley Decl., **Ex. 15**, ¶¶ 5, 8.

47. Defendants subjectively believed that paying independent sales representatives on commission was lawful. Grizelj Tr., **Ex. 1**, at; Rutledge Tr., **Ex. 2**, at 88:16-21.

48. Once MD Labs was instructed by its counsel that *U.S. v. Mallory*, 988 F.3d 730 (4th Cir. 2021) held that certain commission-based compensation arrangements for laboratory independent contractor sales representatives could violate the AKS MD Labs disbanded its independent sales force and hired sales representatives as W-2 employees. Rutledge Decl., **Ex. 3**, ¶ 21.

**D. *MD Labs' Billing Practices***

49. For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. MD Labs did so with the understanding that this was part of MD Labs' financial hardship policy for certain patients.. Rutledge Decl., **Ex. 3**, ¶ 19.

50. The only Omni provider that the record has shown was aware of some patients being charged $50 was Deligdish (*see* OMNI00073, **Ex. 16**), who admitted that his motivation to send samples to MD Labs was based on his desire to substantiate allegations in this lawsuit. Deligdish Tr., **Ex. 12**, at 42:24-43:5; 86:14-87:3.

51. MD Labs' intent in offering the lower charge was to relieve demonstrated financial burden on patients, and Defendants did not believe a potential benefit to *patients* was an inducement to *providers*. Rutledge Tr., **Ex. 2**, at 147:1-8; Rutledge Decl., **Ex. 3**, ¶ 19.

52. In or about 2020, MD Labs changed its financial hardship policy to no longer offer a reduced price where the patient was not insured or their insurance denied coverage for PCR UTI tests, regardless of a patient's financial condition. Rutledge Decl., **Ex. 3**, ¶ 20.

**E. *Omni and Dr. Deligdish***

53. Omni, owned by Deligdish, is a Florida medical group that also operates a physician-owned office laboratory called Melbourne Medical Laboratory. Deligdish Tr., **Ex. 12**, at 21:4-5; 23:10-18; 89:23-90:1; 91:6-8.

54. Omni has received between $10 million and $20 million in revenue from settlements or other awards from *qui tam* actions. Deligdish Tr., **Ex. 12**, at 26:17-20.

55. Deligdish also owns another entity, Lo Tignov, whose sole purpose is to investigate potential *qui tam* defendants and reap substantial investigatory fees through settlements with its targets. Deligdish Tr., **Ex. 12**, at 26:17-20 (Omni has received between $10 million and $20 million in settlements or other awards from *qui tam* actions); *id.* at 164:8-16 (Lo Tignov has investigated companies that it alleged engaged in Medicare and Medicaid fraud); 285:19-23 (Deligdish is the sole owner of Lo Tignov); *id.* at 286:7-9 (Lo Tignov does not conduct investigations for anyone or any entity other than Deligdish or Omni).

56. Deligdish diverted Omni patient specimens for which Omni providers had ordered a BUC to MD Labs for PCR UTI testing in an effort to create a basis for this action. Deligdish Tr., **Ex. 12**, at 86:14-87:24; 95:23-96:3.

57. Deligdish caused Omni to submit nearly 600 requisitions for PCR UTI testing to MD Labs, notwithstanding that patients' treating providers instead ordered a different type of test. Deligdish Tr., **Ex. 12**, at 38:1-9; 95:23-96:3.

58. Although Deligdish asserted that Omni providers were informed that samples would be sent to MD Labs for PCR testing, he could not recall how they were informed, who informed them, whether it was verbally or in writing, or when they were informed. Deligdish Tr., **Ex. 12**, at 96:4-20.

59. When an Omni provider determined that a particular laboratory test was necessary, the provider generally would choose from a list of available tests in Omni's electronic medical record and Omni medical assistants completed a requisition form for a particular lab. Deligdish Tr., **Ex. 12**, at 81:7-13; 82:5-9; 83:24-84:3.

60. However, in 2017 and 2018, irrespective of the Omni providers' decisions to order a *BUC* test for their patients, Deligdish instructed Omni's staff to order *PCR* testing from MD Labs. Deligdish admitted that he did this "so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint." Deligdish Tr., **Ex. 12**, at 84:4-6; 86:14-87:10; 95:23-96:3.

61. Notwithstanding the fact that Omni providers determined that a BUC was the appropriate test for each patient, Omni ordered PCR testing of these samples at Deligdish's direction. Deligdish Tr., **Ex. 12**, at 95:23-96:3.

62. Deligdish also submitted duplicate patient samples to up to ten *other* medical laboratories, seeking to manufacture fodder for a slew of additional *qui tam* complaints, knowing that federal health care programs would be billed for the duplicate medically unnecessary tests. Deligdish Tr., **Ex. 12**, at 255:4-256:4.

63. Medicare rules make clear that knowingly testing a patient with the same test multiple times on the same date of service is not medically necessary. *See* Medicare Claims Processing Manual, ch. 16, § 100.5.1, *available at* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

64. Omni's expert witness reviewed and opined only upon claims submitted to MD Labs from Omni, representing less than 0.5% of all PCR UTI tests performed by MD Labs. Dr.

Arrigo Deposition Transcript ("Arrigo Tr.")., **Ex. 17**, at 82:16-83:9; Expert Report of Dr. Yiannoutsos ("Yiannoutsos Rpt."), **Ex. 18**, at 5.

65. Deligdish's opinion is that PCR UTI testing is *never* medically necessary. Deligdish Tr., **Ex. 12**, at 267:13-16.

66. When asked at his deposition for the basis of his assertion that MD Labs' PCR UTI testing was experimental, Deligdish was unable to reference any specific article or medical literature to support his position. Deligdish Tr., **Ex. 12**, at 239:22-240:14.

67. Deligdish criticized another laboratory for running too *few* targets in its PCR UTI test, suggesting that a narrower panel "had a much greater likelihood of missing a diagnosis." Deligdish Tr., **Ex. 12**, at 265:24-266:14.

68. Deligdish claimed that he believed the other lab "tests for too many, too, and at the same time, not enough" pathogens. Deligdish Tr., **Ex. 12**, at 267:10-11.

69. MD Labs' written proposal to Omni did not include profit splitting or pass-through billing. *See generally* OMNI00075, **Ex. 19**.

70. MD Labs and Omni never entered executed the proposed written agreement. *See* OMNI00075, **Ex. 19** (unexecuted proposal); Deligdish Tr., **Ex. 12**, at 170:22-171:9 (testifying that the proposed arrangement "never happened anyway"); *id.* at 199:6-7 (testifying that he did not believe Omni executed the agreement and that he could not recall).

71. MD Labs contemplated entering into the proposed agreement with Melbourne Medical Laboratory, Omni's physician-owned office laboratory (commonly referred to as a "reference laboratory agreement"). Deligdish requested that any agreement be between MD Labs and Melbourne Medical Laboratory wherein Melbourne Medical Laboratory would pay MD Labs directly for laboratory testing and bill patient insurances themselves. During contract

negotiations with Omni, MD Labs understood that any agreement for Melbourne Medical Laboratory to refer tests to MD Labs would be a lawful reference arrangement pursuant to Medicare rules. MD Labs sent a proposed written agreement on August 27, 2018 that was never executed. *See* Rutledge Decl., **Ex. 3**, ¶ 22, Deligdish Tr., **Ex. 12**, at 89:21-91:11 (testifying that Melbourne Medical is Omni's "in-house laboratory" and that Deligdish is the 100 percent owner); OMNI00852, **Ex. 20**, (Deligdish requesting that the agreement be set up "through the Melbourne Medical Laboratory"); OMNI00075, **Ex. 19** (unexecuted proposal); Medicare Claims Processing Manual, ch. 16, § 40.1, *available at* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

Dated: July 31, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on July 31, 2024.

*/s/ Seth B. Orkand*
Seth B. Orkand