# EXHIBIT 1

Volume I Pages 1-260

Exhibits A-N

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA, et al., ex rel.
OMNI HEALTHCARE, INC.
Plaintiffs Case No.
V. 18-cv-12558-PBS
MD SPINE SOLUTIONS LLC, D/B/A MD LABS
INC., DENIS GRIZELJ, MATTHEW RUTLEDGE
AND DOE HEALTHCARE PROVIDERS 1-100
Defendants

---

VIDEOCONFERENCE DEPOSITION OF

DENIS GRIZELJ

Wednesday, December 20, 2023, 11:00 a.m.

-----REPORTER: Sonya Lopes, RPR, CSR-----

A. No.
Q. What year did you leave at Uber?
A. It was either end of 2010 or early 2011.
Q. What did you do next?
A. I took another position.
Q. What company?
A. NeuroTherm.
Q. Where is that located?
A. Their headquarters are somewhere in the East Coast as well. I don't recall the state.
Q. Was that also a remote position?
A. Yes.
Q. Was that also in sales?
A. Yes.
Q. Was it medical sales?
A. Yes.
Q. How long were you there?
A. Yeah. Also around a couple of years as well.
Q. Where did you go after that?
A. MD Labs.
Q. Do you remember what year?
A. 2011.
Q. 2011. Focusing on MD Labs, that refers to

MD Spine Solutions LLC doing business as MD Labs Inc.; is that correct?
A. Correct.
Q. Okay. What type of business is that?
A. It's an independent clinical laboratory.
Q. Where is MD Labs located?
A. Reno, Nevada.
Q. Is there more than one location?
A. No.
Q. Is it all one facility?
A. Yes.
Q. So, like, all the offices are contained to one building?
A. Yes.
Q. Okay. Who founded MD Labs?
A. It was myself and my partner Matthew Rutledge.
Q. Is it a Nevada company or another state company?
A. It's a California company.
Q. You mentioned your cofounder. Is that Matthew Rutledge?
A. Correct.
Q. How do you know him before that?

operations of the lab, maintained equipment, oversaw, you know, employees; whereas, Dr. Parker was more as far as providing expertise in the subject matter of molecular diagnostics and the -- and kind of the -- what an infectious disease specialist does and how their practice runs and how this type of testing could help them better take care of their patients.

Q. Was Dr. Parker using his expertise or bringing his expertise with regard to urinary tract infections specifically?

A. I didn't hear all that. Was any of his expertise -- what was the rest of the question?

Q. Was the expertise that he offered related to urinary tract infections specifically?

A. Yes.

Q. Was it also related to sexually transmitted infections?

A. Yes.

Q. As well as the respiratory?

A. I believe so, yes.

Q. What about the women's health, those group of testing?

A. Yeah. I don't recall on women's health or

referring to?
A. I mean, SOPs for, you know -- again, in the lab and in billing. We would also have annual trainings the employees would have to complete that, you know, were compliance related with Anti-Kickback Statute, you know, HIPAA and then, you know, workplace conduct, all those kinds of things. So those were conducted annually as well.
Q. Did you have any annual trainings about the Stark Law?
A. We did.
Q. Did or didn't?
A. We did. Yes. Yes. I'm sorry.
Q. In 20 -- currently, 2023, we discussed that there is a compliance department now at MD Labs. When was that created for the first time?
A. Around October of 2021.
Q. Why was the compliance department created in October 2021?
A. We entered into a corporate integrity agreement at that time. That was one of the requirements of the integrity agreement. But, you know, we also felt like it was -- it made, you know -- it was a role that we felt like needed to

your employees were trained?
A. Oh, yeah. We used third-party compliance training software. And so it would record, you know, who conducted their training and when and who still needed to do it.
Q. So, like, an online course?
A. Correct.
Q. Did everybody at MD Labs get the same training, or did they vary by position?
A. I believe some positions may have had additional training.
Q. Do you recall what those positions were?
A. Lab, for example, I believe would also have to do bloodborne pathogens or everybody that was in the home office so if you're going to even be anywhere near the lab. That would be one, for example. Then sales, I believe, had -- didn't have to do the bloodborne pathogen training, for example.
Q. What type of training did sales have to do?
A. Anti-Kickback Statute training, Stark Law, HIPAA, workplace conduct. There may have been others, but those four come to mind.
Q. Did -- what software did you use for these trainings?

Q. Okay. But do you believe that based on your reply that you are replying to the fixed test rate argument that he -- that Phillips presented?
MR. ORKAND: Objection.
A. I don't know. I mean, I don't know what my thoughts were at that date five years ago.
Q. Do you know if there was a -- if this was in relation to an independent service contract with PathMD at that time?
A. I don't know.
Q. You said earlier you had a rudimentary knowledge of the safe harbor. Did you have any knowledge of the safe harbor back in 2018?
A. Yes. I recall doing some research on it. And, you know, whatever time I did do the research -- I don't remember what year -- but based on my interpretation of it, our interpretation of it, we felt that, you know, our contracts fell within the safe harbor.
Q. Okay. Did you feel that way in 2019?
A. Yeah, I believe so.
Q. I'm going to go back to the CIA for just a moment. That is Exhibit D, I believe. Again, showing you Exhibit D. Under the training and

somewhere?
A. Yes. We would get an e-mail notification stating that we had to complete the courses by a certain date, and then we had the link to log in and take those trainings.
Q. Did they -- did you circulate the trainings at the same time every year?
A. I don't think so. I think it had to do more with the employee's work anniversary. So it was staggered based on that, I believe.
Q. Prior to 2019, was this the only type of training regarding compliance that employees received at MD Labs?
MR. ORKAND: Objection.
A. No. We had trainings, like -- we had compliance trainings prior to 2019.
Q. Yeah. What kind?
A. We had these softwares in place before 2019.
Q. So these were all the softwares -- this is how you trained your employees --
A. Yes. Correct.
Q. -- beforehand? Okay.
A. Yeah. I don't know what year, though, we

A. I don't recall exactly this was the final decision or what the initial approach was.
Q. So do you know what was the final decision regarding the approach to EKRA at that time in 2019?
MR. ORKAND: Objection.
A. Not at that time, no.
Q. So you don't know what MD Labs decided to do when the new law was passed?
MR. ORKAND: Objection. Form.
A. Well, I'm just answering specific to what was done after this exact conversation, which I can't have, you know, a specific answer to. I do know that MD Labs -- what we wanted to do is to always be compliant. Any kind of agreement -- whether it be sales compensation, whatever it may be -- you know, the intent was always to be lawful and compliant.
And so we solicited opinions about potentially changing our sales compensation and how to do so in a compliant manner. However, you know, talking to other laboratories and consultants, everybody was in the same boat. Nobody knew how to react since this was kind of sprung upon the entire industry when it first came out. So it was very

difficult to react to in quick fashion.

MS. TESIC: I'm going to mark Exhibit I, MD188759.

(April 18, 2019 e-mail and attachment, Exhibit I, marked)

Q. Sharing my screen. Can you see this e-mail?

A. Yes.

Q. Okay. At the top, it's an e-mail from April 18, 2019 from Howard Claussen to yourself and Matthew Rutledge. Do you see that?

A. Yes.

Q. In the subject, it says "Forward: 2019 EKRA presentation." And it looks like it's a PPTX, which means it's a PowerPoint; correct?

MR. ORKAND: Objection.

MS. TESIC: To what? To "Did he see that?"

MR. ORKAND: I'm sorry.

MS. TESIC: I'm asking him does he see that. What's the objection?

MR. ORKAND: As to form.

Q. Do you see on this piece of paper that I'm showing you, it says "Forward: 2019 EKRA

from the urine culture.

With respect to the PCR testing for UTIs you mentioned MD Labs offered in 2018, do you know what that process entailed as far as the testing process?

A. Like the SOPs? Is that what you're asking?

Q. Not on a molecular level. But do you know what happened once the lab received physical specimen? Do you know the process going from there?

A. Yes.

Q. Okay. What was it?

A. Samples would be prepared and, you know, we would do the PCR analysis. And concurrently, the specimens would also be put onto a plate for -- in the event that -- of a potentially positive result on the PCR test.

And so if we did get a positive result initially on the PCR test, then the specimen that was on the plate would then go to the antibiotics susceptibility phase. Had there been a negative test, then that would be the conclusion of it.

And the plate -- the part of the specimen that was put under the plate, the plate would be discarded. And we would not bill for that service,

since there was no further need for testing upon that initial negative result.

Q. Okay. Is there -- in that process, is there also a urine culture that's run simultaneously?

A. No. The culturing is not simultaneous. I mean -- well, the processing of the specimen, putting the specimen onto the plate -- so it's put onto the plate. I mean, if that's what you're referring to as a culture, I'm not sure. But we did put specimens onto a separate plate, you know, in the event that the PCR test was going to be positive.

So again, my level of technical knowledge gets to about this point. But the second test that was performed was only performed if the initial PCR test was positive and there was pathogens detected.

Q. So you can run an antibody susceptibility test without a culture? Is that your understanding?

MR. ORKAND: Objection.

A. I believe those two terms are interchangeable, if I'm not mistaken.

Q. You're referring to a urine culture and a susceptibility testing?

Q. Are you permitted to bill the patient if they haven't authorized this Section 5 right here where it says patient's authorization signature?
MR. ORKAND: Objection.
A. We're still able to bill a patient if they don't sign the form.
Q. Okay. So it's not required either for testing or billing purposes?
A. Correct.
Q. Where it says urinary tract infection testing on file here on Section 3, you mentioned that they have -- providers had an option to choose what test they're choosing. When do they choose -- at what stage are they choosing which test they want?
A. I'm sorry. On this version of the req form, there wasn't an option to choose other tests. We just had one proprietary resolution test. So that was basically all that was available.
And so the panel on file that it's referring to was our resolution panel. That was the only one on file that could be ordered.
Q. Okay. Did MD Labs offer anything like a custom panel for UTI testing?

A. Are we talking about 2018 still?
Q. Yes.
A. I mean, no. This was essentially it. It was the resolution test which was the 17 pathogens. It later expanded to 19, but I don't recall when exactly that was.
Q. Okay. You mentioned earlier that with respect to at least Dr. Patterson, you didn't have a contract for sending specimens to MD Labs. Was that true for other providers as well regarding UTI testing?
A. Yes.
Q. I'm going to scroll down to the next page. This is consistent with the same patient. At the top of the page, reads "MD Labs results report." Have you seen a form that looks like this before?
A. Yes.
Q. Okay. I'm going to zoom back in. What do you understand this to be?
A. This is the result of our -- or of a patient's, you know, specimen that came in. So this is what a provider would get upon completion of the analysis performed at the lab.
Q. Who at MD Labs prepares this results

report?
    A. I believe the format of the report itself is prepared by our lab information system that -- the software. But as far as the data itself, it gets reviewed by our certifying scientists.
    Q. I'm going to scroll down. Says reviewed and released under Dr. Steven Parker, MD, molecular diagnostic division medical director. Is that what you're referring to?
    A. I don't believe he reviews -- he reviewed every single result. But it was under, you know -- the results are reported and reviewed per the SOPs that, you know, he's basically signed off on, so.
    Q. So this doesn't mean he reviewed and released this specific MD Labs results report, this sentence reviewed and released that starts right here?
    A. Correct. Because it's under Steven Parker, not by Steven Parker.
    Q. I see. The results page shows right here under pathogens tested, is this what the 17 pathogen testing result looks like for PCRs?
    A. It looks to be, yes.
    Q. Obviously, there's a micro. That's the

the request form?
A. No.
Q. Was there ever an option to do just a urine culture and antibiotic sensitivity test on any specimens?
A. Are we still talking about 2018 or --
Q. Yeah. Yeah. 2018.
A. It wasn't an option then.
Q. After 2018, you mentioned that 17 tests might have expanded to 19. Does that mean that in 2019, MD Labs continued to provide a panel for 17 pathogens?
MR. ORKAND: Objection.
Q. At least 17 pathogens?
A. At least 17. In 2019, I believe so, so -- yes. I believe so.
Q. Okay. Are -- with regard to the sales representatives, are they considered employees or independent contractors at MD Labs in 2018?
A. We had both.
Q. You had both?
A. Yes.
Q. Was Howard Claussen an employee or independent contractor?

# REPORTER'S CERTIFICATE

I, SONYA LOPES, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4th day of January, 2024.

Sonya Lopes [signature] My Commission Expires:
Notary Public October 28, 2027

Notice Date: 01/05/2024

Deposition Date: 12/20/2023

Deponent: Denis Grizelj

Case Name: United States of America v.
MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|---|---|---|
| 15:20 | Uber | Huber |
| 16:2 | Uber | Huber |
| 62:4 | Stroll | Strull |
| 62:9 | Stroll | Strull |
| 62:21 | Stroll | Strull |
| 63:2 | Stroll | Strull |
| 63:11 | Stroll | Strull |
| 63:15 | Stroll | Strull |
| 64:2 | Stroll | Strull |
| 71:21 | Dennis | Denis |
| 71:24 | Dennis | Denis |
| 72:1 | Dennis | Denis |
| 98:22 | Telecore | TELCOR |
| 162:11 | kickbacks and recoveries act | kickbacks in recoveries act |
| 169:3 | Craussen | Claussen |
| 220:18 | resolution | Resolution |
| 238:16 | Telecore | TELCOR |

Notice Date: 01/05/2024

Deposition Date: 12/20/2023

Deponent: Denis Grizelj

Case Name: United States of America v.
MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|---|---|---|
| 238:20 | Telecore | TELCOR |
| 238:24 | Telecore | TELCOR |
| 242:11 | Telecore | TELCOR |
| 242:12 | Telecore | TELCOR |
| 242:22 | Telecore | TELCOR |
| 243:3 | Telecore | TELCOR |
| 245:1 | Telecore | TELCOR |
| 245:2 | Telecore | TELCOR |
| 245:10 | Telecore | TELCOR |
| 245:14 | Telecore | TELCOR |
| 245:22 | Telecore | TELCOR |
| 245:24 | Telecore | TELCOR |
| 248:5 | Telecore | TELCOR |
| 248:14 | Telecore | TELCOR |
| 258:7 | Some cases. | In some cases. |
| | | |
| | | |

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 26th day of January, 2024, and executed the above certificate in my presence.

Rory Brennan

NOTARY PUBLIC IN AND FOR

SAN MATEO, CALIFORNIA

County Name

MY COMMISSION EXPIRES: 06.16.2025

RORY BRENNAN
COMM. # 2358418
NOTARY PUBLIC • CALIFORNIA
COUNTY OF SAN MATEO
My commission expires June 16, 2025