# EXHIBIT 2

UNITED STATERS DISTRICT COURT

DISTRICT OF MASSACHUSETTS

****************************

UNITED STATES OF AMERICA, et al, ex rel. OMNI HEALTHCARE, INC.,

Plaintiffs, Case No.:

vs. 18-cv-12558-PBS

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1-100,

Defendants

****************************

Deposition of MATTHEW RUTLEDGE

Via Zoom Videoconferencing

Friday, December 22, 2023

10:59 a.m.

Reported by:

Adam D. Miller, Registered Professional Reporter

Page 10

Q I'm sorry?
A Is this better? I'm closer to the camera.
Q Yes. Are you currently employed, Mr. Rutledge?
A I am.
Q Where you currently employed?
A MD Spine Solutions LLC.
Q That's the defendant in this action?
A I believe it is.
Q Or -- excuse me -- one of the defendants in this action?
A I believe it is.
Q And what is your role at MD Spine Solutions?
A I am a managing partner.
Q Are you an owner of MD Spine Solutions?
A I am.
Q What percentage of MD Spine Solutions do you own?
A 47.5.
Q Who owns the remainder of

Page 11

MD Spine Solutions?
A My partner, Denis Grizelj, and a Mr. Michael Lynch.
Q What percentage of MD Spine Solutions does Mr. Grizelj own?
A 47.5 percent.
Q And Mr. Michael Lynch, how much does he own?
A 5 percent.
Q As a managing partner of MD Spine Solutions, what are your job duties?
A Quite a few job duties. Overall management of the scientific laboratory side of the house, primarily.
Q What type of business is MD Spine Solutions?
A We are a clinical laboratory.
Q How does MD Spine Solutions earn revenue?
A We analyze patient specimens sent to us by our client physicians and we bill for those services.
Q How many employees does

Page 12

MD Spine Solutions have?
A I don't know the exact number.
Q What's your estimate of how many employees MD Spine Solutions has?
A Roughly 35 to 40.
Q How long have you been an owner of MD Spine Solutions?
A I've been an owner of MD Spine Solutions since 2011.
Q Was that the year MD Spine Solutions was founded, or did it exist before you became an owner?
A That was the year that it was founded.
Q And has your role at MD Spine Solutions always been that of managing partner, or have you had other roles or titles?
A That's always been my ownership official title.
Q Before you became an owner and managing partner of MD Spine Solutions, where were you employed, if you were?
A I was employed with

Page 13

Kimberly-Clark Healthcare.
Q And what type of business is that?
A Kimberly-Clark is a major American corporation in the healthcare space, a manufacturer of goods.
Q What type of goods?
A Various healthcare-related goods.
Q And what was your role at Kimberly-Clark?
A I forget the exact title.
Q What were your job duties at Kimberly-Clark?
A Sales and customer education.
Q How long were you employed at Kimberly-Clark?
A I don't remember the exact duration.
Q More than five years or less than five years?
A It was more than five years.
Q Before you were employed at Kimberly-Clark, where were you employed?

Q I can't define it any further than how it's defined in the settlement agreement.
A Then I can't give an answer. I'm sorry.
Q How many different types of tests does MD Labs currently perform?
A What you mean by "types of tests"? I'm sorry.
Q Well, how many different -- how many different types of, I guess, diseases does MD Labs test for?
A We don't test for any diseases.
Q How about infections? How many types of infections does MD Labs test for?
A None.
Q What does MD Labs test for?
A We do chemistry and toxicology testing and we do pharmacogenomics testing.
Q What's the purpose of the chemistry testing that MD Labs perform?
A It's tied to urine and saliva drug testing.



Q And how about the toxicology testing that MD Labs performs?
A They overlap. They're two descriptions of a similar line of testing.
Q And how about the pharmacogenetic testing that MD Labs performs?
A What's your question? I'm sorry.
Q What is the purpose of the pharmacogenetic testing that it performs?
A It's to give providers information about their patients' drug metabolism and response.
Q Does MD Labs currently perform testing for urinary tract infections?
A We do not.
Q Has it ever?
A We have.
Q During what period did it perform testing for urinary tract infections?
A I believe it was 2017 through 2022.



Q When did MD Labs begin offering testing for urinary tract infections?
A Originally, it was because we were seeing a lot of our patient specimens be referred to us come in looking, resembling having the characteristics of an infection.
Many of the patient specimens that are referred to us are from patients that are on an opiate or some sort of and NSAID or some sort of painkiller. And those can suppress the patients responding to a lot of symptoms.
So that we thought there might be a lot of undiagnosed urinary tract infections coming through the lab. And we thought we could help a lot of people by, you know, bringing that to the provider's attention.
Q When you say "we," whom are you referring to?
A MD Labs.
Q But which person specifically would make the decision to start offering this testing?



A Well, when I said "we," I was referring to the company as a whole. Scientists, our staff, everyone who's able to contribute helping those patients. What's your question?
Q I understand that. But individual persons actually had to make a decision to offer a test or not. Who at MD Labs is responsible or, you know, would take the initiative to offer this type of test?
A It's usually a group decision.
Q Who's in that group?
A Executive leadership.
Q Who's the executive leadership?
A At the time its ownership and heads of the relevant divisions.
Q So ownership is yourself and Mr. Grizelj?
A And Mr. Lynch; yeah.
Q And who were the heads of the different divisions?
A Depends on the era you're

Page 42

Q Is it accurate that MD Labs stopped offering UTI testing in 2022?
A That's accurate, yes.
Q Why did it stop offering UTI testing?
A Several reasons.
Q What are those reasons?
A Primarily, a lot of our larger referring customers had started bringing realtime PCR into their clinics, no longer needed to refer specimens out.
Q Who are MD Labs' larger customers?
A Large urology practices, urgent cares. I can't recall the other larger practices right now.
Q Did MD Labs ever perform any UTI testing that was not PCR-based?
A I don't understand the question.
Q Well, the UTI testing that MD Labs performed was using a method that involved the PCR, polymerase chain reaction; is that correct?

Page 43

A Part of the process involved that, yes.
Q Okay. Was there ever any testing that MD Labs performed that didn't involve that, didn't involve PCR?
A Did it or did not?
Q Did not.
A Antibiotic susceptibility testing does not involve PCR. We perform that. There's also -- you know, dipstick urinalysis does not involve PCR as well, and that was sometimes performed. Microscopy does not involve PCR.
Q And this is all testing for urinary tract infections?
A Yes.
Q If a provider wanted a UTI test that did not involve a PCR, how would it request that?
A They probably would not have used the Resolution test. They probably would not have used MD Labs.
Q Show you Rutledge 3. This was produced with a Bates number OMNI00528.

Page 44

(Exhibit 3 was marked for identification.)
BY ATTORNEY KENNY:
Q Do you recognize this document, Mr. Rutledge?
A Would you do me the courtesy of scrolling down so I could see the entire document.
Q It's just one page.
A I do not recognize this document.
Q Do you know who would have prepared a document like this?
A Do I know who would have produced a document like this? I do not.
Q Was there any person or department at MD Labs that was responsible for preparing marketing materials that would be sent to providers?
A Yes.
Q Who was that? Who were they?
A We had a marketing person named Chuck Dushman for a period of time. We've also had a graphic designer prepare

Page 45

documents, but -- no content, just graphics.
Q Who was the graphic designer?
A Name's Angela Bess.
Q Is she still employed at MD Labs?
A She's never been employed. She's been a contractor. We use her from time to time. We still continue to use her from time to time.
Q And how about Mr. Dushman; was he an employee or contractor?
A He's both.
Q Is he currently either an employee or contractor of MD Labs?
A He's neither.
Q When did he last work as an employee for MD Labs?
A I don't recall.
Q When did he last work as a contractor to MD Labs?
A Prior to his work as an employee. But I don't recall the date.
Q Was he -- did he end his

Page 78

anti-kickback law.
Q What's the Stark Law?
ATTORNEY HEATH: Object to form.
THE WITNESS: It's a law that surrounds remuneration going back to referring providers, I believe.
BY ATTORNEY KENNY:
Q And what does the Stark Law apply to, to your understanding?
A I couldn't -- I'm not an expert on Stark Law. I couldn't recite it on the record.
Q Does it prohibit certain types of compensation?
A I believe it does.
Q What types of compensation does it prohibit?
A I do not know precisely.
Q How about anti-kickback; what's that referring to there?
A That is regulations against remuneration going -- kicking back to referring providers.

Page 79

Q And this conversation is talking about training for sales reps; is that correct?
A I'm not sure. It specifically mentions sales reps training around privacy and security.
Q Did MD Labs during this time period provide training to sales reps for the Stark Law and the anti-kickback statute?
A I believe so.
Q What type of training did it provide?
A Online modules, regularly scheduled trainings.
Q Who would provide it? Who was responsible for providing it?
A I believe Wendy Brown was.
Q Did she design the courses, or did she just -- I guess she's going to purchase them from services?
A She may have designed some as well. I'm not sure.
Q Were you involved at all in any

Page 80

of the training that she prepared?
A I believe so.
Q You believe you were involved?
A Yes.
Q What do you recall about your involvement?
A I recall I was asked to test out some of the modules and give my thoughts on different vendors of these training modules.
Q Do you have sales responsibilities for MD Labs?
ATTORNEY HEATH: Object to form.
THE WITNESS: I do.
BY ATTORNEY KENNY:
Q Do you have client accounts for MD Labs that you're primarily responsible for?
A What you mean by "client accounts"?
Q Well, do you have providers or, you know, other types of entities that provide specimens to MD Labs that you're

Page 81

responsible for?
A That I'm responsible for the relationship?
Q Yes.
A Yeah, I do. Yes.
Q How many?
A I don't know offhand.
Q Is it more than ten or less than ten?
A I'd say less than ten.
Q Have you always had sales accounts for which you're responsible for the relationships since you started MD Labs?
A No.
Q But you currently do?
A Yes.
Q During this period in 2019, did you have any client accounts for which you were primarily responsible?
A Yes.
Q Approximately how many?
A I don't know the answer to that.

Page 82

Q When you say "I think we need a better course on Stark law and HIPAA for our reps," what are you referring to?
A I don't recall.
Q By "reps," you're referring to sales representatives?
A Yes.
ATTORNEY KENNY: Looking at another document. This will be Rutledge 10. It's produced with the Bates number MD 203040.
(Exhibit 10 was marked for identification.)
BY ATTORNEY KENNY:
Q I'll start at the bottom. It looks like it's in a long email that begins it.
Let me know when you'd like me to scroll down.
A Start at the bottom, at signatures and things.
It ends with Robert Phillips.
Okay. Now, scroll up to the start, please.

Page 83

Okay. Would you scroll down a little bit.
Would you scroll down a little bit more.
Would you scroll up, please, to the signature in the header.
From Robert Phillips to Howard Claussen; okay.
Q Robert Phillips appears to be the same person from the agreement we looked at earlier, with Path MD?
A I believe so, yes.
Q Do you recall this email exchange?
A Vaguely, yes.
Q In his email with Mr. Claussen, Mr. Phillips is referring to: The federal anti-kickback statute -- which we discussed -- to generally prohibit percentage-based compensation arrangements in marketing agreements with independent contractors.
Is that correct? Is that what you're seeing here in this section?

Page 84

A I believe so.
Q At this time did MD Labs have any percentage-based compensation arrangements in its marketing agreements with independent contractors?
A At which time?
Q The time this email was sent on September 27th, 2018?
A Yes, I believe so.
Q Was there any concern at MD Labs that such arrangements would violate the anti-kickback statutes?
ATTORNEY HEATH: Object to form.
THE WITNESS: We had concerns about all sorts of statutes; yes.
BY ATTORNEY KENNY:
Q What action did MD Labs take -- did MD Labs take any action to address those concerns?
A I don't recall.
Q Do you recall if MD labs terminated its percentage-based compensation arrangements in marketing

Page 85

agreements with independent contractors?
A We did.
Q When did MD Labs terminate those agreements?
A I believe -- it took a while to sort out those agreements. But I believe they were all completed this year, all converted this year.
Q So up until this year, MD Labs still had some active percentage-based compensation arrangements in its marketing agreements with independent contractors?
A No. We haven't had any independent contractors since 2021.
Q So was 2021 the last time MD Labs had any active independent -- actually, excuse me -- active percentage-based compensation arrangements in marketing agreements with independent contractors?
A I believe so.
Q But it ceased all those arrangements; is that correct?
A You're asking me why or --

Page 86

Q No. I'm just asking you if it did.
A I believe we did.
Q But you're not certain?
A Correct.
Q Well, to the extent that's accurate, why did MD Labs end all those arrangements?
A There was a pivotal precedent case that made it clear that they weren't compliant. So we -- that was the, the signal to move away from 1099 arrangements.
Q When you say a case, you mean a court case?
A Yes, a court case.
Q A decision from a court finding these arrangements are not compliant? Is that your understanding of it?
A That was included in the overall decision; yes.
Q What else do you understand about the decision?
ATTORNEY HEATH: Object to the

Page 87

form.
THE WITNESS: I'm sorry. Repeat the question. And if you can be more clear.
BY ATTORNEY KENNY:
Q Sure. What else do you understand about the decision?
A Could you be more clear into what you're asking. Sorry.
Q First of all, what's the -- do you know the name of this court case?
A I believe one of the entities was Bluewave.
Q And it's your understanding this decision found these type of percentage-based compensation arrangements in marketing agreements with independent contractors were not compliant with the anti-kickback statute?
A No, that's not my understanding. It was the use of independent contractors was not compliant, as part of the overall decision --
(Crosstalk.)

Page 88

Q I'm sorry. Finish your answer.
A There's a lot in that case.
Q The use of independent contractors for what?
A Sales and marketing.
Q So is it your current understanding that use of independent contractors for sales and marketing by labs is not allowed?
A My current understanding is that it's not protected under any safe harbors.
Q Safe harbors of the anti-kickback statute?
A Correct.
Q Before you became aware of this Bluewave decision, did you believe that using independent contractors for sales and marketing was protected by safe harbor in the antikickback statute?
A It wasn't clear to me.
Q So you're not sure whether these types of arrangements were permitted or not by the anti-kickback statute?

Page 89

ATTORNEY HEATH: Object to the form.
THE WITNESS: It was not clear to me.
BY ATTORNEY KENNY:
Q So while it was unclear to you, MD Labs used independent contractors for sales and marketing?
A Correct.
ATTORNEY KENNY: Look at another document. We'll mark this as Rutledge 11. This is the document produced with Bates number MD 203338.
(Exhibit 11 was marked for identification.)
BY ATTORNEY KENNY:
Q I'll share my screen. It's three-page document. I'll start at the bottom. Let me know when you'd like me to scroll up.
A Okay. You can scroll up.
Okay. You can scroll up.
Okay. You can scroll up.

not?
A That's correct. I do not know if I did or I did not.
Q Do you know if anyone at MD Labs ended up reviewing those contracts?
A I don't know.
(Discussion held off the record.)
BY ATTORNEY KENNY:
Q Are you familiar with a statute called the Eliminating Kickbacks in Recovery Act?
A Yes, I am. Yes.
Q What's your understanding of that statute?
A That came into law in 2018 and it prohibits paying compensation for the referral of work based on specimen count or revenues from that work.
Q When did you first become aware of -- if I call it "EKRA," will you understand that?
A Yeah, I understand "EKRA."
Q -- Eliminating Kickbacks In



Recovery Act? When did you first become aware of it?
A I don't recall.
Q Was it in or around 2018 when it was first enacted?
A In that timeframe, yes.
Q When you first became aware of it, did you have any understanding as to whether it could apply to any of the work that MD Labs did?
A We weren't paying our referring providers. We never have. So it was unclear to me.
Q Well, do you think it could potentially apply to any arrangements or contracts that MD Labs had?
A Certainly something to be considered; yeah.
Q Did MD Labs take any action in response to the enactment of EKRA?
A I don't recall.
Q You don't recall if at any point in, I guess, the last five years if MD Labs has taken any response in response



to the enactment of EKRA?
A In the last five years we have; yes.
Q What actions have you taken?
A We developed a compensation plan for our sales force that does not rely on those metrics --
Q What metrics --
(Crosstalk.)
Go ahead. Finish your answer. Excuse me.
A That would be specimens, volumes, or revenues.
Q Other than that, did the compensation of your sales force rely on volumes?
A Not directly, no.
Q Well, how about indirectly? Did they rely indirectly on volumes?
A Not necessarily, no.
Q How were those sales representatives compensated in or about 2018?
A Our W-2s and our full-time



employees would have a base salary plus some performance-based compensation. They'd also have a car allowance, typically a cellphone allowance, and an expense allowance.
Our independent contractors would typically not get any base salary. They'd be paid based on their performance.
Q How would their performance be evaluated to determine compensation?
A I believe it was revenues, percentage of revenues, based on the services they were providing.
Q Percentage of the volume these independent contractor sales representatives generated?
A The referring providers that they supported would send us specimens. Those specimens would be billed. And those billings would result in revenue.
Q So independent contractors would -- they would handle certain relationships with providers for MD Labs; is that accurate?

Page 98

A That's accurate.
Q So a, you know, an independent contractor would -- you know, whether it be a medical group or some other type of entity that would send specimens to MD Labs, any revenue generated from that medical group would be attributable to the sales representative for the compensation?
ATTORNEY HEATH: Object to the form.
THE WITNESS: Sorry. Would you repeat that.
BY ATTORNEY KENNY:
Q Sure. Yeah. So an independent contractor representative would be handling a client relationship for MD Labs with a medical group; is that correct?
A Yes.
Q And MD Labs would generate revenue based on specimens provided and testing performed from that certain medical group; is that correct?
A Specimens referred to us from that medical group; yes.

Page 99

Q And independent contractor sales representatives will be paid a percentage of the revenue generated by the medical group or other clients for whom they manage the relationship?
A Yes. For a period of time; yes.
Q For what period of time?
A Up until we stopped using independent contractors.
Q In 2021? Is that your understanding?
A Correct.
ATTORNEY KENNY: This will be Rutledge 12, I believed we're up to. And the document was produced with the Bates number MD0247682.
(Exhibit 12 was marked for identification.)
BY ATTORNEY KENNY:
Q It's a four-page email. And I'll start at the bottom. It's four pages of e-mails, rather. The fourth page, though, just appears to be a signature.

Page 100

Let me know when you'd like to scroll up.
A Okay. You can scroll up. I've completed reading that section.
Okay. You can scroll up, please.
You can scroll up, please.
Okay.
Q Who is Jon Harol?
A Jon Harol is one of the owners of Lighthouse Lab Services.
Q And what is Lighthouse Lab Services?
A They are consultants in the laboratory space.
Q And what services were they providing to MD Labs?
A They are providing our lab director, Mr. Alexander Stojanoff. We pay them -- they connected us with him originally. We pay them a recurring fee to provide our lab direction services.
Q You actually pay Lighthouse to pay for Mr. Stojanoff's services?

Page 101

A Correct.
Q When he says here "With the new EKRA legislation, we are pumping the breaks [sic] a bit on connecting labs to ensure that we can do this in a compliant way," what does he mean by "connecting labs"?
A You're asking me to interpret an email between Jon and Denis and speak for Jon. So I'm not really comfortable doing that.
Q What's your understanding of what he means when he says your "connecting labs"?
A He means putting us in touch with another laboratory.
Q For what purpose?
A This appears to be to find a lab that's in network with those insurance companies so we can have them do the work.
Q Do what work?
A The lab work.
Q Testing?
A Laboratory testing, yeah.

Page 146

numbered: We do not balance bill. The most your patients will pay is $50, about the same as a specialist co-pay in many cases.

Is that accurate that MD Labs does not balance bill. Or at least was it accurate at the time of this email, September 18th, 2019?

A I don't know. I do not believe we balance bill. I believe that part is correct.

The part about "the most your patients will pay is $50" is not correct. I know that.

Q What's incorrect about that?

A That's not the most patients will be billed.

Q What's the most a patient could be billed?

A There is no most. There is no maximum a patient could be billed.

Q Do you have any idea why he would have made that representation here?

A I believe he misinterpreted

Page 147

our, our policy about patients with financial hardship.

Q What's MD Labs' policy about patients with financial hardship?

A If the patients have a balance due to us and they can demonstrate financial hardship, we can reduce their bill.

Q How would a patient demonstrate financial hardship?

A I don't know exactly. It's -- I believe there's a federal form that's used as an industry standard. But I'm not a hundred percent sure.

Q Who at MD Labs determines whether a patient has demonstrated financial hardship?

A I believe it's Joan Cuenca.

ATTORNEY KENNY: Rutledge 20. And it's the document produced with the Bates number OMNI 29.

(Exhibit 20 was marked for identification.)

BY ATTORNEY KENNY:

Page 148

Q It's a one-page document. Let me know if you'd like me to scroll up or down.

A Yeah, please scroll to the top.

Okay. Please scroll down.

Okay. Thank you.

Q Do you recognize this document?

A I do.

Q Okay. From where do you recognize it?

A I believe it's a marketing piece we've used.

Q Did you have any role in preparing this document?

A I believe I did review it.

Q Who else had a role in preparing this document?

A I don't know precisely.

Q Do you know anyone else who had a role in preparing this document?

A I know Chuck Dushman had a role in preparing this document.

Q Anyone else?

A Howard Claussen had a role in

Page 149

preparing this document.

Q Do you know when it was prepared?

A I do not.

Q Do you know for what purpose it was prepared?

A It appears to be a marketing document for urinary tract infection testing.

Q So was it prepared to provide to providers?

A Yes.

Q So to your recollection, you reviewed this document and Mr. Dushman and Mr. Claussen had a role in preparing it?

A Yes.

Q And Mr. Claussen was vice president of sales for MD Labs at the time?

A He was.

Q And Mr. Dushman was vice president of marketing or had a marketing role at MD Labs at the time?

A He had a marketing role.

Notice Date: 01/08/2024

Deposition Date: 12/22/2023

Deponent: Matthew Rutledge

Case Name: United States of America v. MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|---|---|---|
| 6:9 | Michai | MacKay |
| 18:13 | You talking | Are you talking |
| 20:22-24 | they're not excluded in any lists or any of the Medicare/Medicaids | make sure they're not on the exclusion list or excluded by Medicare or Medicaid. |
| 23:6 | Brown is our director of IT | Brown was our Director of IT |
| 32:12-13 | those can suppress the patients responding to a lot of symptoms | they can suppress the patients' ability to identify a lot of symptoms |
| 34:16 | There's several people | There were several people |
| 34:24 | equipment, support personnel | equipment support personnel |
| 41:9-10 | Likely be Lori Martin would know. | It is likely Lori Martin would know. |
| 42:10 | clinics, no longer | clinics and no longer |
| 43:9 | perform | performed |
| 45:13 | He's both. | He was both. |
| 51:12 | Well, and low workload and, you | Well, and my current workload. You |
| 55:7 | Martins, I am -- is no | Martins is no |
| 66:14 | reference | inference |
| 76:23-24 | of a chat | of an IT chat |

Notice Date: 01/08/2024

Deposition Date: 12/22/2023

Deponent: Matthew Rutledge

Case Name: United States of America v.
MD Spine Solutions LLC

| Page:Line | Now Reads | Should Read |
|---|---|---|
| 114:10 | forced to legally | forced to, legally |
| 126:4 | Alexandra | Alexander |
| 133:24 | knew | now |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

Signature of Deponent

State of Nevada
County of Washoe

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this 25 day of January, 2024, and executed the above certificate in my presence.

NOTARY PUBLIC IN AND FOR

Washoe

County Name

MY COMMISSION EXPIRES: 04/16/2027

DEANNA L CALLAHAN
Notary Public
State of Nevada
Appt. No. 19-2405-2
My Appt. Expires Apr. 16, 2027