# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>Defendants. | Case No. 18-cv-12558-PBS |

**DECLARATION OF MATTHEW RUTLEDGE**

I, Matthew Rutledge, hereby declare as follows:

1. The facts set forth herein are known to me personally, and if called upon to testify, I could and would competently testify thereto. This Declaration is offered in support of Defendants' Motion for Summary Judgment.

2. I am co-founder and President of MD Spine Solutions LLC ("MD Labs"). MD Labs is an independent clinical laboratory in Reno, Nevada. I have been employed by MD Labs since 2011.

3. In my role as President of MD Labs, I oversee its scientific operations, facilities, research and development, and test development.

4. MD Labs historically performed urine drug testing ("UDT"). In or about 2017, it added urinary tract infection ("UTI") testing using highly accurate and sensitive polymerase chain reaction ("PCR") technology.

5. MD Labs used PCR technology to test for the presence of genetic material for 17

or 19 pathogens, depending on the time period.

6. MD Labs was aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority of PCR UTI testing over bacterial urine culture ("BUC").

7. At the time MD Labs offered PCR UTI testing, no local coverage determination ("LCD") or national coverage determination ("NCD") limited the use of PCR UTI testing and government and commercial payors routinely paid claims for PCR UTI testing.

8. In addition to the PCR UTI test, MD Labs simultaneously conducted an antibiotic susceptibility test ("AST") by culturing the specimen to grow any bacteria present in the urine so it could then determine whether it was susceptible to a broad array of antibiotics.

9. Performing both tests simultaneously enabled MD Labs to provide faster than results than would be available if the lab delayed culturing the sample for AST until PCR results were available.

10. If PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST.

11. If a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test.

12. MD Labs could often determine if a patient had an infection 24 to 48 hours before a BUC would have produced results.

13. Several of MD Labs' accounts requested that PCR UTI results be reported while AST results were still pending to further aid in the clinical decision-making process.

14. Like most laboratories, MD Labs staff are not trained medical professionals, do not examine patients to assess their medical conditions, and do not treat patients.

15. At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of PCR UTI testing to providers. MD Labs trained independent contractors and W-2 employee sales representatives identically and all sales representatives were instructed to use the same marketing materials.

16. MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner, regardless of whether they were independent contractors or W-2 employees.

17. Pursuant to agreements with sales representatives, MD Labs paid commissions based on the revenue generated from the providers at their sales accounts.

18. MD Labs' agreements with sales representatives did not provide for any payment to providers. MD Labs sales representatives did not offer or pay anything of value to providers.

19. For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. MD Labs did so with the understanding that this was part of MD Labs' financial hardship policy for certain patients. MD Labs' intent in offering the lower charge was to relieve demonstrated financial burden on patients, and we did not believe a potential benefit to *patients* was an inducement to *providers.*

20. In or about 2020, MD Labs changed its financial hardship policy to no longer offer a reduced price for uninsured patients or when patients' insurance denied coverage for PCR UTI tests, regardless of a patient's financial condition.

21. Once we were instructed by our counsel that *U.S. v. Mallory* held that certain commission-based compensation arrangements for laboratory independent contractor sales representatives could violate the AKS, MD Labs disbanded its independent sales force and hired sales representatives as W-2 employees.

22. In or about 2018, MD Labs contemplated entering into a proposed agreement with Melbourne Medical Laboratory, Omni's physician-owned office laboratory (commonly referred to as a “reference laboratory agreement”). Deligdish requested that any agreement be between MD Labs and Melbourne Medical Laboratory wherein Melbourne Medical Laboratory would pay MD Labs directly for laboratory testing and bill patient insurances themselves. During contract negotiations with Omni, MD Labs understood that any agreement for Melbourne Medical Laboratory to refer tests to MD Labs would be a lawful reference arrangement pursuant to Medicare rules. MD Labs sent a proposed written agreement on August 27, 2018 that was never executed.

I declare that the foregoing is true and correct to the best of my knowledge subject to the pains and penalties of perjury, this 31st day of July, 2024

Matthew Rutledge