# EXHIBIT 10

EXHIBIT 3
Arthur Mourtzinos, M.D. 4/25/24
J. Williamson, RMR



# How to get reimbursed for multiplex PCR urine cultures

November 8, 2022
Jonathan Rubenstein, MD
Mark Painter

Publication Article
**Urology Times Journal**
Vol 50 No 11
Volume **50** Issue **11**

*"Although Medicare has developed previous coverage directives for several types of PCR tests outside of UTI detection and there are sound arguments for the use of PCR tests in detecting UTIs, Medicare only recently published a local coverage determination that included the use of PCR tests for UTI detection," write Jonathan Rubenstein, MD, and Mark Painter.*



*Jonathan Rubenstein, MD, is compliance officer and medical director of coding and reimbursement, United Urology Group and Chesapeake Urology, Towson, Maryland.*

**Q. I have been asked to return money because of the use of multiplex polymerase chain reaction (PCR) urine cultures for patients. For each patient, I believe the PCR test ordered was medically necessary, and there were no rules at the time regarding the use of PCR. Can you help?**

**A.** We have heard of this happening to several medical providers, and it can be a challenge. Let's start at the beginning. The multiplex (or quantitative) PCR test has a broad application for pathogen identification in individuals with respiratory, gastrointestinal, urinary, blood, and



*Mark Painter is CEO of PRS Urology SC in Denver, Colorado.*

neurologic infections, with potential for many other applications. Focusing on PCR testing for urinary tract infections (UTIs), studies have compared PCR tests with standard urine cultures. These studies have indicated that:

PCR tests can detect bacteria that may not be able to be grown on typical agar.

PCR results are often available in less than 24 hours compared with a few days for traditional culture results.

PCR tests may be superior in some respects to typical urine cultures for detecting and identifying of bacteria.

PCR tests detected bacteria in 36% of symptomatic patients who had a negative urine culture result.

PCR tests detected more polymicrobial infections than urine cultures detected (20% of patients compared with 7% of patients).

Although Medicare has developed previous coverage directives for several types of PCR tests outside of UTI detection and there are sound arguments for the use of PCR tests in detecting UTIs, Medicare only recently published a local coverage determination (LCD) that included the use of PCR tests for UTI detection. This policy became effective June 2, 2022, requiring any PCR test set that targets more than 1 pathogen to be defined as a panel. The PCR test set is subject to LCD L39001, which is titled MolDX: Molecular Syndromic Panels for Infectious Disease Pathogen Identification Testing. Furthermore, a test panel that includes more than 5 pathogens and does not have FDA approval as a panel would require application to the MolDx program for a specific panel code.

This policy has only been adopted by half the Medicare administrative contractors (MACs), and the LCD and associated local coverage article provide limited guidance as to when these tests should be used and when they will be covered. The policy requirements have created a different set of administrative issues for billing of PCR tests for UTIs in states where the MAC has adopted the LCD.

For your question, we will focus on the lack of guidance issued in the LCD or elsewhere for PCR testing in relation to UTIs. We will start with general Medicare policy as it relates to services provided with a lack of specific guidance for appropriate use, in accordance with the Medicare Program Integrity Manual (PIM)[1] (emphasis added):

This section applies to MACs, CERT [comprehensive error rate testing], Recovery Auditors, and UPICs [united program

integrity contractors], as indicated. CMS [Centers for Medicare & Medicaid Services] issues national coverage determinations (NCDs) that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1) (A) of the Act. **In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no local coverage determination (LCD) exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria**:

It is safe and effective;

It is not experimental or investigational; and

It is appropriate, including the duration and frequency in terms of whether the service or item is:

Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;

Furnished in a setting appropriate to the beneficiary's medical needs and condition;

Ordered and furnished by qualified personnel; and

One that meets, but does not exceed, the beneficiary's medical need.

Medical necessity is defined under Title XVIII of the Social Security Act[2]: "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services which, except for items and services described in a succeeding subparagraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." The Medicare statute requires that any rule or other statement of policy (other than a material coverage decision) establishing or changing a substantive legal standard must be promulgated by regulation[3]:

The terms "Medically Necessary" or "Medical Necessity" shall mean health care services that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: a) in accordance with generally accepted standards of medical practice; b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness,

injury or disease; and c) not primarily for the convenience of the patient, physician or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease. For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community or otherwise consistent with the standards set forth in policy issues involving clinical judgment. Unless the contrary is specified, the term "medical necessity" must refer to what is medically necessary *for a particular patient,* and hence entails an individual assessment rather than a general determination of what works in the ordinary case. But where, as here, the plan administrator presents sufficient evidence to show that a treatment is not medically necessary in the *usual* case, it is up to the patient and his or her physician to show that *this* individual patient is different from the usual in ways that make the treatment medically necessary for *him* or *her.*"[4]

These citations constitute a legal doctrine by which evidence-based clinical standards are used to determine whether a treatment or procedure is reasonable, necessary, and/or appropriate. The definitions cited further clarify those legal citations. The answer to your question comes back to whether your care of a single patient and the services you provide to your patients more broadly represent a pattern of care that complies with medical necessity as defined under Title XVIII of the Social Security Act.

As noted, we have some guidance through peer-reviewed medical articles that support the use of PCR testing for the treatment of patients with UTIs. A practice must implement the guidance and data from these peer-reviewed articles for each patient it cares for. Additionally, chart documentation and practice policies need to demonstrate the medical necessity of the service for each case.

If Medicare or another payer has reviewed your records and found they lack support for medical necessity, you have several options to refute them, assuming you have provided appropriate medical care according to the definitions above. You are allowed to develop an appeal and provide to the payer a clear, medically based argument that supports the services you have provided.

In addition to the arguments surrounding medical necessity, you have the right to demand the credentials of the party who

has determined the services provided were not medically necessary. Developing an appropriate appeal for these types of takebacks requires careful consideration and attention to detail; in short, they require a plan and the dedication of resources to respond appropriately. You may wish to seek assistance from an organization that specializes in appeals if you are left with any questions.

## Additional guidance for others

To assist you and others in developing processes and procedures moving forward, we recommend that each practice using PCR testing develop a guideline or list of appropriate-use criteria agreed upon by your group after review of existing medical literature and discussion. You will the need to educate your professional clinic staff on what these guidelines are, how they should be implemented, and importantly, how to support the use of these tests for each patient.

Below is a sample set of indications for medically necessary and appropriate use of PCR for UTIs that represents a combination of policies developed by different groups:

Refractory UTI: failed standard therapy from urine culture/traditional empiric treatment

Patients sent to urology for recurrent or refractory UTI

Need for better test

PCR test allows identification of specific organisms and resistance genes

Repeat PCR test after treatment in symptomatic patients allows evaluation of treatment and tailoring to sterilize the urine

Complicated UTI: male, fever, foreign body, stone, obstruction, etc

Need for prompt, specific treatment due to risk

Empiric antibiotics started and tailored to resistance genes in 24 to 48 hours (urine culture 48-72 hours)

Urine culture unable to identify extended-spectrum β-lactamase, high prevalence

Interstitial cystitis (IC)/pelvic pain: traditional culture misses Ureaplasma, can be seen with positive or negative urinalysis result

PCR test to help delineate IC vs embedded infection

Complete divergence of treatment course

Incurable state vs difficult infection

We encourage you to add these types of programs to your group and develop educational policies and reviews, ensuring members of your group comply with the intention of the recommendations.

**References**

1. Medicare Program Integrity Manual. Centers for Medicare & Medicaid Services. Accessed November 4, 2022. https://go.cms.gov/3NBT1dV

2. Compilation Of The Social Security Laws. Social Security Administration. Accessed November 4, 2022. https://www.ssa.gov/OP_Home/ssact/title18/1862.htm

3. Title 42—the public health and welfare. Accessed November 4, 2022. https://bit.ly/3SZWjJe

4. *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, (C.A.2 N.Y., 2002). December 20, 2002. Accessed November 4, 2022. https://caselaw.findlaw.com/us-2nd-circuit/1463839.html

**Send coding and reimbursement questions to Jonathan Rubenstein, MD, and Mark Painter c/o *Urology Times*®, at UTeditors@mjhlifesciences.com.**

Questions of general interest will be chosen for publication. The information in this column is designed to be authoritative, and every effort has been made to ensure its accuracy at the time it was written. However, readers are encouraged to check with their individual carrier or private payers for updates and to confirm that this information conforms to their specific rules.

Download Issue PDF

Articles in this issue




Distinguishing between malignant and benign renal masses

Related Videos

Future work in urology may look at factors influencing pursuit of the field

Study highlights need to recruit and retain URiM urologists

Study
URiM

## Related Content

**How to bill for performing complex urodynamics**

April 23rd 2024

*Article*

"To answer this question, one must know what is and is not included in the global payment for the UDS, and the definition and instructions for appropriate use of modifier 25," write Jonathan Rubenstein, MD, and Mark Painter.

**Health policy in urology: 2024 AUA Advocacy Summit recap**

March 21st 2024

*Podcast*

In this episode of Speaking of Urology®, Eugene Rhee, MD, MBA, and Logan Galansky, MD, discuss key topics in health policy and recap the AUA's recent Annual Urology Advocacy Summit.

**Coding for bladder catheterization via a Monti channel**

April 8th 2024

*Article*

"Use code 51702 for the routine insertion of an indwelling bladder catheter, such as a Foley," write Jonathan Rubenstein, MD, and Mark Painter.

**How APPs can bridge the gap in urologist shortages**

August 28th 2023

*Podcast*

In this episode, Janelle Bunce, PA-C, highlights the role that advanced practice providers can play in filling the gaps created by the growing workforce shortages in urology.

**Potential code for prior authorizations on AMA CPT Editorial Panel meeting agenda**

March 28th 2024

*Article*

"Good public and economic policy must align costs, benefits, and incentives; currently, all costs are incurred by physician practices, and all financial savings and benefits from prior authorization accrue to health insurance plans, leading to perverse incentives," says Alex Shteynshlyuger, MD.

**Expert discusses the potential for telesurgery in urology**

March 23rd 2024

*Article*

"The implications for urology, and every specialty, are immense. It does improve care, and it helps the patient. I think this is what it will be, it just may take some time," says Vipul Patel, MD.



Contact Info

2 Commerce Drive Cranbury, NJ 08512

609-716-7777

© 2024 MJH Life Sciences

All rights reserved.