# EXHIBIT 12

Volume: I
Pages: 1-297
Exhibits: 1-29

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * *

UNITED STATE OF AMERICA, et al., ex rel,
OMNI HEALTHCARE, INC.,

Plaintiffs,

v.

MD SPINE SOLUTIONS LLC, d/b/a MD LABS, INC.,
DENIS GRIZELJ, MATTHEW RUTLEDGE AND
DOE HEALTHCARE PROVIDERS 1-100,

Defendants.

* * * * * * * * * * * * * * * * * * * * * * *

30(b) DEPOSITION OF OMNI HEALTHCARE, INC.,

(BY CRAIG K. DELIGDISH, M.D.)

AND CRAIG DELIGDISH, M.D., PERSONALLY

APPEARING REMOTELY FROM

INDIATLANTIC, FLORIDA

THURSDAY, DECEMBER 21, 2023

8:01 a.m.

Reported by:
Mary K. Corcoran
Professional Court Stenographer/Notary Public
Appearing Remotely from Norfolk County,
Massachusetts

A. Yes.
Q. Do you have an ownership interest in OMNI?
A. Yes.
Q. What percentage of OMNI do you currently own?
A. 100 percent.
Q. How long have you been the 100 percent owner?
A. A couple of years.
Q. How many?
A. I'm sorry, a couple of years, two years, two to three years.
Q. Did anyone else previously hold an ownership interest in OMNI?
A. Yes.
Q. Who else has owned an ownership interest?
A. John Olinde.
Q. Did you say Olinde?
A. Yeah, O-l-i-n-d-e.
Q. Any other -- strike that.
Were there any other individuals who have ever held an ownership interest in OMNI?
A. Yes.
Q. Who else?
A. Well, there were nearly 30 of them.
Q. Were those 30 providers at OMNI?

**A.** No.
**Q.** What was the reason, as far as you're aware, of the other owners relinquishing their shares?
**A.** They were different in every case.
**Q.** Did you provide any compensation of any type to the other owners when they relinquished their shares?
**A.** No.
**Q.** When was OMNI incorporated?
**A.** In 1994 as the Melbourne Medical Group, and the name was changed in 2000.
**Q.** How many locations does OMNI currently have?
**A.** Approximately, six physical locations, but multiple offices within some of the locations.
**Q.** Okay. And are all of those locations in the Melbourne, Florida, area?
**A.** Yes.
**Q.** How many providers does OMNI currently employ?
**A.** Between 20 and 30.
**Q.** Has the number of locations that OMNI has changed over the years?
**A.** Yes.
**Q.** Did OMNI previously have more locations than

**Q.** Approximately, how many qui tam cases has OMNI Healthcare filed in the past ten years?
**A.** I don't know.
**Q.** Can you estimate?
**A.** Excuse me?
**Q.** Can you estimate?
**A.** Estimate? No.
**Q.** You have no sense of how many qui tam actions OMNI Healthcare has filed in the past ten years?
**A.** More than five.
**Q.** More than ten?
**A.** I don't know. I'd have to -- I don't know.
**Q.** How many qui tam cases have you personally filed in the last ten years?
**A.** None.
**Q.** What is the approximate total revenue that OMNI Healthcare has received from settlements or other awards from qui tam actions?
**A.** Somewhere between 10 and 20 million dollars.
**Q.** Were OMNI and you personally defendants in a False Claims Act qui tam action in 2016 -- sorry -- 2006?
**A.** Yes.

**Q.** Okay. Correct me, then.
**A.** My testimony is that there is no peer-reviewed literature that provides evidence that these tests are medically necessary or that these -- that these tests are medically necessary. I'll leave it at that.
**Q.** And when you're referring to these tests, you're referring to PCR-based UTI tests?
**A.** Yes.
**Q.** Okay. You reference -- excuse me -- OMNI references an entire test panel in its response.
Can you explain what that means?
**A.** Sure, sure. The use of test panels is -- I'll use the word frowned upon. It's not permitted under Medicare billing rules, other than those that are set forth by Medicare to include CVCs, comprehensive metabolic profiles, basic metabolic profiles, etc.
**Q.** So, is it your testimony that Medicare rules prohibit panels, except in enumerated circumstances?
ATTORNEY KENNY: Objection.
**A.** There are other enumerated circumstances.

I've just provided some examples.
**Q.** Who determines medical necessity?
**A.** I'm not sure that question can be answered. I mean, it's too broad. I can't answer that question.
**Q.** For any particular test, who determines the medical necessity of that test for a particular patient?
**A.** Well, I'm not sure how you're using the word medically necessary. If you're using it -- I mean, physicians determine what they believe to be medically necessary, but that doesn't mean that a payer agrees that a test is medically necessary just because a physician orders it or deems it to be medically necessary, so I don't have an answer to that question.
**Q.** Does a laboratory have a role in determining the medical necessity of a test?
ATTORNEY KENNY: Objection.
**A.** Not to my knowledge.
**Q.** Does -- based on your training and experience, Doctor, does a provider have any way to determine the specific pathogens that may be

a microscope using the analysis that you just described, or whether it should not be?
A. Most urinalyses are done with microscopic. It would depend on what the doctor ordered.
Q. Did the providers of OMNI have the ability to select whether to send a sample for microscopic evaluation or not?
A. Yes.
Q. Okay. Now, are you familiar with the term balance billing?
A. Yes.
Q. What is your understanding of what balance billing means?
A. It's the bill that remains after insurance or a third-party payer pays their portion.
Q. In response to Interrogatory No. 4, which is the second bullet point from the bottom of page 6, it states: Defendants have been further violating the Anti-Kickback Statute through their routine practice of not balance billing patients.
Do you see that?
A. Yes.
Q. Can you explain what is meant by the

allegation that the Defendants had a routine practice of not balance billing patients?

**A.** Just what you just said is what it says. They had a routine practice of not balance billing patients.

**Q.** So in other words, let's take a Medicare beneficiary, for example.

Is it OMNI's contention that MD Labs' failure to bill patients for the balance left over after Medicare's coverage was a violation of the Anti-Kickback Statute?

**A.** Well, I would answer that that's not a very good example, since Medicare pays 100 percent of your laboratory test.

**Q.** What would be a better example?

**A.** That they don't bill for deductibles and -- deductibles, coinsurance or the remaining portion of the bill for patients with commercial insurance.

**Q.** How is the purported failure to bill deductibles coinsurance or the remaining portion for commercial insurance in violation of the Anti-Kickback Statute in OMNI's view?

**A.** Well, OMNI doesn't really maintain a view.

It's the federal government that enforces the law, and it's their view.

**Q.** Well, it's OMNI's allegation, so that's what I'm referring to when I say OMNI's view.

What is OMNI's contention with respect to how your purported failure to bill for deductibles coinsurance or the remaining portion of commercial insurance is a violation of the Anti-Kickback Statute?

**A.** Well, our view is basically that that's the government's position, and if it's the government's position, it's our position. I'm not sure without a lawyer, but I mean, I don't make the laws or enforce them. It's the government's rule of law, and they're the ones that enforce it.

**Q.** What's your basis of your understanding of the government's view?

ATTORNEY KENNY: Objection.

**A.** The basis to that view is my reading of complaints filed by the government, settlement agreements, press releases from the Department of Justice, and other -- and assessments by lawyers that that practice violates the

testing?
**A.** No.
**Q.** Has OMNI ever had policies or procedures on which external testing laboratories could be used by OMNI providers?
**A.** No.
**Q.** Were OMNI providers during 2018 and 2019 free to use any laboratory, external laboratory, they chose? Excuse me. Let me rephrase that.
In 2018 and 2019, were OMNI providers free to use any external laboratory they chose?
**A.** Yes.
**Q.** Has OMNI ever had policies or procedures concerning which external laboratory's requisition forms could be used by medical assistants for OMNI's administration staff?
**A.** No.
**Q.** Has OMNI ever had policies or procedures concerning the type of UTI test that could be ordered by an OMNI provider, either a bacterial urine culture or a PCR-based UTI test?
**A.** No.

**Q.** Has OMNI ever had policies or procedures concerning who may fill out or how to fill out requisition forms for laboratory orders?

**A.** No.

**Q.** Who at OMNI is responsible for completing external laboratory requisition forms?

**A.** It would either be somebody in the medical lab or somebody in the physician's office, like a medical assistant.

**Q.** When an OMNI provider orders a laboratory test in the electronic medical record, how are paper requisitions then generated?

**A.** I'm sorry. Sometimes paper requisitions are used, but for the most part, it's done through the computer. I don't know whether that answered the question.

**Q.** Was that the case in 2018 and 2019?

**A.** Yes.

**Q.** Has OMNI ever had policies or procedures concerning the provision of missing information on requisition forms?

**A.** No.

**Q.** Does OMNI keep any written record of corrections to requisition forms or

information provided to an external laboratory that was missing on a requisition form?
**A.** I don't know. I presume so.
**Q.** Where are those records located?
**A.** They would be in the computer.
**Q.** When you say the computer, are you referring to the electronic medical record?
**A.** Yes. We use Allscripts Professional.
**Q.** Is it your understanding that if information was missing on a laboratory requisition form but later provided, that that information would be reflected in OMNI's electronic medical record for the patient?
**A.** Yes.
**Q.** Does the electronic medical record impose limitations on what type -- and this is, again, in 2018 or 2019 -- did OMNI's electronic medical record impose limitations on what type of UTI test could be ordered by a provider, either a bacterial urine culture or a PCR test?
**A.** Yes.
**Q.** What limitations did it impose?
**A.** We can only order tests that are in the

system. So if the test isn't in the system, it doesn't exist, you'd have to order it, you know, using the external requisitions.
**Q.** In 2018 and '19, were PCR-based UTI tests available in OMNI's electronic medical record?
**A.** I don't believe so.
**Q.** Who is responsible for the testing options that are available in OMNI's electronic medical record?
**A.** I'm sorry. Who's responsible for the testing what?
**Q.** The testing options that are available in OMNI's electronic medical record?
**A.** Well, I mean, the electronic medical record provider, and OMNI can presumably modify it or request a modification.
**Q.** Is there someone at OMNI whose responsibility includes modifying, requesting modifications to the tests that are available?
**A.** You mean, there were a variety or people in the IT Department that would be tasked with either doing it or contacting Allscripts?
**Q.** In cases when an external laboratory is used for a laboratory test, who determines which

**Q.** Does anyone at OMNI -- again, in 2018 or 2019, did anyone at OMNI instruct its offices to use particular external laboratories?

**A.** I instructed the laboratory to send the specimens to MD Labs and some other labs that we used at that time.

**Q.** So when you said it was the insurance -- excuse me -- the patient's insurance company or the physician that decided which laboratory to use for a laboratory test, in fact, you instructed the laboratory to send specimens to MD Labs; is that right?

**A.** Yes.

**Q.** So in the case of PCR-based UTI tests, is it your testimony that the patient's insurance or physician did not determine which laboratory to use?

**A.** Correct.

**Q.** Is it normally -- is the laboratory that's used normally determined by a patient's insurance or by the physician?

**A.** Yes.

**Q.** Why was the process different in the case of MD Labs?

A. So, we could -- so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint.
Q. Was all of the testing ordered by -- strike that.
Was all of the testing ordered by OMNI providers and sent to MD Labs ordered to accumulate evidence to substantiate the allegations in the Complaint?
A. I believe so, yes.
Q. Did providers at OMNI know that MD Labs would be used for the laboratory tests that they ordered?
A. Yes.
Q. How did they know that?
A. They filled out the requisitions, and they were informed of such, and they received the results.
Q. Did OMNI providers know that the purpose of using MD Labs was to accumulate evidence to substantiate a complaint?
A. No.
Q. Why were they not informed?
A. I don't know.

different laboratories for different testing, and sometimes it's determined by the administration. Sometimes it's determined by the physician. Sometimes it's determined by the insurance company. It just varies. There's no hard and fast rule.

**Q.** I see, okay.

Has OMNI ever had policies concerning the role or scope of duties of medical assistants at OMNI?

**A.** I don't know. We have job descriptions.

**Q.** Are medical assistants at OMNI delegated or authorized to sign laboratory requisition forms on behalf of ordering providers?

**A.** I couldn't say that OMNI has any policies relative to that.

**Q.** Is it up to each individual providers whether they authorize medical assistants to sign on their behalf?

**A.** I don't know.

**Q.** I want to focus for a moment on Melbourne Medical Laboratory.

Is Melbourne Medical Laboratory OMNI's in-house laboratory?

A. Yes.
Q. Does Melbourne Medical Laboratory have a CLIA number?
A. Yes.
Q. Is Melbourne Medical Laboratory authorized to perform high-complexity testing?
A. Yes.
Q. Does OMNI Healthcare have a CLIA number?
A. It has multiple CLIA numbers.
Q. Does Melbourne Medical have its own NPI number?
A. I don't know. I don't know, actually. You can Google it.
Q. Does Melbourne Medical have its own Tax ID number?
A. No.
Q. Does Melbourne Medical bill payers for services it performs?
A. I don't believe so. I mean, it bills under OMNI's Tax ID number.
Q. Does it bill under its own NPI number or OMNI's NPI number?
A. I presume its own NPI number, but I don't know.

Q. Is Melbourne Medical a separate entity from OMNI Healthcare?
A. I'm not sure how you define entity.
Q. Does it have its own corporate assistance?
A. Yes.
Q. Does that mean that you are the 100 percent owner of Melbourne Medical?
A. Yes.
Q. Who operates Melbourne Medical?
A. It's part of OMNI Healthcare. It goes to all the answers that I answered previously.
Q. Were you the medical director of Melbourne Medical Laboratory in 2018?
A. Yeah, laboratory director.
Q. Laboratory director, okay.
Has Melbourne Medical ever entered into contracts on its own behalf?
A. Not in the last 10 or 15 years, not in the last 20 years.
Q. So, any contracts that Melbourne Medical Laboratory might have with any other party, would those be between OMNI and the other party?
A. Yes.

through to send samples to --
**A.** Is it listed as one of the items?
**Q.** I'm asking the question.
Do you have an understanding?
**A.** Let me review the -- just review the Notice of Deposition. A doctor would order a urine culture, and a medical assistant would instruct the patient to collect the urine culture, and a requisition would be filled out, and it would be sent to the Melbourne Medical Lab that would then send it to whatever laboratory it was ordered from or based on the patient's -- yeah, whatever laboratory was ordered to.
**Q.** For the samples that were sent to MD Labs, were those samples first sent to Melbourne Medical Laboratory, which then sent them to MD Labs?
**A.** That's my understanding.
**Q.** Now, you mentioned that the doctor ordered a urine culture; is that correct?
**A.** Yes.
**Q.** Is it your understanding that in cases where a doctor ordered a urine culture, that a

PCR-based UTI was ordered from MD Labs?
**A.** For the period in which the specimens were sent to MD Labs, yes.
**Q.** Were providers informed that their orders for a urine culture would be sent for a PCR-based UTI test?
**A.** Yes.
**Q.** How were they informed?
**A.** I don't recall.
**Q.** Who informed them?
**A.** I don't recall.
**Q.** Were they informed verbally or in writing?
**A.** I don't recall.
**Q.** When were they informed?
**A.** I don't recall.
**Q.** So, you don't know how they were informed, when they were informed, who informed them, but you're confident that the providers were informed; is that your testimony?
**A.** Yes.
**Q.** And were providers informed that during the period of time when testing was conducted by MD Laboratory, by MD Labs, that providers knew that when they ordered a urine culture, the

on the call with Howard Claussen. I don't know if anybody else was on the call or not.
**Q.** Okay. Who's Brad Smith?
**A.** He's an individual who worked for a company of mine.
**Q.** That company is LoTignov, right?
**A.** Correct.
**Q.** And what is LoTignov?
**A.** What is it?
**Q.** Yes.
**A.** Well, it is or was a company that engaged in investigations.
**Q.** And investigations of what, in particular?
**A.** Investigation of companies who we alleged -- LoTignov allegedly engaged in Medicare and Medicaid fraud.
**Q.** At the time of this conversation with Mr. Claussen, was OMNI -- well, actually, strike that.
At the time that this call with Howard Claussen took place on August 13, 2018, was OMNI considering filing a qui tam lawsuit against MD Labs?
**A.** Against who?

Q. Did you have conversations prior to this August 13 conversation about a profit-splitting, profit-sharing arrangement with anybody from MD Labs?
A. I don't recall.
Q. Do you recall whether OMNI proposed a profit-splitting arrangement prior to this August 13 call?
A. We would have never proposed anything like that.
Q. At the time, you and LoTignov were investigating MD Labs; is that correct?
A. At what time?
Q. As of August 13, 2018.
A. Yes.
Q. As part of the investigation -- strike that.
OMNI ordered PCR-based UTI tests for OMNI's patients in order to substantiate allegations that would later be made in this litigation, correct?
A. Correct.
Q. So, did OMNI propose an arrangement with MD Labs that it believed was unlawful in order to substantiate claims that it would later

make in this lawsuit?
**A.** No. That's patently absurd.
**Q.** Why is that absurd?
**A.** Why would we do that? They did it. It's here in this memo. I don't think there's any dispute about that, and it never happened anyway.
**Q.** That's my question -- did it happen?
**A.** No.
**Q.** Now, was it your understanding that what Mr. Claussen proposed was that if payers increased what they paid to OMNI or Melbourne Medical, the fee that MD Labs charged to OMNI would be adjusted in the future?
**A.** No.
**Q.** Okay. Then what is your understanding of the sentence I've highlighted that begins with, He stated that they would settle in arbitration?
**A.** I don't know. I mean, I can't speak to what he thought or what I thought at the time. I can only speak to what it says.
**Q.** Did you have an understanding of what this meant at the time?
**A.** It appears that it's some sort of

specimens to MD Labs, correct?
**A.** Correct.
**Q.** Had OMNI received any training from anyone at MD Labs?
**A.** I don't know.
**Q.** Did OMNI execute this agreement?
**A.** I don't believe so. I don't recall.
**Q.** Did OMNI propose any revisions to this agreement?
**A.** I don't know.
**Q.** Did OMNI ever enter into a written clinical testing program agreement with MD Labs?
**A.** I don't believe so.
**Q.** Did OMNI and MD Labs ever share profits from testing performed at MD Labs?
**A.** No.
**Q.** Now, I want to switch gears here and ask about the testing that was performed for OMNI.
Who at OMNI filled out requisition forms for lab testing performed at MD Labs?
**A.** I don't know.
**Q.** And let me just clarify. I'm not looking for specific names. I'm looking for the categories of employees.

**Q.** You stated at the end of this paragraph: None of the tests performed by MD Labs have been determined to have any clinical validity, by CMA, the FDA or any 3rd party organization, which generally is utilized to confirm the accuracy of laboratory testing, as required by CLIA.
Do you see that?
**A.** Yes.
**Q.** Were the tests performed -- you already testified about the FDA. Were the tests performed by MD Labs required to be determined to be clinically valid by CMS?
**A.** Yes.
**Q.** How so?
**A.** To be reimbursed.
**Q.** Does CMS perform clinical validation testing based on your training and experience?
**A.** No. But CMS doesn't pay for experimental testing, and this testing was clearly experimental.
**Q.** And on what do you base your statement, that this testing is experimental?
**A.** I don't know that I can answer that question.

I don't think there's any question that it's an experimental test, that this testing is experimental.

**Q.** What's your basis for saying that it's experimental?

**A.** Just my opinion.

**Q.** On what do you base that opinion?

**A.** Medical literature, experience, and training.

**Q.** What medical literature indicates that the test performed at MD Labs was experimental?

**A.** The world, medical literature, all medical literature. There's no medical literature that has shown this to be anything other than experimental.

**Q.** Do medical studies conclude, based on your training and experience, whether a test is experimental or no?

**A.** I'm not sure I can answer that question. I'm not sure that question has an answer.

**Q.** Have you ever seen a study published in medical literature concluding that a test is or is not experimental?

**A.** Yes.

**Q.** What type of test did that study refer to?

**A.** Yes.
**Q.** Do you recognize the handwriting on this form?
**A.** No.
**Q.** So, in summary, you ordered PCR-based UTI tests from ten different laboratories for REDACTED - PHI on October 21, 2021?
**A.** Correct.
**Q.** And at the time, you did not believe that these tests were reasonable and necessary, correct?
**A.** Correct.
**Q.** All right. Did you bill for an office visit when ordering these tests?
**A.** I don't know.
**Q.** Now, when you ordered each of these ten tests, you knew that each of those laboratories would bill the patient's Medicare Advantage plan, correct?
**A.** Well, if the patient had Medicare Advantage, yes.
**Q.** Did you indicate to any of the ten labs that you were conducting comparative testing?
**A.** No.
**Q.** Did you inform any of the laboratories from

which you ordered testing, that you believed that the tests were not reasonable or necessary?

**A.** No.

**Q.** Was REDACTED - PHI a patient of yours?

**A.** Yes.

**Q.** Did you inform REDACTED - PHI that you submitted her urine specimen to ten different laboratories?

**A.** Yes.

**Q.** What did you tell REDACTED - PHI?

ATTORNEY KENNY: I'll instruct the witness not to answer if it's to discuss private conversations with a patient.

**Q.** I'm just referring to the conversation with her, not with respect to her health care or diagnosis, but with respect to you ordering duplicate tests.

What did you tell REDACTED - PHI about ordering duplicate tests?

ATTORNEY KENNY: Doctor, to the extent that you're not disclosing any confidential doctor/patient conversations, you can answer.

(Exhibit No. 24, OMNI11261-288, shown.)
**A.** Correct.
**Q.** Now, after you requested those tests, do you recall communicating with any of the 13 laboratories from which you ordered those tests?
**A.** No.
**Q.** Do you recall contacting Medical Diagnostic Lab about its failure to detect bacteria that other labs detected?
**A.** I'm sorry, which lab?
**Q.** Medical Diagnostic Laboratory?
**A.** No, I don't recall having any conversations with them.
**Q.** Not conversations, do you recall writing to MDL stating that their test failed to detect bacteria that other labs detected?
**A.** No.
**Q.** Do you recall informing MDL that it tested for the smallest number of organisms out of all of the labs to which you sent samples?
**A.** No.
**Q.** Did you understand at the time that Medical

Diagnostic Lab tested for fewer organisms than other laboratories?
A. Yes.
Q. Did you view that as a problem with respect to the accuracy of their test?
A. Yes.
Q. Why?
A. Well, they have -- because they tested for fewer organisms, they had a much greater likelihood of missing a diagnosis.
Q. So, are the laboratories that test for more pathogens more likely to -- less likely to miss a diagnosis?
A. Yes.
Q. Is there, in your view, an appropriate number of pathogens to test for so you don't miss a diagnosis?
A. I don't know.
Q. But you knew Medical Diagnostic Labs is testing for too few?
A. Yes.
Q. Are there any laboratories that you viewed as testing for too many?
A. I don't know that it makes much of a

difference.
Q. I'm asking the question. Are there any laboratories that you believe were testing for too many organisms?
A. All of them.
Q. But not MDL, correct?
A. Correct.
Q. So, all of those, other than MDL, tested for too many?
A. Correct, and I believe that MDL tests for too many, too, and at the same time, not enough.
Q. Explain that.
A. Well, because I believe the test is not medically necessary. Billing for any would be too many, but they certainly didn't bill for enough or test for enough.
Q. Okay. So when you refer to the lack of medical necessity, is that based on the number of pathogens that are tested for or the number of pathogens that it bills for?
A. Tests for. Well, if it's not medically necessary, which results in it not being appropriate to bill for, the test itself is potentially inaccurate. And if you were to

**A.** Yes.
**Q.** What are Lotignov's sources of revenue?
**A.** It is -- well, currently, it doesn't have any revenue, so it hasn't had any revenue for about five years, so I don't know that it has revenue.
**Q.** When Lotignov had revenue, what were the sources of its revenue?
**A.** I funded it, and we received funds from a litigation and financing firm.
**Q.** Have you received any funds from a litigation and financing firm for this litigation?
ATTORNEY KENNY: Objection. I instruct the witness not to answer.
ATTORNEY ORKAND: Is the basis of your objection privilege?
ATTORNEY KENNY: Yes.
BY ATTORNEY ORKAND:
**Q.** Who owned Lotignov in 2018?
**A.** I did.
**Q.** Do you still -- are you still the sole owner of Lotignov?
**A.** Yes.
**Q.** What was your role at Lotignov?

A. I'm sorry?
Q. What was your role at Lotignov?
A. Participated in investigations and business development, worked with federal agencies, third parties, general duties, provided expertise, direction, oversight.
Q. Did Lotignov conduct investigations for anyone or any entity other than you or OMNI?
A. No.
Q. Did you personally begin investigating MD Labs prior to Lotignov's involvement?
A. Yes.
Q. How long did you investigate MD Labs prior to Lotignov becoming involved?
A. A short period, I don't know.
Q. A matter of months?
A. Yes.
Q. Has OMNI or Melbourne Medical ever considered opening a molecular lab?
A. Yes.
Q. When?
A. In the last three years.
Q. What types of molecular testing did OMNI consider performing?

ATTACH TO THE DEPOSITION OF: OMNI Healthcare (Craig K. Deligdish, MD

CASE: UNITED STATE OF AMERICA, et al. v. MD SPINE SOLUTIONS LLC, d/b/a MD LABS, INC. et al.

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, please note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Please sign and date this errata sheet (before a Notary Public, if required).

PAGE LINE CHANGE OR CORRECTION AND REASON

I have read the foregoing transcript of my deposition taken on December 21, 2023, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

(Signature of Deponent) (Date)

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS

I, Mary K. Corcoran, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify there came before me on the 21st day of December, 2023, the person hereinbefore named was duly sworn to testify to his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon oath, and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of December, 2023.

Mary K. Corcoran

Mary K. Corcoran
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 5, 2028

PLEASE NOTE:
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.