# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, *et al.*, *ex rel.*
OMNI HEALTHCARE, INC.,

                Plaintiffs,

v.

MD SPINE SOLUTIONS LLC, D/B/A MD LABS
INC., DENIS GRIZELJ, MATTHEW RUTLEDGE
AND DOE HEALTHCARE PROVIDERS 1 - 100,

                Defendants.

**No. 18-cv-12558-PBS**

---

**MEMORANDUM IN SUPPORT OF RELATOR OMNI HEALTHCARE, INC.'S
OPPOSITION TO MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS
GRIZELJ AND MATTHEW RUTLEDGE'S MOTION FOR SUMMARY JUDGMENT**

---

DAVID B. HARRISON (PRO HAC VICE)
THOMAS M. KENNY (PRO HAC VICE)
SVJETLANA TESIC (PRO HAC VICE)
SPIRO HARRISON & NELSON
363 BLOOMFIELD AVENUE, SUITE 2C
MONTCLAIR, NJ 07042
(973) 232-0881

SHN\846096.1

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.    PROCEDURAL HISTORY ..................................................................................... 2

II.   MD LABS' UTI TESTING ..................................................................................... 4

III.  THE LABORATORY'S RESPONSIBILITY ..................................................... 6

IV.  MD LABS' USE OF INDEPENDENT CONTRACTORS ........................................... 7

V.   NO BALANCE BILLING BY MD LABS ................................................................ 8

LEGAL ARGUMENT ................................................................................................... 9

I.    LEGAL STANDARD ............................................................................................ 9

II.   THE RECORD DEMONSTATES THAT DEFENDANTS SUBMITTED
THOUSANDS OF FALSE CLAIMS ............................................................................. 9

    A.    PCR UTI Testing was not Medically Necessary ....................................... 10

       1.   MD Labs Cannot Rely on the Defense That it was Simply Following
Physicians' Orders ............................................................................... 10

       2.   MD Labs was Using PCR Testing Inappropriately ............................................ 12

       3.   PCR Testing was and Still is Experimental ......................................................... 13

       4.   MD Labs Used an Unreasonably Broad Panel that was Not Approved by CMS . 14

    B.    MD Labs' Commission-Based Payment to Independent Contractors Violated
the AKS and EKRA ................................................................................... 16

III.  MD LABS CAUSED THE SUBMISSION OF FALSE CLAIMS ............................. 19

    A.    Defendants Submitted Claims for Hundreds of Thousands of Medically
Unnecessary PCR UTI Tests ..................................................................... 19

    B.    MD Labs' Payments to Independent Contractors Caused the Submission of False
Claims ...................................................................................................... 21

    C.    MD Labs Acknowledged its Practice was not to Balance Bill .......................... 22

i

**IV.    OMNI CAN PROVE AT TRIAL THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER**................................................................................................ **22**

    **A.    The Record Shows Defendants Knowingly Performed Medically Unnecessary PCR UTI Tests**............................................................................................................ **23**

    **B.    There is Extensive Evidence that Defendant Knowingly Made Payments to Improperly Influence Provider Decisions**.................................................................. **24**

**V.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON OMNI'S STATE LAW CLAIMS**.............................................................................................. **24**

**CONCLUSION** ................................................................................................................ **25**

SHN\846096.1

# TABLE OF AUTHORITIES

**CASES**                                                                                                                    **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................................ 9

*Cox v. City of Boston*,
   _ F Supp. 3d _, No. CV 22-11009-RGS, 2024 WL 2186840 (D. Mass. May 14, 2024) .......
   .......................................................................................................................................... 16, 23

*Greenburg v. Puerto Rico Mar. Ship. Auth.*,
   835 F.2d 932 (1st Cir. 1987) ............................................................................................... 9

*Gual Morales v. Hernandez Vega*,
   579 F.2d 677 (1st Cir. 1978) ............................................................................................. 16

*Guilfoile v. Shields*,
   913 F.3d 178 (1st Cir. 2019) ............................................................................................. 21

*Hahn v. Sargent*,
   523 F.2d 461 (1st Cir. 1975) ............................................................................................... 9

*In re Xerox Corp.*,
   555 S.W.3d 518 (Tex. 2018) .............................................................................................. 25

*Lipsett v. University of Puerto Rico*,
   864 F.2d 881 (1st Cir., 1988) .............................................................................................. 9

*Poller v. Columbia Broad. System, Inc.*,
   368 U.S. 464 (1962) ............................................................................................................ 9

*Rush v. Parham*,
   625 F.2d 1150 (5th Cir. 1980) .......................................................................................... 13

*U.S. v. Berkeley Heartlab, Inc.*,
   225 F. Supp. 3d 487 (D.S.C. 2016) .................................................................................. 11

*U.S. v. Diebold, Inc.*,
   369 U.S. 654 (1962) ............................................................................................................ 9

*U.S. v. Fam. Med. Centers of S.C., LLC*,
   No. CV 3:14-382-MBS, 2016 WL 6601017 (D.S.C. Nov. 8, 2016) ..................................... 11

*U.S. v. Ricard*,
   922 F.3d 639 (5th Cir. 2019) ........................................................................................... 24

iii

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023) ............................................................................................. 23

*United States v. Teva Pharm. USA, Inc.*,
No. 13-cv-3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) .............................. 21

*United States v. Teva Pharms. USA, Inc.*,
682 F. Supp. 3d 142 (D. Mass. 2023) ............................................................... 17, 21

*United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*,
No. 13-cv-3003, 2021 WL 101193 (D. Minn. Jan. 12, 2021) ................................. 21

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
880 F.3d 89 (3d Cir. 2018) .................................................................................... 21

*U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*,
296 F. Supp. 3d 155 (D.D.C. 2017) ...................................................................... 11

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
647 F.3d 377 (1st Cir. 2011) ................................................................................. 21

*United States ex. rel. Morgan v. Champion Fitness, Inc.*,
368 F. Supp. 3d 1198 (C.D. Ill. 2019) .................................................................. 20

**STATUTES**

18 U.S.C. § 220(a) ...................................................................................................... 7

31 U.S.C. § 3729 et. seq ................................................................................... 2, 23, 25

42 U.S.C. § 1320a-7b ............................................................................................. 7, 16

42 U.S.C. § 1395y(a)(l)(A) ....................................................................................... 10

Tex. Hum. Res. Code § 32.039(b) .............................................................................. 25

Tex. Hum. Res. Code §§ 36.001(5-a) ......................................................................... 25

Tex. Hum. Res. Code §§ 36.002(1)-(13) ............................................................... 24, 25

**RULES**

Fed. R. Civ. P. 9(b) .................................................................................................... 25

Fed. R. Civ. P. 56(a) .................................................................................................... 9

iv

**REGULATIONS**

42 C.F.R. § 1001.952(h)(5)(iv) ................................................................................................... 9

SHN\846096.1

**PRELIMINARY STATEMENT**

Plaintiff-Relator OMNI Healthcare, Inc. ("OMNI" or "Relator") respectfully submits this memorandum of law in opposition to the motion (ECF #252) of defendants MD Spine Solutions LLC, d/b/a MD Labs, Inc. ("MD Labs"), Denis Grizelj and Matthew Rutledge (collectively, "Defendants") for entry of summary judgment dismissing OMNI's Second Amended Complaint (ECF #184).

Relator initiated this action on behalf of the United States, 29 states and the District of Columbia (the "Plaintiff States") alleging extensive violations of the False Claims Act ("FCA") by Defendants which had defrauded the United and the Plaintiff States out of tens of millions, if not hundreds of millions of dollars.  In 2021, Defendants entered a Settlement Agreement in which they admitted to substantial wrongful conduct and agreed to pay millions of dollars to OMNI, the United States and the Plaintiff States for the submission of false claims for urine drug tests ("UDTs") that were not medically necessary.  Now, after several more years of discovery, the record is clear that Defendants further defrauded the United States and the Plaintiff States by submitting claims to Medicare and other government healthcare programs for laboratory tests for Urinary Tract Infections ("UTI") using polymerase chain reaction ("PCR") technology that were not medically necessary.  Defendants carried out this extensive testing program even though the Centers for Medicare & Medicaid Services ("CMS") had not issued any National Coverage Determination ("NCD") or Local Coverage Determination ("LCD") for PCR UTI testing. Defendants carried out this extensive testing program even though the American Urological Association ("AUA") guidelines stated that PCR technology is not beneficial in the diagnostic evaluation of patients with a suspected UTI.  Defendants failed to adhere to the formal guidance issued to clinical laboratories by the Department of Health and Human Services ("HHS") Office

1

of Inspector General ("OIG") and performed PCR UTI tests even if there was no documentation in the medical chart demonstrating the intent of the ordering physician to perform the PCR diagnostic testing and antimicrobial susceptibility testing.  Defendants further failed to follow HHS-OIG guidance and only provided the option on the MD Labs requisition form to order a full panel of 17 separate tests for which MD Labs billed Medicare $700.

Defendants compounded their medically unnecessary testing by using independent contractor sales representatives to market and sell its PCR testing for UTIs and paying those independent contractors a percentage of the revenue Defendants received for each test sold. Such use of independent contractors violated the Anti-Kickback Statute ("AKS") and the Eliminating Kickbacks in Recovery Act ("EKRA").  Defendants used independent contractor sales representatives to sell PCR UTI testing for years despite being repeatedly warned by their own counsel and employees that such conduct could violate both the AKS and EKRA, and that they were at risk of criminal penalties.

Defendants have not come close to meeting their heavy burden on summary judgment of showing that there is no genuine dispute as to any material fact regarding Relator's claims. The factual record demonstrates that Relator's allegations are well-founded and supported by the evidence and its claims should proceed to trial.

## BACKGROUND

### I.    PROCEDURAL HISTORY

OMNI originally filed this action on December 12, 2018.  ECF #1.  OMNI's original complaint asserted that MD Labs misled providers into ordering a high volume of medically unnecessary bacterial urine culture tests, pharmacogenetic tests, and UDTs. *Id.* at ¶3.  On or about October 20, 2021, MD Labs and its co-founders Grizelj and Rutledge entered a settlement

2

agreement (the "Settlement Agreement") with the Federal Government and OMNI.  *See* Exhibit

("Exh.") A.  In the Settlement Agreement, MD Labs, Grizelj, and Rutledge admitted that

between 2015 and 2019, MD Labs offered its health care provider ("HCP") clients UDT,

including presumptive UDT via an enzyme immuno-assay method and confirmatory UDT via a

liquid chromatography mass spectrometry method.  *Id.* at 2.  For those HCP clients who

submitted orders to MD Labs for presumptive and confirmatory UDT, MD Labs performed both

tests at or around the same time, and simultaneously reported the results of both tests to the HCP

clients.  *Id.*  For drug targets that are reliably detected by both presumptive and definitive testing

methods, Defendants knew, as defined by 31 U.S.C. § 3729(b)(1) of the FCA, that HCPs would

not use such presumptive test results in their medical decision-making because MD Labs

reported more precise confirmatory test results to the HCPs at the same time.  *Id.*

Although the laboratory is not responsible for ordering tests, Defendants also knew, as

defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCP clients could not have reviewed

such presumptive test results for those drug targets for which presumptive testing was available

prior to ordering confirmatory UDT.  *Id.* at 2-3.  Absent HCP-designated reflex orders in certain

situations or clear orders from HCPs, for example, this confirmatory testing was not medically

reasonable and necessary.  *Id.* at 3.  Yet, from January 1, 2015 through December 31, 2019,

Defendants improperly billed, or caused to be billed, Federal Health Care Programs for

presumptive and confirmatory UDT that MD Labs simultaneously reported to HCP clients,

without HCP-designated reflex orders in place.  *Id.*

Under the terms of the Settlement Agreement, MD Labs will pay the government and

various states no less than $11.6 million and up to $16 million, depending on MD Labs' financial

circumstances over time.  *Id.* at 3-6.  Following the Settlement Agreement, Relator retained all

3

SHN\846096.1

claims against Defendants for submission or causing the submission of false claims for UTI testing.  *Id.* at 8.

## II.    MD LABS' UTI TESTING

In or about 2017, MD Labs began performing UTI testing using PCR technology.  ECF #254 at ¶2.  MD Labs advertised its UTI Testing at DNA-Genotyping Pathogen Detection with Real-Time PCR Analysis".  *See* Exh. B.  MD Labs represented to physicians and other potential customers of MD Labs that this PCR testing identifies 17 different pathogens with 100 percent specificity as compared to standard microbiology pathogen culture testing, which could identify only 5-6 different pathogens with 71 percent accuracy.  *Id.*

At the time MD Labs began performing UTI testing using PCR technology in 2017, CMS had not issued any NCD or LCD for PCR UTI testing.  Medicare issues NCDs for items and services that are reasonable and necessary for the diagnosis or treatment of an illness or injury. *See* Exh. C ("Medicare Coverage Determination Process", *available at* https://www.cms.gov/medicare/coverage/determination-process, last accessed August 27, 2024). CMS makes NCDs through an evidence-based process, with opportunities for public participation.  *Id.*  Absent a NCD, an item or service may be covered at the discretion of the Medicare contractors based on a LCD.  *Id.*  CMS has never issued a NCD for the type of PCR UTI testing performed by MD Labs and only published a LCD in June 2022, which only half of Medicare contractors have adopted to date.  *See* ECF #254-10 at 3.

Additionally, the most recent AUA guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI.  *See* Exh. D ("Recurrent Uncomplicated Urinary Tract Infections in Women:

4

SHN\846096.1

AUA/CUA/SUFU Guideline (2022), *available at* https://www.auanet.org/guidelines-and-quality/guidelines/recurrent-uti, last accessed August 27, 2024).  Often greater specificity and accuracy are not clinically useful because any incremental information they provide does not affect the treatment the patient will receive.  *Id.*  AUA guidelines state that "[s]ensitive detection of microorganisms will likely be associated with increased diagnostic confusion and dilemmas, including overdiagnosis and associated overtreatment."  *Id.*  While the AUA guidelines acknowledge that "[m]olecular testing technologies have the potential to provide accurate and rapid information, and hold promise for the future," they advise that "more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics."  *Id.*

AUA guidelines state that "[t]he impact of [PCR tests for UTI] on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice."  *Id.*  The guidelines conclude that "despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant."  *Id.*

Defendants' expert, Dr. Dicken Ko attempted to defend the widespread use of PCR UTI testing but acknowledged that in his own practice, he did not begin using PCR testing for UTIs until June 2020, several years after MD Labs introduced it.  *See* Exh. E, Ko Dep. Tr. at 107:19-108:3.[1]  He also acknowledged that the research around the PCR testing for UTIs was ongoing,

---

[1] Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR test for UTIs and thus stands to benefit directly from the expanded use of PCR UTI testing.  *See* Exh. E at 18:1-19:15. In publishing Dr. Ko's research into PCR UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics.  *See* Exh. F at 9.

SHN\846096.1

stating: "that's why we're trying to collect evidence and that's why I'm in this research field. That's why I'm in this area to try to collect the information so that people could help various patients to have a better diagnostic in terms of how to treat infection." Exh. E at 175:1-8.

## III.    THE LABORATORY'S RESPONSIBILITY

Defendants attempt to absolve themselves  from their extensive use of these medically unnecessary and experimental PCR UTI tests by stating that state that "clinical laboratories do not determine the medical necessity of testing ordered by medical providers." ECF #253 at 5. The Compliance Program Guidance for Clinical Laboratories published by the HHS-OIG makes clear though that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Exh. G at 45079. The OIG's Guidance states that "[w]e recognize that laboratories do not and cannot treat patients or make medical necessity determinations.  However, there are steps that such facilities can take to assure compliance with applicable statutes, regulations and the requirements of Federal, State and private health plans." *Id.*  The OIG recommends that laboratories "construct the requisition form to capture the correct program information as required by Federal or private healthcare programs and to promote ordering of tests by physicians or other authorized individuals." *Id.* The OIG further recommends that laboratories should provide their physician clients with the Medicare national policy and Medicare contractor local medical review for lab tests as well as make sure physicians are aware that Medicare will only pay for tests that meet the Medicare coverage criteria and are reasonable and necessary to treat an individual patient.  *Id.*

Here, the record demonstrates that MD Labs failed to follow the OIG's guidance and performed medically unnecessary UTI tests and submitted those tests for payment by Medicare and other providers.  MD Labs frequently performed PCR UTI tests even if there was no

6

documentation in the medical chart demonstrating the intent of the ordering physician to perform the PCR diagnostic testing and antimicrobial susceptibility testing. Exh. H (patient names and dates of birth are redacted from this exhibit). MD Labs often performed PCR UTI testing even when the MD Labs requisition forms were not signed by the health care provider and/or where the MD Labs requisition form left the box for the PCR UTI testing panel unchecked. *Id.*

## IV.    MD LABS' USE OF INDEPENDENT CONTRACTORS

The AKS prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. 42 U.S.C. § 1320a-7b. Similarly, EKRA makes it illegal to knowingly and willfully (1) solicit or receive remuneration for referring a patient to a recovery home, clinical treatment facility, or laboratory, or (2) pay or offer remuneration to either induce a referral of an individual to or in exchange for an individual using the services of a recovery home, clinical treatment facility or laboratory. 18 U.S.C. § 220(a). EKRA adopts the same broad approach as the AKS, and applies to the soliciting or receiving, or paying or offering to pay remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

Defendants were violating the AKS and EKRA by entering into independent contractor service agreements in which MD Labs agrees to compensate marketing companies or independent contractors for collecting specimens. ECF #254-3 at ¶39. Defendants admit that at all times relevant to this litigation, MD Labs used independent contractors to promote and sell PCR UTI testing to providers. *Id.* at ¶15. MD Labs paid commissions to the independent contractors based on the revenue generated by sales of PCR UTI testing. *Id.* at ¶16.

MD Labs used independent contractors for sales and marketing through at least 2021,

7

even though Grizelj and Rutledge were made aware numerous times by counsel and their own employees that such conduct violated the AKS and could violate EKRA.  As early as 2016, MD Labs' counsel provided a summary of the AKS which advised that "payment of percentage of sales commissions to contract sales personnel implicates the federal AKS, and is not protected by an AKS safe harbor."  *See* Exh. I.  In 2017, Grizelj stated that he had concerns about paying sales representatives as independent contractors "based on what I have learned over the past couple of months and the fact that there doesn't seem to be a lab out there that I know of paying reps as 1099s."  *See* Exh. J.  Also in 2017, MD Labs' counsel advised Grizelj that the OIG "has expressed concern about percentage-based compensation for independent marketing agents, and particularly where there is direct contact between the marketing rep and referring physicians."  *See* Exh. K.  Similarly, regarding EKRA, Grizelj and Rutledge were made aware in 2019, shortly after EKRA was enacted, that fines and imprisonment were potential penalties for commission-based payments to independent contractor sales representatives.  *See* Exh. L.

## V.   NO BALANCE BILLING BY MD LABS

MD Labs further violated the AKS by routinely not balance billing patients.  Balance billing is when a provider bills a patient for the difference between the provider's charge and the allowed amount.   If a provider's charge is $100 and the allowed amount is $70, the provider may bill a patient the balance for the remaining $30.  While it may be permissible to waive bill balances in certain situations, such as financial hardship or because the bill is uncollectible, the routine waiver of bill balances violates the AKS.   The routine waiver of a patient's obligations to pay bill balances violates the AKS's prohibition on the offering of any remuneration to induce a person to purchase or order any service for which payment may be made under Medicare.  By reducing the amount a patient pays for services, it can induce the patient to seek more services

8

that are payable by Medicare.  The HHS OIG has stated that safe harbor protection does not apply to any discount offered to beneficiaries in the form of "a reduction in price offered to a beneficiary."  42 C.F.R. § 1001.952(h)(5)(iv).

As a matter of practice, MD Labs routinely did not balance bill patients.  In a September 18, 2019 email, Chuck Dushman, Vice President for Marketing and Business Development for MD Labs, stated "we do **NOT** balance…the most your patients will pay is $50 (about the same as a specialist in many cases)".  Exh. M.  In marketing materials for its Resolution testing panel, MD Labs advertises: **No Balance Billing**/$50 Maximum Patient Cost.  Exh. N.

**LEGAL ARGUMENT**

## I.    LEGAL STANDARD

A court may grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  [T]he court must "look at the record . . . in the light most favorable to . . . the party opposing the motion . . .."  *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975) (citing *Poller v. Columbia Broad. System, Inc.*, 368 U.S. 464, 473 (1962)).  "Similarly the court must indulge all inferences favorable to the party opposing the motion."  *Id.* (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654 (1962)).  "If, after this canvassing of the material presented, the district court finds that *some* genuine factual issue remains in the case, whose resolution one way or another *could* affect its outcome, the court must deny the motion."  *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir., 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  "Notwithstanding that recent caselaw has invited greater use of Rule 56, the test remains a fairly rigorous one."  *Greenburg v. Puerto Rico Mar. Ship. Auth.*, 835 F.2d 932, 934 (1st Cir. 1987).

## II.    THE RECORD DEMONSTATES THAT DEFENDANTS SUBMITTED THOUSANDS OF FALSE CLAIMS

9

Federal and State laws governing payment for healthcare services, as well as contractual requirements for both government-funded and commercial insurers, rely on the fundamental principle that they will only pay for healthcare services that are "medically necessary." A service is "medically necessary" if it is "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(l)(A). Thus, for clinical laboratory tests to be covered, they must provide information about the patient's condition that can or will help the treating physician care for the patient. For each test ordered, and for which the clinical laboratory seeks payment, must meet the test of medical necessity. Labs may not bundle a group of tests together into a "panel" to pad their profits if only one, or a few, of the tests in the panel are medically necessary. MD Labs violated these fundamental principles, using and misusing standing orders, overly broad and rigid test requisition forms and other misleading paperwork to justify the use of PCR UTI testing that was not medically necessary. Any claim for payment for a clinical laboratory test that was not medically necessary is a false or fraudulent claim within the meaning of the FCA.

### A. PCR UTI Testing was not Medically Necessary

#### 1. MD Labs Cannot Rely on the Defense That it was Simply Following Physicians' Orders

As set forth above, while the OIG recognizes that laboratories do not make medical necessity determinations, a laboratory still has an obligation to "take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Exh. G at 45079. MD Labs failed to do that here, and it cannot absolve itself by hiding behind the defense that it was simply following physicians' orders. This defense is especially hollow where MD Labs frequently performed PCR UTI tests even if there was no documentation in the medical chart demonstrating the intent of the ordering physician to perform

10

the PCR diagnostic testing and antimicrobial susceptibility testing and even when the MD Labs requisition forms were not signed by the health care provider and/or where the MD Labs requisition form left the box for the PCR UTI testing panel unchecked.  Exh. H.

Defendants rely on the decision in *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155 (D.D.C. 2017) in which a relator, who was the medical director for health insurance company, brought a qui tam action under the FCA against a clinical laboratory that performed diagnostic testing, alleging that various genetic and non-genetic tests performed by a laboratory were not medically necessary for patients.  While this holding from another district is of course not binding on this Court, the court in *Boston Heart* denied the defendant's motion to dismiss the relator's complaint.  *Id.* at 166.  The court stated that "it still remains convinced that laboratories have a legal duty to ensure that they do not submit claims for medically unnecessary tests" and that "the relator has sufficiently alleged that Boston Heart submitted false claims by engaging in a scheme that encouraged non-cardiology physicians to order medically unnecessary tests, and then billing the Government for those tests." *Id.  See also U.S. v. Fam. Med. Centers of S.C., LLC*, No. CV 3:14-382-MBS, 2016 WL 6601017, at *3 (D.S.C. Nov. 8, 2016) (denying a motion to dismiss the United States' complaint in which it "allege[d] that [the d]efendants created and utilized custom disease-oriented panels that included more diagnostic tests than typical for screening or routine testing," noting that "[t]he United States alleges that [the d]efendants stressed to the physicians ... to utilize the laboratory panels designed by [the d]efendants, regardless of whether all components of the panel were medically necessary"); *U.S. v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 499 (D.S.C. 2016) (declining to dismiss the government's presentment claim against a laboratory because "[t]he complaint describes each of the four alleged schemes in detail," including one scheme to encourage

11

physicians to order medically unnecessary tests, and "specifies particular genetic testing that is medically unnecessary for the vast majority of the population, yet [was] still included in the panels [the d]efendants offered to physicians").

Similarly, here Defendants engaged in a scheme to encourage physicians to order medically unnecessary tests.  MD Labs only offered the option to conduct and bill for its full option of 17 tests.  Its requisition form only offered the option to order its "Urinary Tract Infection Panel on File."  Exh. O (patient identifying information redacted).  There was no option to order only a limited number of follow-up PCR tests to identify specific bacteria.  *Id.*  MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

### 2.  MD Labs was Using PCR Testing Inappropriately

OMNI's medical expert, Dr. Arthur Mourtzinos, testified that only once in his 17 years of practice did he find it appropriate to order a PCR test for a suspected UTI even though he practices in a tertiary care referral center which sees complex patients as opposed to a private practice like OMNI.  Exh. P, Mourtzinos Dep. Tr. at 101:2-22.  He emphasized that while he "could do 17 tests on every patient that walks in the door", it is not appropriate to perform those tests if it is not going to affect patient care.  *Id.* at 98:10-16.  He used the example of a hypothetical patient who is concerned about prostate cancer because their friend has prostate cancer, while it would be possible to order a prostate biopsy and MRI and subject the patient to harm, it would not be appropriate because only tests that are clinically relevant should be performed.  *Id.* at 99:1-9.

Defendants' expert, Dr. Ko, while advocating for more extensive use of PCR testing, acknowledged that most patients whom he treats, and for whom he orders PCR tests, are those

SHN\846096.1

with recurrent or complicated UTIs.  Exh. E, Ko Dep. Tr. at 45:3-24.  MD Labs though, did not

limit its PCR testing in any way.  It offered no option for any other type of UTI test.  Rutledge

testified that if a provider wanted a UTI test that did not involve a PCR, that provide "probably

would not have used MD Labs."  Exh. Q, Rutledge Dep. Tr. at 43:17-22.  MD Labs performed a

PCR test in every instance regardless of whether the requisition form requested one or whether

there was any indication in the patient's medical chart that the provider wanted a PCR test.

### 3.  PCR Testing was and Still is Experimental

In arguing that its PCR testing for UTIs was not experimental, Defendants rely on the

Fifth Circuit's decision in *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980).  While this case is

more than 40 years old and not precedential in this Court, it is instructive in quoting a letter

Medicare used at that time to explain to its clients why a service is ineligible for treatment:

> In making such a decision (whether to provide payment for a particular service), a
> basic consideration is whether the service has come to be generally accepted by
> the professional medical community as an effective and proven treatment for the
> condition for which it is being used. If it is, Medicare may make payment. *On the
> other hand, if the service or treatment is not yet generally accepted, is rarely
> used, novel or relatively unknown, then authoritative evidence must be obtained
> that it is safe and effective before Medicaid may make payment.*

*Id.* at 1156, n.11 (quoting Enclosure # 2 to Intermediary Letters Nos. 77-4 & 77-5, (1976

Transfer Binder) Medicare & Medicaid Guide (CCH) P 28,152 (1976)) (emphasis added).

As Defendants' own expert acknowledged, PCR testing for UTIs is not generally

accepted by the medical community, and certainly was not generally accepted when Defendants

began employing it as MD Labs' exclusive test for UTIs in 2017.  Dr. Ko did not begin using

PCR testing for UTIs until June 2020, several years after MD Labs introduced it.  *See* Exh. E, Ko

Dep. Tr. at 107:19-108:3.  He also acknowledged that the research around the PCR testing for

UTIs was ongoing, stating: "that's why we're trying to collect evidence and that's why I'm in

13

this research field.  That's why I'm in this area to try to collect the information so that people could help various patients to have a better diagnostic in terms of how to treat infection." *Id.* at 175:1-8.  Additionally, the AUA guidelines advise that "more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics." Exh. D.

### 4. MD Labs Used an Unreasonably Broad Panel that was Not Approved by CMS

As set forth above, in its PCR UTI testing, MD Labs only offered the option to conduct and bill for its full option of 17 tests.  Its requisition form only offered the option to order its "Urinary Tract Infection Panel on File." Exh. O (patient identifying information redacted).  There was no option to order only a limited number of follow-up PCR tests to identify specific bacteria.  *Id.*  It is well established that laboratories may not use unreasonably large "panels" of tests to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.  The HHS-OIG's laboratory guidance warns about situations where the standardized order or requisition form encourages or even misleads the physician into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.  Specifically, the Guidance cautions:

> a. Requisition design: While [CMS] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals.  The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the

14

laboratory will bill…"

Exh. G at 45079.   MD Labs' requisition form did not give physicians the option to make an independent medical necessity decision with regard to each test.  Exh. O.[2] Additionally, in May of 2018, the Healthcare Fraud Prevention Partnership, a public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations, published a report highlighting the problem of fraud in the clinical laboratory industry.  Exh. S.  The report specifically warned about the use of excessively large testing panels:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels.  For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances, such as marijuana, cocaine/crack, heroin, and methamphetamine.  In contrast, larger and more expensive definitive panels *(i.e.,* 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances.  While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity.  A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

*Id*.

MD Labs argues that its UTI testing for 17-19 pathogens was "within the range of pathogens endorsed by peer-reviewed literature."  The only authority it cites for this statement though is its own expert's report, not any independent analysis.  *See* ECF #254 at ¶29. Defendants' expert acknowledged that he was not aware of any other studies besides own that

---

[2] MD Labs' own Laboratory Director, Alexander Stojanoff, testified that he was "totally confused" by MD Labs' requisition form, stating, "I don't know where the panel is. It just – it just is all of these different diagnoses.  So that is what is confusing."  Exh. R, Stojanoff Dep. Tr. at 37:5-20.

15

reached similar conclusions on the purported value of PCR UTI testing.  Exh. E, Ko Dep. Tr. at 163:21-164:2.

### B.  MD Labs' Commission-Based Payment to Independent Contractors Violated the AKS and EKRA

The AKS prohibits any person from knowingly or willfully paying or receiving remuneration to induce a referral for services under the Medicare or Medicaid programs. 42 U.S.C. § 1320a-7b(b)(2).  As set forth above, Defendants were violating the AKS and EKRA by entering into independent contractor service agreements in which MD Labs agrees to compensate marketing companies or independent contractors for collecting specimens.  ECF #254-3 at ¶39. Defendants admit that at all times relevant to this litigation, MD Labs used independent contractors to promote and sell PCR UTI testing to providers.  *Id.* at ¶15.  MD Labs paid commissions to the independent contractors based on the revenue generated by sales of PCR UTI testing.  *Id.* at ¶16.

Defendants attempt to argue that they are entitled to summary judgment on OMNI's claims for violation of the AKS because OMNI "lacks evidence to support a finding that Defendants acted with the intent required by the AKS."  ECF #253 at 16. As an initial matter, "[w]here summary judgment 'is sought on an issue involving state of mind, 'great circumspection is required.'"  *Cox v. City of Boston*, _ F Supp. 3d _, No. CV 22-11009-RGS, 2024 WL 2186840, at *4 (D. Mass. May 14, 2024) (quoting *Gual Morales v. Hernandez Vega*, 579 F.2d 677, 680-681 (1st Cir. 1978)). Additionally, as set forth above, Grizelj and Rutledge were repeatedly advised by their own counsel and employees that compensating independent contractor sales representatives based on a percentage of tests ordered by providers could violate the AKS and EKRA.  *See* Exhs. I-L.  Despite being unquestionably aware that the AKS prohibited such arrangements,

16

Defendants still used independent contractors to market PCR UTI testing to providers for a period of years. *See* Exhs. I-L and ECF #254-3 at ¶15.

The recent decision in *United States v. Teva Pharm. USA, Inc.*, 682 F. Supp. 3d 142, 147 (D. Mass. 2023) is instructive. There, the court denied defendants summary judgment on the government's claims for violations of the AKS because there was documentary evidence that defendant's employees knew that their conduct in making donations to foundations who in turn subsidized Medicare co-pays could potentially violate the AKS. *Id.* Similar to here, where Grizelj and Rutledge received various presentations prepared by attorneys that paying independent contractors based on a percentage of sales could violate the AKS, in *Teva* the defendants' employees circulated a presentation from counsel that their conduct could violate the AKS.

Aware that there is overwhelming evidence that Grizelj and Rutledge violated the AKS, Defendants next rely on the argument that there is "no evidence that Defendants intended to improperly influence providers who ordered UTI testing." ECF #253 at 18. In fact, the evidence in this case demonstrates that MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered. For example, on April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, an independent contractor, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers. Todd explained the financial assumptions underlying the proposal as follows:

- We considered a monthly volume of 200 specimens (plus or minus)
- We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid and Tricare.
- You collect all specimens in your lab and we will pick up daily.

17

- We bill Omni their share monthly.

Exh. T.

On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg, an independent contractor, wrote to OMNI's practice administrator, offering to bring the office lunch the following week. On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked Stenberg how much MD Labs bills for UTI testing. Stenberg forwarded her question to Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni." Stenberg forwarded Todd's response to Williams:

> Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we. (FYI. Currently it is approximately $700.00.)
>
> We accept whatever the insurance company pays us ... no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

Exh. U.

On August 13, 2018, OMNI's Dr. Craig Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were doing 16 samples a month and they are now doing 16,000 samples a month. He then stated that approximately 70% of MD Labs' UTI tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance. Exh. V.

On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Clausen and Todd. Bobango reported in an email summary of the call that Clausen had stated, inter alia:

> 1. [MD Labs] will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible. They do not want patients to have to pay a lot

18

for this service.  They do not go after  the patient for any balances over $50.00.

….

3.  For UTI tests, he stated Omni will profit between $200 and $700 per claim.
The price for Omni is $250.00.  Their cost is approximately $75.00 for these tests.
After 90 days, they will take a look at EOBs and negotiate the rate as well.

Exh. W.  On August 27, 2018, Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between MD Labs and OMNI.  The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for UTI testing.  The UTI tests did not include an option or differential pricing for a smaller panel of tests than the standard, broad MD Labs panel.  *See* ECF #254-19.  Although the UTI price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

MD Labs' independent contractor sales representatives engaged in exactly the type of conduct the AKS is intended to proscribe.  They encouraged providers to order medically unnecessary testing to increase their own profits as well as MD Labs's profits.  The fact that W-2 employee sales representatives were trained in the same manner is irrelevant to whether MD Labs violated the AKS by paying these contractors.

### III.   MD LABS CAUSED THE SUBMISSION OF FALSE CLAIMS

#### A.  Defendants Submitted Claims for Hundreds of Thousands of Medically Unnecessary PCR UTI Tests

Throughout their motion, Defendants attempt to defend their submission of hundreds of thousands of false claims for medically unnecessary tests by arguing that it was OMNI's principal, Dr. Deligdish, who directed OMNI to submit specimens to MD Labs for testing.  Such an argument runs contrary to the very principles upon which the FCA is based – to incentivize

19

private citizens to report fraud on the Government by providing them with a reward for assisting with the recovery of damages to the Government.  The FCA "is not designed only to encourage innocent parties who happen upon fraud to report; it also serves *to drive a wedge between conspiring fraudsters and entice persons involved to turn upon a fraudulent scheme.*" *United States ex. rel. Morgan v. Champion Fitness, Inc.*, 368 F. Supp. 3d 1198, 1207-1208 (C.D. Ill. 2019) (emphasis added).  But here, no allegation has been made, nor could one be made, that OMNI's had any involvement whatsoever in the planning and implementation of Defendants' fraudulent scheme.  Rather, the record is clear that MD Labs, through its independent contractor sales representatives like Todd, approached OMNI, and Dr. Deligdish, to encourage them to use MD Labs' medically unnecessary PCR UTI testing.  *See* Exh. T.  Once approached and made aware of this scheme through which Defendants were submitting tens of millions of dollars' worth of false claims to Medicare, OMNI, led by Dr. Deligdish, began to gather evidence to document Defendants' fraud and file this action which seeks to recover these tens of millions of dollars for the American taxpayer.  To allow MD Labs to use a relator's efforts to root out fraud as a defense would gut the purpose of the FCA.

Defendants further state that "Omni provided MD Labs with false certifications of medical necessity…"  Defendants do not cite any documents for this assertion and it is unclear to what "certifications" Defendants are referring.  Undermining this assertion though is the fact that Defendants still conducted PCR UTI tests even where there was no documentation in the medical chart demonstrating the intent of the ordering physician to perform the PCR diagnostic testing and antimicrobial susceptibility testing and even when the MD Labs Requisition Forms were not signed by the health care provider and/or where the MD Labs Requisition form left the box for the PCR UTI testing panel unchecked.  *See* Exh. H.

20

**B. MD Labs' Payments to Independent Contractors Caused the Submission of False Claims**

Defendants ignore recent precedent from this Court in arguing that the AKS requires proof of "but-for" causation. In *Teva*, this Court held that the Relator need not prove that kickbacks were the "but-for" cause of any claim. 682 F. Supp. at 148. So long as there is a "sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA." *Guilfoile v. Shields*, 913 F.3d 178, 190 (citing *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-98 (3d Cir. 2018) (requiring plaintiff to establish only "a link between the alleged kickbacks and the medical care received []")); *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 394 (1st Cir. 2011) ("If kickbacks affected the transaction underlying a claim, as Hutcheson alleges, the claim failed to meet a condition of payment.").

Courts within and outside the First Circuit have rejected the view that a plaintiff must establish that a healthcare provider would not have submitted a claim to the Medicare program *but for* the illegal remuneration. In *Hutcheson*, 647 F.3d at 392-94, the First Circuit determined that a sufficient causal connection existed even where (i) the defendant was a non-submitting entity outside the direct causal chain of claim submission, and (ii) the defendant's alleged kickbacks to induce the use of its medical devices occurred in the context of a bundled, procedure-based reimbursement rate (as opposed to one in which the devices were separately billed). *See also United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003, 2021 WL 101193, at *11 (D. Minn. Jan. 12, 2021) ("[B]ut-for causation is not a requirement of the AKS."); *United States v. Teva Pharm. USA, Inc.*, No. 13-cv-3702, 2019 WL 1245656, at *23 (S.D.N.Y. Feb. 27, 2019) (recognizing that "the FCA does not require the kickback to be the 'but for' cause of the prescription.").

21

SHN\846096.1

Here, as set forth above, the record demonstrates that MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered.  *See* Exhs. T-W.  There is no dispute that there was a sufficient causal connection between the efforts of these independent contractor sales representatives and the submission of false claims for medically unnecessary PCR tests to Medicare.  Defendants submit the affidavit of one independent contractor sales representative who claims his status as an independent contractor paid based on sales generated did not incentivize him to sell medically unnecessary UTI tests.  ECF #254-15.  Even accepting his uncorroborated claims as true, it does not account for the motives of dozens of other independent contractor sales representatives working on behalf of MD Labs throughout the country.  Todd, MD Labs' Sales Manager, East Coast Region, testified that as far as he was aware, all MD Labs sales representatives were independent contractors.  Exh. X, Todd Dep. Tr. at 52:12-23.

### C. MD Labs Acknowledged its Practice was not to Balance Bill

Defendants do not dispute, and cannot dispute the documentary evidence which shows that it was their practice to not balance bill patients, and the routine waiver of bill balances violates the AKS.  Defendants again attempt to shift the blame to OMNI and Dr. Deligdish for their own wrongful conduct, stating that only Dr. Deligdish was aware of "the existence of a lower self-pay rate."  ECF #253 at 22.  The record squarely contradicts that assertion.  MD Labs' widely distributed marketing materials to promote its PCR UTI test specifically state, in bold, "**No Balance Billing.**"  Exh. N.  There is no dispute that MD Labs sought to use its policies of not balance billing to generate more sales of medically unnecessary UTI tests.

### IV.    OMNI CAN PROVE AT TRIAL THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

SHN\846096.1

### A.  The Record Shows Defendants Knowingly Performed Medically Unnecessary PCR UTI Tests

To satisfy the FCA's requirement that Defendants knowingly performed medically unnecessary UTI tests, "either actual knowledge, deliberate ignorance, or recklessness will suffice." *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023).  The term "'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* at 751.  The term "'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submitted them anyway." *Id.*  The FCA also specifies that the term "'knowingly'… require[s] no proof of specific intent to defraud." *Id.* at 750 n.3 (quoting 31 U.S.C. § 3729(b)(1)(B).

Defendants argue that OMNI cannot prove Defendants knowingly performed unnecessary UTI tests.  ECF #253 at 23.  Of course, courts should rarely grant summary judgment on questions of intent.  *Cox*, 2024 WL 2186840, at *4.  Furthermore, the record demonstrates that Defendants performed thousands of PCR UTI tests beginning in 2017 even though at that time CMS had not issued any NCD or LCD (and still has not issued any NCD) for PCR UTI testing and the AUA guidelines state that "more evidence is needed before [PCR UTI testing] become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics."  In early January 2018, as MD Labs was beginning to roll out PCT UTI testing, Grizelj recommended to Rutledge that they seek "guidance on medical necessity" from Noridian, a Medicare Administrative Contractor.  *See* Exh. Y.  At the very least, there is a significant question of fact as to whether MD Labs, Grizelj and Rutledge were in "deliberate ignorance" that the PCR UTI testing was medically unnecessary.

23

SHN\846096.1

### B. There is Extensive Evidence that Defendant Knowingly Made Payments to Improperly Influence Provider Decisions

As Defendants point out in their memo, under the AKS, "knowledge that the conduct is unlawful is all that is required." *U.S. v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019). Here, the record demonstrates that MD Labs' counsel repeatedly advised Grizelj and Rutledge that MD Labs' widespread practice of paying independent contractor sales reps a commission based on percentage of sales of UTI tests was potentially unlawful. As early as 2016, MD Labs' counsel provided a fact sheet which advised that "payment of percentage of sales commissions to contract sales personnel implicates the federal AKS and is not protected by an AKS safe harbor." Exh. I. In 2017, Grizelj stated that he had concerns about paying sales representatives as independent contractors "based on what I have learned over the past couple of months and the fact that there doesn't seem to be a lab out there that I know of paying reps as 1099s." *See* Exh. J. The facts here are like those in *Teva*, where the Court denied summary judgment to defendants on the government's AKS claims because there was documentary evidence that defendants were made aware that their conduct violated the AKS. 682 F. Supp. 3d at 147. Despite Grizelj and Rutledge's dubious claims of ignorance and confusion about their counsel's advice, there is more than enough evidence for a reasonable factfinder to conclude that Defendants knew that their conduct violated the AKS.

### V. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON OMNI'S STATE LAW CLAIMS

Although similar in its goals, the Texas Medicaid Fraud Prevention Act ("TMFPA")[3] is not identical to the FCA. Rather, the TMFPA sets out several unlawful acts that each proscribe specific conduct generally involving the Medicaid program. *See* Tex. Hum. Res. Code §§

---

[3] As amended on September 1, 2023, the Texas Medicaid Fraud Prevention Act is now known as the Texas Health Care Program Fraud Prevention Act (THFPA).

24

36.002(1)-(13).  Relators are not required to plead the submission of false claims under the TMFPA for the majority of unlawful acts or that an unlawful act was material to payment to meet the particularity requirements of Fed. R. Civ. P. 9(b).  Defendants fail to acknowledge these substantial differences between the TMFPA and the FCA, which is fatal to their contention that all state claims, including the Texas causes of action, should be dismissed for the same reasons as the FCA claims.

Defendants further fail to address how their analysis of the FCA materiality standard applies to any of the TMFPA unlawful acts. "Material" is a defined term in both the TMFPA and the FCA, and a review of those definitions emphasizes the significant differences between the definitions in these statutes.  The TMFPA defines "material" as "having a natural tendency to influence or to be capable of influencing."  Tex. Hum. Res. Code § 36.001(5-a).  The FCA, however, defines "material" as "having a natural tendency to influence, or be capable of influencing, *the payment or receipt of money or property*."  31 U.S.C. § 3729(b)(4) (emphasis added).  Under the TMFPA, materiality is not limited in the way Defendants suggest because the TMFPA reaches conduct beyond influencing the payment of money.  Claims arising under the TMFPA should be reviewed using the statute's plain language as it was written.  *In re Xerox Corp.,* 555 S.W.3d 518, 527 (Tex. 2018)."

Neither the TMFPA nor the Texas Anti-Kickback Statute requires Relators to plead that Defendants acted willfully to commit an unlawful act.  Tex. Hum. Res. Code § 32.039(b).  Therefore, neither the TMFPA nor the Texas AKS imposes a "willful" standard for scienter.

## CONCLUSION

OMNI respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

25

SHN\846096.1

August 29, 2024

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

*/s/ Thomas M. Kenny*
DAVID B. HARRISON (*pro hac vice*)
THOMAS M. KENNY (*pro hac vice*)
SVJETLANA TESIC (*pro hac vice*)
SPIRO HARRISON & NELSON

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

August 29, 2024

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

*/s/ Thomas M. Kenny*
THOMAS M. KENNY (*pro hac vice*)
SPIRO HARRISON & NELSON

26

SHN\846096.1