# EXHIBIT A

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS") and the United States Department of Veterans Affairs (collectively, the "United States"), MD Spine Solutions LLC, d/b/a MD Labs Inc. ("MD Labs"), Denis Grizelj ("Grizelj"), Matthew Rutledge ("Rutledge") (together, MD Labs, Grizelj, and Rutledge are "MD Labs & Owners") and Omni Healthcare, Inc., ("Omni" or "Relator") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

RECITALS

A.    MD Labs is a California corporation headquartered in Reno, Nevada.  MD Labs operates a clinical laboratory and offers clinical laboratory services to health care providers and patients across the United States, specializing in urine drug testing ("UDT"), urinary tract infection testing ("UTI"), and pharmacogenetic testing ("PGT").

B.    Denis Grizelj and Matthew Rutledge are co-founders, owners, and operators of MD Labs.  Grizelj and Rutledge each own approximately 47.5% of MD Labs.

C.    On or about December 11, 2018, Omni filed a qui tam action in the United States District Court for the District of Massachusetts captioned *United States et al., ex rel. Omni Healthcare, Inc. v. MD Spine Solutions LLC, D/B/A MD Labs Inc. and Doe Healthcare Providers 1-100*, No. 18-cv-12558, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").

D.    Relator alleges, among other things, that MD Labs billed Federal Health Care Programs for medically unnecessary laboratory services including UDT, UTI, and PGT, in violation of 42 U.S.C. § 1395y(a)(1)(A), and the False Claims Act, 31 U.S.C. §§ 3729-33.

E.      The United States contends that it has certain civil claims against MD Labs & Owners for submitting false claims for payment for medically unnecessary UDT to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"), the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"), and the Veterans Health Administration Program, 38 U.S.C. Chapter 17 ("VA") (collectively, "Federal Health Care Programs").

F.      On April 13, 2021, the Centers for Medicare & Medicaid Services ("CMS") suspended MD Labs' Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2) ("CMS Suspension"). The CMS Suspension remains in effect. The term "CMS Suspended Amount" refers to the funds that CMS has held in suspense of payment to MD Labs from the date of implementation of the suspension through October 6, 2021. As of October 6, 2021, the CMS Suspended Amount was approximately $1,644,826.28.

G.      MD Labs & Owners admit, acknowledge, and accept their responsibility for the following facts. From January 1, 2015 through December 31, 2019, MD Labs offered its health care provider ("HCP") clients UDT, including presumptive UDT via an enzyme immuno-assay method and confirmatory UDT via a liquid chromatography mass spectrometry method. For those HCP clients who submitted orders to MD Labs for presumptive and confirmatory UDT, MD Labs performed both tests at or around the same time, and simultaneously reported the results of both tests to the HCP clients. For drug targets that are reliably detected by both presumptive and definitive testing methods, MD Labs & Owners knew, as defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCPs would not use such presumptive test results in their medical decision-making because MD Labs reported more precise confirmatory test results to the HCPs at the same time. Although the laboratory is not responsible for ordering tests, MD Labs & Owners also knew, as defined by 31 U.S.C. § 3729(b)(1), that in certain situations HCP clients could not have

2

reviewed such presumptive test results for those drug targets for which presumptive testing was available prior to ordering confirmatory UDT.  Absent HCP-designated reflex orders in certain situations or clear orders from HCPs, for example, this confirmatory testing was not medically reasonable and necessary.  Yet, from January 1, 2015 through December 31, 2019, MD Labs & Owners improperly billed, or caused to be billed, Federal Health Care Programs for presumptive and confirmatory UDT that MD Labs simultaneously reported to HCP clients, without HCP-designated reflex orders in place.  The foregoing conduct in Paragraph G is hereinafter referred to as the "Covered Conduct."

H.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees, and costs.

I.      MD Labs & Owners have entered or will enter into separate settlement agreements described in Paragraph 1 below (the "Medicaid State Settlement Agreements"), with the states (the "Medicaid Participating States") in settlement of the conduct released in those separate Medicaid State Settlement Agreements.

In consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1.      MD Labs & Owners shall pay to the United States and the Medicaid Participating States (the "Government Plaintiffs") the sums specified in this paragraph (collectively, the "Settlement Amount"), pursuant to the terms and conditions specified herein.

  a. MD Labs & Owners shall make an initial payment of $3,000,000 (the "Initial Payment") within ten (10) days of the Effective Date of this Agreement. The Initial Payment shall not be paid with any funds from the CMS Suspended

3

Amount. Of the Initial Payment, MD Labs & Owners shall pay $2,287,010 to the United States and $712,990 to the Medicaid Participating States;

b. MD Labs & Owners shall forfeit any and all right or claim to the CMS Suspended Amount, and the United States shall apply this full amount towards the Minimum Guaranteed Payment, as defined below. MD Labs & Owners expressly relinquish any and all rights of any kind they have with respect to the CMS Suspended Amount, including but not limited to: any and all rights to have an overpayment determined under any statute, regulation, or rule; any and all rights to payment of the CMS Suspended Amount; any and all rights to appeal, whether formally or informally and whether administratively or judicially, the right of the United States and/or CMS to retain the CMS Suspended Amount; and any other rights MD Labs & Owners may have to challenge the withholding of the CMS Suspended Amount or the CMS Suspension in any respect;

c. MD Labs shall pay the Government Plaintiffs ten percent (10%) of its annual revenues derived from laboratory testing operations, as MD Labs reports revenue in its annual federal tax returns, each year for five years from 2022 through 2026, beginning one year from the Effective Date of this Agreement, and shall do so regardless of whether payments by MD Labs & Owners— including the Initial Payment and payment under subparagraph 1.b—exceed the Minimum Guaranteed Payment (as defined below). At the same time that it makes each payment described in this subparagraph, MD Labs shall submit to the U.S. Attorney's Office for the District of Massachusetts documents

4

sufficient to show how it calculated each such payment (including by providing a copy of the underlying annual federal tax returns);

d.  No later than five years from the Effective Date of this Agreement, MD Labs & Owners, collectively, shall pay to the Government Plaintiffs no less than $11,600,000 plus interest as set forth in subparagraph 1.f (the "Minimum Guaranteed Payment"). Payments made in accordance with subparagraphs 1.a, 1.b, and 1.c shall be credited towards the Minimum Guaranteed Payment;

e.  Under no circumstances shall MD Labs & Owners, individually or collectively, pay more than $16,000,000 plus interest, as described in subparagraph 1.f, to the Government Plaintiffs (the "Maximum Payment");

f.  MD Labs & Owners, individually or collectively, shall make a separate annual interest payment on the unpaid balance of $11,600,000 with interest accruing at an annual rate of 1.5% from May 17, 2021, beginning one year from the Effective Date of this Agreement and continuing, if necessary, until 2026. However, if MD Labs & Owners' payments in accordance with subparagraphs 1.a, 1.b, and 1.c exceed $11,600,000, MD Labs & Owners, individually or collectively, shall pay interest annually on the difference between $11,600,000 and any amount owed pursuant to subparagraphs 1.a, 1.b, and 1.c in excess of $11,600,000 (up to and including $16,000,000), until and including their final payment. Such interest shall accrue at an annual rate of 1.5% from May 17, 2021. Amounts paid pursuant to 1.a, 1.b, and 1.c do not constitute interest payments.

g.  Following MD Labs' payment of the fifth and final payment to the Government Plaintiffs in 2026 (as described in subparagraph 1.c), if MD Labs has not paid

5

the Government Plaintiffs the Minimum Guaranteed Payment, Grizelj and Rutledge, jointly and severally, shall pay the Government Plaintiffs the difference between the Minimum Guaranteed Payment and all payments made pursuant to subparagraphs 1.a, b, and c;

h. Any funds CMS suspends after October 6, 2021, until the termination of the CMS Suspension, shall be applied towards the Minimum Guaranteed Payment and the Maximum Payment, but will not be considered "annual revenues derived from laboratory testing operations" for purposes of subparagraph 1.c; and

i. Within five years of the Effective Date of this Agreement, if MD Labs & Owners obtain any insurance coverage for any payments relating to the substance of litigation, disputes, or claims relating to the United States' investigation and/or the Covered Conduct (excluding coverage for legal fees and expenses), MD Labs & Owners shall also pay to the Government Plaintiffs seventy-five percent (75%) of the amount of each such insurance payment, within ten (10) business days of the date that the payment is made to, or on behalf of, MD Labs & Owners.  MD Labs & Owners will request coverage under any applicable insurance policy.  Following the Effective Date of this Agreement and for five years thereafter, MD Labs & Owners will annually notify the U.S. Attorney's Office for the District of Massachusetts, c/o Affirmative Civil Enforcement Chief, in writing of each such request under this subparagraph.

j. For any such payment any one or more of MD Labs & Owners make pursuant to Paragraph 1 subparagraphs a-i, MD Labs & Owners shall pay 84.83% of such

payment to the United States and 15.17% of such payment to the Medicaid Participating States. The federal share of the first payment shall be decreased in accordance with the CMS Suspended Amount.

k. If MD Labs is sold, merged, or transferred, or all or substantially all of MD Labs' assets are sold, merged, or transferred into another non-affiliated entity, MD Labs & Owners shall promptly notify the United States, and all remaining payments owed pursuant to the Settlement Agreement shall be accelerated and become immediately due and payable upon consummation of such transaction.

l. Of the total $16,000,000 settlement amount, $8,000,000 is restitution, and of that amount $6,786,400 is restitution to the United States, and the remainder is restitution to the Medicaid Participating States.

2. MD Labs & Owners, as applicable pursuant to Paragraph 1, shall make all payments in Paragraph 1 owed to the United States (the "Federal Settlement Amount") by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the District of Massachusetts. Further, MD Labs & Owners, as applicable pursuant to Paragraph 1, shall make all payments in Paragraph 1 to the Medicaid Participating States (the "State Settlement Amount") pursuant to the terms of the Medicaid State Settlement Agreements that MD Labs & Owners have entered or will enter into with the Medicaid Participating States. The entire balance of the Settlement Amount, or any portion thereof, may be prepaid without premium or penalty. If MD Labs & Owners elect to prepay the Settlement Amount, or any portion thereof, interest shall accrue through the date on which MD Labs & Owners make said prepayment.

3. Conditioned upon the United States receiving the Federal Settlement Amount payments from MD Labs & Owners, and as soon as feasible after receipt, the United States shall

pay by electronic funds transfer to Relator 15% of each such payment, including the CMS Suspended Amount, (the "Relator's Share") as soon as feasible after receipt of the payment.

4.  Subject to the exceptions in Paragraph 7 (concerning reserved claims) below, and upon the United States' receipt of the Federal Settlement Amount, the United States releases MD Labs & Owners, their predecessors, their current and former parents, divisions, subsidiaries, successors, and assigns ("MD Labs & Owners Releasees"), from any and all civil or administrative monetary claims the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-33, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12, or the common law theories of payment by mistake, unjust enrichment, and fraud.

5.  Upon the United States' receipt of the Federal Settlement Amount, Relator, for itself and for its heirs, successors, attorneys, agents, and assigns, releases MD Labs & Owners Releasees from any and all claims and potential claims, including but not limited to all claims included in the qui tam complaint filed in the Civil Action, any other claims the Relator has on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733, and any common law claims; provided, however, that the Relator retains any and all claims based on MD Labs & Owners' submission or causing the submission of false claims for urinary tract infection testing, subject to any applicable defenses MD Labs & Owners otherwise retain (the "Non-Released UTI Claims").

6.  In consideration of the obligations of MD Labs & Owners in this Agreement and the Corporate Integrity Agreement (CIA), entered into between OIG-HHS and MD Labs, Denis Grizelj, and Matthew Rutledge, and upon the Government Plaintiffs' receipt of full payment of the Settlement Amount, plus interest due under Paragraph 1, the OIG-HHS shall release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion

8

from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against MD Labs, Denis Grizelj, and Matthew Rutledge under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, except as reserved in this paragraph and in Paragraph 7 (concerning reserved claims), below.  The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude MD Labs, Denis Grizelj, and Matthew Rutledge from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct.  Nothing in this paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 7, below.

7.      Notwithstanding the releases given in Paragraphs 4, 5, and 6 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.      Any criminal liability;

c.      Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory exclusion from Federal Health Care Programs;

d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.      Any liability based upon obligations created by this Agreement; and

f.      Any liability of individuals not released pursuant to this Agreement.

8.      Relator and its heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under

9

all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).  Conditioned upon Relator's receipt of the Relator's Share, Relator and its heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

9.      Relator, for itself, and for its heirs, successors, attorneys, agents, and assigns, fully and finally releases MD Labs & Owners Releasees, and their officers, agents, and employees, from any liability to Relator arising from the filing of the Civil Action, except as to liability arising out of the Non-Released UTI Claims.

10.     MD Labs & Owners have provided sworn financial disclosures and supporting documents ("Financial Disclosures") to the United States, and the United States has relied on the accuracy and completeness of those Financial Disclosures in reaching this Agreement.  MD Labs & Owners warrant that the Financial Disclosures are complete, accurate, and current as of the date provided.  If, after the Effective Date of this Agreement, the United States learns of asset(s) in which MD Labs & Owners had an interest of any kind as of the date of the disclosures (including, but not limited to, promises by insurers or other third parties to satisfy MD Labs & Owners' obligations under this Agreement) that were not disclosed in the Financial Disclosures, or if the United States learns of any false statement or misrepresentation by MD Labs & Owners on, or in connection with, the Financial Disclosures, and if such nondisclosure, false statement, or misrepresentation changes the estimated net worth set forth in the Financial Disclosures by $1.6 million or more, the United States may at its option:  (a) rescind this Agreement and reinstate its suit or file suit based on the Covered Conduct, or (b) collect the Maximum Payment in accordance with the Agreement plus one hundred percent (100%) of the net value of MD Labs

10

& Owners' previously undisclosed assets.  MD Labs & Owners agree not to contest any collection action undertaken by the United States pursuant to this provision, and agree that they will immediately pay the United States (i) a ten-percent (10%) surcharge of the amount collected in the collection action, or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action, in each case, to the extent allowed by 28 U.S.C. § 3011.  In the event that the United States, pursuant to this Paragraph, rescinds this Agreement, MD Labs & Owners waive and agree not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 120 calendar days of written notification to MD Labs & Owners that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on December 11, 2018.

11.    MD Labs & Owners waive and shall not assert any defenses MD Labs & Owners may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

12.    MD Labs & Owners fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that MD Labs & Owners have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

13. MD Labs & Owners fully and finally release the Relator from any claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that MD Labs & Owners have asserted, could have asserted, or may assert in the future against Relator, related to the Civil Action, except for the Non-Released UTI Claims, and Relator's investigation and prosecution of the Covered Conduct.

14. Subject to the provisions of Paragraph 1 above, the Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (*e.g.*, Medicare Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered Conduct; and MD Labs & Owners agree not to resubmit to any Medicare contractor or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

15. MD Labs & Owners agree to the following:

a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of MD Labs & Owners, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2) the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3) MD Labs & Owners' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil

12

investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4)    the negotiation and performance of this Agreement;

(5)    the payment MD Labs & Owners make to the United States pursuant to this Agreement and any payments that MD Labs & Owners may make to Relator, including costs and attorney's fees; and

(6)    the negotiation of, and obligations undertaken pursuant to the CIA to: (i) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and (ii) prepare and submit reports to the OIG-HHS;

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, and VA Program (hereinafter referred to as Unallowable Costs).  However, nothing in paragraph 15.a.(6) that may apply to the obligations undertaken pursuant to the CIA affects the status of costs that are not allowable based on any other authority applicable to MD Labs & Owners.

b.    Future Treatment of Unallowable Costs:  Unallowable Costs shall be separately determined and accounted for by MD Labs & Owners, and MD Labs & Owners shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by MD Labs & Owners or any of their subsidiaries or affiliates to the Medicare, Medicaid, or VA Programs.

c.    Treatment of Unallowable Costs Previously Submitted for Payment:  MD Labs & Owners further agree that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare fiscal intermediaries, carriers, and/or contractors, and Medicaid or

13

VA fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by MD Labs & Owners or any of their subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. MD Labs & Owners agree that the United States, at a minimum, shall be entitled to recoup from MD Labs & Owners any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by MD Labs & Owners or any of their subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on MD Labs & Owners' or any of their subsidiaries' or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine MD Labs & Owners' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

16.      MD Labs & Owners agree to cooperate fully and truthfully with the United States' investigation of entities not released in this Agreement and not affiliated with MD Labs & Owners. Upon reasonable notice, MD Labs & Owners shall encourage, and agree not to impair, the cooperation of MD Labs' directors, officers, and employees, and shall use its best efforts to make

14

available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. MD Labs & Owners further agree to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

17.    This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 18 (waiver for beneficiaries paragraph), below.

18.    MD Labs & Owners agree that they waive and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

19.    The Settlement Amount represents the amount the United States is willing to accept in compromise of its civil claims arising from the Covered Conduct due solely to MD Labs & Owners' financial condition as reflected in the Financial Disclosures referenced in Paragraph 10.

a.    In the event that MD Labs & Owners fail to pay any portion of the Settlement Amount in accordance with the terms and conditions in Paragraph 1 of this Agreement, MD Labs & Owners shall be in default of their payment obligations ("Payment Default"). The United States will provide a written Notice of Payment Default, and MD Labs & Owners shall have an opportunity to cure such Payment Default within seven (7) business days from the date of receipt of the Notice of Payment Default by making the payment due under the payment schedule and paying any additional interest accruing under the Agreement up to the

15

date of payment.  Notice of Payment Default will be delivered to any one of MD Labs &

Owners, or to such other representative as they shall designate in advance in writing.  If MD

Labs & Owners fail to cure the Payment Default within seven (7) business days of receiving the

Notice of Payment Default and in the absence of an agreement with the United States to a

modified payment schedule ("Uncured Payment Default"), the remaining unpaid balance of the

Settlement Amount shall become immediately due and payable, and interest on the remaining

unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the

date of Payment Default, on the remaining unpaid total (principal and interest balance).

      b.    In the event of an Uncured Payment Default, MD Labs & Owners agree

that the United States, at its sole discretion, may (i) retain any payments previously made,

rescind this Agreement and pursue the Civil Action, or bring any civil and/or administrative

claim, action, or proceeding against MD Labs & Owners for the claims that would otherwise be

covered by the releases provided in Paragraphs 4, 5, 6, and 9 above, with any recovery reduced

by the amount of any payments previously made by MD Labs & Owners to the United States

under this Agreement; (ii) take any action to enforce this Agreement in a new action or by

reinstating the Civil Action; (iii) offset the remaining unpaid balance from any amounts due and

owing to MD Labs & Owners and/or affiliated companies by any department, agency, or agent

of the United States at the time of Payment Default or subsequently; and/or (iv) exercise any

other right granted by law, or under the terms of this Agreement, or recognizable at common law

or in equity.  The United States shall be entitled to any other rights granted by law or in equity by

reason of Payment Default, including referral of this matter for private collection.  In the event

the United States pursues a collection action, MD Labs & Owners agree immediately to pay the

United States (i) a ten-percent (10%) surcharge of the amount collected in the collection action,

or (ii) the United States reasonable attorneys' fees and expenses incurred in such an action, in

16

each case, to the extent allowed by 28 U.S.C. § 3011. In the event that the United States opts to rescind this Agreement pursuant to this Paragraph, MD Labs & Owners waive and agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against MD Labs & Owners within 120 days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on December 11, 2018. MD Labs & Owners agree not to contest any offset, recoupment, and/or collection action undertaken by the United States pursuant to this Paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

c.   In the event of an Uncured Payment Default, OIG-HHS may exclude MD Labs & Owners from participating in all Federal Health Care Programs until MD Labs & Owners pay the Settlement Amount, with interest, and reasonable costs as set forth above ("Exclusion for Default"). OIG-HHS will provide written notice of any such exclusion to MD Labs & Owners. MD Labs & Owners waive any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7), and agree not to contest such exclusion either administratively or in any state or federal court. Reinstatement to program participation is not automatic. If at the end of the period of exclusion, MD Labs & Owners wish to apply for reinstatement, each must submit a written request for reinstatement to OIG-HHS in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005. MD Labs & Owners will not be reinstated unless and until OIG-HHS approves such request for reinstatement. The option for Exclusion for Payment Default is in addition to, and not in lieu of, the options identified in this Agreement or otherwise available.

20.   Subject to Paragraph 7 and the remedies accorded the United States in Paragraphs 10 and 19, (a) upon receipt of the Initial Payment described in Paragraph 1, above, the Parties

shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action, pursuant to the terms of this Settlement Agreement, pursuant to Rule 41(a)(1), which shall be without prejudice to the United States as to all claims in the Civil Action and with prejudice to Relator as to all claims in the Civil Action, except the Non-Released UTI Claims, and (b) upon receipt and deposit of the final Payment as set forth in Paragraph 1, above, and the passage of 91 days, the United States agrees to submit to MD Labs & Owners a Stipulation of Dismissal with Prejudice for the Covered Conduct.

21.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

23.     This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

24.     This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.

25.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

26.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

27.     This Agreement is binding on MD Labs & Owners' successors, transferees, heirs, and assigns.

18

28.     This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

29.     All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

30.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

**THE UNITED STATES OF AMERICA**

DATED: 10/20/2021        BY:   ABRAHAM GEORGE

Digitally signed by ABRAHAM GEORGE
Date: 2021.10.20 09:46:22 -04'00'

ABRAHAM R. GEORGE
CHARLES B. WEINOGRAD

Assistant United States Attorneys
United States Attorney's Office
District of Massachusetts


DATED: 10/19/2021        BY:   _Lisa M. Re_

LISA M. RE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

20

**MD SPINE SOLUTIONS LLC, d/b/a MD LABS INC.**

DATED: 10/14/2021        BY: _____

DENIS GRIZELJ
MATT RUTLEDGE
Co-Founders MD Spine Solutions, LLC,
d/b/a MD Labs, Inc.


DATED: 10/14/2021        BY: _____

BARAK COHEN
BRIA COCHRAN
Counsel for MD Labs, Inc.

**DENIS GRIZELJ**

DATED: 10/14/2021      BY: _____

DENIS GRIZELJ
Co-Founder MD Spine Solutions, LLC,
d/b/a MD Labs, Inc.


DATED: 10/14/2021      BY: _____

BARAK COHEN
BRIA COCHRAN
Counsel for Denis Grizelj

22

OMNI HEALTHCARE, INC. - RELATOR

DATED: 10/15/2021    BY: _____
CRAIG DELIGDISH
Omni Healthcare, Inc., Founder

DATED: 10/18/21    BY: _____
JESSE HOYER ESTES
Counsel for Omni Healthcare, Inc.