# EXHIBIT I

| **From:** | Redman, Anne M. (Perkins Coie) [ARedman@perkinscoie.com] |
|---|---|
| **Sent:** | 12/9/2016 8:07:49 PM |
| **To:** | Denis Grizelj [denis@mdlabs.com] |
| **CC:** | Schneiderman, Jason (Perkins Coie) [JSchneiderman@perkinscoie.com]; Ripke, Jill (Perkins Coie) [Jripke@perkinscoie.com]; Hanna, Cindy (Perkins Coie) [CHanna@perkinscoie.com] |
| **Subject:** | MD Labs - BAA; Sales Rep Agreement |
| **Attachments:** | MD Labs BAA (2) 12.9.16.DOC; Slideserve.co.uk-Draft Ccla Lab Compliance Matrix 3 17 2015 Dwt.pdf; 141072 Kickbacks bribes or rebates punishment.pdf |

Denis,

Here is the BAA.  I have removed the statement giving permission to de-identify information and simplified the first paragraph to refer to the date of execution of the BAA as the effective date.

Also attached is a summary of the federal and California authorities we discussed and separately the Medi-Cal Anti-Kickback Law, Cal. Welf. & Insti. Code § 1407.2(a) and (b).

Please let me know if you have questions.

Have a good weekend. Anne

**Anne Redman | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1 206.359.6750
F. +1.206.359.7750
E  ARedman@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

MD0167563

## 1. Commission (%) - based Independent Contractor Marketing of Laboratory Testing

| Federal Law | California Law |
|---|---|
| According to the OIG and various federal cases, payment of percentage of sales commissions to contract sales personnel implicates the federal AKS, and is not protected by an AKS safe harbor. | A lab's payment of percentage of sales commissions to contract sales personnel has been held by California courts to violate the Medi-Cal AKS. |

**Federal Law**

According to the OIG and various federal cases, payment of percentage of sales commissions to contract sales personnel implicates the federal AKS, and is not protected by an AKS safe harbor.

<u>FEDERAL ANTI-KICKBACK STATUTE (AKS)</u>: Prohibits knowing and willful solicitation, offer, payment or acceptance of any remuneration … directly or indirectly, overtly or covertly, in cash or in kind: (1) for referring an individual for a service or item covered by a federal health care benefit program, or (2) for purchasing, leasing, ordering, or **arranging for or recommending** the purchase, lease, or order of any good, facility, service or item reimbursable under a federal health care benefit program. **[See, 42 U.S.C. § 1320-a-7(b)]**

<u>SAFE HARBORS</u>: AKS safe harbor regulations exempt practices HHS deems unlikely to result in fraud or abuse. **[See, 42 C.F.R. § 1001.952]**

*<u>Bona Fide</u> Employee*: AKS exception and safe harbor **[see, 42 U.S.C. § 1320-a-7b (b)(3)(B); 42 C.F.R. § 1011.952(i)]** for payments to (W-2) sales "employee", as defined by IRS at 26 U.S.C. § 3121(d)(2) --

*"This statutory exemption permits an employer to pay an employee in whatever manner he or she chooses for having that employee assist in the solicitation of Medicare or State health care program business...."* **[54 Fed. Reg. 3088, 3093 (Jan. 23, 1989)]**

<u>Personal Services and Management Contracts Safe Harbor:</u> Protects arrangements with (1099) non-employee sales representatives **ONLY IF** there is a written agreement (i) signed by the parties; (ii) for a term of at least 1 year; (iii) for specified and necessary services (which do not violate federal or state laws); (iv) with a set schedule for any part-time services--and (v) aggregate (total) compensation **MUST**:

- be fair market value,
- be fixed in advance for the contract term; and
- NOT take into account (vary with) volume or value of any federal program referrals. **[See, 42 C.F.R. § 1001.952 (d)]**

<u>OIG GUIDANCE:</u> OIG has consistently warned that commission-based contract marketing does not meet safe harbors and implicates AKS:

*[M]any commenters suggested that we broaden the [employment] exemption to apply to independent contractors paid on a commission basis. We have declined to adopt this approach because we are aware of many examples of abusive practices by sales personnel who are paid as independent contractors and who are not under appropriate supervision. We believe that if individuals and entities desire to pay a salesperson on the basis of the amount of business they generate, then to be exempt from civil or criminal prosecution, they should make these salespersons employees where they can and should exert appropriate supervision for the individual's acts.* **[54 Fed. Reg. 3088, 3093 (1989)]**

*Commission-based compensation to contract sales force will not meet the personal services and management contracts safe harbor because it is "not fixed in advance and is determined in a manner that takes into account the value or volume of business generated between the parties, including Federal health care program business. * * ***

*Percentage compensation arrangements are potentially abusive, however, because they provide financial incentives that may encourage overutilization of items and services and may increase program costs.* **[See, OIG Advisory Opinion No. 98-1 (Mar. 25, 1998)]**

*Payments for marketing services involving Federal health care program business warrant close scrutiny under the anti-kickback statute. Marketing fees paid on the basis of successful orders for items or services are inherently subject to abuse because they are linked to business generated by the marketer.* **[See, OIG Advisory Opinion No. 10-23 (Oct. 28, 2010)]**

<u>FEDERAL CASE LAW - %-BASED CONTRACT MARKETING VIOLATES AKS:</u>

- <u>U.S. v. Polin</u>, 194 F.3d 863 (7th Cir. 1999)(sales agent paid by physician for each Medicare referral to physician's cardiac monitoring company)
- <u>U.S. v. Starks</u>, 157 F. 3d 833 (11th Cir. 1998)(contractors paid marketing expenses by drug treatment provider to influence patient referrals)
- <u>Zimmer v. NuTech Medical</u>, 54 F. Supp. 2d (N.D.Ind.1999)(medical supplier paid by medical supply manufacturer to market products to physicians)

**California Law**

A lab's payment of percentage of sales commissions to contract sales personnel has been held by California courts to violate the Medi-Cal AKS.

<u>CALIFORNIA ANTI-KICKBACK LAW [PHYSICIAN OWNERSHIP AND REFERRAL ACT ("PORA")</u>: Prohibits *"[t]he offer, delivery, receipt, or acceptance by any person licensed under this division ... of any ... commission ... or other consideration ... as compensation or inducement for referring patients, clients, or customers to any person ..."* **[Cal. Bus. & Prof. Code § 650(a)]**

<u>PORA Safe Harbor:</u> Permits *"[t]he payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished or with the fair rental value of any premises or equipment leased or provided by the recipient to the payer."*

<u>MEDI-CAL ANTI-KICKBACK LAW (Medi-Cal AKS)</u>: Prohibits any person from soliciting or receiving, offering or paying, any remuneration in any form directly or indirectly, overtly or covertly in cash or in kind in return for the referral, or promised referral, of any individual to a person for the *"(a) furnishing or arranging for the furnishing of any service or merchandise for [the Medi- Cal program]; or (b) purchasing, leasing, ordering, or **arranging for or recommending** the purchasing, leasing, or ordering of any goods, facility, service or merchandise for [the Medi-Cal program]."* **[See, Cal. Welf. & Inst. Code § 14107.2 (a) + (b)]**

<u>Medi-Cal AKS Safe Harbor:</u> Exempts payments by an employer to a *bona fide* employee. **[See, Cal. Welf. & Inst. Code § 14107.2 (c)]**

<u>CA CASE LAW:</u>

<u>People v. Duz-Mor Diagnostic Laboratory</u> found that payment of sales commissions to an independent contractor sales agent to market laboratory services to physicians violates the Medi-Cal AKS:

*"[T]he statute prohibits payment of a commission to someone who **arranges**, through marketing activities, for services to be furnished to Medi-Cal beneficiaries [and] the statute prohibits payment for **recommendations** of services, quite clearly encompassing [that] kind of marketing...."* **[68 Cal.App.4th 654, 671 (1998)(emphasis added)]**

[See, also, <u>People v. Palma</u>, 40 Cal.App.4th 1559 (Cal. Ct. App. 1995) (contract sales agent paid by medical supply company to market to nursing homes)].

However, <u>Duz-Mor</u> concluded that the contract sales agent's conduct did not violate PORA because the conduct of the independent sales agent fell within the PORA Safe Harbor:

*"payment or receipt of consideration for services **other than the referral of patients** which is based on a percentage of gross revenue or similar type of contractual arrangement shall not be unlawful if the consideration is commensurate with the value of the services furnished...."* **[68 Cal.App.4th at 667 (emphasis added)]**

<u>People v. Guiamelon</u> upheld the conviction of Dr. Guiamelon under PORA for her payment of $20 per patient to contracted marketers in exchange for the marketers' **referring** patients to her office, "by either driving them to her office, or directing them there." The court clarified that its holding did not conflict with <u>Duz-Mor</u>,

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

MD0167571

## 1. Commission (%) - based Independent Contractor Marketing of Laboratory Testing

| Federal Law | California Law |
|---|---|
| • Nursing Home Consultants v. Quantum Health Services, 926 F. Supp. 835 (E.D. Ark. 1996)(marketing company paid by medical suppliers to market to nursing home residents)<br>• Joint Technology v. Weaver, CIV-11-846-M (W.D. Okla. Jan. 23, 2013)(contract sales agent to paid by DME company)<br>• Modern Medical Laboratories v. Smith-Kline Beecham Clinical Laboratories, 1994 U.S. Dist. LEXIS 11525 (N.D. Ill. Aug. 16, 1994)(management agreement for SKBCL to market MML's laboratory business)<br><br>**RECENT FEDERAL SETTLEMENTS:**<br><br>**[OIG - Kickback and Physician Self-Referral (08-21-2014)]** Zimmer-Deptula (ZDI) entered into a $123,000 settlement agreement with OIG to resolve allegations that two ZDI independent contractors paid third parties to recommend products to Florida physicians. OIG contends that ZDI knowingly and willfully offered and paid the kickbacks to the 3rd parties to induce them to recommend and arrange for the purchase of products paid for by Federal health care programs.<br><br>**[OIG - Kickback and Physician Self-Referral (10-21-2013)]** In resolution of FCA liability, two owners of a DME company agreed to be excluded from Federal health care programs for 20 years. OIG alleged that the owners, through their company, entered into contracts with marketing companies whereby, in violation of the Anti-Kickback Statute, the company paid for referrals from marketing companies when Medicare beneficiaries ordered diabetic supplies.<br><br>**[OIG Archives - Kickback and Physician Self-Referral (02-15-2005)]** Tender Loving Care Health Care Services (TLC), a nationwide home health agency, paid $130,000 to resolve CMP liability for false claims and kickbacks. OIG alleged that one of TLC's franchisees paid commissions to non-employees for marketing services, for each patient referred by the contract sales agents. | stating: "Guiamelon argues the facts of her case are 'not materially different' from the payments by a laboratory to a marketer in Duz-Mor…. We disagree." **[205 Cal.App.4th 383, 413, 140 Cal.Rptr.3d 584 (2012)]**<br><br>**LEGISLATIVE COUNSEL OPINION:** California Legislative Counsel Bureau Opinion # 1128674, "Clinical Laboratory Referral Practice" (Apr. 20, 2012), addresses the legality under both state and federal law of a commission-based contract marketing arrangement between a clinical lab and a middleman entity<br><br>*"to arrange for physician referrals to the clinical laboratory in return for a fee or other consideration [while pursuant to] a separate agreement, the [middleman] agrees to provide a physician with staff…, supplies, or other goods or services at less than fair market rates … in return for an agreement that the physician will refer laboratory tests to the clinical laboratory that has the arrangement with the [middleman]."*<br><br>The Legislative Counsel concluded that PORA *"prohibits any arrangement in which consideration is offered or delivered for the purpose of inducing a referral to a particular licensed health care professional, regardless of whether that consideration is paid directly to the referring physician or is paid to another entity that induces the referral. Thus, we believe that the clinical laboratory would violate [PORA] by indirectly compensating the physician for making referrals."* |

2

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

MD0167572

## 2. In-Office Phlebotomists

| Federal Law | California Law |
|---|---|
| **According to OIG and CMS, a lab's placement of personnel in a physician practice <u>solely</u> to collect and process lab specimens to be tested by the lab is permitted under federal law, so long as lab personnel do not perform services ordinarily provided by the physician's staff.**<br><br>*[I]f the phlebotomist is purely performing laboratory functions for the laboratory that places the phlebotomist, then <u>there would be no remuneration to the physician or group practice</u>...However, if the phlebotomist performs services that are not directly related to the collection or processing of laboratory specimens for the laboratory that has provided the phlebotomist, he or she may be providing a benefit to the physician or group practice, thus creating a [prohibited] compensation arrangement...*[**See, CMS Commentary to Final Stark II Regs., 66 Fed. Reg. 856, 948-49 (Jan. 4, 2001)**].<br><br>*When permitted by state law, a laboratory may make available to a physician's office a phlebotomist who collects specimens from patients for testing by the outside laboratory ... While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's office staff...These tasks can include taking vital signs or other nursing functions, testing for the physician's office laboratory, or performing clerical services.... Furthermore, the mere existence of a contract between the laboratory and the health care provider that prohibits the phlebotomist from performing services unrelated to specimen collection does not eliminate OIG's concern, where the phlebotomist is not closely monitored by his [or her] employer or where the contractual prohibition is not rigorously enforced.*<br><br>**[See, OIG Special Fraud Alert: Special Arrangements for the Provision of Clinical Lab Services (Issued Oct. 1994), 59 Fed. Reg. 65372 (Dec. 19, 1994)]** | **According to the California Legislative Counsel, a lab's placement of personnel in a physician practice is prohibited by California law.**<br><br>California's Legislative Counsel provided a Legal Opinion in 1996 that CA AKS prohibits placing clinical lab personnel in a physician's office:<br><br>*The placement by a clinical laboratory of a phlebotomist or other clinical laboratory personnel in the office of a physician who refers patients to the laboratory would violate the Physician Ownership and Referral Act of 1993.* [**See, Legislative Counsel of California, Clinical Laboratory Personnel: Placement in Physician's Offices - #2433 (Feb. 29, 1996)**]<br><br>California Department of Public Health, Laboratory Field Services Division (LFS) repeated the guidance on the issue in 1997:<br><br>*(5) What about phlebotomists provided by laboratories to work in physician offices?*<br><br><u>*Answer:*</u> *Refer to the Legislative Counsel Opinion #2433, dated February 29, 1996, which addressed the issue of phlebotomists in a physician office. This document, entitled "Clinical Laboratory Personnel: Placement in Physicians' Offices", stated that the placement by a clinical laboratory of a phlebotomist or other clinical laboratory personnel in the office of a physician who refers patients to the laboratory would violate the Physician Ownership and Referral Act of 1993. While not specifically addressing BPC Section 650, the Legislative Counsel report states that a physician accepting the services of a phlebotomist provided by a laboratory may be considered to be accepting an inducement. Likewise, a laboratory providing the services of a phlebotomist in order to gain that physician's test referrals, would be considered as providing an inducement to the physician.* [**See, Memorandum re: Legal opinions regarding phlebotomy issues from Karen Nickel, Ph.D., Chief, LFS (July 11, 1997)**] |

## 3. Use of Mobile Phlebotomists

| Federal Law | California Law |
|---|---|
| **Neither OIG nor CMS has provided guidance specific to "Mobile Phlebotomy" beyond the guidance (described above) regarding restrictions against phlebotomists performing tasks that are normally the responsibility of the physician's office staff.**<br><br>Laboratories do have responsibility under CLIA for specimen collection as part of the pre-analytical phase of laboratory testing. **[See, 42 C.F.R. § 493.1242 (2)]** | **California LFS has opined that PORA prohibits providing a "roving phlebotomist" to a physician practice.**<br><br>California Department of Public Health, Laboratory Field Services Division (LFS) addressed the question of "roving phlebotomists" in 1997:<br><br>*(4) Is a roving phlebotomist provided a physician's office for the purpose of collecting blood specimens by a clinical laboratory considered an inducement and a violation of BPC section 650?*<br><br><u>*Answer:*</u> *BPC section 650 specifically prohibits any inducement to the physician for referral of patients to their laboratory. If the physician is receiving any benefit from the laboratory, such as the laboratory paying the phlebotomist to draw the specimen or if the phlebotomist is on "standby time", awaiting calls from the physician, then section 650 would be violated. If, however, the phlebotomy service is paid for by the physician, then section 650 is not violated and the arrangement would be permitted, provided the laboratory accepting the specimen assumes responsibility for the collection procedures.* [**See, Memorandum re: Legal opinions regarding phlebotomy issues from Karen Nickel, Ph.D., Chief, Laboratory Field Services**]<br><br>"Only people who are authorized can perform phlebotomy in California. Generally those authorized are licensed physicians, registered nurses, licensed vocational nurses, licensed clinical lab scientists and certified phlebotomists" Specifically, phlebotomy may only be performed by:<br><br>▪ persons licensed under Cal. Bus. & Prof. Code § 650, Chapter 3 – (Clinical Consultant, General Supervisor, Technical Consultant, Technical Supervisor, Technical Supervisor) **(Cal. Bus. & Prof. Code § 1242)**<br>▪ RN, LVN, and RCP **(Cal. Bus. & Prof. Code § 1242.6)**<br>▪ a certified phlebotomist who must be **employed by** a laboratory **(Cal. Bus. & Prof. Code § 1246)** |

3

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

MD0167573

| 4. Leasing Office Space from Physicians | |
|---|---|
| **Federal Law** | **California Law** |
| **Leasing office space from physicians is permitted by federal law, subject to meeting the requirements of the Stark law exception and AKS safe harbor for leases.** | **Leasing office space from physicians is permitted by California law, subject to meeting the PORA lease exception requirements.** |

**Federal Law**

Leases with physicians are governed by the federal Stark Law and Anti-Kickback Statute. To the extent the lab leases such locations from a referring provider the lease must meet the under the AKS space rental safe harbor **[42 C.F.R. 10001.952(b)]**, as well as the Stark law space rental exception when the leasing provider is a physician. **[42 U.S.C. § 1395nn (e) (1)(A); 42 C.F.R. § 411.357(a)]**.

A lease with a physician must meet the following requirements:

- There is a written lease for a minimum term of one year.
- The lease is fully signed by both parties before the lease begins.
- Rent is set in advance, and is consistent with fair market value—OIG says not more than pass-thru rent for sub-lease.
- The lease is commercially reasonable without taking into account the volume or value of the referrals between the parties.
- Lab has exclusive use of dedicated space.
- Shared space has been carefully and accurately measured and documented in accordance with OIG 2000 Guidelines/formula.
- Renewal terms are carefully followed.

**[See, OIG Special Fraud Alert, Rental of Office Space in Physician Offices by Persons or Entities to which Physicians Refer (Feb. 2000)]**

**California Law**

Leases with physicians are governed by Cal. Bus. & Prof. Code § 650.01 and 650.02(b)(2):

**Cal. Bus. & Prof. Code § 650.01:**

*(a) Notwithstanding Section 650, or any other provision of law, it is unlawful for a licensee to refer a person for laboratory… services if the licensee or his or her immediate family has a financial interest with the person or in the entity that receives the referral.*

*(b)(2) A "financial interest" includes … any type of … lease….*

**Cal. Bus. & Prof. Code § 650.02(b)(2):**

*The prohibition of Section 650.01 shall not apply to or restrict …*

*(b) A licensee, when the licensee or his or her immediate family has one or more of the following arrangements with another licensee, a person, or an entity, is not prohibited from referring a patient to the licensee, person, or entity because of the arrangement: (2) A lease of space or equipment between a licensee and the recipient of the referral, if the lease is written, has commercially reasonable terms, has a fixed periodic rent payment, has a term of one year or more, and the lease payments are not affected by either party's referral of any person or the volume of services provided by either party.*



4

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry. This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

MD0167574

## 5.    Laboratory Pricing Practices

| Federal Law | California Law |
|---|---|
| **Medicare Usual Charge Rule.**  A provider may be excluded if its charges to Medicare or Medicaid are "substantially in excess of its usual charges."**[See, 42 U.S.C. §1320a-7(b)(6)(A)]** However, OIG stated in 2000 that "we do not believe that the [the rule] is implicated unless a provider's charge to Medicare is substantially in excess of its median non-Medicare / Medicaid charge. In other words, a provider need not even worry about [the rule], unless it is discounting close to half of its non-Medicare / Medicaid business." **[Letter from Kevin G. McAnaney, Chief, Industry Guidance Branch, HHS Office of Inspector General, dated April 26, 2000].**<br><br>**Federal AKS:**  In Advisory Opinion 99-13, OIG concluded that discounted pathology services might constitute prohibited remuneration under the anti-kickback statute because the discounts were offered with the possible improper motive of exchanging lower priced laboratory services (which the physicians would re-bill to patients) in exchange for referred high priced laboratory services which the laboratory billed to payors.<br><br>OIG set forth a test for evaluating discounts:<br><br>In evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, neither the size nor structure of the discount is determinative of an anti-kickback violation. Rather, the appropriate question to ask is whether the discount -- regardless of its size or structure -- is tied or linked directly or indirectly to referrals of other Federal health care program business. Evidence that the discount is not commercially reasonable in the absence of other, non-discounted business is highly probative. In this regard, discounts on account billing business that are particularly suspect include, but are not limited to:<br><br>    discounted prices that are below the laboratory's cost, and<br>    discounted prices that are lower than the prices that the laboratory offers to a buyer that:<br>    (i) generates a volume of business for the supplier that is the same or greater than the volume of account billing business generated by the physician, but<br>    (ii) does not have any potentially available Federal health care program business.<br><br>This is an illustrative, not exhaustive, list of suspect discounts; other arrangements may be equally suspect. Each of the above pricing arrangements independently gives rise to an inference that the laboratory and the physicians may be "swapping" discounts on account billing business in exchange for profitable non-discounted Federal health care program business.<br><br>Following up on this Advisory Opinion, OIG clarified:<br><br>An anti-kickback statute violation is not determined by the size of the discount; rather, a violation arises if the discount - whatever its size - is implicitly or explicitly tied to referrals of Federal business. Advisory Opinion 99-13 specifically addressed the issue of a laboratory giving deep discounts to physicians for business that the physicians pay for out of their own pockets, in return for the referral of more lucrative Medicare Part B business for which the laboratories receive direct reimbursement from Medicare. Our concern was that the proposed conduct potentially involved purposeful discounting of private pay business to induce the referral of Federal health care program business - prohibited conduct under the Federal anti-kickback statute. ......<br><br>In order to establish a violation, there must be evidence to support a linkage between the discounts and the referral of non-discounted Federal health care program business. In order to determine if a discount is linked to the referral of other Federal program business, such as Medicare, we would first look to see if there is any Medicare business referred by the facility to the laboratory, and if so, if it is substantial enough in relation to the discounted business to infer a connection between the two.<br><br>Where there is evidence of a connection between the two, the size of a discount may provide further indicia of intent. | **Cal. Bus. & Prof. Code § 655.5** prohibits physicians (and other licensed healing arts), hospitals and clinical laboratories from marking up of the price charged for a clinical laboratory test, and requires any such person or entity, when billing for a lab test that they have not actually rendered, to disclose "the name, address, and charges of the clinical laboratory performing the service."<br><br>**Cal. Bus. & Prof. Code § 655.7 (direct billing for anatomic pathology)**<br><br>**Medi-Cal "Lowest Charge Rule":** Title 22, California Code of Regulations, Section 51501(a), states:<br><br>    "Notwithstanding any other provisions of these regulations, no provider shall charge for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances."<br><br>The Medi-Cal "lowest charge rule" has been the subject of legal action, including most recently, *State of California ex rel. Hunter Laboratories v. Quest Diagnostic Laboratories*, prosecuted by State of California under the California false claims act, and settled in 2011.  In the wake of the settlements, the California Legislature in 2012 adopted legislation (AB 1494) to cut Medi-Cal reimbursement rates by 10%; and to direct the Department of Health Care Services (DHCS) to develop a new methodology for setting Medi-Cal rates for lab testing, to be based on the lowest amounts other payers are paying for similar lab services.  AB 1494 provides that once the new rate methodology is put in place, labs will be exempt from the "lowest charge rule." AB 1494 also effected a temporary exemption while DHCS implements the new rate methodology—that temporary exemption is scheduled to expire on July 1, 2015, unless the methodology is implemented prior to that date, or unless the date is extended by the legislature (as it has been thus far, with DHCS support). |

5

*This guide is published by the California Clinical Laboratory Association (CCLA) for the purpose of providing its membership with a resource when navigating various issues in the laboratory industry.  This guide is not intended to provide an interpretation of the legal principles cited, does not constitute a legal opinion, and does not represent a statement of standardized or uniform practices of CCLA's membership.

MD0167575