**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENNIS GRIZELI, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>Defendants. | **No. 18-cv-12558-PBS** |

**PLAINTIFF-RELATOR OMNI HEALTHCARE, INC.'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff-Relator OMNI Healthcare, Inc. ("OMNI" or "Relator") submits the following response to Defendants' Statement of Material Facts (ECF #254) and Statement of Facts as to Which There Exists a Genuine Issue to be Tried.

**A.** ***MD Labs and PCR UTI Testing***

1. Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011. Denis Grizelj Deposition Transcript ("Grizelj Tr."), **Ex. 1**, at 16:20-17:17; Matthew Rutledge Deposition Transcript ("Rutledge Tr."), **Ex. 2**, at 10:7-12:14.

**RESPONSE:** Admit that Grizelj and Rutledge testified that Defendant MD Labs is an independent clinical laboratory in Reno, Nevada, founded by defendants Matthew Rutledge and Denis Grizelj in 2011.

2. MD Labs historically performed urine drug testing ("UDT"). Declaration of Matthew Rutledge ("Rutledge Decl."), **Ex. 3**, ¶ 4; Second Amended Complaint ("SAC"), ECF No. 184, ¶ 34. In or about 2017, it added urinary tract infection ("UTI") testing using polymerase chain reaction ("PCR") technology. Rutledge Tr., **Ex. 2**, at 31:15-24; 42:21-43:1.

**RESPONSE:** Admit that Rutledge testified that in or about 2017, MD Labs added UTI testing using PCR technology.

3. PCR testing technology has been available since the mid-1980s. *Polymerase Chain Reaction* (*PCR*), NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/probe/docs/techpcr/ (last visited July 29, 2024), **Ex. 4**.

**RESPONSE:** Admit that the cited exhibit states that the PCR method was developed in the 1980s.

4. PCR testing is highly accurate and amplifies copies of a segment of DNA to enable identification of genetic material belonging to a particular biological origin. Expert Report of Dr. Ko ("Ko Rpt."), **Ex. 5**, at 6-7; Dr. Dicken Ko Deposition Transcript ("Ko Tr."), **Ex. 6**, 123:8-124:1.

**RESPONSE:** Relator objects to paragraph 4 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

5. In recent years, PCR technology has become a standard test to identify a range of pathogens, including HIV, Hepatitis C, and most recently, COVID-19. Ko Rpt., **Ex. 5**, at 6; Ko. Tr., **Ex. 6**, 123:12-2

**RESPONSE:** Relator objects to paragraph 5 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

6. By contrast the standard test for UTIs for over 60 years has been the bacterial urine culture ("BUC"), where a urine sample is placed on a growth medium in a Petri dish, and laboratories wait between 24 and 48 hours to determine if any bacteria grew, and sometimes longer for slow-growing bacteria. Ko Rpt. **Ex**. **5**, at 4; Ko. Tr. **Ex. 6**, 82:18-24.

**RESPONSE:** Admit only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko Dep. Tr. at 18:1-19:15. In publishing Dr. Ko's research into PCR-based UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. *See* Exh. F at 9.

7. MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens, depending on the time period. Grizelj Tr., **Ex. 1**, at 220:16-221:6; 226:9-16; Rutledge Decl., **Ex. 3**, ¶ 5.

**RESPONSE:** Admit that Grizelj and Rutledge testified that MD Labs used PCR technology to test for the presence of genetic material for 17 or 19 pathogens, depending on the time period.

8. In addition to the PCR test, MD Labs simultaneously conducted an antibiotic susceptibility test ("AST") by culturing the urine specimen to grow any bacteria present so it could then determine whether it was susceptible to a broad array of antibiotics. Grizelj Tr., **Ex. 1**, at 198:12-24; Dr. Steven Parker Deposition Transcript ("Parker Tr."), **Ex. 7**, at 75:16-76:1; Rutledge Decl., **Ex. 3**, ¶ 8.

**RESPONSE:** Admit that Grizelj and Parker testified that MD Labs simultaneously conducted an AST by culturing the urine specimen to grow any bacteria present so it could then determine whether it was susceptible to a broad array of antibiotics.

9. Performing both tests simultaneously provided faster than results than would be available if the lab delayed culturing the sample for AST until PCR results were available. Rutledge Decl., **Ex. 3**, ¶ 9.

**RESPONSE:** Relator objects to paragraph 9 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

10. If PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST. Grizelj Tr., **Ex. 1**, at 198:12-24; 199:14-17; Rutledge Decl., **Ex. 3**, ¶ 10.

**RESPONSE:** Admit that Grizelj and Rutledge testified that if PCR testing identified pathogens, MD Labs allowed the urine culture to continue to grow and performed AST.

11. If a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test. Grizelj Tr., **Ex. 1**, at 198:12-199:2; Rutledge Decl., **Ex. 3**, ¶ 11.

**RESPONSE:** Admit that Grizelj and Rutledge testified that if a PCR test did not detect any pathogens, MD Labs discarded and did not report or bill for the culture, instead billing only for the PCR pathogen detection test.

12. PCR testing produces results more quickly than BUC. Ko Rpt., **Ex. 5**, at 5-6.

**RESPONSE:** Admit only that Defendants' expert stated that PCR testing produces results more quickly than BUC.

13. MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results. Parker Tr., **Ex. 7**, at 121:24-122:3; Ko Rpt., **Ex. 5**, at 4-5; Rutledge Decl., **Ex. 3**, ¶ 12.

**RESPONSE:** Admit only that Defendants testified that MD Labs could often determine if a patient had an infection 24 hours before a BUC would have produced results.

14. MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of patient symptoms. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, at 134:21-135:19.

**RESPONSE:** Admit only that Defendants' expert stated that PCR testing produces results more quickly than BUC.

15. MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See*, *e.g.*, MDLabs_0008722, **Ex. 8**.

**RESPONSE:** Admit that MD Labs order form for UTI testing stated providers could receive PCR UTI results before AST results were available.

16. PCR UTI testing is more accurate than BUC, which may miss bacteria where a patient has already started antibiotics or where there is a polymicrobial infection where a dominant organism overgrows a secondary pathogen. Parker Tr., **Ex. 7**, at 114:15-23; Ko Tr., **Ex. 6**, 94:3-20; 113:12-24.

**RESPONSE:** Relator objects to paragraph 16 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

17. MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., **Ex. 5**, at 5; Ko. Tr., **Ex. 6**, 94:16-95:1; 113:12-24.

**RESPONSE:** Relator objects to paragraph 17 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further admits only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko Dep. Tr. at 18:1-19:15. In publishing Dr. Ko's research into PCR-based UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. Exh. F at 9.

18. PCR testing, combined with AST, decreases the spread of antibiotic-resistant bacteria that can generate dangerous infections because it ensures that clinicians use an effective antibiotic the first time around, rather than potentially using an antibiotic that may not be as effective. Ko Rpt., **Ex. 5**, at 6-7.

**RESPONSE:** Relator objects to paragraph 18 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further admits only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko Dep.

Tr. at 18:1-19:15. In publishing Dr. Ko's research into PCR-based UTI testing, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. Exh. F at 9.

19. At the time MD Labs offered PCR UTI testing, no local coverage determination ("LCD") or national coverage determination ("NCD") limited the use of PCR UTI testing and government and commercial payors routinely paid claims for PCR UTI testing. Rutledge Decl., **Ex. 3**, ¶ 7.

**RESPONSE:** Denied. At the time MD Labs began performing UTI testing using PCR technology in 2017, Centers for Medicare & Medicaid Services ("CMS") had not issued any National Coverage Determination ("NCD") or Local Coverage Determination ("LCD") for PCR-based UTI testing. Medicare issues NCDs for items and services that are reasonable and necessary for the diagnosis or treatment of an illness or injury. *See* Exh. C. CMS makes NCDs through an evidence-based process, with opportunities for public participation. *Id.* In the absence of a national coverage policy, an item or service may be covered at the discretion of the Medicare contractors based on a LCD. *Id.* CMS has never issued a NCD for the type of PCR-based UTI testing performed by MD Labs and only published a LCD in June 2022, which only half of Medicare contractors have adopted to date. *See* ECF #254-10 at 3.

20. Both parties' experts agreed that PCR UTI testing is reasonable and necessary in certain cases. Dr. Mourtzinos Deposition Transcript ("Mourtzinos Tr."), **Ex. 9**, at 54:11-55:8; 77:4-20 Ko Tr., **Ex. 6**, at 89:4-13.

**RESPONSE:** Admit that OMNI's medical expert, Dr. Arthur Mourtzinos, testified that only once in his 17 years of practice did he find it appropriate to order a PCR-based test for a suspected UTI even though he practices in a tertiary care referral center which sees complex patients as opposed to a private practice like OMNI. Exh. P, Mourtzinos Dep. Tr. at 101:2-22. He emphasized that while he "could do 17 tests on every patient that walks in the door", it is not appropriate to perform those tests if it is not going to affect patient care. *Id.* at 98:10-16.

21. Omni's own medical expert agreed with a myriad of reasons that PCR testing for UTIs may be medically necessary, including: (1) Refractory UTI: failed standard therapy from urine culture/traditional empiric treatment; (2) Patients sent to urology for recurrent or refractory

UTI; (3) Need for better test; (4) PCR test allows identification of specific organisms and resistance genes; (5) Repeat PCR test after treatment in symptomatic patients allows evaluation of treatment and tailoring to sterilize the urine; (5) Complicated UTI: male, fever, foreign body, stone, obstruction, etc.; (6) Empiric antibiotics started and tailored to resistance genes in 24 to 48 hours (urine culture 48-72 hours); (7) Urine Culture unable to identify extended-spectrum β-lactamase, high prevalence; and (8) Complete divergence of treatment course. Mourtzinos Tr., **Ex. 9**, at 77:4-20, 78:7-80:16; Jonathan Rubenstein, MD & Mark Painter, *How to get reimbursed for multiplex PCR urine cultures*, 50 Urology Times Journal (2022), **Ex. 10**.

**RESPONSE:** Denied. Dr. Mourtzinos testified that PCR testing for UTIs could be reasonable and necessary in situations where a patient has a history of recurrent UTIs and has been treated with a number of antibiotics that have not been effective. ECF #254-9 at 77:4-20.

22. Dr. Mourtzinos' opinion was consistent with that of MD Labs' expert, Dr. Ko, who testified that PCR testing was indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome." Ko Tr., **Ex. 6**. at 89:4-13; *see also id.* at 94:3-95:3.

**RESPONSE:** Admit only that Defendants' expert stated that PCR testing was indicated for patients with a "complicated urinary tract infection or a recurrent urinary tract infection with prior negative studies or recurrent positive polymicrobial infection and a lot of antibiotic resistance," to "help the providers further define . . . what is in the urine, what is the interplay of organisms that exist in that urobiome."

23. PCR UTI testing is also indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component. Ko Tr., **Ex. 6**, at 94:8-20.

**RESPONSE:** Admit only that Defendants' expert stated that PCR UTI testing is also indicated for patients with persistent symptoms but for whom a standard culture does not identify the bacteria and there is a suspected inflammatory component.

24. PCR testing is not new, novel, relatively unknown or rarely used and is the standard test for a range of pathogens. Ko Rpt., **Ex. 5**, at 6.

**RESPONSE:** Denied. The most recent American Urological Association guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI. *See* Exh. D.

25. Peer-reviewed literature notes that BUC has several limitations, including missed polymicrobial infections, false negatives, contamination of urine specimens, and prolonged turnaround times. Ko Rpt., **Ex. 5**, at 4-5.

**RESPONSE:** Admit only that Defendants' expert stated that BUC testing has limitations.

26. Additionally, one study found that in cases where PCR testing detected microorganisms missed by SUC, over 75 percent of those cases were "'true UTIs, as evidenced by elevated levels of urinary biomarkers in a symptomatic population with a presumptive UTI diagnosis.'" Ko Rpt., **Ex. 5**, at 6 (quoting Haley, et al., *Comparison Shows that Multiplex Polymerase Chain Reaction Identifies Infection-associated Urinary Biomarker-positive Urinary Tract Infections that are Missed by Standard Urine Culture*, 58 EUROPEAN UROLOGY OPEN SCI., 73-91 (2023)).

**RESPONSE:** Admit that one study found as such.

27. Furthermore, "[d]ata are now emerging that using PCR instead of SUC has led to fewer recurrent infections, hospitalizations, and significantly less overall cost for complicated urinary infections." Ko Rpt., **Ex. 5**, at 7 (citing Ko, et al., *Real-World Evidence That a Novel Diagnostic Combining Molecular Testing With Pooled Antibiotic Susceptibility Testing is*

*Associated With Reduced Infection Severity and lower Cost Compared With Standard Urine Culture in Patients With Complicated or Persistently Recurrent Urinary Tract Infections*, 1 JU OPEN PLUS 5 (2023)).

**RESPONSE:** OMNI admits only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko. Dep. Tr. at 18:1-19:15. In publishing the article cited in paragraph 27, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. Exh. F at 9.

28. MD Labs' expert opined that PCR UTI testing is not experimental and instead is "very standard across the country." Ko Tr., **Ex. 6**, at 84:22-86:3 (noting PCR UTI testing is not included among a list of experimental UTI tests).

**RESPONSE:** Admit only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko. Dep. Tr. at 18:1-19:15. In publishing the article cited in paragraph 27, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. Exh. F at 9.

29. MD Labs' test for 17 or 19 pathogens was within the range of pathogens endorsed by peer-reviewed literature, and the specific pathogens for which MD Labs tested were appropriate. Ko Rpt., **Ex. 5**, at 5.

**RESPONSE:** Admit only that Defendants' expert, Dr. Dicken Ko, made these statements. OMNI further states that Dr. Ko serves on the Scientific Advisory Board of Pathnostics, a laboratory which has developed its own PCR-based test for UTIs and thus stands to benefit directly from the expanded use of PCR-based UTI testing. *See* Exh. E, Ko. Dep. Tr. at 18:1-19:15. In publishing the article cited in paragraph 27, the Journal of Urology has acknowledged Dr. Ko's potential conflict of interest due to his affiliation with Pathnostics. Exh. F at 9.

30. Providers not affiliated with MD Labs also recognized and praised the clinical utility of MD Labs' PCR UTI test. *See*, *e.g*., MD0211812, **Ex. 11**.

**RESPONSE:** Denied. The cited evidence does not support the statement in paragraph 30.

31. Based on MD Labs' medical director's clinical expertise, Defendants believed PCR UTI testing could assist providers treating patients better than BUCs, as PCR testing could be completed more quickly and was more sensitive in identifying bacteria than BUC. Grizelj Tr., **Ex. 1**, at 73:2-16; *see also* Parker Tr., **Ex. 7**, at 81:11-82:16; 104:10-20; 121:24-122:3.

**RESPONSE:** Relator objects to paragraph 31 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

32. Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing, and that contemporaneous research indicated the superiority over BUCs. Rutledge Decl., **Ex. 3**, ¶ 6.

**RESPONSE:** Admit only that Rutledge stated that Defendants were aware that several labs already offered PCR UTI testing when MD Labs began offering the testing.

## B. *The Role of the Clinical Laboratory*

33. Clinical laboratories do not have a role in determining the medical necessity of testing ordered by medical providers. Dr. Deligdish Deposition Transcript ("Deligdish Tr."), **Ex. 12**, at 39:18-21.

**RESPONSE:** Relator objects to paragraph 33 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank*

*USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further states that the Compliance Program Guidance for Clinical Laboratories published by the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") makes clear though that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Exh. G at 45079. The OIG's Guidance states that "[w]e recognize that laboratories do not and cannot treat patients or make medical necessity determinations. However, there are steps that such facilities can take to assure compliance with applicable statutes, regulations and the requirements of Federal, State and private health plans." *Id.*

34. Laboratory staff are not trained medical professionals, do not examine patients to assess their medication conditions, and do not treat patients. Rutledge Decl., **Ex. 3**, ¶ 14; *see also* Brief of Amicus Curiae American Clinical Laboratory Association at 3, *U.S. ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 165 (D.D.C. 2017), **Ex. 13** ("In the vast majority of cases, laboratories do not see the patient for whom testing is being ordered. Even in cases in which the patient comes to a laboratory facility to have a specimen drawn, the laboratory does not examine the patient to assess his or her medical condition.").

**RESPONSE:** Relator objects to paragraph 34 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of an Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further states that the Compliance Program Guidance for Clinical Laboratories published by the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") makes clear though that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Exh. G at 45079. The OIG's Guidance states that "[w]e recognize that laboratories do not and cannot treat patients or make medical necessity determinations. However, there are steps that such facilities

can take to assure compliance with applicable statutes, regulations and the requirements of Federal, State and private health plans." *Id.*

35. By contrast, providers meet with patients, assess their conditions, have knowledge of their medical histories, and determine the course of treatment appropriate for patients based on their skill and expertise. *See*, *e.g.*, Dr. Kimberly McGrath Deposition Transcript ("McGrath Tr."), **Ex. 14**, at 25:3-26:13

**RESPONSE:** Admit that providers meet with patients.

36. Medical providers typically send laboratories such as MD Labs only a requisition form indicating the test the *provider* determined to be medically necessary and the applicable diagnosis code provided by the provider. *See*, *e.g.*, McGrath Tr., **Ex. 14**, at 15:2-8 (testifying that only he determines what laboratory tests to order for his patients).

**RESPONSE:** Admit only that the OIG recommends that laboratories "construct the requisition form to capture the correct program information as required by Federal or private healthcare programs and to promote ordering of tests by physicians or other authorized individuals." Exh. G at 45079. The MD labs requisition form only offered the option to order its "Urinary Tract Infection Panel on File." Exh. O (patient identifying information redacted). There was no option to order only a limited number of follow-up PCR tests to identify specific bacteria. *Id.*

37. Clinical laboratories must perform the tests ordered by providers; it would be inappropriate to override their clinical decisions. Ko Rpt., **Ex. 5**, at 9.

**RESPONSE:** Admit that Defendants' expert made these statements. OMNI further states that MD Labs frequently performed PCR-based UTI tests even if there was no documentation in the medical chart demonstrating the intent of the ordering physician to perform the PCR diagnostic testing and antimicrobial susceptibility testing. Exh. H. MD Labs often performed PCR-based UTI testing even when the MD Labs requisition Forms were not signed by the health care provider and/or where the MD Labs requisition form left the box for the PCR-based UTI testing panel unchecked. *Id.*

**C. *MD Labs' Sales Force***

38. At all times relevant to this litigation, MD Labs used both independent contractor and W-2 employee sales representatives to promote the existence and benefits of PCR UTI testing to providers. Grizelj Tr., **Ex. 1**, at 226:17-20; Rutledge Tr., **Ex. 2**, at 96:21-97:8; Rutledge Decl., **Ex. 3**, ¶ 15.

**RESPONSE:** Admit that MD Labs used independent contractor sales representatives to sell PCR-based UTI testing.

39. Pursuant to agreements with sales representatives, MD Labs paid commissions based on the revenue generated from the testing ordered by providers at their sales accounts. Rutledge Tr., **Ex. 2**, at 99:1-13; Rutledge Decl., **Ex. 3**, ¶ 17.

**RESPONSE:** Admit that MD Labs paid commissions based on the revenue generated from the testing ordered by providers at their sales accounts.

40. These agreements did not provide for any payment to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

**RESPONSE:** Denied. Defendants' citation to Rutledge's declaration, and not to the agreements themselves, is not sufficient evidence to substantiate the assertion in paragraph 40.

41. MD Labs sales representatives did not offer or pay anything of value to providers. Rutledge Decl., **Ex. 3**, ¶ 18.

**RESPONSE:** Denied. Defendants' citation to Rutledge's declaration is not sufficient evidence to substantiate the assertion in paragraph 41.

42. MD Labs trained, managed, and, if needed, disciplined its sales representatives in the same manner, regardless of whether they were independent contractors or W-2 employees. Grizelj Tr., **Ex. 1**, at 128:13-20; Rutledge Tr., **Ex. 2**, at 79:7-15; Rutledge Decl., **Ex. 3**, ¶ 16.

**RESPONSE:** Denied. Defendants' citation to Rutledge's testimony and declaration and Grizelj's testimony is not sufficient evidence to substantiate the assertion in paragraph 42.

43. MD Labs trained independent contractor and W-2 employee sales representatives identically and all sales representatives were instructed to use the same marketing materials. Rutledge Decl., **Ex. 3**, ¶ 15.

**RESPONSE:** Denied. Defendants' citation to Rutledge's declaration is not sufficient evidence to substantiate the assertion in paragraph 43.

44. Roy Riley ("Riley"), owner and sales representative of Pace Solutions LLC, explicitly denies that either the way he was compensated by MD Labs or his 1099 status affected the sales message he used about the benefits of PCR testing, or that his compensation structure incentivized him to sell medically unnecessary tests. Declaration of Roy Riley ("Riley Decl.,")., **Ex. 15**, ¶ 7.

**RESPONSE:** Admit only that Riley made this otherwise uncorroborated statement in the declaration he provided on behalf of Defendants.

45. Pace Solutions LLC and Riley promoted PCR UTI testing as appropriate for patients who suffer from recurrent or intractable UTIs. Riley Decl., **Ex. 15**, ¶ 5.

**RESPONSE:** Admit only that Riley made this otherwise uncorroborated statement in the declaration he provided on behalf of Defendants.

46. Defendants told Riley to promote PCR UTI testing based on medical necessity and never asked him to do anything that compromised his integrity. Riley Decl., **Ex. 15**, ¶¶ 5, 8.

**RESPONSE:** Admit only that Riley made this otherwise uncorroborated statement in the declaration he provided on behalf of Defendants.

47. Defendants subjectively believed that paying independent sales representatives on commission was lawful. Grizelj Tr., **Ex. 1**, at; Rutledge Tr., **Ex. 2**, at 88:16-21.

**RESPONSE:** Relator objects to paragraph 47 on the grounds that it contains legal arguments or arguments of counsel which are not properly part of a Local Rule 56.1 statement. *See Dukanci v. Ann Inc. Retail*, 117 F. Supp. 3d 115, 117 n.2 (D. Mass. 2015) ("proffered statements fail to comply with Local Rule 56.1 as they ... consist largely of legal argument"); *Matt v. HSBC Bank*

*USA*, 968 F. Supp. 2d 351, 354 n.2 (D. Mass. 2013) (plaintiff "offered paragraphs of legal argument that have no place in a party's concise statement of facts"); *see also Neponset Landing Corp. v. Northwest Mut. Life Ins. Co.*, 902 F. Supp. 2d 149, 153 (D. Mass. 2012) (not crediting as facts LR. 56.1 statements that "merely reflect the arguments of counsel").

OMNI further states that MD Labs used independent contractors for sales and marketing through at least 2021, even though Grizelj and Rutledge were made aware numerous times by counsel and their own employees that such conduct violated the Anti-Kickback Statute and could violate EKRA. As early as 2016, MD Labs' counsel provided a fact sheet which advised that "payment of percentage of sales commissions to contract sales personnel implicates the federal AKS, and is not protected by an AKS safe harbor." Exh. I. In 2017, Grizelj stated that he had concerns about paying sales representatives as independent contractors "based on what I have learned over the past couple of months and the fact that there doesn't seem to be a lab out there that I know of paying reps as 1099s." Exh. J. Also in 2017, MD Labs' counsel advised Grizelj that the OIG "has expressed concern about percentage based compensation for independent marketing agents, and particularly where there is direct contact between the marketing rep and referring physicians." Exh. K. Similarly, regarding EKRA, Grizelj and Rutledge were made aware in 2019, shortly after EKRA was enacted, that fines and imprisonment were potential penalties for commission-based payments to independent contractor sales representatives. Exh. L.

48. Once MD Labs was instructed by its counsel that *U.S. v. Mallory*, 988 F.3d 730 (4th Cir. 2021) held that certain commission-based compensation arrangements for laboratory independent contractor sales representatives could violate the AKS MD Labs disbanded its independent sales force and hired sales representatives as W-2 employees. Rutledge Decl., **Ex. 3**, ¶ 21.

**RESPONSE:** Admit only that Rutledge stated that MD Labs ceased using independent contractor sales representatives in 2021.

## D. *MD Labs' Billing Practices*

49. For approximately two years, MD Labs charged some patients $50 for PCR UTI testing if they were uninsured or their insurers denied coverage. MD Labs did so with the understanding that this was part of MD Labs' financial hardship policy for certain patients. Rutledge Decl., **Ex. 3**, ¶ 19.

**RESPONSE:** Admit only that as a matter of practice, MD Labs routinely did not balance bill patients. *See* Exhs. M and N.

50. The only Omni provider that the record has shown was aware of some patients being charged $50 was Deligdish (*see* OMNI00073, **Ex. 16**), who admitted that his motivation to send samples to MD Labs was based on his desire to substantiate allegations in this lawsuit. Deligdish Tr., **Ex. 12**, at 42:24-43:5; 86:14-87:3.

**RESPONSE:** Denied. MD Labs' widely distributed marketing materials to promote its PCR-based UTI specifically state, in bold, "No Balance Billing." Exh. N.

51. MD Labs' intent in offering the lower charge was to relieve demonstrated financial burden on patients, and Defendants did not believe a potential benefit to *patients* was an inducement to *providers*. Rutledge Tr., **Ex. 2**, at 147:1-8; Rutledge Decl., **Ex. 3**, ¶ 19.

**RESPONSE:** Admit only that Rutledge testified to these otherwise unsubstantiated statements.

52. In or about 2020, MD Labs changed its financial hardship policy to no longer offer a reduced price where the patient was not insured or their insurance denied coverage for PCR UTI tests, regardless of a patient's financial condition. Rutledge Decl., **Ex. 3**, ¶ 20.

**RESPONSE:** Admit only that Rutledge testified to these otherwise unsubstantiated statements.

**E. *Omni and Dr. Deligdish***

53. Omni, owned by Deligdish, is a Florida medical group that also operates a physician-owned office laboratory called Melbourne Medical Laboratory. Deligdish Tr., **Ex. 12**, at 21:4-5; 23:10-18; 89:23-90:1; 91:6-8.

**RESPONSE: Admitted.**

54. Omni has received between $10 million and $20 million in revenue from settlements or other awards from *qui tam* actions. Deligdish Tr., **Ex. 12**, at 26:17-20.

**RESPONSE: Admitted.**

55. Deligdish also owns another entity, Lo Tignov, whose sole purpose is to investigate potential *qui tam* defendants and reap substantial investigatory fees through settlements with its targets. Deligdish Tr., **Ex. 12**, at 26:17-20 (Omni has received between $10 million and $20 million in settlements or other awards from *qui tam* actions); *id.* at 164:8-16 (Lo Tignov has investigated companies that it alleged engaged in Medicare and Medicaid fraud); 285:19-23 (Deligdish is the sole owner of Lo Tignov); *id.* at 286:7-9 (Lo Tignov does not conduct investigations for anyone or any entity other than Deligdish or Omni).

**RESPONSE:** Admit that Dr. Deligdish owns Lo Tignov, which investigates companies it suspects are committing Medicare and Medicaid fraud.

56. Deligdish diverted Omni patient specimens for which Omni providers had ordered a BUC to MD Labs for PCR UTI testing in an effort to create a basis for this action. Deligdish Tr., **Ex. 12**, at 86:14-87:24; 95:23-96:3.

**RESPONSE:** Denied that Dr. Deligdish "diverted" any patient specimens as OMNI providers had not requested a specific lab perform the test.

57. Deligdish caused Omni to submit nearly 600 requisitions for PCR UTI testing to MD Labs, notwithstanding that patients' treating providers instead ordered a different type of test. Deligdish Tr., **Ex. 12**, at 38:1-9; 95:23-96:3.

**RESPONSE:** Admit that OMNI submitted nearly 600 requisitions to MD Labs.

58. Although Deligdish asserted that Omni providers were informed that samples would be sent to MD Labs for PCR testing, he could not recall how they were informed, who informed them, whether it was verbally or in writing, or when they were informed. Deligdish Tr., **Ex. 12**, at 96:4-20.

**RESPONSE:** Admit that Dr. Deligdish testified that OMNI providers were informed that samples would be sent to MD Labs.

59. When an Omni provider determined that a particular laboratory test was necessary, the provider generally would choose from a list of available tests in Omni's electronic medical record and Omni medical assistants completed a requisition form for a particular lab. Deligdish Tr., **Ex. 12**, at 81:7-13; 82:5-9; 83:24-84:3.

**RESPONSE:** Admitted.

60. However, in 2017 and 2018, irrespective of the Omni providers' decisions to order a *BUC* test for their patients, Deligdish instructed Omni's staff to order *PCR* testing from MD Labs. Deligdish admitted that he did this "so that OMNI could accumulate the necessary evidence to substantiate the allegations in the Complaint." Deligdish Tr., **Ex. 12**, at 84:4-6; 86:14-87:10; 95:23-96:3.

**RESPONSE:** Admit that OMNI ordered testing from MD Labs to substantiate the allegations in its complaint against Defendants.

61. Notwithstanding the fact that Omni providers determined that a BUC was the appropriate test for each patient, Omni ordered PCR testing of these samples at Deligdish's direction. Deligdish Tr., **Ex. 12**, at 95:23-96:3.

**RESPONSE:** Admit that OMNI ordered testing from MD Labs to substantiate the allegations in its complaint against Defendants.

62. Deligdish also submitted duplicate patient samples to up to ten *other* medical laboratories, seeking to manufacture fodder for a slew of additional *qui tam* complaints, knowing that federal health care programs would be billed for the duplicate medically unnecessary tests. Deligdish Tr., **Ex. 12**, at 255:4-256:4.

**RESPONSE:** Admit that Dr. Deligdish stated he ordered PCR-based UTI testing from 10 different laboratories on October 21, 2021.

63. Medicare rules make clear that knowingly testing a patient with the same test multiple times on the same date of service is not medically necessary. *See* Medicare Claims Processing Manual, ch. 16, § 100.5.1, *available at* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

**RESPONSE:** Admit that the cited document states that "[w]hen it is necessary to obtain multiple results in the course of treatment, the modifiers 59 or 91 are used to indicate that a test was performed more than once on the same day for the same patient."

64. Omni's expert witness reviewed and opined only upon claims submitted to MD Labs from Omni, representing less than 0.5% of all PCR UTI tests performed by MD Labs. Dr. Arrigo Deposition Transcript ("Arrigo Tr.")., **Ex. 17**, at 82:16-83:9; Expert Report of Dr. Yiannoutsos ("Yiannoutsos Rpt."), **Ex. 18**, at 5.

**RESPONSE:** Admit that OMNI's expert opined on claims where he had access to the patient's medical record.

65. Deligdish's opinion is that PCR UTI testing is *never* medically necessary. Deligdish Tr., **Ex. 12**, at 267:13-16.

**RESPONSE:** Admit that Dr. Deligdish testified that he believed the PCR UTI test is not medically necessary.

66. When asked at his deposition for the basis of his assertion that MD Labs' PCR UTI testing was experimental, Deligdish was unable to reference any specific article or medical literature to support his position. Deligdish Tr., **Ex. 12**, at 239:22-240:14.

**RESPONSE:** Admit that Dr. Deligdish testified that "[t]here's no medical literature that has shown [PCR UTI testing] to be anything other than experimental."

67. Deligdish criticized another laboratory for running too *few* targets in its PCR UTI test, suggesting that a narrower panel "had a much greater likelihood of missing a diagnosis." Deligdish Tr., **Ex. 12**, at 265:24-266:14.

**RESPONSE:** Admit that Dr. Deligdish testified that "because they tested for fewer organisms, they had a much greater likelihood of missing a diagnosis."

68. Deligdish claimed that he believed the other lab "tests for too many, too, and at the same time, not enough" pathogens. Deligdish Tr., **Ex. 12**, at 267:10-11.

**RESPONSE:** Admit that Dr. Deligdish testified that "because I believe the test is not medically necessary. Billing for any would be too many, but they certainly didn't bill for enough or test for enough."

69. MD Labs' written proposal to Omni did not include profit splitting or passthrough billing. *See generally* OMNI00075, **Ex. 19**.

**RESPONSE:** Admit that MD Labs' proposed "Clinical Testing Program Agreement", which was not executed by any party, did not include profit splitting or passthrough billing.

70. MD Labs and Omni never entered executed the proposed written agreement. *See* OMNI00075, **Ex. 19** (unexecuted proposal); Deligdish Tr., **Ex. 12**, at 170:22-171:9 (testifying that the proposed arrangement "never happened anyway"); *id.* at 199:6-7 (testifying that he did not believe Omni executed the agreement and that he could not recall).

**RESPONSE:** Admitted.

71. MD Labs contemplated entering into the proposed agreement with Melbourne Medical Laboratory, Omni's physician-owned office laboratory (commonly referred to as a "reference laboratory agreement"). Deligdish requested that any agreement be between MD Labs and Melbourne Medical Laboratory wherein Melbourne Medical Laboratory would pay MD Labs directly for laboratory testing and bill patient insurances themselves. During contract

negotiations with Omni, MD Labs understood that any agreement for Melbourne Medical Laboratory to refer tests to MD Labs would be a lawful reference arrangement pursuant to Medicare rules. MD Labs sent a proposed written agreement on August 27, 2018 that was never executed. *See* Rutledge Decl., **Ex. 3**, ¶ 22, Deligdish Tr., **Ex. 12**, at 89:21-91:11 (testifying that Melbourne Medical is Omni's "in-house laboratory" and that Deligdish is the 100 percent owner); OMNI00852, **Ex. 20**, (Deligdish requesting that the agreement be set up "through the Melbourne Medical Laboratory"); OMNI00075, **Ex. 19** (unexecuted proposal); Medicare Claims Processing Manual, ch. 16, § 40.1, *available at* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/clm104c16.pdf (citing 42 U.S.C. § 1395l(h)(5)(A)).

**RESPONSE:** Admit that on August 27, 2018, Jack, Todd, OMNI's Sales Manager, East Coast Region, also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between "MD Spine Solutions, LLC dba MD Labs" and "Omni Healthcare, a practice organized and existing under the laws of the State of Florida." Although Dr. Deligdish had asked in an earlier email that any billing arrangement be "set [] up through the Melbourne Medical Laboratory," MD Labs nonetheless proposed a contract directly with OMNI, the physician group.

## F. Statement of Additional Facts as to Which There Exists a Genuine Issue to be Tried

1. The most recent AUA guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI. *See* Exh. D ("Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022), *available at* https://www.auanet.org/guidelines-and-quality/guidelines/recurrent-uti, last accessed August 27, 2024).

2. Often greater specificity and accuracy are not clinically useful because any incremental information they provide does not affect the treatment the patient will receive. *Id.*

3. AUA guidelines state that "[s]ensitive detection of microorganisms will likely be associated with increased diagnostic confusion and dilemmas, including overdiagnosis and associated overtreatment." *Id.*

4. While the AUA guidelines acknowledge that "[m]olecular testing technologies have the potential to provide accurate and rapid information, and hold promise for the future," they advise that "more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics." *Id.*

5. AUA guidelines state that "[t]he impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice." *Id.*

6. The guidelines conclude that "despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant." *Id.*

7. As Defendants' own expert acknowledged, PCR testing for UTIs is not generally accepted by the medical community, and certainly was not generally accepted

when Defendants began employing it as MD Labs' exclusive test for UTIs in 2017. Dr. Ko did not begin using PCR testing for UTIs until June 2020, several years after MD Labs introduced it. *See* Exh. E, Ko Dep. Tr. at 107:19-108:3.

8. He also acknowledged that the research around the PCR testing for UTIs was ongoing, stating: "that's why we're trying to collect evidence and that's why I'm in this research field. That's why I'm in this area to try to collect the information so that people could help various patients to have a better diagnostic in terms of how to treat infection." *Id.* at 175:1-8.

9. It is well established that laboratories may not use unreasonably large "panels" of tests to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.

10. The HHS-OIG's laboratory guidance warns about situations where the standardized order or requisition form encourages or even misleads the physician into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

11. Specifically, the Guidance cautions:

> a. Requisition design: While [CMS] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill…"

Exh. G at 45079.

12. MD Labs' requisition form did not give physicians the option to make an independent medical necessity decision with regard to each test. Exh. O.

13. MD Labs' own Laboratory Director, Alexander Stojanoff, testified that he was "totally confused" by MD Labs' requisition form, stating, "I don't know where the panel is. It just – it just is all of thee different diagnoses. So that is what is confusing." Exh. R, Stojanoff Dep. Tr. at 37:5-20.

14. Additionally, in May of 2018, the Healthcare Fraud Prevention Partnership, a public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations, published a report highlighting the problem of fraud in the clinical laboratory industry. Exh. S.

15. The report specifically warned about the use of excessively large testing panels:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels. For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances, such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels *(i.e.,* 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances. While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity. A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

Exh. S.

16. MD Labs argues that its UTI testing for 17-19 pathogens was "within the range of pathogens endorsed by peer-reviewed literature." The only authority it cites for this statement though is its own expert's report, not any independent analysis. *See* ECF #254 at ¶29.

17. Defendants' expert acknowledged that he was not aware of any other studies besides own that reached similar conclusions on the purported value of PCR UTI testing. Exh. E, Ko Dep. Tr. at 163:21-164:2.

18. MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered.

19. MD Labs, through its independent contractor sales representatives like Todd, approached OMNI, and Dr. Deligdish, to encourage them to use MD Labs' medically unnecessary PCR UTI testing. *See* Exh. T.

20. On April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, an independent contractor, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers.

21. Todd explained the financial assumptions underlying the proposal as follows:

> We considered a monthly volume of 200 specimens (plus or minus)
> We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid and Tricare.
> You collect all specimens in your lab and we will pick up daily.
> We bill Omni their share monthly.

Exh. T.

22. On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg, an independent contractor, wrote to OMNI's practice administrator, offering to bring the office lunch the following week. On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked Stenberg how much MD Labs bills for UTI testing. Stenberg forwarded her question to Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni." Stenberg forwarded Todd's response to Williams:

> Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we. (FYI. Currently it is approximately $700.00.)
>
> We accept whatever the insurance company pays us ... no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

Exh. U.

23. On August 13, 2018, OMNI's Dr. Craig Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were doing 16 samples a month and they are now doing 16,000 samples a month. He then stated that approximately 70% of MD Labs' UTI tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance. Exh. V.

24. On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Clausen and Todd. Bobango reported in an email summary of the call that Clausen had stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure. This is what he confirmed:

> 1. They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible. They do not want patients to have to pay a lot for this service. They do not go after the patient for any balances over $50.00.
>
> ….
>
> 3. For UTI tests, he stated Omni will profit between $200 and $700 per claim. The price for Omni is $250.00. Their cost is approximately $75.00 for these tests. After 90 days, they will take a look at EOBs and negotiate the rate as well.

Exh. W.

25. On August 27, 2018, Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between MD Labs and OMNI. The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for UTI testing. The UTI tests did not include an option or differential pricing for a smaller panel of tests than the standard, broad MD Labs panel. *See* ECF #254-19.

26. Although the UTI price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests

27. In early January 2018, as MD Labs was beginning to roll out PCT UTI testing, Grizelj recommended to Rutledge that they seek "guidance on medical necessity" from Noridian, a Medicare Administrative Contractor. *See* Exh. Y.

August 29, 2024

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

*/s/ Thomas M. Kenny*
DAVID B. HARRISON *(pro hac vice)*
THOMAS M. KENNY (*pro hac vice*)
SVJETLANA TESIC (*pro hac vice*)
SPIRO HARRISON & NELSON

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

August 29, 2024

**OMNI HEALTHCARE, INC.**
*By its attorneys,*

*/s/ Thomas M. Kenny*
THOMAS M. KENNY (*pro hac vice*)
SPIRO HARRISON & NELSON