**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* OMNI HEALTHCARE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ, MATTHEW RUTLEDGE AND DOE HEALTHCARE PROVIDERS 1 - 100,<br><br>Defendants. | Case No. 18-cv-12558-PBS |

**DEFENDANT MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE'S RESPONSE TO PLAINTIFF-RELATOR OMNI HEALTHCARE, INC'S ADDTIONAL STATEMENT OF MATERIAL FACTS**

1. The most recent AUA guidelines issued in 2022 found that more sensitive culture-based or molecular bacterial detection methods (e.g., polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with a suspected UTI. *See* Ex. D ("Recurrent Uncomplicated Urinary Tract Infections in Women: AUA/CUA/SUFU Guideline (2022), available at https://www.auanet.org/guidelines-and-quality/guidelines/recurrent-uti, last accessed August 27, 2024).

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines, published in 2019 and reviewed in 2022, state that "[m]ore sensitive cultured-based or molecular bacterial detection methods (e.g., high-throughput sequencing, polymerase chain reaction-based detection methods) are not necessarily beneficial in the diagnostic evaluation of patients with suspected bacterial cystitis." In further answering, the AUA guidelines state, "[f]or the purposes of the AUA guidelines, the Panel considers only recurrent episodes of uncomplicated cystitis in women. The guideline does not apply to pregnant women, patients who are immunocompromised, those with anatomic or functional abnormalities of the urinary

tract, women with [recurrent UTIs] due to self-catheterization or indwelling catheters or those exhibiting signs or symptoms of systemic bacteremia, such as fever and flank pain." *See* Ex. D at 1. By its terms, the AUA guidelines do not apply to women with other types of complicated UTIs or to men. *Id.*

2. Often greater specificity and accuracy are not clinically useful because any incremental information they provide does not affect the treatment the patient will receive. *Id.*

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Defendants deny that greater specificity and accuracy are not clinically useful. MD Labs' faster results enabled providers to prescribe appropriate antibiotics more quickly or eliminate a UTI as the cause of the patient symptoms. Ko Rpt., Ex. 5, at 5; Ko. Tr., Ex. 6, at 134:21-135:19. MD Labs offered providers the ability to receive PCR UTI results before AST results were available to further aid in the clinical decision-making process. *See, e.g.*, MD Labs_0008722, Ex. 8. Additionally, MD Labs' PCR testing provided significant clinical benefit to patients whose UTIs were caused by pathogens traditional BUC was incapable of identifying. Ko Rpt., Ex. 5, at 5; Ko. Tr., Ex. 6, 94:16-95:1; 113:12-24.

3. AUA guidelines state that "[s]ensitive detection of microorganisms will likely be associated with increased diagnostic confusion and dilemmas, including overdiagnosis and associated overtreatment." *Id.*

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines are accurately quoted. In further answering, PCR testing, combined with AST, ensures that clinicians use an effective antibiotic the first time, and thus decreases overtreatment. *See* Ko. Rpt., Ex. 5, at 6-7.

4. While the AUA guidelines acknowledge that "[m]olecular testing technologies have the potential to provide accurate and rapid information, and hold promise for the future," they advise that "more evidence is needed before these technologies become incorporated into the guideline, as there is concern is that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics." *Id.*

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines state, "[m]olecular testing technologies have the

potential to provide accurate and rapid information, and hold promise for the future. To date, more evidence is needed before these technologies become incorporated into the guideline, as there is concern that adoption of this technology in the evaluation of lower urinary tract symptoms may lead to over treatment with antibiotics."

5. AUA guidelines state that "[t]he impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice." *Id.*

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that AUA guidelines state, "While there is some early evidence that molecular diagnostic methods to rapidly identify uropathogen antibiotic susceptibility may help to avoid delayed or inappropriate antimicrobial treatment, the impact of such tests on the accuracy of diagnosis is not documented and cannot yet be recommended for incorporation into clinical practice."

6. The guidelines conclude that "despite a growing desire for the accurate diagnosis of UTI in patients with suggestive symptoms, particularly those who lack positive urine cultures or who have vague lower urinary tract symptoms (LUTS), the utility of this technology remains unproven and the potential for overtreatment with antibiotics remains significant." *Id*.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the AUA guidelines are accurately quoted. In further answering, the AUA guidelines do not call for abstaining from using PCR or abandoning the use of PCR to add information to diagnose UTIs accurately. Ko. Rpt., Ex. 5, at 8.

7. As Defendants' own expert acknowledged, PCR testing for UTIs is not generally accepted by the medical community, and certainly was not generally accepted when Defendants began employing it as MD Labs' executive test for UTIs in 2017. Dr. Ko did not begin using PCR testing for UTIs until June 2020, several years after MD Labs introduced it. *See* Ex. E, Ko Dep. Tr. At 107:19-108:3.

**RESPONSE**: Denied that PCR testing for UTIs is not generally accepted by the medical community and was not generally accepted when Defendants began employing it as MD Labs' exclusive test for UTIs in 2017. These assertions are not supported by the cited materials. Admitted that Dr. Ko testified that he did not begin using PCR testing for UTIs until June 2020 and that MD Labs began using PCR UTI testing in 2017.

Furthermore, Dr. Ko testified that he began using PCR testing in June 2020 when he started at Brown University, but that the testing was already available when he started at Brown at the time he joined. In other words, Brown University had already been using PCR UTI testing prior to Dr. Ko's employment. *See* Ex. E, Ko Dep. Tr. at 108:4-6.

8. He also acknowledged that the research around the PCR testing for UTIs was ongoing, stating: "that's why we're trying to collect evidence and that's why I'm in this research field. That's why I'm in this area to try to collect the information so that people could help various patients have a better diagnostic in terms of how to treat infection." *Id*. at 175:1-8.

**RESPONSE**: Admitted. Further answering, given that this quotation has been deprived of critical context, medical research is constantly evolving and thus Dr. Ko further stated in his Report, "[T]he development of society guidelines in antibiotics stewardship usually takes years after peer-reviewed articles are reviewed for data relevance and whether there has been an impact on disease processes. Thus, there has always been a lag between evidence supporting new treatments and technologies and their incorporation into society guidelines. The lag does not suggest that the treatment or technology is experimental. Such lags are typical of medical society guidelines. As is typical in medical practice, society guidelines for PCR UTI testing must catch up to the scientific data regarding such testing." Ex. 5, Ko Rpt. at 7-8.

9. It is well established that laboratories may not use reasonably large "panels" of tests to cause physicians to prescribe many tests at once, when only one or a few tests are medically necessary.

**RESPONSE**: Defendants object to this statement as it is unsupported by any citation to evidence in the record, as required by Fed. R. Civ. P. 56(c)(1) and L.R. 56.1. As such, the entire statement is denied.

10. The HHS-OIG's laboratory guidance warns about situations where the standardized order or requisition form encourages or even misleads the physicians into ordering more than one test as part of a "panel" when the full "panel" is not medically necessary and/or without giving the physician the option or enough information to understand how to order only those tests that are necessary.

**RESPONSE**: Paragraph 10 does not state a fact but rather consists of argument. As such, the entire statement is denied.

11. Specifically, the Guidance cautions:

a. Requisition design: While [CMS] does not design or approve requisition forms, laboratories, should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill . . ."

Ex. G at 45079.

**RESPONSE**: Admitted that HHS-OIG laboratory guidance is accurately quoted. In further answering, the Guidance does not use the word "caution" but states "[l]laboratories ***may*** implement the following steps through their compliance programs or some other appropriate mechanism . . . ." Ex. G at 45079 (emphasis added).

12. MD Labs' requisition form did not give physicians the option to make an independent medical necessity decision with regard to each test. Ex. O.

**RESPONSE**: Denied. MD Labs' requisition form gave physicians the option to make an independent medical necessity decision with regard to whether MD Labs' PCR UTI test was appropriate for each patient. *See* Ex. O. Moreover, certain requisition forms offered by MD Labs reflected that MD Labs gave ordering providers the option of customizing the UTI panel to include certain pathogen targets. *See*, *e.g.*, MDLabs_0151537, attached hereto as **Exhibit 25**.[1]

13. MD Labs' own Laboratory Director, Alexander Stojanoff, testified that he was "totally confused" by MD Labs' requisition form, stating, "I don't know where the panel is. It just – it just is all of three different diagnoses. So that is what is confusing." Ex. R, Stojanoff Dep. Tr. at 37:5-20.

**RESPONSE**: Admitted that Dr. Stojanoff's testimony is accurately quoted. In further answering, Dr. Stojanoff is neither a medical doctor nor had he seen a copy of the requisition form prior to his deposition. *See* Stojanoff Dep. Tr. at 17:4-6; 35:21-23, attached hereto as **Exhibit 26**.

[1] The patient's protected health information has been redacted from this exhibit.

14. Additionally, in May of 2018, the Healthcare Fraud Prevention Partnership, a public-private partnership between the Federal Government, state and local government agencies, law enforcement, private health insurance plans, employer organizations, and healthcare anti-fraud associations, published a report highlighting the problem of fraud in the clinical laboratory industry. Ex. S.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the Healthcare Fraud Prevention Partnership published the stated report. In further answering, Exhibit S does not discuss PCR UTI testing.

15. The report specifically warned about the use of excessively large testing panels:

> A commonly reported problem is the use of more expensive, excessively broad panels in place of smaller panels. For example, a 5-panel urine drug screening test for cannabinoids, cocaine, amphetamines, opioids, and phencyclidine is typically sufficient to detect the use of commonly abused substances such as marijuana, cocaine/crack, heroin, and methamphetamine. In contrast, larger and more expensive definitive panels (i.e., 12- or 14-panel) can be used to detect particular subsets of the substances identified in the smaller panels, as well as the presence of some other less-commonly abused substances. While this may be clinically warranted in some cases, the use of overly broad panels can also be used for the purpose of maximizing reimbursement in the absence of medical necessity. A related problem that can be difficult to control is the use of definitive drug testing for a wide range of substances for which the patient has no history of abuse.

Ex. S.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the Healthcare Fraud Prevention Partnership's report is accurately quoted. In further answering, the quoted section of the report discusses the design of panels for urine drug testing which is a fundamentally different than PCR UTI testing.

16. MD Labs argues that its UTI testing for 17-19 pathogens was "within the range of pathogens endorsed by peer-reviewed literature." The only authority it cites for this statement though is its own expert's report, not any independent analysis. See ECF #254 at ¶29.

**RESPONSE**: Admitted that MD Labs argues that its PCR UTI testing for 17-19 pathogens was "within the range of pathogens endorse by peer-reviewed literature." Defendants admit that the authority cited for its statement is Dr. Ko's report. In further

answering, the cited portion of Dr. Ko's expert report cites a peer-reviewed study not authored by Dr. Ko. *See* Ex. 5, p. 5. (citing Hao et al., *The Essential Role of PCR and PCR Panel Size in Comparison with Urine Culture in Identification of Polymicrobial and Fastidious Organisms in Patients with Complicated Urinary Tract Infections*, INT J MOL SCI, 24(18) (2023), available at https://doi.org/10.3390/ijms241814269).

17. Defendants' expert acknowledged that he was not aware of any other studies besides own that reached similar conclusions on the purported value of PCR UTI testing. Ex. E, Ko Dep. Tr. at 163:21-164:2.

**RESPONSE**: Defendants object to Paragraph 17 as vague because it is not clear what "similar conclusions" refers to. Defendants admit that Dr. Ko testified that he was not aware of other studies on the overall ***cost-savings*** of PCR UTI testing. Ex. E, Ko Dep. Tr. at 163:21-164:2.

18. MD Labs' independent contractor sales representatives made extensive efforts to cause providers like those at OMNI to order PCR UTI testing, especially since this was the only type of UTI testing that MD Labs offered.

**RESPONSE**: Paragraph 18 does not state a fact but rather consists of argument. As such, the entire statement is denied.

19. MD Labs, through its independent contractor sales representatives like Todd, approached OMNI, and Dr. Deligdish, to encourage them to use MD Labs' medically unnecessary PCR UTI testing. *See* Ex. T.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that MD Labs representatives encouraged Omni to use MD Labs for PCR UTI testing services. Denied that such services were medically unnecessary or that MD Labs independent contractor sales representatives encouraged Omni to use any medically unnecessary services. *See* Defs.' SOF ¶¶ 16-32.

20. On April 23, 2018, MD Labs' Jack Todd, Sales Manager, East Coast Region, an independent contractor, emailed OMNI Healthcare executives and proposed an arrangement where MD Labs would charge OMNI $150 per PCR UTI test to be billed to commercial customers.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that on April 23, 2018 Jack Todd emailed Deligdish and Bobango. Admitted further that Todd's email discussed a potential business arrangement between MD Labs and Omni. The remainder of the allegations in Paragraph 20 are denied as unsupported by the email that Relator cites. The email does not propose a charge of $150 per PCR UTI test to be billed to commercial customers but rather states that that is MD Labs' preferred price. Furthermore, while the email discusses a proposed business arrangement between MD Labs and Omni, the email itself does not establish whether the proposal was originally made by Todd or by Omni personnel. Moreover, the aforementioned email discusses a reference lab arrangement, by which Omni would pay MD Labs a flat rate for each PCR UTI test, and where Omni would bill its patients or their insurance carriers for each test.

21. Todd explained the financial assumptions underlying the proposal as follows:

> We considered a monthly volume of 200 specimens (plus or minus)
> We considered a payer mix of 35% Commercial and 65% all Federal plans to include Medicare, Medicaid, and Tricare.
> You collect all specimens in your lab and we will pick up daily.
> We bill Omni their share monthly.

Ex. T.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that the quoted text appears in Exhibit T.

22. On Jul 26, 2018, MD Labs' sales representative Dale A. Stenberg, an independent contractor, wrote to OMNI's practice administrator, offering to bring the office lunch for the following week. On July 30, 2018, manager Wendy Williams, the practice for OMNI's Urgent Care Clinic, asked Stenberg how much MD Labs bills for UTI testing. Stenberg forwarded her question to Todd, with the note: "This question comes up frequently, what should my response be? This is the Urgent Care Omni." Stenberg forwarded Todd's response to Williams:

> Our PCR based UTI is billed at 1 time Medicare rate to all. When Medicare changes so do we . (FYI. Currently it is approximately $700.00.)
> We accept whatever the insurance company pays us … no balance bill. If insurance does not pay we bill patient $50.00 only. They also get the credit for the deductible the insurance company had shared with them on their EOB.

Ex. U.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. As to the first sentence, admitted that the email attached as Exhibit U so states. As to the second sentence, admitted that Exhibit U states that On July 30, 2018, Wendy Williams asked Stenberg how much MD Labs bills for "urine cultures," not "UTI testing." As to the third and fourth sentences, admitted that Exhibit U so states.

23. On August 13, 2018, OMNI's Dr. Craig Deligdish and Brad Smith spoke with MD Labs' Director of Sales, Howard Clausen. Clausen shared that he had been with MD Labs for four years. He observed that when he began working with the lab they were 16 samples a month and they are now doing 16,000 samples a month. He then stated that approximately 70% of MD Labs' UTI tests are paid for by Medicare, and the remainder are covered by Medicaid or commercial insurance. Ex. V.

> **RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that Exhibit V consists of a memorandum authored by Deligdish that so states.

24. On August 27, 2018, OMNI's Mark Bobango spoke with MD Labs' Clausen and Todd. Bobango reported in an email summary of the call that Clausen had stated, inter alia:

> I had another conversation with Howard today regarding the pricing structure. This is what he confirmed:
>
> 1. They will not bill any patient anything greater than $50.00 regardless of insurance, co-pay or deductible. They do not want patients to have to pay a lot for this service. They do not go after the patient for any balances over $50.00.
>
> ….
>
> 3. For UTI tests, he stated Omni will profit between $200 and $700 per claim. The price for Omni is $250.00. Their cost is approximately $75.00 for these tests. After 90 days, they will take a look at EOBs and negotiate the rate as well.

Ex. W.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. Admitted that Exhibit W consists of an email authored by Bobango that so states.

25. On August 27, 2018, Todd also emailed OMNI personnel a proposed "Clinical Testing Program Agreement," between MD Labs and OMNI. The contract proposed that MD Labs would provide clinical laboratory testing for OMNI, and bill OMNI $250 for UTI testing. The UTI tests did not include an option or differential pricing for smaller panel of tests than the standard, broad MD Labs panel. *See* ECF #254-19.

**RESPONSE**: Defendants object to this paragraph as noncompliant with Local Rule 56.1 because it does not contain page citations, and the Court should disregard it for that reason. As to the first sentence, denied that the cited document supports that any email was sent on that date. As to the second sentence, admitted that Ex. W contains a fee schedule listing the "Cost per specimen" for a "Custom UTI panel on file" as $250. As to the third sentence, denied that Exhibit W addresses the size of the panel for any UTI testing.

26. Although the UTI price purported to cover "Custom UTI Panel on file," MD Labs personnel had never discussed establishing a custom panel or offering anything other than the full panel of PCR follow up tests.

**RESPONSE**: Defendants object to this statement as it is unsupported by any citation to evidence in the record. As such, the entire statement is denied.

27. In early January 2018, as MD Labs was beginning to roll out PC[R] UTI testing, Grizelj recommended to Rutledge that they seek "guidance on medical necessity from Noridian, a Medicare Administrative Contractor. *See* Ex. Y.

**RESPONSE**: Admitted.

/ / /

Dated: September 18, 2024

Respectfully submitted,

MD SPINE SOLUTIONS LLC, D/B/A MD LABS INC., DENIS GRIZELJ AND MATTHEW RUTLEDGE

By their attorneys,

*/s/ Seth B. Orkand*
Seth B. Orkand (BBO #669810)
Julianna M. Charpentier (BBO #703284)
ROBINSON & COLE LLP
One Boston Place, 25th Floor
Boston, Massachusetts 02108
Tel: (617) 557-5915
Fax: (617) 557-5999
sorkand@rc.com
jcharpentier@rc.com

Edward J. Heath (admitted *pro hac vice)*
Kevin P. Daly (BBO #675644)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8200
Fax: (860) 275-8299
eheath@rc.com
kdaly@rc.com

Danielle H. Tangorre (admitted *pro hac vice*)
ROBINSON & COLE LLP
Chrysler East Building
666 Third Avenue, 20th Fl.
New York, NY 10017
Tel: (212) 451-2900
Fax: (212) 451-2999
dtangorre@rc.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on September 18, 2024.

*/s/ Seth B. Orkand*
Seth B. Orkand