# EXHIBIT 1

Original



IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
IN AND FOR BREVARD COUNTY, FLORIDA

CASE NO.: 05-2021-CA-019260-XXXX-XX

MICROGEN DX, LLC,
Plaintiff,
vs.
OMNI HEALTHCARE, INC.,
Defendant.
_______________________/

DEPOSITION OF
CRAIG DELIGDISH, M.D.
Taken on behalf of Plaintiff

DATE TAKEN: March 15, 2022
TIME: 10:22 a.m. - 1:04 p.m.
PLACE: OMNI Healthcare
1344 South Apollo Boulevard, Suite 406
Melbourne, Florida 32901

Examination of the witness taken before:
Elizabeth J. Beyer, FPR

ANGELL REPORTING SERVICE, INC.
8195 N. Wickham Rd., Suite 200
Melbourne, Florida 32940
(321) 259-8500



A P P E A R A N C E S

For the Plaintiff:

DANIEL D. CAMINITI, ESQUIRE
Handler Thayer, LLP
191 North Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 641-2100
dcaminiti@handlerthayer.com

For the Defendant:

RYAN D. O'CONNOR, ESQUIRE
WhiteBird
1701 Highway A1A, Suite 102
Vero Beach, Florida 32963
(772) 610-5580
ryan@whitebirdlaw.com



I N D E X


| | PAGE |
|---|---|
| CRAIG DELIGDISH, M.D. | |
| DIRECT EXAMINATION BY MR. CAMINITI | 4 |
| CERTIFICATE OF OATH | 102 |
| CERTIFICATE OF REPORTER | 103 |
| ERRATA SHEET | 104 |
| READ AND SIGN NOTIFICATION | 105 |


E X H I B I T S

PLAINTIFF'S

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Diagnostic Services Agreement | 18 |
| Exhibit 2 | Invoices | 30 |
| Exhibit 3 | Text Messages | 65 |
| Exhibit 4 | 11/12/2020 E-mail | 75 |



THEREUPON:

CRAIG DELIGDISH, M.D.,

a Witness herein, having first been duly sworn, was examined and testified on his oath as follows:

THE DEPONENT: I do.

DIRECT EXAMINATION

BY MR. CAMINITI:

Q Good morning again, Doctor. Could you please state and spell your name for the record?
A Craig Deligdish, C-r-a-i-g, D-e-l-i-g-d-i-s-h.
Q Thank you, sir. Again, I just met you, but, again, my name is Dan Caminiti. I represent MicroGen in a case against OMNI, As I'm sure you're aware.
Have you ever given a deposition before?
A Yes.
Q Okay. Just to tell you a little bit about the procedure that I do, I'm going to be asking you a series of questions about the relationship between MicroGen and OMNI. If at any time you don't hear or you don't understand one of my questions, it's very important that you let me know. I will rephrase or I will ask a different question, to get us on the same page. Seem fair?
A Yes.
Q If you need to take a break at any time, again, please let me know. If there is a question pending, I'll

Currently, it's AmerisourceBergen. Prior to that, it was Cardinal. And prior to that, it was McKesson. Those are the three pharmaceutical distributors.
Q Okay. So you -- OMNI owes AmerisourceBergen $500,000 for pharmaceuticals?
A Yes.
Q Have you had any conversations with Mark Bobango about paying that amount?
A For example, two weeks ago we paid them $150,000 because we were over the 500. If we go over the 500, they threaten to not send us pharmaceuticals, so we paid them $150,000.
We had received a large settlement from Cardinal, which allowed us to pay AmerisourceBergen -- we had owed Cardinal $250,000; but we negotiated that down to $25,000 as part of a lawsuit that we filed against them. They paid us, I think, $2 million.
I would strongly recommend that your client do the same before we sue them for much more than $2 million.
Q Anything else you want to add to that?
A You know, I hope he doesn't go to jail as a result -- as a two-time offender -- but I suspect this time he will.
Q So do you recall conversations that you had with Mark Bobango about this check that you cut for $50,000 on



October 2, 2020?
A No.
Q In all likelihood, he could have just come to you and said, "Doctor, we owe MicroGen some money for COVID testing -- all we have to pay towards the balance is $50,000 -- so we should get a check out to them"; something of that nature?
A I have no idea.
Q How does he approach you to talk about bills that need to get paid?
A I mean, we might have a phone call. My office is downstairs so, you know, we're close by, but we don't meet or discuss -- we don't have regular meetings or he doesn't e-mail me or anything like that.
Q Let's turn the page here. This one is stamped October 7, 2020, "FedEx overnight" -- another check -- for a total of $45,000. Looks like it's to pay an outstanding balance of $1,160, and then also to pay for a different invoice for $43,840; correct?
A Yes. Number 72442?
Q Yes, sir.
A Yes.
Q Do you remember approving this check?
A No.
Q Do you remember approving this $45,000 payment?



A No.
Q If you had had any issue with MicroGen's services, would you have paid them this $50,000 on October 2nd, followed by $45,000 on October 7th?
A I could have. I don't know.
Q Well, I think you testified earlier that MicroGen was processing the samples and sending you results up through this point; right?
A Correct.
Q So the fact that you paid them $95,000 in five days to go towards the $352,000 that you owed, that would confirm to you that they were at least processing the samples and sending results; right?
A No, not necessarily.
Q You wouldn't pay them $95,000 if they weren't sending you any results in a month and a half, two months; would you?
A I don't know.
Q So someone would have had to confirm that the results came in; correct? Someone at OMNI.
A Yes. Yes, I presume so.
Q I understand that's probably not you, it's somebody else that's getting the results and then they're informing the patient of whether they're positive or negative for COVID; right?



A Correct.
Q So that person would get the results back, maybe make a telephone call or send an e-mail to the patient, saying you do or do not have COVID; right?
A Yes.
Q And that was happening through August, September of 2020, based on the results sent from MicroGen; yes?
A Yes.
Q I assume you have no reason -- but correct me if I'm wrong.
Do you have any reason to know why you only paid $95,000 of the $352,000 that was owed to MicroGen at this time in early October 2020?
A I know that at some point we became very concerned about the accuracy of the results, and I don't recall exactly when that was.
Q Okay. That was subsequent to your conversation with Dr. Finkler?
A Yes, I believe so.
Q After your conversation with Dr. Finkler, did you do any investigating to follow up on what he told you?
A No.
Q Did you hire a third-party vendor to do any digging, any investigation into the accuracy of MicroGen's COVID testing accuracy?

on before.
A Is it a bill or a payment?
Q It's a bill. It's an invoice dated 10/15/2020.
A Yeah, I got it. Agreed.
Q Excellent. So even though you paid $95,000 by October 7th, that just got your bill down to $302,240 after this invoice of the 15th.
Do you see that on the first page there?
A Yes.
Q So if you turn the page again, another payment was made for $45,440 --
A Yes.
Q -- from OMNI to MicroGen for tests received between 8/31 and 9/13/2020; do you agree?
A Yes.
Q Would you agree that you're well beyond, again, the seven or 14 days that the contract requires OMNI pay MicroGen?
A Yes.
Q Was OMNI having a cash flow problem at this time?
A Yes. OMNI always has a cash flow problem.
Q Even now, after the $2 million settlement?
A Yes.
Q Is the reason that you were paying these amounts and not the full balance due to the cash flow problem that



OMNI was experiencing at that time?
A I don't know.
Q If you had had the funds to pay the entire invoice on October 15th of 2020, you would have paid it; right?
A I don't know.
Q Why not?
A I don't know.
Q Well, if you have the money to pay an invoice, and Mark Bobango or anyone in your accounts payable department said, we have the money, we can pay this, we can get square with this vendor, let's do it; is there a reason that you would say no?
A One reason in this particular case was because we questioned the validity of the results. We never billed them to -- as far as I know -- to the third party that would have been responsible for paying them, because of our concern regarding the validity, once we learned what we did.
Q When you paid them on October 15, 2020, the fact that you paid them over $45,000, wouldn't that suggest to you that you didn't have any concern at that time about the validity of the COVID testing?
A I don't know.
Q So let me see if I understand. The relationship with MicroGen broke down due to what Dr. Finkler told you, and your concerns that you had about the validity, the



accuracy of those test results; right?
A I believe there were also issues about the turnaround time.
Q You're telling me that if you had those concerns on October 15th when you signed or authorized or executed or allowed payment to go for over $45,000 to MicroGen, you're telling me that if those concerns existed, you would have still paid them?
A I think it's more complicated than that. I think they were also holding the results hostage. So we were having issues with having tested patients, and MicroGenDX not reporting any results.
So even though we had concerns, I think we paid them because -- in an effort to have them release the results.
Q Okay. If you look at the first page of this exhibit, Doctor, October 15, 2020, second from the bottom, the balance is $313,880; right?
A Right.
Q So if you owed them $313,880 was it your expectation that MicroGen should just keep sending you the results for these tests, despite your balance?
A Yes.
Q Why?
A Because that's what a laboratory does. That's what



a doctor does. If you go to a physician and you owe them money, they -- it's not -- they can't deny care. It's unheard of.
If you're a laboratory and you accept the specimens, there is an expectation, especially if you've done the test, that you're going to report the results. To not report the results -- regardless of money owed -- is unheard of. It's outrageous. It's criminal.
Q I see. So what is the amount of specimens that would justify MicroGen canceling the contract? What is the amount of invoice where this could have gone up to that would have justified them saying, "Okay, we're not going to send you any more results until we receive a payment"?
A No amount.
MicroGen, like any company that has an agreement, had the right -- as did we -- to either stop sending specimens -- or in MicroGen's case, to stop accepting specimens. Eventually, I presume they did that; I don't know.
But once you have the specimens and you've accepted the specimens, you're obligated ethically, legally, and in other ways, to report the results or send the specimens back.
Q When you say "accepted the specimens," what do you mean?